UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

LEXINGTON INSURANCE COMPANY AND
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,
                         Plaintiffs

v.

VIRGINIA SURETY COMPANY, INC.,
                         Defendant.

CIVIL ACTION
NO. 04-11109 RGS

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR MODIFICATION OF THE SCHEDULING ORDER AND AN ORDER LIMITING DISCOVERY

Plaintiffs, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and Lexington Insurance Company ("Lexington"), hereby submit this Memorandum of Law in support of their Motion for Modification of the Scheduling Order entered by the Court on September 16, 2004 and for an Order Limiting Discovery. National Union and Lexington request that the Court enter an Order:

(1)     limiting the initial phase of discovery to the production and authentication of the relevant insurance policies;

(2)     after the initial phase of discovery, staying discovery, to allow the parties to bring, and the Court to decide, motions to summarily adjudicate the following issues:

      (i)     The scope of Virginia Surety's defense and indemnity obligations to its policyholders;

      (ii)    The scope of the defense and indemnity obligations of National Union and Lexington to their policyholders;

      (iii)   Whether National Union and Lexington have any obligation to pay any defense or indemnification costs, in connection with any of the underlying claims, until Virginia Surety has exhausted its policy limits by paying $250,000 in indemnification costs for any one occurrence.

(3)    if the foregoing issues cannot be resolved by the above-described motions, allowing a second phase of discovery for 180 days regarding the parties' underwriting intent in issuing their respective insurance policies and the basis for the affirmative defenses of National Union and Lexington to Virginia Surety's counterclaim.

(4)    after completion of the second phase of discovery, providing a period of 90 days within which the parties may file additional dispositive motions;

(5)    after a determination on the Phase II dispositive motions, and only if the Court finds against National Union and Lexington on both Phase I and Phase II, allowing a third phase of discovery for 120 days regarding the amount that Virginia Surety is entitled to recover from National Union and Lexington;

(6)    Thereafter, the court's Scheduling Order shall remain as previously ordered, with modification of dates to accommodate the above changes.

This motion is brought pursuant to Fed. R. Civ. P. 42(b) and Local Rules 16.1(g), 16.3(a)(5) and 26.3, in order to preclude voluminous, expensive, and unnecessary discovery concerning the parties' underwriting intent. Because the National Union, Lexington and Virginia Surety policies are all unambiguous, the Virginia Surety policy language must be enforced, requiring it to defend and indemnify its insureds until it has exhausted its policies by paying $250,000 in indemnity costs for any one occurrence.

## I.  FACTUAL BACKGROUND

This is an insurance coverage case. Beginning in May 2000, National Union began participating in a program with an insurance broker, National Program Services, Inc. ("NPS"). In connection with this program, National Union issued certain liability insurance policies to various real estate owners and property managers who were members of the National Coalition of Property Owners and Managers/Insurance Purchasing Group Association ("NCPO")(Amended Complaint, ¶ 8; Virginia Surety's Counterclaim, ¶ 1). None of the National Union policies provided first dollar coverage; instead, each of the National Union policies were written over a $250,000 self-insured retention amount.(Amended Complaint, ¶ 9; Virginia Surety's Counterclaim, ¶ 2). Virginia Surety also participated in the NPS program (Amended Compliant, ¶ 10; Virginia Surety's Counterclaim, ¶ 6). All of the Virginia Surety policies provided first dollar coverage, subject to limits of liability of $250,000 per occurrence, with defense costs outside of the policies' limits of liability (Amended Complaint, ¶¶ 10,11; Virginia Surety's Counterclaim, ¶ 6).

In mid-2002, National Union ceased issuing policies as part of the NPS program. Thereafter, National Union and Lexington issued certain liability insurance policies directly to various members

of the National Coalition of Property Owners and Managers/Insurance Purchasing Group Association (Amended Complaint, ¶ 12). Like the National Union and Lexington "program policies," these National Union and Lexington "post-program policies" did not provide first dollar coverage, but instead were written over a $250,000 self-insured retention amount. (Amended Complaint, ¶ 9) Upon information and belief, Virginia Surety issued general liability insurance policies to most of the same entities that were insured by National Union and Lexington. Virginia Surety used the same policy form for each insured. (Amended Complaint, ¶ 10).

