# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MASSACHUSETTS

---

LEXINGTON INSURANCE COMPANY AND NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH,
                                Plaintiffs

v.

VIRGINIA SURETY COMPANY, INC.,
                                Defendant.

CIVIL ACTION NO.  04-11109 RGS

---

# MEMORANDUM OF PLAINTIFFS, LEXINGTON INSURANCE COMPANY AND
# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA,
# IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

In this case, Plaintiffs, Lexington Insurance Company ("Lexington") and National Union Fire Insurance  Company of Pittsburgh, Pennsylvania ("NUFIC"), simply ask this court to apply a fundamental principle of insurance law, namely: All policies at a lower layer of coverage in an "insurance tower" have to be exhausted before policies at a higher layer have to contribute to the costs of defense and indemnity, regardless of the wording of the "other insurance" clauses in the respective policies.[1]

---

[1] The lowest layer of insurance that attaches at "dollar one" is sometimes called "true primary" coverage and a higher layer of insurance, that does not provide first dollar coverage and does not assume a duty to immediately defend all claims, is often referred to as a "true excess" policy. Regardless of the nomenclature, however, the overriding principle that has been applied by the courts is that an insurer that issues a policy at a higher layer does not have to pay any defense or indemnity costs until all lower layer policies are completely exhausted. Courts contrast this situation – policies on entirely different layers – with the situation where two or more policies attach at exactly the same level. In these latter type of cases, courts generally declare that the priority of coverage is determined by the "other insurance" clauses in the policies at issue. Virginia Surety is asking this court to apply the rule that is used in the latter situation to a case that actually involves the former situation.

Here, Lexington and NUFIC issued policies to hundreds of owners of residential and commercial property complexes located throughout the United States.  Plaintiffs had initially been asked by the insurance brokers for these insureds to write policies on a first dollar,[2] primary, basis, with limits of liability of $1 million, i.e., the insureds wanted Plaintiffs to agree that they would have a duty to defend and to pay defense and indemnity costs for covered claims from the moment that the claim was first made.  Plaintiffs, however, declined to accept this risk.  Instead, Plaintiffs agreed to only provide coverage that attached in excess of $250,000 in defense and indemnity costs.  Plaintiffs gave the insureds the option to either self insure for this first $250,000 layer of coverage or else the insureds could obtain primary first layer coverage.  All of the insureds whose policies are at issue in this case chose to obtain primary, first dollar, coverage from Virginia Surety.  The Virginia Surety policies all have limits of liability of $250,000 in indemnity costs for each occurrence.  Other Lexington/NUFIC insureds decided to self insure the initial layer or obtain coverage from insurers other than Virginia Surety.  Some of Virginia Surety's insureds did not obtain excess insurance from Plainitiffs.

The Virginia Surety policies explicitly state that defense costs are outside of and in addition to the $250,000 in indemnity coverage that is provided by the Virginia Surety policies.  In other words, pursuant to the express terms of the Virginia Surety policies, the Virginia Surety policies are not exhausted until indemnity costs alone reach $250,000 for any one occurrence, no matter how much in defense costs are spent in connection with that occurrence.

For those insureds of the Plaintiffs who did not choose to obtain primary insurance, but instead self insured, the Plaintiffs policies attach once $250,000 in defense and indemnity costs are paid.

---

[2] A policy that provides "first dollar" coverage attaches immediately upon a loss, rather than after a primary insurance policy or (such as the situation in the present case), a self insured retention amount, is exhausted.

Even though the Plaintiffs' policies and the Virginia Surety policies are on entirely different layers of coverage, Virginia Surety now asks this court to ignore the express language of its own policies, which expressly provide that defense costs are outside the limits of liability. Virginia Surety also asks the court to ignore the fundamental principle of insurance law, that a true excess policy is excess over all primary coverage. Instead, Virginia Surety asks this court to hold that its policies are exhausted once it has paid $250,000 in defense and indemnity costs combined, in connection with any one occurrence, despite the explicit language in its policies to the contrary.

The rationale for the rule, that an insurer that issues a policy on a higher level does not have any duty to pay defense or indemnity costs, until all policies that are written on a lower level are exhausted, has been explained by the courts in many cases: When a policy is written at a higher layer and does not assume a duty to defend from dollar one, that insurer assumes less risk than a dollar one primary insurer. As a result, the excess insurer typically charges a lower premium, relatively speaking, for issuing more indemnity coverage, to cover the same insured against the same type of risk, than a true primary insurer. Therefore, it is only fair that the limits of liability of the lower layer policy must be completely exhausted, according to the terms of the contract that the lower level insurer wrote, before the higher layer insurer is called upon to contribute to the costs of defense, regardless of the terms of the other insurance clauses in the respective policies.

This is exactly the situation that is presented by this case. Virginia Surety agreed to provide true primary insurance coverage that attached at dollar one and Virginia Surety agreed to defend all potentially covered claims made against its insureds from the time that the claim is first made, until it pays $250,000 in indemnity for each covered occurrence. Moreover, Virginia Surety charged its insureds a premium that corresponded to the risk that it was accepting, including its obligation to assume an initial duty to defend. Moreover, although Virginia Surety knew about the terms and existence of the Plaintiffs' policies, it nevertheless chose to issue policies that specified that defense costs were outside the Virginia Surety limits of liability. By contrast, Plaintiffs declined to issue

policies that attached from dollar one.  And the premiums that Plaintiffs charged their insureds reflected that much lower assumption of the risk– in fact, for many months after NUFIC first began to issue the program policies that are at issue, NUFIC charged their insureds a premium equal to only 12% of the premium that was being charged to the same insureds by Virginia Surety, even though Virginia Surety's indemnity limits were one-fourth ($250,000) as much as Plaintiffs' limits of liability ($1,000,000 in excess of the self insured retention).

