**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **LEXINGTON INSURANCE COMPANY AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,**<br>                              Plaintiffs<br><br>v.<br><br>**VIRGINIA SURETY COMPANY, INC.,**<br>                              Defendant. | **CIVIL ACTION NO.<br>04-11109 RGS** |

**STATEMENT OF UNDISPUTED FACTS OF PLAINTIFFS, LEXINGTON INSURANCE COMPANY AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

_____

The following constitutes the statement of undisputed facts in this matter of the Plaintiffs, Lexington Insurance Company ("Lexington") and National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("NUFIC"), in support of their Motion for Summary Judgment:

1. NUFIC is a New York corporation, with its principal place of business in New York. It is licensed by the New York State Insurance Department to engage in the business of liability insurance.

    Supporting Evidence:  Affidavit of John B. Gould, ¶ 2.

2. Lexington is a Delaware corporation, with its principal place of business in Massachusetts.

    Supporting Evidence:  Affidavit of John B. Gould, ¶ 3.

3.  Risk Specialists Company of New York ("Risk Specialists") is a sister company of NUFIC and Lexington. All three of these companies are members of the American International Group. Risk Specialists is a New York corporation with its principal place of business in New York. It is licensed to do business as an insurance broker and engages in the business of acting as a surplus and excess lines broker for NUFIC and Lexington and other members of the American International Group.
    Supporting Evidence:  Affidavit of John B. Gould, ¶ 4.

4.  Virginia Surety Company ("Virginia Surety') is an Illinois corporation which has its principal place of business in Illinois.
    Supporting Evidence: Answer of Virginia Surety to Complaint,  ¶ 4. (**Exhibit G**)

5.  In May 2000, Dowd and Associates ("Dowd"), an insurance broker, approached Risk Specialists with a submission requesting that a liability insurance policy be issued on behalf of a company called AIMCO. AIMCO owns and/or manages several hundred thousand apartment units throughout the United States. Risk Specialists, on behalf of NUFIC, declined to issue AIMCO primary, first dollar, coverage, but instead offered to write excess coverage with limits of liability of $1 million and an attachment point of $250,000. The proposed NUFIC policy gave AIMCO the option of either self insuring the first $250,000 in defense and indemnity costs or else obtaining primary insurance coverage to "buy back" the self insured retention amount.
    Supporting Evidence:  Affidavit of Charles Messery, ¶ 2.

6.  Shortly after the AIMCO submission by Dowd, Risk Specialists was contacted by First Capital Group ("First Capital"), another wholesale insurance broker located in New York,

which had taken over the submission from Dowd. First Capital renegotiated the submission with Risk Specialists, so that coverage would be issued by NUFIC to the National Coalition of Property Owners and Managers/Insurance Purchasing Group Association ("NCPO"). This association consisted of hundreds of property owners, in addition to AIMCO.

Supporting Evidence: Affidavit of Charles Messery, ¶ 3.

7.  NCPO accepted NUFIC's proposal and, beginning in May 2000, NUFIC issued several insurance policies to NCPO and its members at NCPO's office in New York City. Although these policies were issued by NUFIC, the policies were marketed and underwritten by Lexington and Lexington was responsible for handling the claims covered by the NUFIC policies. Under the terms of these NUFIC "program policies," NUFIC did not assume any duty to defend or to indemnify the insureds until $250,000 in defense and indemnity costs was incurred. A specimen copy of the policies issued by NUFIC to NCPO and its members is attached as **Exhibit A.**

    Supporting Evidence: Affidavit of Charles Messery, ¶ 4; Affidavit of John B. Gould, ¶ 5.

8.  All of the NUFIC "program policies" policies included a Self Insured Retention endorsement which provides that::

    [NUFIC's] obligation, under the coverages provided by this policy, to pay "Ultimate Net Loss" on behalf of the "Insured," applies only to the "Ultimate Net Loss" in excess of the Self Insured Retention stated below, and subject to the Limits of Liability stated in the policy. The terms of this policy, including with respect to our rights and duties with respect to defense of suits apply in excess of the application of the Self Insured Retention amount.

    A sample of this type of Self Insured Retention Endorsement is included as part of **Exhibit B.**

    Supporting Evidence: Affidavit of Charles Messery, ¶ 4; Affidavit of John B. Gould, ¶ 6.

