### UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF MASSACHUSETTS

LEXINGTON INSURANCE COMPANY AND NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH,

                Plaintiffs

v.

VIRGINIA SURETY COMPANY, INC.,

                Defendant.

CIVIL ACTION NO. 04-11109 RGS

### AFFIDAVIT OF CHARLES J. MESSERY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF PLAINTIFFS, LEXINGTON INSURANCE COMPANY AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

—————————————————————

I, Charles J. Messery, upon oath depose and state as follows:

1.      From before May 1, 2000 until after July 2002, I was employed as an underwriter at Risk Specialists Company of New York ("Risk Specialists"), located in New York City, New York. As part of my job duties at Risk Specialists, I was responsible for negotiating and underwriting a series of policies issued by National Union Insurance Company of Pittsburgh, PA ("NUFIC") and Lexington Insurance Company ("Lexington"), that were issued to the National Coalition of Property Owners and Managers/Insurance Purchasing Group Association and its members.

2.      In May 2000, Dowd and Associates ("Dowd"), an insurance broker, approached Risk Specialists with a submission requesting that a primary liability insurance policy with limits

of liability of $1,000,000 per occurrence be issued on behalf of a company called AIMCO. AIMCO owns and/or manages several hundred thousand apartment units throughout the United States.  Risk Specialists, on behalf of NUFIC, declined to issue AIMCO primary, first dollar, coverage, but instead offered to write excess coverage with limits of liability of $1 million and an attachment point of $250,000.  The proposed NUFIC policy gave AIMCO the option of either self insuring the first $250,000 in defense and indemnity costs or else obtaining primary insurance coverage to "buy back" the self insured retention amount.

3.     Shortly after the AIMCO submission by Dowd, Risk Specialists was contacted by First Capital Group ("First Capital"), another wholesale insurance broker located in New York, which had taken over the submission from Dowd.  First Capital renegotiated the submission with Risk Specialists, so that coverage would be issued by NUFIC to the National Coalition of Property Owners and Managers/Insurance Purchasing Group Association ("NCPO"). This association consisted of hundreds of property owners, in addition to AIMCO.

4.     NCPO accepted NUFIC's proposal and, beginning in May 2000, NUFIC issued several insurance policies to NCPO and its members at NCPO's office in New York City.   Under the terms of these NUFIC "program policies," NUFIC did not assume any duty to defend or to indemnify the insureds until $250,000 in defense and indemnity costs was incurred.  A specimen copy of the policies issued by NUFIC to NCPO and its members is attached as **Exhibit A**.

5.     Soon after the first NUFIC policy was issued to NCPO, I discovered that NCPO had "bought back" coverage for the NUFIC policies' self-insured retention from Virginia Surety Company ("Virginia Surety").  Beginning in May 2000, Virginia Surety issued first dollar, primary,

2

general liability policies to various members of NCPO, with limits of liability of $250,000 per occurrence. The Virginia Surety policies were administered by an insurance broker, National Program Services, Inc. ("NPS"), which served as Virginia Surety's Managing General Agent in connection with these policies. NPS collected premiums from the insureds for both the Virginia Surety and the NUFIC policies and NPS paid the NUFIC premiums to First Capital, which was also located in New York. First Capital, in turn, paid the premiums to NUFIC. NPS routinely called this arrangement the NCPO "program."

6.    When the first NUFIC policy was issued to NCPO on May 31, 2000, the NUFIC premium, for a second layer of insurance of $1,000,000 per occurrence, was approximately 12 percent of the amount of the Virginia Surety premiums for policies covering the same insureds with a limit of $250,000 per occurrence. The premiums for the NUFIC policies issued on July 1, 2000 and August 1, 2000 also totaled approximately 12 percent of the Virginia Surety premiums. From September 1, 2000 through December 2000, NUFIC charged a premium based on a flat rate per apartment unit insured. These premiums were also far less than the Virginia Surety premiums.

7.    In mid-2002, NUFIC ceased issuing policies as part of the NCPO program. Thereafter, NUFIC and Lexington issued certain "post program" policies directly to various former members of NCPO. Like the NUFIC program policies, the NUFIC and Lexington post-program policies did not provide first dollar coverage, but instead were written over a

3

$250,000 self-insured retention amount and had limits of liability of $1 million.  Many of the Lexington post-program policies were written as "Stand-Alone Excess Policies."

SIGNED UNDER THE PENALTIES OF PERJURY this 27th day of September, 2006.

_____

_____

_____/s/ Charles J. Messery_____
Charles J. Messery

STATE OF NEW YORK
COUNTY OF_____, ss.

Subscribed and sworn to before me, under the penalties of perjury, this _____ day of _____, 2006.

_____
Notary Public
My Commission Expires: _____

4