National Union and Lexington seek a declaration from the Court as to, <u>inter</u> <u>alia</u>, Virginia Surety's defense and indemnity responsibilities to its insureds. National Union and Lexington also seek a declaration from the Court that National Union and Lexington do not have any duty to defend or indemnify any of their insureds in connection with any underlying occurrence under policies issued by them, until Virginia Surety has paid $250,000 in indemnity costs in connection with any one occurrence. Virginia Surety disputes seeks a declaration that the National Union and Lexington policies are primary policies, and that once Virginia Surety has paid $250,000 in defense and indemnity costs combined in any one claim, Virginia Surety and National Union/Lexington have to share the loss.

Virginia Surety has served Requests for the Production of Documents on National Union and Lexington, copies of which are attached hereto as **Exhibit A**. These requests for production of documents seek an extremely broad variety of documents. In fact, Virginia Surety's requests for the production of documents essentially seek, among other things, every document in the possession of National Union and Lexington relating in any way to the subject policies and to any claims covered under these policies. Responding to these requests could require production of, among other

things, all of the non privileged portions of the National Union and Lexington underwriting and claims files relating to the subject policies.

Production of the relevant National Union and Lexington insurance policies could be accomplished in a matter of days. (Affidavit of Brenda Bouyer-Windley, ¶ 5) Production of the underwriting files for the dozens of policies issued by National Union and Lexington that are at issue in this case would require as much as one hundred hours of counsel's time and would involve the production of tens of thousands of pages of documents. (Affidavit of Brenda Bouyer-Windley, ¶¶ 3, 4). Production of the claims files would take at least a hundred more hours of counsel's time and would potentially require the production of hundreds of thousands of pages of documents. (Affidavit of Brent Poetschke, ¶ 2). Discovery concerning the affirmative defenses of National Union and Lexington to Virginia Surety's counterclaim also would be quite time consuming.

## II. ARGUMENT

### A. Segmentation of Discovery and Phased Resolution of the Case Will Promote Judicial Economy

Pursuant to Fed. R. Civ. P. 42(b), the, "court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim . . . or of any separate issue . . . ." The decision to order the separation of any particular issue is in the discretion of court. See Gonzalez-Marin v. Equitable Life Assurance Soc'y, 845 F.2d 1140, 1145 (1st Cir. 1988) (Rule 42(b) motion is a matter particularly within the discretion of the trial court); Lieberman-Sack v. Harvard Community Health Plan, 882 F. Supp. 249, 257 (D. R.I. 1995) (court bifurcated trial sua sponte, pursuant to Fed.R.Civ.P. 42(b)); Gold v. Johns-Manville

Sales Corp., 723 F.2d 1068, 1077 (3rd Cir. 1983) ("The power to stay proceedings is incidental to the power inherent in every court to schedule disposition of the cases on its docket so as to promote fair and efficient adjudication. How this can best be done is a decision properly vested in the trial courts . . . District courts have wide discretion in setting their own calendars . . ."); <u>Ayala-Gerena v. Bristol Myers-Squibb</u>, 95 F.3d 86 (1st Cir. 1996) (trial judge has broad discretion in ruling on pre-trial management matters). The Court may bifurcate (or for that matter trifurcate, or slice even more finely) a case at whatever point will minimize the overlap in evidence between the segmented phases or otherwise promote economy and accuracy in adjudication. 9 C.Wright & A. Miller, <u>Federal Practice and Procedure</u> §2389 (2d ed. 1994).