Accordingly, this court should allow Plaintiffs' motion for summary judgment and deny Virginia Surety's motion for summary judgment.


## II.    FACTUAL BACKGROUND

In May 2000, Dowd and Associates ("Dowd"), an insurance broker, approached Risk Specialists Company of New York ("Risk Specialists"),[3] with a submission requesting that a liability insurance policy be issued on behalf of AIMCO.  AIMCO owns and/or manages several hundred thousand apartment units throughout the United States.  (Affidavit of Charles J. Messery ["Messery Affidavit"], ¶ 2)  Risk Specialists, on behalf of NUFIC, declined to issue AIMCO primary, first dollar, coverage, but instead offered to write excess coverage with limits of liability of $1 million and an attachment point of $250,000.  (Id.)  The NUFIC policy gave the insureds the option of either self insuring the first $250,000 in defense and indemnity costs or else obtaining primary insurance coverage to "buy back" the self insured retention amount.  (Id.)  Risk Specialists was then contacted by First Capital Group ("First Capital"), another wholesale insurance broker located in New York, which had taken over the submission from Dowd.  First Capital renegotiated the submission with Risk Specialists, so that coverage now would be issued by NUFIC to the National Coalition of

---

[3] Risk Specialists is a surplus lines insurance broker and it is a sister company of the Plaintiffs. Risk Specialists and Plaintiff, NUFIC, are New York Corporations and have their principal place of business in New York. Lexington is a Delaware corporation which has its principal place of business in Massachusetts.  Virginia Surety is an Illinois corporation which has its principal place of business in Illinois.  (Affidavit of Jack B. Gould, ¶¶ 2, 3; Virginia Surety's Answer to Complaint, ¶ 4)

Property Owners and Managers/Insurance Purchasing Group Association ("NCPO"). This association consisted of hundreds of property owners, in addition to AIMCO. (Messery Affidavit, ¶ 3)

Subsequently, beginning in May 2000, NUFIC issued several insurance policies to NCPO at NCPO's office in New York City. (Messery Affidavit, ¶ 4) Although these policies were issued by NUFIC, the policies were marketed and underwritten by Lexington and Lexington was responsible for handling the claims covered by the NUFIC policies. (Gould Affidavit, ¶ 5) Under the terms of the NUFIC "program policies," NUFIC did not assume any duty to defend or to indemnify the insureds until $250,000 in defense and indemnity costs was incurred. (Messery Affidavit, ¶ 5; Gould Affidavit, ¶ 4) A copy of a specimen policy issued by NUFIC to NCPO members is attached as Exhibit "A." (Id.) All of the NUFIC program policies included a self insured retention endorsement which provided:

> [NUFIC's] obligation, under the coverages provided by this policy, to pay damages, DEFENSE COSTS AND CLAIM EXPENSES, applies only to damages in excess of the Self Insured Retention stated below, and subject to the applicable Limit of Insurance, stated in this policy. The terms of this policy, including with respect to our rights and duties with respect to defense of "suits" apply in excess of the application of the Self Insured Retention amout[4].

(Gould Affidavit, ¶ 6)

Beginning in May 2000, Virginia Surety issued first dollar, primary, general liability policies to various members of NCPO. (Messery Affidavit, ¶ 5) All of the Virginia Surety policies are subject to limits of liability of $250,000 per occurrence, with defense costs outside of and in addition to the policies' limits of liability.[5] (Id.; Virginia Surety Counterclaim (**Exhibit G**), ¶ 6.) A specimen copy of the Virginia Surety policies that are at issue in this case is attached hereto as Exhibit E. The Virginia Surety policies all provide that Virginia Surety:

---

[4] A sample of this type of Self Insured Retention Endorsement is included in Exhibit "B".

[5] Virginia Surety used the same policy form for each insured.

> Will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .
>
> (2) Our right and duty to defend ends when we have used up the applicable limit of insurance [i.e., $250,000] in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

(Id.)

The Virginia Surety policies were administered by an insurance broker, National Program Services, Inc. ("NPS"). (Messery Affidavit, ¶ 5) Pursuant to a written agreement with Virginia Surety, NPS served as Virginia Surety's Managing General Agent in connection with these policies. (Id.) NPS collected premiums from the insureds for both the Virginia Surety and the NUFIC policies and NPS paid the NUFIC premiums to First Capital, which was also located in New York. (Id.) First Capital, in turn, paid the premiums to NUFIC. (Gould Affidavit, ¶ 7) NPS styled this arrangement as the NCPO "program." (Messery Affidavit, ¶ 5)

When the first NUFIC policy was issued to NCPO on May 31, 2000, the NUFIC premium, for a second layer of insurance of $1,000,000 per occurrence, was approximately 12 percent of the amount of the Virginia Surety premiums for policies covering the same insureds with a limit of $250,000 per occurrence. (Messery Affidavit, ¶ 6) The premiums for the NUFIC policies issued on July 1, 2000 and August 1, 2000 also totaled approximately 12 percent of the Virginia Surety premiums. (Id.) From September 1, 2000 through December 2000, NUFIC charged a premium based on a flat rate per apartment unit insured. These premiums were also far less than the Virginia Surety premiums. (Id.)