9. Beginning in May 2000, Virginia Surety also issued first dollar, primary, general liability policies to various members of NCPO. All of the Virginia Surety policies are subject to limits of liability of $250,000 per occurrence, with defense costs outside of and in addition to the policies' limits of liability. Virginia Surety used the same policy form for each insured. A specimen copy of the Virginia Surety policies that are at issue in this case is attached hereto as **Exhibit E**.

   <u>Supporting Evidence</u>: Counterclaim of Defendant Virginia Surety, ¶ 6 (**Exhibit G**); Deposition of Wayne J. Baliga, (**Exhibit H**), p. 14, lines 3-20, p. 18, lines 2-6; Deposition of John Goring, (**Exhibit I**), p. 19, lines 11-19.

10. The Virginia Surety policies all provide that Virginia Surety:

    > Will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .
    >
    > (2) Our right and duty to defend ends when we have used up the applicable limit of insurance [i.e., $250,000] in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

    <u>Supporting Evidence</u>: Counterclaim of Defendant Virginia Surety, ¶ 6 (**Exhibit G**); Deposition of Wayne J. Baliga, (**Exhibit H**), p. 14, lines 3-20, p. 18, lines 2-6; Deposition of John Goring, (**Exhibit I**), p. 19, lines 11-19; p. 22, lines 16-24; p. 23, lines 1-14, p. 26, lines 5-10.

11. **Exhibit F** contains a Virginia Surety endorsement that would have placed defense costs and expenses within the limits of liability of the Virginia Surety policies. This endorsement, however, was not used on any of the Virginia Surety policies that are at issue in this case. Virginia Surety could not make this endorsement part of any policies because it was not approved for use by any state.

<u>Supporting Evidence</u>: Deposition of Wayne J. Baliga (**Exhibit H**), p. 105, lines 12-24, p. 106, lines 1-24, p. 107, lines 1-15; Deposition of John Goring, (**Exhibit I**), p. 25, lines 4-24; p. 27, lines 16-24; p. 28, lines 17-20.

12. The Virginia Surety policies were administered by an insurance broker, National Program Services, Inc. ("NPS"). Pursuant to a written agreement with Virginia Surety, NPS served as Virginia Surety's Managing General Agent in connection with these policies. NPS collected premiums from the insureds for both the Virginia Surety and the NUFIC policies and NPS paid the NUFIC premiums to First Capital, which was also located in New York. First Capital, in turn, paid the premiums to NUFIC. NPS routinely called this arrangement the NCPO "program."

    <u>Supporting Evidence</u>:  Affidavit of Charles Messery, ¶ 5;  Deposition of Wayne J. Baliga (**Exhibit H**), p. 146, lines 5-20; p. 147, lines 6-9.

13. When the first NUFIC policy was issued to NCPO on May 31, 2000, the NUFIC premium, for a second layer of insurance with limits of liability of $1,000,000 per occurrence, was approximately 12 percent of the amount of the Virginia Surety premiums for policies covering the same insureds, even though the Virginia Surety policies had limits of liability of $250,000 per occurrence. The premiums for the NUFIC policies issued on July 1, 2000 and August 1, 2000 also totaled approximately 12 percent of the Virginia Surety premiums. From September 1, 2000 through December 2000, NUFIC charged a premium based on a flat rate per apartment unit insured. These premiums were also far less than the Virginia Surety premiums for the policies that were issued to the same insureds.

    <u>Supporting Evidence</u>: Affidavit of Charles Messery, ¶ 6.

14. In mid-2002, NUFIC ceased issuing policies as part of the NCPO program. Thereafter, NUFIC and Lexington issued certain "post program" policies directly to various former members of NCPO. Like the NUFIC program policies, the NUFIC and Lexington post-program policies did not provide first dollar coverage, but instead were written over a $250,000 per occurrence self-insured retention amount and had limits of liability of $1 million. Many of the Lexington post-program policies were written as "Stand-Alone Excess Policies." A specimen copy of the Lexington Stand-Alone Excess Policy form is attached hereto as **Exhibit C**. Specimen copies of Self Insured Retention Endorsements used by NUFIC and Lexington in the "post program policies" are attached hereto as **Exhibit D**.
    <u>Supporting Evidence</u>: Affidavit of Charles Messery, ¶ 7; Affidavit of Jack B. Gould, ¶ 8.