Fed.R.Civ.P. 16 provides for a scheduling order by the Court that controls the conduct of the litigation. Pursuant to Rule 16(c)), the order may consider, <u>inter alia,</u>

(5)    the appropriateness and timing of summary adjudication under Rule 56;

(6)    the control and scheduling of discovery, including orders affecting disclosures and discovery pursuant to Rule 26 and Rules 27 through 37;

[ . . . ]

(14)    an order directing a party or parties to present evidence early in the trial with respect to a manageable issue that could, on the evidence, be the basis for a judgment as a matter of law under Rule 50(a) or a judgment on partial findings under Rule 52(c));

[ . . . ]

(16)    such other matters as may facilitate the just, speedy, and inexpensive disposition of the action.

Local Rule 16.1 provides that the Court's Scheduling Order shall include time frameworks for any, "procedural matter that the judge determines is appropriate for the fair and efficient management of the litigation."

Local Rule 16.3(a), regarding Case Management Conferences, provides that the presiding judicial officer, in furtherance of the Scheduling Order, may,

> (3)   prepare (or order the attorneys to prepare) a specific discovery schedule and discovery plan that, if the presiding judicial officer deems appropriate, might:
>
>    (a)   identify and limit the volume of discovery available in order to avoid unnecessary or undyuly burdensome or expensive discovery;
>    (b)   sequence discovery into two or more stages; and
>    (c)   include time limits set for the completion of discovery
>
> [ . . . ]
>
> (5)   provide for the "phased resolution" or "bifurcation of issues for trial" consistent with Federal Rule 42(b); and
>
> (6)   explore any other matter that the judicial officer determines is appropriate for the fair and efficient management of the litigation.

Regarding discovery, Local Rule 26.3 provides that,

> In order to facilitate settlement and the efficient completion of discovery, the judicial officer has discretion to structure discovery activities by phasing and sequencing the topics which are the subject of discovery. For example, an order may be framed limiting the first phase to developing information needed for a realistic assessment of the case. If the case does not terminate, the second phase would be directed at information needed to prepare for trial.

As more fully discussed below, this case should be able to be resolved following limited discovery regarding the relevant insurance policies that were issued by each party and (if necessary) the factual basis for the affirmative defenses of National Union and Lexington to Virginia Surety's counterclaim. Discovery as to other issues, including the unexpressed underwriting intent of the parties, would be unnecessary and would be much more extensive, expensive and time consuming for the parties and for the court, which would have to officiate disputes regarding such discovery. Virginia Surety has requested production of documents from defendants' underwriting and claims files that potentially would require the production of hundreds of thousands of pages of documents.

The considerable unnecessary time and expense that would be required for this discovery could be avoided if the Scheduling Order is modified as requested by plaintiffs. In furtherance of this Court's policy to encourage efficient, speedy and inexpensive disposition of cases, discovery should be limited to production and authentication of the relevant insurance policies until the court has the opportunity to rule on dispositive motions filed by the parties based upon the language of the policies.

III. **ALL DISCOVERY EXCEPT FOR THE PRODUCTION AND AUTHENTICATION OF THE RELEVANT INSURANCE POLICIES SHOULD BE STAYED UNLESS AND UNTIL THE COURT DETERMINES THAT THE PARTIES' UNDERWRITING INTENT AND THE UNDERLYING CLAIMS FILES ARE RELEVANT TO A DETERMINATION OF THE PRIORITY OF COVERAGE**

A. **New York Law Applies to the Interpretation of the Policies and the Determination of Whether the Extrinsic Evidence is Admissible**

As a threshold matter, the Court must determine which jurisdiction's law to apply to the issue of whether extrinsic evidence is admissible to establish the parties' intent regarding the priority of coverage (as well as to the substantive coverage issues that are presented by this case).

In determining the choice of law, the choice of law rules of the forum state ( in this case, Massachusetts) apply in lawsuits, such as this case, brought in federal courts sitting in diversity. Spurlin v. Merchants Ins. Co., 57 F.3d 9, 10 (1st Cir. 1995). The standard under Massachusetts law for determining which jurisdiction's law is applicable to a case such as this were set forth in Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21 (1st Cir. 1997).