In mid-2002, NUFIC ceased issuing policies as part of the NCPO program. (Messery Affidavit, ¶ 7; Gould Affidavit, ¶ 8) Thereafter, NUFIC and Lexington issued certain "post program" policies directly to various former members of NCPO . (Id.) Like the NUFIC program policies, the NUFIC and Lexington post-program policies did not provide first dollar coverage, but instead were written over a $250,000 self-insured retention amount and had limits of liability of $1 million. (Id.)

6

Many of the Lexington post-program policies were written as "Stand-Alone Excess Policies." (Id.)

A specimen copy of the Lexington Stand-Alone Excess Policy form is attached hereto as Exhibit

C. The post-program Self Insured Retention Endorsements contained the following language:

All of the NUFIC and Lexington "post-program" policies included a self insured retention

endorsement which contained one of the following clauses:

> [NUFIC's] obligation, under the coverages provided by this policy, to pay damages, DEFENSE COSTS AND CLAIM EXPENSES, applies only to damages in excess of the Self Insured Retention stated below, and subject to the applicable Limit of Insurance, stated in this policy. The terms of this policy, including with respect to our rights and duties with respect to defense of "suits" apply in excess of the application of the Self Insured Retention amount.
>
> or
>
> [NUFIC's] obligation, under the coverages provided by this policy, to pay "Ultimate Net Loss" on behalf of the "Insured," applies only to the "Ultimate Net Loss" in excess of the Self Insured Retention stated below, and subject to the Limits of Liability stated in the policy. The terms of this policy, including with respect to our rights and duties with respect to defense of suits apply in excess of the application of the Self Insured Retention amount.
>
> or
>
> The LIMITS OF INSURANCE as set forth in Item 3 of the Declarations shall apply excess of a Self-Insured Retention (hereafter referred to as the "Retained Limit") in the amount of: $250,000 each "occurrence"and you agree to assume the Retained Limit. . . . "We" do not have the duty to investigate or defend any "occurrence," claim or "suit" unless and until the Retained Limit is exhausted with respect to that "occurrence," claim or "suit."

Specimen copies of Self Insured Retention Endorsements used by NUFIC and Lexington in the

"post program policies" are attached hereto as Exhibit D. (Gould Affidavit, ¶ 8)

Numerous claims have been made against the insureds under the Virginia Surety, NUFIC

and Lexington policies.   (Affidavit of Elizabeth Viscione ("Viscione Affidavit"), ¶ 3) In connection

with some of these claims, Virginia Surety asserts that it has expended in excess of $250,000 in

defense and indemnity costs. (Id.)  Virginia Surety paid all defense costs for more than two years,

until $250,000 per occurrence in indemnity costs were incurred per claim. (Viscione Affidavit, ¶ 4)

Despite this, Virginia Surety, in its Counterclaim, contends that once it has paid $250,000 in defense and indemnity costs combined for any given claim under a program policy or post-program policy, for an insured covered by its policy and either a NUFIC or a Lexington policy, it and NUFIC or Lexington are co-primary insurers, and NUFIC or Lexington has to share with Virginia Surety the responsibility of paying additional defense and indemnity costs, from that point forward.  (Virginia Surety Counterclaim (Exhibit G), ¶ 21)  In discovery in this case, however, Virginia Surety now has taken the position that once it has paid $250,000 in defense and indemnity costs combined for any given occurrence under a program policy or post-program policy, for an insured covered by its policy and either a NUFIC or a Lexington policy, Virginia Surety's obligations to its policyholders are extinguished, and NUFIC or Lexington then becomes responsible to pay 100 percent of defense and indemnity costs incurred from the time Virginia Surety paid the $250,000. (Deposition of Wayne J. Baliga, p. 28, lines 22-24, p. 29, lines 1-5; p. 32, lines 13-22; p. 30, lines 21-24, p. 31, lines 1-3.)

NUFIC and Lexington seek a declaration from the Court that they do not have any obligation to pay defense or indemnity costs until the applicable Virginia Surety policy is exhausted by the payment of $250,000 in indemnity costs in connection with any one occurrence.


II.    **ARGUMENT**

A.    **Summary Judgment Standard**

The role of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.  <u>Mesnick v. General Electric, Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991).  The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, that there is no genuine issue as to any material fact and it is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only where the party opposing summary judgment provides evidence such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986).  Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing there is a genuine, triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 324,(1986).  If, after viewing the record in the light most favorable to the non-moving party, the Court determines that no genuine issue of material fact exists, summary judgment is appropriate.  Chapman v. Bernard's Inc., 167 F. Supp. 2d 406, 411 (D. Mass. 2001).

III.    **NEW YORK LAW APPLIES TO THE RESOLUTION OF THE COVERAGE DISPUTE BETWEEN LEXINGTON AND VIRGINIA SURETY**

As threshold matters, the Court must determine which jurisdiction's law to apply to the substantive coverage issues that are presented by this case, and whether extrinsic evidence concerning the unexpressed, subjective intent of the insureds, insurers and their brokers is relevant and admissible to the determination of the priority of coverage between the respective policies.

In determining the choice of law, the choice of law rules of the forum state (i.e., Massachusetts) apply.  Spurlin v. Merchants Ins. Co., 57 F.3d 9, 10 (1st Cir. 1995).  The standard under Massachusetts law for determining which jurisdiction's law is applicable to an insurance coverage  case, when the insured risks are located in more than one jurisdiction, were set forth in Millipore Corp. v. Travelers Indemnity Co., 115 F.3d 21 (1st Cir. 1997).