15. All of the NUFIC and Lexington "post-program" policies included a self insured retention endorsement which contained one of the following clauses:

    > [NUFIC's] obligation, under the coverages provided by this policy, to pay damages, DEFENSE COSTS AND CLAIM EXPENSES, applies only to damages in excess of the Self Insured Retention stated below, and subject to the applicable Limit of Insurance, stated in this policy. The terms of this policy, including with respect to our rights and duties with respect to defense of "suits" apply in excess of the application of the Self Insured Retention amount.
    >
    > or
    >
    > [NUFIC's] obligation, under the coverages provided by this policy, to pay "Ultimate Net Loss" on behalf of the "Insured," applies only to the "Ultimate Net Loss" in excess of the Self Insured Retention stated below, and subject to the Limits of Liability stated in the policy. The terms of this policy, including with respect to our rights and duties with respect to defense of suits apply in excess of the application of the Self Insured Retention amount.
    >
    > or
    >
    > The LIMITS OF INSURANCE as set forth in Item 3 of the Declarations shall apply excess of a Self-Insured Retention (hereafter referred to as the "Retained Limit") in the amount of: $250,000 each "occurrence"and you agree to assume the Retained Limit. . . . "We" do not have the duty to investigate or defend any "occurrence," claim or "suit" unless and until the Retained Limit is exhausted with respect to that "occurrence," claim or "suit."

Samples of these three types of Self Insured Retention Endorsements are attached as part of **Exhibit D**.

Supporting Evidence: Affidavit of John B. Gould, ¶ 8.

16. Numerous claims have been made against the insureds under the Virginia Surety, NUFIC and Lexington policies. In connection with some of these claims, Virginia Surety asserts that it has expended in excess of $250,000 in defense and indemnity costs.

    Supporting Evidence: Affidavit of Elizabeth Viscione, ¶ 3; Counterclaim of Defendant Virginia Surety, ¶ 11 (**Exhibit G**).

17. From June 2000 until at least December 2002, Virginia Surety paid all defense costs in claims made against its insureds under the program policies and post-program policies, until $250,000 per occurrence in indemnity costs were incurred. During this period of time, Virginia Surety made no demand on NUFIC or Lexington for reimbursement of any costs.
    Supporting Evidence: Affidavit of Elizabeth Viscione, ¶ 4.

18. Virginia Surety, in its Counterclaim, contended that once it has paid $250,000 in defense and indemnity costs combined for any given claim under a program policy or post-program policy, for an insured covered by its policy and either a NUFIC or a Lexington policy, it and NUFIC or Lexington are co-primary insurers, and NUFIC or Lexington has to share with Virginia Surety the responsibility of paying additional defense and indemnity costs, from that point forward. In discovery in this case, however, Virginia Surety now has taken the position that once it has paid $250,000 in defense and indemnity costs combined for any given occurrence under a program policy or post-program policy, for an insured covered by its policy and either a NUFIC or a Lexington policy, Virginia Surety's obligations to its

policyholders are extinguished, and NUFIC or Lexington then becomes responsible to pay 100 percent of defense and indemnity costs incurred from the time Virginia Surety paid the $250,000.

Supporting Evidence: Counterclaim of Defendant Virginia Surety, ¶ 21 (**Exhibit G**); Deposition of Wayne J. Baliga (**Exhibit H**), p. 28, lines 22-24; p. 29, lines 1-5; p. 30, lines 21-24; p. 31, lines 1-3; p. 32, lines 13-22.

Dated:   September 29, 2006

Respectfully submitted,

*Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA*
by their attorneys,

 /s/ Robert J. Maselek
| Mark E. Cohen | [BBO #089800] |
| Robert J. Maselek | [BBO #564690] |
| Gerald S. Frim | [BBO #656204] |

THE MCCORMACK FIRM, LLC
One International Place - 7th Floor
Boston, MA   02110
Phone:   (617) 951-2929
Fax:   (617) 951-2672
E-mail:   mcohen@mccormackfirm.com

### Certificate of Service

I, Gerald S. Frim, hereby certify that I have served this document and all exhibits thereto by hand upon counsel of record and that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 29, 2006.

/s/ Gerald S. Frim                              Dated: September 29, 2006

89250.1