If there is an actual conflict between the laws of the interested jurisdictions, then the court applies the Massachusetts choice of law rule. As the court in Millipore explained:

> Massachusetts courts take a flexible interest-based approach to conflict of laws issues and will consider a wide variety of factors in choosing the applicable law. Cosme v. Whitin Mach. Works, Inc., 632 N.E.2d 832, 834 (Mass. 1994).

> These factors include those listed in the Restatement (Second) Conflict of Laws: (1) the needs of the interstate and international system, (2) the policies of the forum, (3) the policies of other interested jurisdictions, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result, and (7) ease of applicability. Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 669 (Mass. 1985) (citing Restatement (Second) Conflict of Laws § 6 (1971)). They also include factors proposed by conflict of laws commentators: (1) predictability, (2) maintaining interstate and international order, (3) simplifying the judicial task, (4) advancing the interests of the forum, and (5) applying the better legal rule. Bushkin Assocs., 473 N.E.2d at 670 n.7 (citing Leflar, American Conflicts Law § 109, at 195 (3d ed. 1977)).

Millipore, 115 F.3d at 30.

In Millipore, two insurers, Hartford and INA, issued general liability policies to Millipore (a Massachusetts corporation) and one of its subsidiaries, Worthington, a New Jersey corporation. These insureds tendered numerous environmental cleanup claims to Hartford and INA, for sites located in New Jersey and in Massachusetts. After Hartford and INA refused to indemnify either Millipore or Worthington, Millipore, on behalf of itself and Worthington, brought suit against Hartford and INA. In considering which jurisdiction's law to apply, the Court explained:

> The polices issued by Hartford and INA to Millipore are multistate CGL policies. In addressing the choice of law issue with respect to such policies, ***the SJC has articulated a clear preference for looking to the law of one state to govern the interpretation of such multistate policies***. United Techs. Corp. v. Liberty Mut. Ins. Co., 555 N.E.2d 224, 227 (Mass. 1990); W.R. Grace & Co. v. Hartford Accident & Indem. Co., 555 N.E.2d 214, 221 (Mass. 1990). The SJC reasoned that the expectations of the parties as well as commercial realities require that the language in a single set of insurance policies should mean the same thing in every state. United Techs., 555 N.E.2d at 227 & n.10.
>
> ***Under Massachusetts law, one jurisdiction's rules of decision must be applied*** to all of the sites covered under multistate CGL policies.

Millipore at 30-31 (emphasis supplied).

The Court then concluded that Massachusetts law would apply to the determination of coverage under Millipore's policies, because:

> Here, the state with the strongest interest in seeing its substantive law applied to all of the sites is Massachusetts. Massachusetts is Millipore's state of incorporation and its principal place of business. Most of the policies were negotiated and administered in and around Boston. Three of the five sites are in Massachusetts. We affirm the district court's decision to apply Massachusetts law to the disputes involving coverage under multistate CGL policies issued directly to Millipore of liability at the New Jersey as well as at the Massachusetts sites.

Id.

The test set forth in Millipore has been applied in other recent court decisions. See, e.g., Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co., 803 N.E.2d 750, 752 (Mass. Ct. App. 2004); MRRM v. Castano Plaintiffs' Legal Committee, 335 F. Supp.2d 156, 160 (D. Mass. 2004); Reicher v. Berkshire Life Ins. Co., 360 F.3d 1, 5 (1st Cir. 2004)(appeal from District of Massachusetts); Value Partners v. Bain & Co., 245 F.Supp.2d 269, 275 (D. Mass. 2003); W.R. Grace v. Hartford Acc. & Ind. Co., 555 N.E.2d 214 (Mass. 1990)(New York law applied in a coverage dispute where: (1) the defendant insurers were licensed to do business in New York; (2) the insured was a New York-based conglomerate; and (3) the policies were negotiated in New York.).