If there is an actual conflict between the laws of the interested jurisdictions, then the court applies the Massachusetts choice of law rule.  As the court in Millipore explained:

> Massachusetts courts take a flexible interest-based approach to conflict of laws issues and will consider a wide variety of factors in choosing the applicable law. Cosme v. Whitin Mach. Works, Inc., 632 N.E.2d 832, 834 (Mass. 1994). These factors include those listed in the Restatement (Second) Conflict of Laws: (1) the needs of the interstate and international system, (2) the policies of the forum, (3) the policies of other interested jurisdictions, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result, and (7) ease of applicability. Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 669 (Mass. 1985) (citing Restatement (Second) Conflict of Laws § 6 (1971)). They also include factors proposed by conflict of laws commentators: (1) predictability, (2) maintaining interstate and international order, (3) simplifying the judicial task, (4) advancing

the interests of the forum, and (5) applying the better legal rule. <u>Bushkin
Assocs.</u>, 473 N.E.2d at 670 n.7 (<u>citing</u> Leflar, <u>American Conflicts Law</u> § 109, at
195 (3d ed. 1977)).

<u>Millipore</u>, 115 F.3d at 30.

In <u>Millipore</u>, two insurers, Hartford and INA, issued liability policies to Millipore (a

Massachusetts corporation) and one of its subsidiaries, Worthington, a New Jersey corporation.

These insureds tendered numerous environmental cleanup claims to Hartford and INA, for sites

located in New Jersey and in Massachusetts.  After Hartford and INA declined coverage, Millipore

brought suit in Massachusetts.  In considering which jurisdiction's law to apply, the Court explained:

> The polices issued by Hartford and INA to Millipore are multistate CGL policies.
> In addressing the choice of law issue with respect to such policies, ***the SJC has
> articulated a clear preference for looking to the law of one state to govern
> the interpretation of such multistate policies***. <u>United Techs. Corp. v. Liberty
> Mut. Ins. Co.</u>, 555 N.E.2d 224, 227 (Mass. 1990); <u>W.R. Grace & Co. v. Hartford
> Accident & Indem. Co.</u>, 555 N.E.2d 214, 221 (Mass. 1990). The SJC reasoned
> that the expectations of the parties as well as commercial realities require that
> the language in a single set of insurance policies should mean the same thing
> in every state. <u>United Techs.</u>, 555 N.E.2d at 227 & n.10.
>
> ***Under Massachusetts law, one jurisdiction's rules of decision must be
> applied*** to all of the sites covered under multistate CGL policies.

<u>Millipore</u> at 30-31 (emphasis supplied).

The Court then concluded that Massachusetts law would apply because:

> Here, the state with the strongest interest in seeing its substantive law applied
> to all of the sites is Massachusetts. Massachusetts is Millipore's state of
> incorporation and its principal place of business. Most of the policies were
> negotiated and administered in and around Boston.

<u>Id.</u> at 31. [6]

---

[6] The test set forth in <u>Millipore</u> has been applied in other recent Massachusetts court decisions.  <u>See</u>, <u>e.g.</u>,
<u>Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co.</u>, 803 N.E.2d 750, 752 (Mass. App. Ct. 2004); <u>MRRM, P.A. v. Castano
Plaintiffs' Legal Comm.</u>, 335 F. Supp. 2d 156, 160-63 (D. Mass. 2004); <u>Reicher v. Berkshire Life Ins. Co.</u>, 360 F.3d 1, 5-6
(1st Cir. 2004) (appeal from District of Massachusetts); <u>Value Partners S.A. v. Bain & Co., Inc.</u>, 245 F. Supp. 2d 269, 275
(D. Mass. 2003);  <u>W.R. Grace & Co. v. Hartford Acc. & Indem. Co.</u>, 555 N.E.2d 214, 221 (Mass. 1990) (New York law
applied in a coverage dispute where: (1) the defendant insurers were licensed to do business in New York; (2) the insured
was a New York-based conglomerate; and (3) the policies were negotiated and issued in New York.).

In the present case, the NUFIC program policies were negotiated and issued to NCPO and its members in New York. The policies were issued to NCPO, which was located in New York. The NUFIC and Virginia Surety program policies cover numerous insureds that conduct operations in numerous states. NUFIC is headquartered in New York and underwrote its policies there. The broker with which Risk Specialists and NUFIC dealt, First Capital, is located in New York and is licensed to do business there and the premiums were paid to First Capital in New York. Many of the policies issued by Virginia Surety to NCPO members specifically contained endorsements entitled, "New York Changes - Calculation of Premium," to allow the policies to conform to New York law. Virginia Surety is seeking to obtain reimbursement of defense costs from NUFIC, which is based in New York. There is no other single jurisdiction with which Virginia Surety, NUFIC, NCPO and NCPO's members all have such significant contacts. Therefore, New York has the strongest interest in this dispute. Since the law of only one state may apply to the interpretation of these policies, it is New York law that should apply.

IV.    **EXTRINSIC EVIDENCE AS TO THE SUBJECTIVE INTENT OF THE PARTIES TO THE POLICIES IS NOT RELEVANT OR ADMISSIBLE WHERE, AS HERE, THE POLICIES ARE UNAMBIGUOUS; THE PRIORITY OF COVERAGE BETWEEN THE POLICIES ISSUED BY PLAINTIFFS AND DEFENDANT MUST BE DETERMINED SOLELY BY THE TERMS OF THE POLICIES THEMSELVES**

NUFIC and Lexington are entitled to obtain a declaration as to the priority of coverage between their policies and the Virginia Surety policies, based upon the unambiguous terms of the policies. Contrary to the position that Virginia Surety has taken in this litigation, evidence concerning the alleged subjective intent of the insurers, insureds and their brokers are not relevant to the determination of the priority of coverage.