In the present case, National Union and Virginia Surety both issued their program policies to members of NCPO. The National Union and Virginia Surety program policies cover numerous insureds which conduct operations in numerous states. NCPO is an association whose offices are located in New York. The National Union policies were issued to NCPO and its members in New York. National Union is headquartered in New York and underwrote its policies there. There is no other single jurisdiction with which Virginia Surety, National Union, NCPO and NCPO's members all have such significant contacts. In light of the significant contacts between NCPO and New York, New York has the strongest interest in protecting NCPO and its members in connection with the

...

program policies. Since the law of only one state may apply to the interpretation of these policies, it is New York law that should apply.

### B. Extrinsic Evidence of the Parties' Intent Regarding the Insurance Policies is Irrelevant and Inadmissible

National Union and Lexington are entitled to obtain a declaration as to the rights and obligations of Virginia Surety to its policyholders based upon the unambiguous terms of the Virginia Surety policies. The Virginia Surety policies were specifically written to provide primary first dollar coverage to Virginia Surety's insureds up to a per occurrence limit of liability of $250,000. The Virginia Surety policies provide that defense costs are outside Virginia Surety's limits of liability. The National Union and Lexington policies are true excess policies, that are excess over all primary coverage, including the Virginia Surety policies. Regardless of whatever was its unexpressed underwriting intent, Virginia Surety is obligated to provide a defense and to indemnify its insureds until Virginia Surety's $250,000 per occurrence policy limit is exhausted.

National Union and Lexington do not allege that the Virginia Surety policies are ambiguous nor does Virginia Surety claim the National Union or Lexington policies are ambiguous. Moreover, only the policies that are at issue here are necessary for the court to determine that: (1) all of the Virginia Surety policies provide first dollar coverage and, hence, are primary policies; and (2) none of the National Union and Lexington policies provide first dollar coverage. Instead, all of the National Union and Lexington policies are all written over a $250,000 per occurrence self-insured retention amount and, therefore, they are true excess policies. Thus, until the court rules otherwise, evidence extrinsic to the terms of the relevant policies is inadmissable and non-discoverable.

Nevertheless, Virginia Surety has recently served written discovery requests (attached hereto as **Exhibit A**) that seek a broad range of extrinsic evidence.

In construing insurance policies, New York courts first examine the relevant policy language to determine whether it is unambiguous; if so, extrinsic evidence as to the insurer's underwriting intent is neither relevant nor admissible. See, e.g., Brunetto v. Massachusetts Mut. Life Ins. Co., 200 F.Supp.2d 380, 382 (S.D.N.Y. 2002); Canada Life Assur. Co. v. Guardian Life Ins. Co., 242 F.Supp.2d 344, 358 (S.D.N.Y. 2003); In re Prudential Lines Inc., 158 F.3d 65, 77 (2nd Cir. 1998); New York Marine & General Ins. Co. v. Tradeline, 266 F.3d 112, 124 (2nd Cir. 2001); Fairchild v. Genesee Patrons Cooperative Ins. Co., 656 N.Y.S.2d 544 (App. Div. 3d Dept. 1997).

The majority of other jurisdictions as well as the First Circuit also follow this rule. See, e.g., Schneider v. Continental Cas. Co., 989 F.2d 718, 732 (4th Cir. 1993); Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 26-27 (2d Cir. 1988); McNeilab, Inc. v. North River Ins. Co., 645 F.Supp. 525, 543-45 (D.N.J. 1986), aff'd, 831 F.2d 287 (3d Cir. 1987); Southern Maryland Agrecultural Ass'n v. Bituminous Cas. Corp., 539 F.Supp. 1295, 1298 (D. Md. 1982); Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp 1368, 1375 (E.D.N.Y. 1988); Peerless Ins. Co. V. Brennan, 564 A.2d 383, 384 (Me. 1989); Western World Ins. Co. v. American and Foreign Ins. Co., 180 F. Supp. 2d 224, 230 (D. Me. 2002); Filiatrault v. Comverse Technology, Inc., 275 F.3d 131, 137 (1st Cir. 2001) (extrinsic evidence is generally inadmissable to interpret unambiguous contract language); Federal Marine Terminals, Inc. v. Worcester Peat Co., Inc., 262 F.3d 22, 28 (1st Cir. 2001) (having concluded that contract's payment provision was unambiguous, the district court properly refused to consider extrinsic documents to alter that language); Andover Newton Theological Sch, Inc. v. Continental Cas. Co., 930 F.2d 89, 94 n.5 (1st Cir. 1991) ("Where language is clear and

unambiguous, extrinsic evidence is inadmissible to prove the parties' intent."); Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) ("As a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous.").