NUFIC and Lexington do not allege that the terms of the Virginia Surety policies are ambiguous, nor does Virginia Surety claim that any of the language of the NUFIC or Lexington policies is ambiguous. Moreover, the policies that are at issue themselves include all of the

information that is necessary for the court to determine that: (1) all of the Virginia Surety policies provide first dollar coverage and, hence, are true primary policies; and (2) none of the NUFIC and Lexington policies provide true primary, first dollar coverage. Instead, all of the NUFIC and Lexington policies are all written over a $250,000 per occurrence self-insured retention amount and, therefore, they are true excess policies. The respective premiums amounts, which are, of course, part of the policies themselves, also conclusively demonstrate that the NUFIC and Lexington policies are on a different, higher, layer of coverage than the Virginia Surety policies.

In construing insurance policies, New York courts first examine whether the policy is unambiguous. If so, extrinsic evidence as to the insurer's subjective underwriting intent is neither relevant nor admissible. See, e.g., Brunetto v. Massachusetts Mut. Life Ins. Co., 200 F. Supp. 2d 380, 382 (S.D.N.Y. 2002); Canada Life Assur. Co. v. Guardian Life Ins. Co., 242 F. Supp. 2d 344, 358 (S.D.N.Y. 2003); New York Marine & General Ins. Co. v. Tradeline, 266 F.3d 112, 124 (2d Cir. 2001); Fairchild v. Genesee Patrons Cooperative Ins. Co., 656 N.Y.S.2d 544 (N.Y. App. Div. 1997). The majority of other jurisdictions, as well as the First Circuit, also follow this rule.[7]

More specifically, when considering the priority of coverage between insurers, courts have ruled that extrinsic evidence concerning the insurers' underwriting intent is neither relevant nor admissible to alter or explain the unambiguous language of the respective policies. For example, in Carrabba v. Employers Casualty Co., 742 S.W.2d 709 (Tex. Ct. App. 1987), the issue was the

---

[7] See, e.g., Schneider v. Continental Cas. Co., 989 F.2d 718, 732 (4th Cir. 1993); Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 26-27 (2d Cir. 1988); McNeilab, Inc. v. North River Ins. Co., 645 F.Supp. 525, 543-45 (D.N.J. 1986), aff'd, 831 F.2d 287 (3d Cir. 1987); Southern Maryland Agricultural Ass'n v. Bituminous Cas. Corp., 539 F.Supp. 1295, 1298 (D. Md. 1982); Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp 1368, 1375 (E.D.N.Y. 1988); Peerless Ins. Co. v. Brennan, 564 A.2d 383, 384 (Me. 1989); Western World Ins. Co. v. American and Foreign Ins. Co., 180 F. Supp. 2d 224, 230 (D. Me. 2002); Filiatrault v. Comverse Technology, Inc., 275 F.3d 131, 137 (1st Cir. 2001) (extrinsic evidence is generally inadmissable to interpret unambiguous contract language); Federal Marine Terminals, Inc. v. Worcester Peat Co., Inc., 262 F.3d 22, 28 (1st Cir. 2001); Andover Newton Theological Sch, Inc. v. Continental Cas. Co., 930 F.2d 89, 94 n.5 (1st Cir. 1991) ("Where language is clear and unambiguous, extrinsic evidence is inadmissible to prove the parties' intent."); Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) ("As a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous.").

priority of coverage between a "true excess" policy and a primary policy. The court held that "other insurance" clauses in true excess and primary policies are not equivalent and, therefore, such clauses cannot be declared to be mutually repugnant. In its opinion, the court observed:

> Unambiguous provisions cannot be varied by parol evidence of surrounding circumstances or the parties' subjective intent. The only relevant evidence is the actual policy. Were our courts to give credence to testimony as to what priority the insurance agent *believed* that a particular policy would have and to vary the type of coverage accordingly, every situation in which more than one carrier was involved would be litigated.

Id. at 716 (citations omitted). See also Towne Realty, Inc. v. Safeco Ins. Co., 854 F.2d 1264, 1267 (11th Cir. 1988); Commerce & Indus. Ins. Co. v. Chubb Custom Ins. Co., 89 Cal. Rptr. 2d 415, 419 (Cal. Ct. App. 2000). (Court based its determination that true excess policy was excess over primary policy, on the unambiguous policy language. The court rejected one insurer's attempt to introduce extrinsic evidence (declarations of two of its underwriters and the insured's insurance manager) that was intended to show that its policy provided "contingent," and not primary, coverage. The court explained that such extrinsic evidence, "may be relevant to insurer-insured disputes about ambiguous policy language, but it cannot be used to substantiate unexpressed intention and thereby vary clear and explicit contract provisions."); American Economy Ins. Co. v. Acceptance Ins. Co., 2004 WL 1080213 *2 (Idaho Dist. Ct. March 26, 2004); American Int'l Specialty Lines Ins. Co. v. Canal Indem. Co., 352 F.3d 254, 264-65 (5th Cir. 2003); Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 1999 WL 33117160 *8 (D. Me. April 12, 1999) (expert testimony concerning insurance industry practices in overlapping insurance situations inadmissible when the policies were unambiguous); Kentucky School Bds Ins. Trust v. Horace Mann Ins. Co., 1999 WL 685929 *2 (6th Cir. Aug. 27, 1999).

In the instant case, because the language in each policy is clear and unambiguous, the priority of coverage must be determined solely with reference to the language of the policies.