Moreover, an ambiguity does not exist "merely because a dispute arises over the meaning of a particular [policy] provision." Greenly v. Mariner Management Group, Inc., 192 F.3d 22 (1st Cir. 1999)(applying Maine law); MDW Enterprises v. CNA Ins. Co., 772 N.Y.S.2d 79, 82 (S.Ct. 2004)(insurance contract is ambiguous only when susceptible of two reasonable interpretations.); B. Ostrager & T. Newman, Handbook on Insurance Coverage Disputes, § 1.01[b] (12th ed. 2004).

More specifically, when considering the priority of coverage between insurers, courts have ruled that extrinsic evidence concerning the insurers' underwriting intent is neither relevant nor admissible to alter or explain the unambiguous language of the respective policies. For example, in Carrabba v. Employers Cas. Co., 742 S.W.2d 709 (Tex. Ct. App. 1987), the issue was the priority of coverage between a "true excess" policy and a primary policy. The court held that other insurance clauses in true excess and primary policies are not equivalent and, therefore, such clauses cannot be declared to be mutually repugnant. In its opinion, the court said that extrinsic evidence the primary carrier tried to introduce, in order to explain the purported meaning of the other insurance clause in the true excess policy, was inadmissible, because the true excess policy was unambiguous. The court observed that: "We will consider the intent of the parties only as that intent is reflected in the writings [i.e., the policies]. Where there is no contention that the contract of insurance is ambiguous, no extrinsic evidence will be considered to vary or control the terms of an insurance policy or to explain what the terms meant to a particular seller or purchaser of insurance." Id. at 713-14. Instead

of basing its decision upon extrinsic evidence concerning what the underwriters had in mind when they issued the policies, the court reached its holding by solely relying upon the language of the policies as a whole, including the overall pattern of the insured's insurance program. Id. at 714.

Likewise, in Towne Realty, Inc. v. Safeco Ins. Co., 854 F.2d 1264 (11th Cir. 1988), the court found that a true excess insurer's policy was excess over a primary policy, and rejected the primary carrier's bid to introduce extrinsic evidence concerning the contracting parties' underwriting intent, when the language of the policies was unambiguous.

Extrinsic evidence was also deemed to be irrelevant in Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co., 89 Cal. Rptr.2d 415 (Cal. Ct. App. 2000). In that case, the court held that a policy that provided true excess coverage was excess over a primary policy. The court based its determination on the unambiguous policy language, which demonstrated that the Commerce and Industry policy, unlike the Chubb policy, was a true excess policy. The court rejected Chubb's attempt to introduce extrinsic evidence (declarations of two of its underwriters and the insured's insurance manager) that were intended to show that the Chubb policy provided "contingent" and not primary coverage. The court explained that such extrinsic evidence, "may be relevant to insurer-insured disputes about ambiguous policy language, but it cannot be used to substantiate unexpressed intention and thereby vary clear and explicit contract provisions." Id. at 419. The court also indicated that "conflicting other insurance" issues do not arise when the policies do not both operate on the same level of coverage. Id. See also, American Economy Ins. Co. v. Acceptance Ins. Co., 2004 WL 1080213 (Idaho Dist. Ct.) (extrinsic evidence intended to clarify meaning of other insurance clause was found to be inadmissible because the policy was unambiguous); American International Specialty Lines Ins. Co. v. Canal Indemnity Co., 352 F.3d 254, 265 (5th Cir. 2003) (In

a case involving the priority of coverage, the court said: "As the words of the policies are clear and our interpretation does not produce any absurd consequences, the AISLIC and Canal policies must be given effect as written without resort to extrinsic evidence."); Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 1999 WL 33117160 (D. Me.) (expert testimony concerning insurance industry practices in overlapping insurance situations was deemed to be inadmissible when the policies were unambiguous); Kentucky School Boards Ins. Trust v. Horace Mann Ins. Co., 1999 WL 685929 (6th Cir.) (because other insurance clauses in policies were unambiguous, extrinsic evidence was not admissible to help court decide the priority of coverage).