**V.     IT IS FIRMLY ESTABLISHED THAT A TRUE EXCESS POLICY IS EXCESS OVER ALL AVAILABLE PRIMARY COVERAGE, REGARDLESS OF THE NATURE OF THE OTHER INSURANCE CLAUSES IN THE RESPECTIVE POLICIES**

Courts throughout the country are in agreement that all liability insurance policies that are written on a lower level of coverage have to be exhausted before a higher level insurer can be called upon to contribute to the insured's defense and indemnity costs. This fundamental rule has been followed in scores, if not hundreds of decisions, and it applies regardless of the wording of the "other insurance" clauses in the respective policies. E.g., Reliance Nat'l Indem. Co. v. General Star Indem. Co., 85 Cal. Rptr. 2d 627, 634-35 (Cal. Ct. App. 1999) ("Under well-settled insurance principles, there are two levels of insurance coverage, primary and excess. . . . Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability.  Excess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted. . . . It has been held that an 'other insurance' clause dispute cannot arise between excess and primary carriers, but only between insurers on the same level.  This is because an 'other insurance' clause is only relevant when two or more policies apply at the same level.")  (internal citations and punctuation omitted); Travelers Cas. & Sur. Co. v. American Equity Ins. Co., 113 Cal. Rptr. 2d 613, 618 (Cal. Ct. App. 2001); Chester Carriers, Inc. v. National Union Fire Ins. Co., 767 A.2d 555, 562 (Pa. Super. Ct. 2001) (true excess policies are excess over any primary coverage, regardless of the nature of the other insurance clause in the primary policy); National Farmers Union Prop. & Cas. Co. v. Farm & City Ins. Co., 689 N.W.2d 619, 624 (S.D. 2004) (holding that the "great weight of authority" indicates that true excess policies are excess over all primary coverage regardless of the nature of the other insurance clauses in the respective policies.); National Surety Corp. v. Ranger Ins. Co., 260 F.3d. 881, 884 (8th Cir. 2001) (applying Iowa law) ("[A]n insurer that issued a 'true excess' or 'umbrella' policy is not liable for any portion of the loss until the primary insurer's policy limit has been exhausted, even if the primary

14

policy contains an other-insurance clause."); Monroe Guar. Ins. Co. v. Langreck, 816 N.E.2d 485, 492 (Ind. Ct. App. 2004) (Noting that numerous courts have held that "a true excess insurance policy is secondary in priority to a primary insurance policy," regardless of the nature of the other insurance clauses in the policy. "Indeed, it appears that not only is this the majority rule, but the practically universal rule in jurisdictions that have addressed this issue.");[8] North River Ins. Co. v. American Home Assurance Co., 257 Cal. Rptr. 129, 132 (Cal. Ct. App. 1989) ("An 'other insurance' dispute can only arise between carriers on the same level, it cannot arise between excess and primary insurers."); Travelers Cas. & Sur. Co. v. American Equity Ins. Co., 113 Cal. Rptr.2d 613, 618 (Cal. Ct. App. 2001) (Noting that it is "settled . . . that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until *all* of the primary insurance has been exhausted."); Insurance Co. of No. America v. American Economy Ins. Co., 746 F. Supp. 59, 62, 64 (W.D. Okla. 1990) (True excess policies are "sold at comparatively modest cost to pick up where primary coverages end, in order to provide an extended protection."  "[T]he trend in the law is to read true excess policies for what they are, regardless of their name and regardless of excess clauses found in primary policies that attempt to limit risk by proration with true excess policies. When viewed in this manner, it is clear to this Court that plaintiff's excess policy should not be touched until defendant's policy's limits have been exhausted."); Safeco Ins. Co. v. Automobile Club Ins. Co., 31 P.3d 52, 57-58 (Wash. Ct. App. 2001) (Primary policies are "the first line of defense in the event of an accident or injury."  A true excess policy is excess over all primary coverage regardless of the nature of the other insurance clauses in the policies.); Oelhafen v. Tower Ins. Co., 492 N.W.2d 321, 324 (Wis. Ct. App. 1992) (True excess policies are excess over all primary coverage regardless of the other insurance clauses in the policies, such policies "are not of the

---

[8] The court also noted that true excess policies  "give the security and peace of mind so necessary today where jury verdicts, or court awards, may be very substantial, to discharge the unexpected, but potentially bankrupting, judgment" and explained that the different premiums rates charged by true primary and true excess insurers  "generally also reflects the different function" served  by these different types of policies.  Id. at 494.

same character and they do not supply coverage at the same level."); Carrabba, 742 S.W.2d at 715 (noting the distinction between true excess policies and primary policies that attempt to limit a portion of the insurer's risk by including an excess other insurance clause and explaining that a true excess policy is one that is not, "dependant upon the existence or non-existence of any other primary policy" in order for its coverage to attach above dollar one.).

This rule has been followed by the New York courts. E.g., Home Ins. Co. v. Liberty Mut. Ins. Co., 678 F. Supp. 1066, 1069 (S.D.N.Y. 1988) (A true excess policy is excess over all primary coverage regardless of the other insurance clauses in the policies; the court said that the difference in premiums between true excess policies and primary policies is one reason for this rule.  The excess insurer's, "lower premium rates [sic] reflects the reduced risk incurred by the insurer."); State Farm Fire & Cas. Co. v. LiMauro, 481 N.Y.S.2d 90, 93-94 (App. Div. 1984) ("[P]arties to insurance contracts may well bargain for different or several tiers of excess coverage, rendering the general rule [that the priority of coverage between policies covering the same risk is determined by the other insurance clauses in the policies] inapplicable in those cases."  The court found the relative premium rates for the respective policies are a reason for holding that a true excess policy is excess over all primary coverage and said that use of the phrase, "ultimate net loss," (which is used in many of Plaintiffs' policies in the present case) demonstrated the true excess nature of the policy. Finally, the court said: "[F]orm should not be exalted over substance, and a functional analysis compels the conclusion that this policy in fact provided last resort coverage.").[9]