In the instant case, before extrinsic evidence is considered, the court must make a threshold determination that the parties' policies are ambiguous. Unless this is the case, then the respective rights of the parties regarding their obligations to their insureds and any rights of Virginia Surety to contribution from National Union and Lexington must be determined solely with reference to the language of the policies. The only discovery necessary to make these determinations is the production and authentication of the relevant policies issued by each party. This limited discovery will be able to be accomplished in a relatively inexpensive and quick manner and the parties will thereafter be in a position to present dispositive motions to the Court.

If the Court considers the parties' motions and determines that there are ambiguities in the policies, extrinsic evidence regarding the parties' underwriting intent in issuing the policies then may become relevant. It would also be necessary, at that point, for National Union and Lexington to conduct discovery concerning their affirmative defenses to the counterclaim of Virginia Surety. Discovery of extrinsic evidence of the parties' unexpressed underwriting intent could require review and production of tens of thousands of pages of underwriting documents, potentially hundreds of

thousands of pages of claims file materials, the taking of numerous depositions and discovery concerning expert testimony regarding underwriting practices. Discovery concerning the affirmative defenses of National Union and Lexington also would be time consuming.

If the court ultimately decides that National Union and Lexington have some obligation to contribute to the costs of defense and settlement of these claims before Virginia Surety's $250,000 per occurrence policy limits are exhausted, then (and only then) will it become necessary to conduct discovery concerning the underlying claims files in order to determine the amount owed by National Union and Lexington. It will not add expense or time to the case to defer discovery as to Virginia Surety's damages and the affirmative defenses of National Union and Lexington until the court resolves whether the National Union and Lexington policies come into play before Virginia Surety's $250,000 per occurrence indemnity only limits of liability are exhausted as a result of the payment of claims.

In light of the very real possibility that the case can be resolved without resort to prohibitively time consuming and expensive discovery, plaintiffs request that the Court modify its Scheduling Order to limit the initial phase of discovery to production and authentication of the relevant insurance policies, followed by dispositive motions to be brought by the parties under F.R.Civ.P. 56. Discovery as to extrinsic evidence is premature and is not relevant. If the court later determines that extrinsic evidence is relevant, then only at that time should discovery as to extrinsic evidence be permitted.

## IV. CONCLUSION

WHEREFORE, Plaintiffs, National Union and Lexington, move for a modification of the Court's Scheduling Order as set forth above; and, pursuant to Local Rule 26.3, for an order limiting the initial phase of discovery to production of the relevant policies, thereby precluding voluminous, expensive, and unnecessary discovery concerning extrinsic evidence of the parties' underwriting intent and the claims brought under the subject policies.

**Dated:** April 12, 2005

Respectfully submitted,

_____
Mark E. Cohen           [BBO #089800]
Robert J. Maselek       [BBO #564690]
**McCormack & Epstein**
One International Place - 7th Floor
Boston, MA    02110
(617) 951-2929 Phone
(617) 951-2672 Fax

*Attorneys for Plaintiffs,*
*Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA.*

69797.1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the of foregoing Memorandum of Law in Support of Motion for Modification of the Scheduling Order and an Order Limiting Discovery has been served upon all counsel of record by mailing a copy hereof, postage prepaid, addressed to:

> Joseph Blute, Esq.
> **Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.**
> One Financial Center
> Boston, MA    02111

**DATED** this 12th day of April, 2005.

_____
Mark E. Cohen