---

[9] This rule has also been followed by courts in Illinois, where Virginia Surety is incorporated and headquartered. E.g., American Country Ins. Co. v. Hanover Ins. Co., 689 N.E.2d 186, 190 (Ill. App. Ct. 1997) (Other insurance clauses are not relevant to the determination of the priority of coverage when the policies are on different levels; premiums are generally lower for true excess policies than primary policies and, therefore, "the two policies cannot be considered on the same level nor can the general rules regarding excess and escape clauses be applied."); Illinois Emcasco Ins. Co. v. Continental Cas. Co., 487 N.E.2d 110, 112 (Ill. App. Ct. 1985)  A true excess policy "in contrast to a primary policy that contains another [sic] insurance clause, has been recognized as providing unique and special coverage."  In true excess policies, "[t]he premium is comparatively small, for the size of the risk, so that the company cannot be expected to prorate with [primary policies with excess other insurance clauses] and public policy should not demand that this be done." Id. quoting 8A. Appleman, Insurance Law and Practice § 4906, at 348 (1981).  "For these reasons we believe that the two policies cannot be considered on the same level nor can the general rules regarding excess and escape clauses be applied.").

The leading insurance commentators also have noted that this is the generally applicable rule.  E.g., L. Russ and T. Segalla, Couch on Insurance, § 219:18 (3d ed. 2003) ("Because true excess insurance, which is written specifically to begin its coverage at a level well above the 'first dollar' of loss does not come into operation until the damage exceeds the maximum limitation of the primary policy, it does not constitute 'other insurance.'"); Couch on Insurance 3d, § 218:5 (2003) ("'Other insurance' clauses become relevant only where several insurers insure the same risk at the same level of coverage.  An 'other insurance' dispute cannot arise between primary insurers and true excess insurers."); 8A Appleman, Insurance Law & Practice, § 4909.85 at 455 (1981) (noting that true excess policies, "almost without dispute," are excess over all primary coverage).

One rationale for the rule that lower level policies must be exhausted, before upper level policies come into play, is because insurers that issue lower level policies assume more risk in return for higher premium payments, than insurers whose policies only attach at a higher level or coverage. E.g., Reliance Nat'l Indem. Co., 85 Cal. Rptr. 2d at 638-39 ("The risks involved in providing primary coverage are different from those involved in issuing an excess policy.  These differences are reflected in part by the premium cost. . . . The premium charged by the primary insurer supports more localized claims adjustment facilities than those of the excess carrier.  It takes into account costs of defense, including legal fees, which the primary carrier normally provides. . . . If we were to accept the arguments of [the primary carrier], the basic rules construing primary and excess policies would be altered.  A primary insurer would be allowed to charge a higher premium for insuring a greater risk; however, then the primary insurer would be allowed to shift the loss to an excess carrier which charged a lower premium.") (internal citations and punctuation omitted).

Stated another way, Virginia Surety cannot recover from Plaintiffs under a theory of equitable contribution, because Virginia Surety did not issue policies that were on the same level as the Plaintiffs' policies.  E.g., RLI Ins. Co. v. CNA Cas., 45 Cal. Rptr. 3d 667, 673 (Cal. Ct. App. 2006) ( "Equitable contribution allows for loss sharing among coinsurers that share the same level of liability on the same risk as to the same insured.") (internal citations and punctuation omitted); American Casualty Co. v. General Star Indem. Co., 24 Cal. Rptr. 3d 34, 41 (Cal. Ct. App. 2005) ("[T]here is no obligation of contribution between primary and excess insurers.  This is so because they are not in the same level of liability."); USF&G v. Federated Rural Elec. Ins. Co., 37 P.3d 828, 832 ("The doctrine [of equitable contribution] applies only when co-insurers have covered the same insured and the same particular risk at the same level of coverage. . . . Therefore two primary insurers will have the right of contribution from each other, but in the absence of an agreement there is generally no right of contribution between a primary and excess insurer, because they do not share a common obligation with common rights."  (collecting cases).

Likewise, Virginia Surety cannot recover from Plaintiffs on an equitable subrogation theory, both because an insurer has no right to subrogation when the insured has no basis for the claim (and here all of the insureds' defense and indemnity costs have been paid, so the insureds do not have any claim against the Plaintiffs) and because courts, "will not apply the doctrine of equitable subrogation to require an excess insurer to participate in the cost of the insured's defense prior to the exhaustion of the primary policy limits, even though the claim against [the] insured exceeds the primary insurer's policy limits."  USF&G v.Federated Rural Elec. Ins. Co., 37 P.3d at 830.

## VI. POLICIES, LIKE THE PLAINTIFFS' POLICIES THAT ARE AT ISSUE IN THIS CASE, THAT ARE WRITTEN ABOVE A SELF INSURED RETENTION AMOUNT, ARE TRUE EXCESS POLICIES

Although true excess, second layer, policies are often written above a specific primary policy, a true excess policy may also be written above a self insured retention amount, such as was

18

the case in the present situation (of course, in the present situation, the insureds also chose to, "buy back" the self insured retention by obtaining primary insurance from Virginia Surety). See, e.g., Couch on Insurance 3d, § 102:20 ( "Yet another type of policy which may come into play is the true 'excess' or 'umbrella' insurance policy which covers only losses that exceed a specified amount, and which specifically contemplates the co-existence of self insurance or a primary insurance policy covering losses below its threshold."); Couch on Insurance 3d, § 220:33 ("True excess insurance generally applies only where a loss exceeds a specified level of liability.  The specified level of liability may be expressed in terms of the obligation of the insured to maintain primary insurance at a specified amount, or, the obligation of the insured to self insure for up to a specified amount, called a 'retained level.'");  D. Wall, Litigation and Prevention of Insurance Bad Faith, §6:3 (2d ed. 2005) ("True excess liability insurance is written on the basis that underlying insurance will be obtained and continued.  Unlike liability insurance which would otherwise be primary and which becomes secondary only because of the fortuitous presence of other insurance, true excess insurance is dependent on the existence either of other liability insurance or of a self-insured retention, for which the insured is responsible.  The true excess liability insurer figures its risks and charges its premiums accordingly.").

In addition to these commentators, several cases have recognized that a true excess policy may be written above a self insured retention amount, as well as above a specific primary policy. For instance, in Travelers Indem. Co. v. American Cas. Co. of Reading, Pennsylvania, 786 N.E.2d 582 (Ill. Ct. App. 2003), the court held that an excess policy issued to a hospital was excess over a primary policy issued to nurses who were also insured under the hospital's excess policy.  The excess policy provided coverage that was in excess of a $500,000 self-insured retention. The court explained:

> Primary and excess policies inherently serve different functions, cover different risks and attach at different stages.  The primary policy typically covers claims starting at the first dollar of loss or the first in excess of a deductible or self-insured retention.  Coverage under an

19

> excess policy is triggered after the limits of the primary policy have been exhausted.  In some instances, the excess policy sits above a self-insured retention, instead of an underlying policy. . . . A policy that provides primary coverage in all respects cannot be considered on the same level as an umbrella excess policy.  In analyzing whether a policy is truly an excess policy, we must not focus solely on the other insurance clauses, but must construe the policies as a whole and review the underlying policy considerations.

Id. at 586.  (internal citations and punctuation omitted.)

In holding that the Travelers excess policy did not come into play until the primary policy issued to the nurses was exhausted, the court explained:  "Here the Travelers excess policy meets all the criteria for an umbrella excess policy . . . the Travelers excess policy is not intended to pay the first dollar of loss.  Rather, the policy is triggered after the self-insured retention limit . . . is reached.  Moreover, the premium for the Travelers excess policy is comparatively smaller than the premium for the Travelers primary policy.  The premium for the first $300,000 [sic] of coverage under the Travelers primary policy was $78,820.   The premium for the Travelers excess policy, which provided $10 million of coverage was $59,977.  This disparity of premiums is indicative of the reduced risk assumed by the excess policy."  Id. at 587 (internal citations and punctuation omitted.).  See also, Monroe Guaranty Ins. Co. v. Langreck, 816 N.E.2d 485, 493-94 (Ind. Ct. App., 2004) (policy written over a self insured retention amount was a true excess policy that was excess over primary, first dollar coverage);  Griewahn v. United States Fidelity & Guaranty Co., 827 N.E.2d 341, 347 (Ohio Ct. App. 2005) (in connection with a discussion of what is a true excess policy, the court, quoted Tscherne v. Nationwide Mut. Ins. Co., 2003 WL 22724630 (Ohio Ct. App. 2003), for the proposition that, "the first layer of coverage above an SIR is sometimes described as 'excess insurance'"); Pacific Employer's Ins. Co. v. Domino's Pizza, Inc., 144 F.3d 1270, 1276-77 (9th Cir. 1998) ("It is well recognized that self insured retentions are the equivalent of primary liability insurance, and that policies which are subject to self insured retentions are 'excess policies' which have no duty to indemnify until the self insured retention is exhausted."); National Union Ins. Co. v. Lawyers Mut. Ins. Co., 885 F. Supp. 202, 206 (S.D. Cal. 1995) (policy written over self-insured

retention amount is a true excess policy and other insurance clauses are therefore not relevant to the determination of the priority of coverage between the true excess policy and a primary policy); Seats Inc. v. Nutmeg Ins. Co., 504 N.W.2d 613 (Wis. Ct. App. 1993) (policy written over a SIR was a true excess policy).

## VII.    CONCLUSION

Because the NUFIC and Lexington policies were written on a higher level than the primary, first dollar, policies that were issued by Virginia Surety, under the well established law that a true excess policy is excess over all primary coverage, the NUFIC and Lexington policies do not come into play until the Virginia Surety policies are exhausted by the payment of $250,000 per occurrence in indemnity costs.  Therefore, the court should allow the Plaintiffs' motion for summary judgment and deny Virginia Surety's motion for summary judgment.

**Dated:**    September 29, 2006                    Respectfully submitted,


                                                  /s/ Robert J. Maselek
                                                  Mark E. Cohen          [BBO #089800]
                                                  Robert J. Maselek      [BBO #564690]
                                                  Gerald S. Frim         [BBO #656204]
                                                  **The McCormack Firm**
                                                  One International Place - 7th Floor
                                                  Boston, MA     02110
                                                  (617) 951-2929 Phone
                                                  (617) 951-2672 Fax

                                                  ***Attorneys for Plaintiffs,***
                                                  ***Lexington Insurance Company and National***
                                                  ***Union Fire Insurance Company of Pittsburgh, PA.***

### Certificate of Service

I, Gerald S. Frim, hereby certify that I have served this document and all exhibits thereto by hand upon counsel of record and that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 29, 2006.

/s/ Gerald S. Frim                              Dated: September 29, 2006
85370.1