UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LEXINGTON INSURANCE COMPANY and
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,

      Plaintiffs,

v.

VIRGINIA SURETY COMPANY, INC.

      Defendant.

Civil Action No. 04-11109 RGS

## VIRGINIA SURETY COMPANY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Virginia Surety Company, Inc. ("Virginia Surety" or "VSC") submits this memorandum in support of its motion for summary judgment as to all claims of plaintiffs Lexington Insurance Company ("Lexington") and National Union Fire Insurance Company of Pittsburgh ("NUFIC") (collectively, "AIG") and as to Count I of its Counterclaim (Declaratory Judgment).[1/]  In this insurance coverage dispute, VSC seeks a declaration that (a) AIG must pay 100% of all sums paid by or on behalf of its policyholders above the $250,000 self-insured retention in its policies or, alternatively, that (b) AIG must share equally with VSC with respect to all such expenses in accordance with the "other insurance" clauses of the AIG policies and up to the respective limits of the parties' policies.

## INTRODUCTION

Virginia Surety and AIG each wrote primary-level commercial general liability

---

[1/]    VSC also brings counts for contribution, subrogation and indemnification for amounts that it has already paid to the parties' common insureds, but that should have been paid by AIG.  If the Court renders declaratory judgment in either party's favor, the parties should be able to resolve any remaining issues through a straightforward accounting.

insurance policies to the members of a nationwide group of residential property owners as part of a coordinated insurance purchasing program set up and administered by a New Jersey insurance broker, National Program Services, Inc. ("NPS") ("the NPS Program"). Both the AIG policies and the VSC policies issued in connection with the NPS Program are written on virtually identical **primary** "Commercial General Liability" ("CGL") forms.  The AIG policies have per-occurrence limits of $1 million but impose on the policyholder a $250,000 self-insured retention ("SIR"), with defense costs within the retention, essentially a large deductible.  Because the NPS Program participants would not accept such a large SIR in the primary layer of insurance, NPS arranged to have VSC issue policies with a $250,000 limit.

The VSC policies were intended solely to insure the amounts within the SIR, with AIG covering all sums incurred excess of the SIR.  AIG was unaware of the terms and conditions of the VSC policies at the time it agreed to participate in the NPS Program.  AIG had no communications with VSC before issuing its policies, and none of the AIG policies mention VSC.  When it issued its policies and established its premium, AIG knew only that it would be responsible for all sums above $250,000 incurred in connection with claims against the program participants.  The issue in dispute is whether AIG is required by the express terms of its policies to contribute to the defense and indemnity of the parties' common insureds when the $250,000 self-insured retention amount in its policies is satisfied, or whether its policies apply only after exhaustion of the VSC policies' indemnity limits through payment of settlements or judgments.

AIG seeks a declaration – contrary to the express language of its policies, the history, structure and intent of the NPS Program, the intent of the parties to the insurance contracts, and the applicable case law – that its policies are so-called "true excess" policies that are not

triggered until the exhaustion of the indemnity limits of the VSC policies, regardless of whether the $250,000 SIR in the AIG policies has been satisfied. The impact of AIG's position is to absolve AIG of any responsibility for the defense of the parties' common insureds and to convey a massive windfall on AIG at VSC's (and the policyholders') expense.

The plain and unambiguous language of the AIG policies and the undisputed material facts establish that AIG's policies are not "true excess" policies, but primary insurance written on a standard primary CGL form (with the characteristic "right and duty to defend" language), subject only to a $250,000 SIR. The express terms of AIG's policies require AIG to pay the total amount incurred by or on behalf of a policyholder in the defense and settlement of claims (*i.e.*, the "Ultimate Net Loss") that exceeds the $250,000 SIR. The policies do not state that they are excess policies, do not state that they are excess over *any* other policy (much less over a VSC policy), and do not contain a Schedule of Underlying Insurance identifying and requiring the maintenance and exhaustion of any underlying insurance. In short, in addition to expressly stating that they are primary policies written on a standard primary CGL form, the AIG policies bear none of the hallmarks of excess or umbrella coverage.

Ignoring these facts, and seeking to take advantage of fortuitous rulings (from AIG's standpoint) by certain state insurance regulators that required VSC to place defense costs outside of its indemnity limits, AIG refuses to perform its NPS Program obligations by paying all defense and indemnity expenses to the extent that they exceed the $250,000 SIR in the AIG policies. AIG seeks a declaration effectively re-writing the policies and completely changing the structure and intent of the NPS Program to limit its obligations to those of an excess insurer sitting over an identified and required underlying primary insurance policy.

3

Unfortunately for AIG, it did not write such a policy and, in fact, could not have sold such a policy because NPS made it clear at the outset that the use of such an excess policy was unacceptable to its program participants.

Application of the plain and unambiguous language of the policies in the context of the NPS Program requires AIG to pay all sums in excess of its SIR. At a minimum, the clear and unambiguous language of the "other insurance" clauses in the AIG and VSC policies requires AIG to share equally with VSC all expenses paid by VSC beyond the AIG SIR. Simply put, to the extent that application of the two policies by their terms results in overlapping coverage obligations, AIG cannot avoid its obligations by pointing to the VSC policy any more than VSC could avoid its obligations by pointing to the AIG policy. To the contrary, AIG must either pay the full amount of loss above the SIR, in accordance with the express terms of its policies and what all parties understood to be the intent of the NPS Program, or (at a minimum) share equally with VSC all such expenses to the full extent of the parties' respective policy limits, as set forth in the "other insurance" clauses.

Thus, Virginia Surety is entitled to summary judgment against AIG for at least four reasons: (1) the AIG policies at issue are by their terms primary insurance policies; (2) the plain language of AIG's policies requires it to pay for or at least contribute to claim expenses in any case involving any combination of defense and/or indemnity expenses greater than $250,000; (3) the intent of the parties as expressed through their policies, interpreted and applied in the context of the NPS Program for which they were written, was that AIG would pay all expenses incurred above the SIR; and (4) finding that AIG has no obligation even after its SIR is satisfied would unfairly provide it with a windfall at the expense of Virginia Surety and AIG's premium-paying policyholders. For these reasons, VSC is entitled to summary judgment as a matter of law.

## BACKGROUND

### The Parties

Virginia Surety is an admitted insurance carrier affiliated with Aon Corporation. Both Lexington and NUFIC are members of the AIG family of insurance Companies. *See* June 8, 2006 Rule 30(b)(6) Deposition of AIG By and Through William R. Eddows, Esq. ("Eddows Dep.") at 12.[2]

### The NPS Program

National Program Services, Inc. ("NPS") is a New Jersey insurance broker. *See* Eddows Dep. at 154. In the late 1990s, NPS set up and administered a specialty insurance program that provided commercial general liability insurance to owners and managers of multi-unit residential housing projects (the "NPS Program"). *See* July 14, 2006 Deposition of John Goring ("Goring Dep.") at 60-62;[3] August 1, 2006 Rule 30(b)(6) Deposition of AIG By and Through John B. Gould ("Gould Dep.") at 17-18.[4] The purpose of such specialty insurance programs is to permit program participants to obtain coverage on more favorable terms. *See* July 31, 2006 Deposition of Charles J. Messery ("Messery Dep.") at 21-22.[5] Prior to 2000, the entire primary layer of the NPS Program was underwritten by Chicago Insurance Company ("Chicago Insurance"). *See* Goring Dep. at 60-62. The policies issued by Chicago Insurance were primary commercial general liability policies with a $1 million per-occurrence limit. Goring Dep. at 62. AIG wrote excess coverage above the

---

[2]    The cited potions of the Eddows Dep. are attached to the Affidavit of Nicholas C. Cramb, Esq., filed herewith ("Cramb Aff."), as **Exhibit A.** Mr. Eddows is claims counsel for Lexington Insurance Company. He was designated under Fed. R. Civ. P. 30(b)(6) to testify on behalf of both plaintiffs.

[3]    The cited portions of the Goring Dep. are attached to the Cramb Aff. as **Exhibit C.**

[4]    The cited portions of the Gould Dep. are attached to the Cramb Aff. as **Exhibit F.**

[5]    The cited portions of the Messery Dep. are attached to the Cramb Aff. as **Exhibit B.** Mr. Messery is a former employee of Lexington Insurance Company or, more specifically, an entity named Risk Specialist Company of New York, which is a wholly-owned subsidiary of Lexington. *See* Messery Dep. at 11, 14. Mr. Messery was the underwriter initially involved setting up the program for AIG (*see id.* at 24-25); he negotiated AIG's original policies and oversaw the issuance of all other related policies in the program. *See id.* at 20.

Chicago Insurance policies for certain of the NPS Program participants. *See, e.g.,* Specimen Copy of a NUFIC Commercial Umbrella Liability Policy ("Specimen AIG Umbrella Policy"), attached to the Cramb Aff. at **Exhibit D**, at Schedule of Underlying Insurance (last page). Chicago Insurance was the only insurer involved in the primary layer of the NPS Program and provided the program participants with "first-dollar" coverage (*i.e.,* there was no deductible or self-insured retention in the Chicago Insurance policies). *See* Specimen AIG Umbrella Policy at Schedule of Underlying Insurance; Goring Dep. at 62. First-dollar coverage was a particularly important feature of the NPS Program because the nature of the risk – multi-unit residential properties – exposes property owners and managers to numerous small claims (*e.g.,* slip-and-falls), the costs of which would need to be borne by the policyholder in the absence of insurance. See Messery Dep. at 37-38, 41; Eddows Dep. at 46-47. At some point in or around 2000, Chicago Insurance informed NPS that upon the lapse of its outstanding policies it would no longer participate in the NPS Program. *See* Goring Dep. 61-62. Thus, in order to preserve the program, NPS needed to find another insurer to write the million-dollar policy with first-dollar coverage previously supplied by Chicago Insurance.

### AIG Involvement In The NPS Program

After learning of Chicago Insurance's planned departure from the NPS Program, NPS sought to find a replacement carrier to provide primary insurance coverage for the NPS Program insureds. *See* July 13-14, 2006 Rule 30(b)(6) Deposition of Virginia Surety By and Through Wayne Baliga ("Baliga Dep.") at 66-67.[6/] Through two brokers, Rob Dowd and Associates and later First Capital, NPS approached AIG (Lexington) and asked if it would write a $1 million primary commercial general liability policy for the NPS Program. *See*

---

[6/]     The cited portions of the Baliga Dep. are attached to the Cramb Aff. as **Exhibit E**.

Messery Dep. at 29, 34, 39. The brokers acted first on behalf of Apartment Investment and Management Company ("AIMCO"), the largest property manager participating in the NPS Program,[7/] and then for the National Coalition of Property Owners "(NCOPO"), a group of similar type insureds - property owners - with no financial relationship who buy insurance collectively. *See* Eddows Dep. at 14, 18; Messery Dep. at 21-22. In this way, NPS sought to substitute AIG for Chicago Insurance in the primary layer of program (*i.e.*, to provide a $1 million primary insurance policy under which the NPS Program insureds would have insurance from the first dollar of any loss). *See* Messery Dep. at 34-35; Eddows Dep. at 45. AIG refused to underwrite the entire $1 million amount because it did not want to be responsible for the claims operation necessary to handle the large number of relatively small claims expected in such a program. *See* Messery Dep. at 37-38, 41; Eddows Dep. at 46-47. Instead, AIG offered to provide a $1 million per-occurrence primary CGL policy subject to a $250,000 self-insured retention. *See id.* With this retention, AIG sought to insulate itself from large numbers of small claims while providing the policyholder substantial coverage for large or catastrophic claims. *See id.* Significantly, at the time AIG made this proposal, and indeed at the time it established its premium charge and issued its first policy, it was unaware of VSC's participation in the NPS Program. *See* Eddows Dep. at 51-53, 122-123. Although it suspected that policyholders might seek to insure the SIR, such insurance was not required and AIG knew nothing about the terms and conditions of any such policy, including the VSC policy that ultimately was issued. *See id.* AIG and VSC had no communications with each other concerning their participation in the NPS Program until after both of their policies were in place. *See* Baliga Dep. at 121-122. The AIG policy is clear, however, that

---

[7/]     In fact, AIMCO is the nation's largest owner and operator of apartment communities, with nearly 1,370 communities including approximately 240,000 units all over the country. *See* http://www.aimco.com/ CorporateInformation.

AIG's obligation to defend and pay claims in the NPS Program is subject only to satisfaction of the SIR.

According to Charles Messery, the AIG underwriter responsible for AIG's participation in the NPS Program, AIG would have preferred to write the policy using an *excess* insurance form that would have made AIG's obligations excess over any other insurance that a policyholder might purchase. *See* Messery Dep. at 54-55. AIG was unable to do so, however, because NPS and the policyholders would not accept anything but a primary insurance policy form. *See* Messery Dep. at 55-57. Because the insureds refused to accept an excess policy, AIG issued a primary CGL insurance policy subject only to the SIR. *See id.*

Thus, when Lexington began writing policies in the NPS Program on June 1, 2000 all of the program policies were written on a NUFIC[8/] standard-form primary commercial general liability form (the "AIG Policies"[9/]). *See* Eddows Dep. at 17-18, 152-153, 167. Each of the AIG Policies included an endorsement providing it was subject to a $250,000 self-insured retention, expressly including expenses (*i.e.*, both indemnity and defense expenses would erode the retention). *See* Eddows Dep. at 48, 66. Thereafter, AIG issued a new, but virtually identical, policy each month to account for the addition and subtraction of insured entities in the program. *See id.* at 63-64, 152-153.

### Virginia Surety's Involvement in the NPS Program

After NPS learned that AIG would only write a policy with a large self-insured

---

[8/]     NUFIC was only involved in the NPS Program to the extent that the AIG Policies were written on its paper. *See* Eddows Dep. at 40. The results of the program are applied to Lexington's profit center and Lexington's management is responsible for the program. *See id.* at 40-41.

[9/]     "AIG Policies," as used herein, refers to all of the policies that AIG issued in the NPS Program and any AIG policy issued to individual insureds after its cancellation that was written on the same or substantially similar commercial general labiality form.

retention, NPS had a problem: to continue the program business, it needed an insurer that would write a $1 million primary CGL policy to replace the lapsing Chicago Insurance policies. Moreover, that coverage had to be first-dollar coverage. The solution devised by NPS was to find an insurer willing to write a $250,000 first-dollar policy insuring amounts within the AIG SIR. *See* Baliga Dep. at 76. The combination of these two policies would effectively substitute for the single $1 million CGL policy issued by Chicago Insurance. Thus, in September 2000, NPS approached VSC, explained the NPS Program and the situation confronted by NPS as a result of AIG's underwriting decisions, and asked Virginia Surety to insure the retained amounts in the AIG policies by writing first-dollar coverage up to a $250,000 limit. *See* Baliga Dep. at 67, 69.

Virginia Surety agreed to participate and appointed NPS as its Managing General Agent with authority to place Virginia Surety policies (the "VSC Policies") covering the $250,000 self-insured retention in the AIG Policies. *See* Baliga Dep. at 145-146. VSC's original understanding and its agreement with NPS was that VSC's total liability for any one occurrence would be capped at $250,000, including defense costs (*i.e.*, the same amount as the AIG SIR). *See* Baliga Dep. at 79-80. To that effect, VSC included an endorsement in its policy that placed defense costs within its limits and authorized NPS to issue VSC policies only if they that contained that endorsement. *See* Baliga Dep. at 106-111. In this way, the NPS Program would work with two policies essentially in the same manner as with the single Chicago Insurance policy. Since defense and indemnity costs would simultaneously erode both AIG's SIR and VSC's limits, the VSC policy would serve to satisfy the policyholders' SIR obligations. AIG's policy would pay amounts above the retention and the policyholder would thus effectively get the benefit of $1 million of first-dollar coverage. AIG also

continued to write excess and umbrella coverage over the AIG primary policy. *See* Eddows Dep. at 75-76.

A problem arose when VSC submitted its policy form for approval by state regulators; certain regulators would not approve a $250,000 primary CGL policy form that included defense costs within limits. *See* Baliga Dep. at 108-110. Thus, the endorsement placing defense costs within the VSC limits could not be used by NPS. Goring Dep. at 27. Although VSC wrote its policies with defense costs outside of limits, it was cognizant of AIG's policies, which attach in any case involving a combination of more than $250,000. *See* Baliga Dep. at 67-69. AIG has nevertheless forced VSC to bear all of the defense costs of the parties' common insureds, by asserting that it is "true excess" even in cases where AIG's SIR has been satisfied and its policy triggered. There is no evidence that AIG was aware of the regulators' decision or the change in the form used by NPS. And it is undisputed that AIG agreed to participate in the program, established its premium rating, and issued its first policy without any knowledge of VSC's participation in the program or the terms and conditions of the VSC policy. *See* Eddows Dep. 51-53, 122-123. VSC issued its first policy in the NPS Program on December 31, 2000. *See* Baliga Dep. at 88.

## Operation, Termination, and Run-Off of the NPS Program

As a result of a massive fraud by NPS that ultimately resulted in felony convictions and a jail sentence for NPS's principal, AIG and VSC cancelled their participation in the NPS Program. *See* Messery Dep. at 99-100.[10] Because of state insurance regulations, however, AIG (and VSC) had to continue insuring certain NPS Program participants. *See* Gould Dep. at 27-28. Although AIG continued to issue some of these policies on the

---

[10] *See* $100 Million Scam Part of Growing Trend in Insurance Professional Fraud Uncovered by New Jersey Office of the Insurance Fraud Prosecutor, available at http://www.state.nj.us/lps/dcj/njinsurancefraud/report/2004/OIFP-AR-sec.5-p44.pdf at 45.

NUFIC CGL form, AIG began to issue other policies on Lexington paper, using an entirely different form called a "Stand Alone Excess Liability" form. *See* Messery Dep. at 189-190; Eddows Dep. at 166-167; August 1, 2006 Deposition of Elizabeth Viscione ("Viscione Dep.") at 39-40. [11/]  Unlike the NUFIC CGL form used for each of the AIG Policies, this form expressly made AIG's coverage above the SIR *excess* over any other available insurance. *See* Exemplar Stand Alone Excess Liability Policy, Conditions at ¶ 8, ME 03808, attached to the Cramb Aff. as **Exhibit J**. Prior to canceling the NPS Program, however, all of the AIG Policies were written on the same *primary* NUFIC commercial general liability form. *See* Viscione Dep. at 23-24; Messery Dep. at 55; Eddows Dep. at 167.

There have been many claims filed against the NPS Program Participants and moreover, new claims will likely continue to be filed until all applicable statutes of limitation have run. *See* Baliga Dep. at 111-112; July 14, 2006 Deposition of Partick Jops ("Jops Dep.) at 42-43. [12/]  Notwithstanding AIG's refusal to comply with its NPS Program obligations under its policies, VSC has fully complied with its defense and indemnity obligations to NPS Program policyholders. *See id.* To date, VSC has incurred defense and indemnity payments in excess of $185 million for claims submitted in conjunction with the NPS insurance program, including sums that should have been paid by AIG. *See id.* AIG has refused to accept the tender of claims or to accept responsibility for the payment of defense costs, even where the SIR has been satisfied by defense payments and the indemnity amounts are within its limits, relying upon its "true excess" mantra. It is AIG's erroneous "true excess" position that has resulted in the dispute now before the Court. *See* Jops Dep. at 39-43.

---

[11/]     Elizabeth Viscione is the Primary Casualty Unit Manager for Lexington Insurance Company. Eddows Dep. at 94. Ms. Viscione was responsible for claims and coverage determinations under the AIG Policies. *Id.* at 95, 98. The cited portions of the Viscione Dep. transcript are attached to the Cramb Aff. as **Exhibit G.**
[12/]     The cited portions of the Jops Dep. are attached to the Cramb Aff. as **Exhibit H.**

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD AND CHOICE OF LAW

#### A.    Summary Judgment Standard

Summary judgment is a mandatory remedy, available pursuant to Fed. R. Civ. P. 56.

Rule 56(c) provides that:

> [t]he judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party is entitled to a
> judgment as a matter of law.

Summary judgment is expressly available, without exception, for every "claim, counterclaim

or cross-claim" in every type of civil action.  Fed. R. Civ. P. 56(b).  The party moving for

summary judgment bears the "initial burden" of asserting the absence of a genuine issue of

material fact and supporting that assertion by affidavits, admissions, or other materials of

evidentiary quality.  *New Haven Sav. Bank v. Follins*, 431 F. Supp. 2d 183, 188-89 (D. Mass.

2006) (citing *Mulvihill v. Top-Flite Golf Co.*, 335 F. 3d 15, 19 (1st Cir. 2003)).  After the moving

party has met its burden, the burden shifts to the non-moving party to "demonstrate that a

trial-worthy issue exists."  *Id.*  A court must allow a motion for summary judgment where the

non-moving party has the burden of proof and fails to satisfy its obligation to establish the

existence of material disputed issues of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

#### B.    Choice Of Law

A federal court sitting in diversity must apply the choice-of-law principles of the state

in which it sits.  *See, e.g., Millipore v. Travelers Indemnity Co.*, 115 F.3d 21, 29 (1st Cir. 1997)

(citing *Spurlin v. Merchants Ins. Co.*, 57 F.3d 9, 10 (1st Cir. 1995)).  Where no conflict of law

exists between Massachusetts and another jurisdiction, however, a formal choice of law

determination is unnecessary.  *See Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064

(1st Cir. 1991) ("It is unnecessary that we make a formal choice of law since, whether Delaware or Massachusetts law is used, the result will not vary."). The Supreme Judicial Court has adopted a "functional choice of law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985). Under this analysis, the law of New Jersey is the most logical choice.

Although the parties have contacts with five separate states through their places of incorporation and principal places of business,[13] New Jersey has the most significant relationship with *all* of the parties and with the underlying insurance program. The NPS Program was developed in New Jersey by NPS, a New Jersey Insurance broker. *See* Baliga Dep. at 74; Eddows Dep. at 154. NPS solicited insureds and maintained the broker contacts with policyholders for placement of policies within the NPS Program. *See* Baliga Dep. at 156. NPS acted as VSC's managing general agent and underwrote, bound and issued policies, and billed and collected premium on VSC's behalf from New Jersey. *See* Baliga Dep. at 145-146, 156. NPS provided lists of insured locations under both the AIG and VSC policies, acted in a "representative capacity on behalf of the insureds with respect to" the AIG Policies, and collected premium payments and remitted them to AIG. *See* Eddows Dep. at 23.

Although there is no direct conflict of law with respect to determining whether an insurance policy is "true excess," and the result should be the same under the laws of both

---

[13] Lexington is organized under the laws of the state of Delaware and has its principal place of business in Boston, Massachusetts. NUFIC is organized under the laws of the State of Pennsylvania and has its principal place of business in New York, New York. The results of the NPS Program, however, are applied to Lexington's profit center, and Lexington's management in Boston is responsible for the program. *See* Eddows Dep. at 39-40. VSC is organized under the laws of Illinois and has its principal place of business in Chicago. The NPS Program policyholders hail from many different states.

states under the circumstances of this case, to the extent that there is a conflict, New Jersey law governs.

## II.   THE UNDISPUTED FACTS ESTABLISH THAT THE AIG POLICIES ARE PRIMARY POLICIES, NOT "TRUE EXCESS" POLICIES.

The proper construction of an insurance contract is a matter of law for the trial court. *Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 7 F.3d 1047, 1050 (1st Cir. 1993) (citing *Cody v. Connecticut Gen. Life Ins. Co.*, 387 Mass. 142 (1982)). "Basic tenets of construction guide the resolution of insurance contract disputes." *Seidenberg v. Mutual Life Ins. Co.*, 949 F. Supp. 269, 274 (D.N.J. 1996). "Generally, New Jersey follows the rule that a contract 'be construed in the context of the circumstances under which it was entered into.'" *Cooper Labs, Inc. v. International Surplus Lines Ins. Co.*, 802 F.2d 667, 672 (1986) (quoting *Tessmar v. Grosner*, 23 N.J. 193, 201 (1957)). "Insurance contract terms are given their ordinary meaning, based on an examination of the entire policy, including its endorsements, with a view to effectuating the intentions of the parties, but without disregard[ing] the plain language of the policy in order to give effect to what [the court considers to have been the probable] intentions of the parties." *Commercial Union Ins. Co.*, 7 F.3d at 1050 (citations omitted). *See also 40 Gardenville, LLC v. Travelers Prop. Cas. of Am.*, 387 F. Supp. 2d 205, 212 (W.D.N.Y. 2005) ("insurance policies, like other contracts, must be construed so as to give effect to 'the intent of the parties as expressed by their words and purposes'").

### A.   The Plain Language Of The AIG Policies Provides That They Are Primary Insurance Policies, Not "True Excess."

The lynchpin of AIG's position is its erroneous characterization of the AIG policies as "true excess." A "true excess" policy "*requires* the existence of a primary policy as a condition of coverage." *CNA Ins. Co. v. Selective Ins. Co.*, 354 N.J. Super 369, 380 (App. Div. 2002) (citing 15 COUCH ON INSURANCE, § 220:32) (emphasis in original). *See also Viacom*

*Int'l, Inc. v. Admiral Ins. Co.*, 2006 WL 1060504, at *2 (N.J. Super. A.D. 2006) ("true excess"

policy is one "which *by its terms* will only provide coverage once the limits of the primary

policy have been exhausted" (emphasis added)); COUCH ON INSURANCE § 219:33, 3rd Ed.

(2006) ("true excess" insurance policy attaches "only after a predetermined amount of

primary coverage has been exhausted").  "A true excess policy provides coverage *conditioned*

*upon the existence of a primary policy*; the coverage does not begin until a loss exceeds a specific

level; and the insured is usually committed to maintaining the primary insurance." *Viacom*

*Int'l*, 2006 WL 1060504 at *2 (emphasis added).  Moreover, the requisite underlying primary

policy must be "set forth in a schedule of insurance set forth in the excess policy."  HOLMES'

APPLEMAN ON INSURANCE 2d § 2:16 ("APPLEMAN ON INSURANCE") (emphasis added).

The purpose of an excess policy is to "protect the insured in the event of a

catastrophic loss in which liability exceeds the available primary coverage." *Viacom Int'l*,

2006 WL 1060504 at *2.  In contrast, a primary policy "start[s] at the first dollar loss *in excess*

*of the insured's retention*." APPLEMAN ON INSURANCE § 2:16 (emphasis added).  *See also Viacom*

*Int'l*, 2006 WL 106054, at *2 (primary policy starts at first dollar above insured's deductible

amount).  Moreover, a primary policy typically includes the a "duty to defend," while excess

coverage may or may not impose an affirmative duty to defend (as opposed to a right to

defend or associate in the defense and a reimbursement obligation).

1.    The AIG Policies Bear None Of The Formal Characteristics Of Excess
      Insurance.

All of the AIG Policies are essentially identical except for the policy period and the

identity of the insureds and covered locations.  *See* Viscione Dep. at 23-24.  All were written

on a standard primary commercial general liability ("CGL") form.  *See* Viscione Dep. at 23-

24; Messery Dep. at 55.  Each of the AIG Policies provides a $1 million per-occurrence limit

and $2 million aggregate limit, subject to a $250,000 self-insured retention.  *See* National

Union Fire Ins. Co. Commercial General Liability Policy, Bates ME 00448-00551("Exemplar Program Policy"), attached to the Cramb Aff. as **Exhibit I**.  All of the AIG Policies were coded in AIG's internal system and for reinsurance purposes as primary insurance policies – not excess.  *See* Messery Dep. at 158.  And they were not written on any of AIG's excess forms.  *See* Eddows Dep. at 167.

Indeed, the AIG Policies bear *none* of the hallmarks of excess insurance.  They do not require the existence of any underlying policy and do not condition coverage on the exhaustion of any other specific policy.  *See* Viscione Dep. at 31-34; Messery Dep. at 158.  The AIG Policies provide that AIG has "the right *and duty to defend* the insured[s]."  *See* Exemplar Policy, Section I - Coverages at ¶ 1.a., ME 00451 (emphasis added).  Although AIG asserts that it has no obligation under the AIG Policies until "[VSC's] $250,000 indemnity limits of liability are exhausted by the payment of a judgment or settlement" (*see* Amended Complaint ¶ 1) AIG admits there is *nothing* in its policies to support this position:

> Q.  So, your understanding is that until Virginia Surety settles their case or pays a judgment of $250,000, NUFIC has no obligation?
> A.  That is our understanding of the coverage agreement that Virginia Surety provided to its insureds.
> Q.  Is there anything in your policy that says that that you're aware of?
> A.  There is not.

Eddows Dep. at 82-83.  For these reasons alone, the AIG Policies are not "true excess."

2.  The AIG Policies' Other Insurance Clauses Explicitly State That The AIG Policies Are Primary.

That Plaintiffs' Program Policies are primary is confirmed by the specific language in each policy's "other insurance" clause, which explicitly states what the policies will cover in the event that other insurance is available for the same loss.  The "other insurance" clause in the AIG Policies provides as follows:

**4. Other Insurance**

If valid and collectible insurance is available to the insured for a loss we cover . . . . our obligations are limited as follows:

**a. Primary Insurance Policy**

***This insurance is primary*** except when b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then we will share with all that other insurance by the methods described c. [sic] below.

**b. Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft . . .

Exemplar Program Policy, Section IV - Conditions at ¶ 4, ME 00461 (emphasis added).

AIG admits that Section 4.b. does not apply here.  None of the VSC Policies are "Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage."  Gould Dep. at 56; Messery Dep. at 126; Eddows Dep. at 120-122.  Nor do they provide coverage for losses arising out of the maintenance or use of "aircraft, 'autos' or watercraft."  *Id.*  The VSC policies are primary commercial general liability policies.  Accordingly, the "other insurance" clause in the AIG Policies reaffirms that the AIG Policies are primary as to any other policy.

The only Massachusetts case to squarely address when a policy is "true excess" focused on the "other insurance" clause and notably also involved plaintiff Lexington Insurance Company.  *See Executive Risk Specialty Ins. Co. v. Lexington Ins. Co.,* 106 F. Supp. 2d 181 (D. Mass. 2000) (Lindsay, J.).  In *Executive Risk*, the court (applying Arizona law) was asked to determine the appropriate allocation between Lexington and another insurer when both issued policies to the same insureds for certain risks.  The court found that because

17

more than one insurance policy would apply to a claim it had to look to the policies' "other insurance" clauses and to extrinsic evidence of the parties' intent. *See id.* at 185-187.

In *Executive Risk*, Lexington argued, exactly as it does here, that its policy was a "true excess" policy and, therefore, should benefit from the "general rule that coverage under a true excess policy applies only after all primary coverage has been exhausted." 106 F. Supp. 2d at 188. Unlike the AIG Policies in this case, however, the Lexington policy in *Executive Risk* was, by its own terms, a "Follow Form Excess Professional Liability Policy." *Id.* Also contrary to the AIG Policies, the insuring agreement used in the *Executive Risk* policy provided that Lexington would only pay the ultimate net loss once a specified underlying insurance policy was exhausted. *Id.* at 184-185.

The "other insurance" clause in the *Executive Risk* policy was also materially different from that contained in the AIG Policies. In *Executive Risk*, the Lexington "other insurance" clause provided: "The insurance afforded by this Policy is *excess* insurance . . . over the Underlying Insurance specified in Item II.A. of the Declarations." *Id.* at 184-185 (emphasis added). The court found that the purpose of this clause was to avoid a call on coverage if there was "any other collectible primary insurance." *Id.* at 188-189.[14] The court also found that Lexington issued the policy as excess because some of its reinsurers did not want to accept the risk of primary insurance. *Id.* at 189. Upon these facts, the court recognized that the Lexington policy was intended and written to serve as the policy of last resort. *Id.*

Here, AIG's policies look nothing like the excess policy in *Executive Risk*. They are written on a *primary* commercial general liability form, they do not refer to any underlying

---

[14] Notably, the court also found that Lexington had a "standard practice" of issuing the first $1 million in coverage as a primary policy and any amount over that as an excess policy. In this case, AIG issued not only the $1 million AIG Policies, but also an excess policy above each $1 million primary policy, presumably in accordance with this "standard practice." *See* Eddows Dep. at 75-76. *See also* Specimen AIG Umbrella Policy.

insurance, and the "other insurance" clause indicates that the AIG Policies are *primary*. The AIG and VSC policies were issued as primary insurance to provide the $1 million primary layer that Chicago Insurance had provided, with AIG then issuing excess and umbrella policies above that primary layer (which are not at issue here), just as it had done when Chicago Insurance was on the risk. There is absolutely nothing in the AIG Policies that suggests an intent to avoid a call on the coverage until another insurer's limits are exhausted.

> 3.    The Self-Insured Retention Endorsement Does Not Convert The AIG Primary Policies Into Excess Policies.

A policy with a self-insured retention is not an excess insurance policy, just as a policy with a deductible is not excess insurance. *See Commercial Union Ins. Co.*, 7 F.3d at 1051, n. 7 (no functional distinction between a primary policy with a deductible and a policy excess of a self-insured retention). A self-insured retention is an amount the insured has to satisfy before there is any coverage requirement under the policy. *See* Messery Dep. at 38; Eddows Dep. at 46. It is typically employed as it was employed here: to avoid having coverage obligations for a large number of small claims. *See* Messery Dep. at 37-38, 41; Eddows Dep. at 46-47. A self-insured retention is essentially a type of deductible.[15/] New Jersey courts have used the terms 'self-insured retention' and 'deductible' interchangeably, and have found that coverage above a self-insured retention is primary. *See, e.g., Moore v. Nayer*, 321 N.J. Super. 419, 729 A.2d 449 (1999); *Owens-Illinois, Inc. v. United Ins. Co.*, 264 N.J. Super. 460, 498-503 (App. Div. 1993), *rev'd on other grounds* 138 N.J. 437 (1994) (using self-insured retention

---

[15/]    The technical difference between a deductible and an SIR becomes important only when the policyholder cannot afford to pay losses within the deductible or SIR amounts. In the case of a deductible, the insurer must nevertheless defend and cover the claim, retaining a contract claim against the policyholder for reimbursement of the deductible amount (an unsecured pre-petition claim if the policyholder subsequently files a bankruptcy petition). An SIR, as its name suggests, is an amount that is not insured and expenses within the SIR are solely the obligation of the policyholder. In the event of a bankruptcy, judgment creditors can recover against the insurer, but the insurer gets a credit against the judgment amount for the SIR. The judgment creditor would then have a pre-petition unsecured claim against the bankruptcy estate for the judgment amount that could not be recovered against the liability insurer.

and deductible interchangeably, and referring to $1 million of coverage above self-insured

retention as primary)).  AIG's underwriter agrees:

> Q.  What's the difference between an excess policy and a primary
>     policy?
> A.  An excess policy is over a primary policy where a primary policy
>     with an SIR is a primary policy.
> Q.  I'm sorry?
> A.  A primary policy with an SIR is still a primary policy.
> Q.  But what's the distinction?
> A.  Usually on an excess policy there's a primary policy that gets
>     triggered.
> Q.  And is it typical in an excess policy for the excess policy to
>     identify the primary policy?
> A.  Yes.

Messery Dep. at 42-43.

The self-insured retention endorsement attached to each of the AIG Policies states

that it is agreed that:

> The Company's obligation, under the coverages provided by this
> policy, to pay "Ultimate Net Loss" on behalf of the "Insured",
> applies only to the "Ultimate Net Loss" in excess of the Self Insured
> Retention stated blow [sic], and subject to the Limits of Liability
> stated in the policy.

Exemplar Program Policy at ME 00534 (Endorsement #28).[16/]  The Endorsement states the

retained amount: "$250,000 per Occurrence, 'including expenses.'"  *Id.*  Thus, both

indemnity and defense expenses exhaust the retention, a fact which AIG's underwriter

admits:

> Q.  And how were defense costs handled under that retention?
> A.  Inside the SIR.
> Q.  And what does that mean?
> A.  That means that the defense costs and indemnity erodes the SIR.
> Q.  So if an insured spent $50,000 in defense costs that would apply
>     against the $250,000?
> A.  Yes.

---

[16/]    Ultimate Net Loss is not defined in the Plaintiffs' Policies.  *See* Viscione Dep. at 35.  However, according to Ms. Viscione, it is used in the insurance industry to mean both indemnity and expense.  *Id.*

Messery Dep. at 53.

The self-insured retention endorsement in the AIG Policies merely places the risk for $250,000 of the insured's Ultimate Net Loss with the insured. Thus, the AIG Policies attach in any case where an insured incurs $250,000 of either defense or indemnity expenses. *See* Viscione Dep. at 25-26. The self-insured retention does not change how the AIG Policies relate to any other available insurance. How the policies relate to other available insurance is addressed exclusively by the "other insurance" clause. *Cf. Republic Franklin Ins. Co.*, 66 Mass. App. Ct. 1108, 847 N.E.2d 1139, 2006 WL 1360019, *3 (policy with self-insured retention provision was excess only because the "other insurance" clause was an "escape clause," not because of presence of self-insured retention).

That the policyholder's obligation to fund the SIR is transferred to another insurer, as was done here with VSC, has no impact on the operation of the retention and does not affect AIG's coverage obligations. Amounts paid on behalf of a policyholder by an insurer erode an SIR in the same manner as payments made by the policyholder itself.

> It would . . . be preposterous, in a matter involving a $2 million dollar loss, if an insurer that is excess over a $1 million SIR were allowed to deny coverage, following another insurer's payment of $1 million on behalf of the insured, by asserting that the SIR had not yet been exhausted. The SIR should be allowed to be satisfied by the other insurer's payment.

Windt, 2 INSURANCE CLAIMS AND DISPUTES, 4th Ed. § 11:31 (2006). AIG admits that insurance payments erode the SIR. *See* Eddows Dep. at 74 (Q: Is there anything in this policy that . . . prohibits dollars being spent by an insurance company on behalf of an insured from applying against the $250,000 SIR? A: Not that I'm aware of."); Viscione Dep. at 33.

There is nothing in the AIG Policies that prohibits an insured from insuring the self-insured retention. *See* Eddows Dep. at 53. No changes were made to the AIG Policies once

the Plaintiffs became aware that VSC was issuing primary policies. *Id.* at 54. And, most significantly, there is nothing in the AIG Policies that provides that AIG's obligations are different or change when an insured obtains insurance coverage for the self-insured retention amounts.

> Q. Is there something in the policy that says when an insured insures the SIR, that it changes National Union's obligations?
> A. There's nothing in our policy.
> Q. Is there anything in that policy that says that when an insured insures the SIR, that the attachment point changes?
> A. There's nothing in the policy that addresses insurance coverage placed on an SIR in the policy.

Viscione Dep. at 46.

AIG could have included a self-insured retention endorsement in its policies that provided that it was only liable in excess of the applicable limits of insurance set forth in a schedule of underlying insurance, but it did not. *See, e.g., Amatex Corp. v. Aetna Cas. & Sur. Co.,* 107 B.R. 856 (E.D. PA. 1989); *Metlife Capital Corp. v. Westchester Fire Ins. Co.,* 224 F. Supp. 374, 391 (2002). Similarly, if AIG wanted to avoid liability for defense expenses, it could easily have used a self-insured retention endorsement that placed defense costs outside of the SIR. *See* Viscione Dep. at 28-31. That would have achieved the result it now seeks because AIG would have no coverage obligations until the full indemnity limits of VSC's policy were exhausted by payments of settlements or judgments. *See id.* AIG did not do so.

> 4. <u>When AIG Changed The Form It Used With The NPS Insureds, It Specifically Used An *Excess* Form.</u>

Approximately two years into the NPS Program, AIG cancelled its role in the NPS Program, but AIG continued writing individual policies to NPS insureds. Significantly, AIG wrote many of these "Post-Program Policies" on a entirely different "Stand Alone Excess Liability" form. These "Post-Program Policies" are by their terms excess insurance policies. That AIG perceived the need to change its policy form to make its policies excess policies

demonstrates that all of AIG's earlier policies, which were all written on the primary form, are in fact primary, not excess:

> Q. So as far as the – certainly as far as the policyholders were concerned, they had a primary CGL policy with $250,000 SIR?
> A  On the original policy?
> Q. On the original policy?
> A. Right.
> Q. And then at some later date you used something called a stand alone excess liability policy; is that right?
> A. Yes.
>
> \* \* \*
>
> Q. Can you tell me why that change was made?
> A. The market turned and we had written the policy for awhile and it continued to write the program.  We were starting to try and change it to the way we originally wanted to do it.

Messery Dep. at 130, 65-66.

Contrary to the AIG Policies, the Stand Alone Excess Liability policies contain an *excess* "other insurance" clause, which provides that they are excess to other valid and collectable insurance.  *See* Exemplar Stand Alone Excess Liability Policy, Conditions at ¶ 8, ME 03808 attached to the Cramb Aff. as **Exhibit J**.  AIG now claims that it would have preferred to use the excess form with the NPS Program insureds from the start, but could not do so.  AIG's obligations are governed by the policies that it issued, not the policies it wishes it had issued.  Indeed, that AIG perceived a need to change the policy form after the collapse of the program simply proves that the earlier NPS Program policies provided entirely different coverage.

**B.    The History, Structure, And Intent Of The NPS Program As Implemented By The AIG Policies Establishes That AIG Is Responsible For All NPS Program Claim Expenses Beyond The $250,000 SIR.**

Because VSC and AIG have no direct contractual relationship, this is not the typical insurance coverage case between an insurer and a policyholder in which the intent can be

divined from an interpretation of a single contract. Rather, it involves the intent of two parties who have contracted with a common third-party (the policyholders) in the context of the NPS Program. Indeed, because AIG and VSC have *no* contractual relationship, the relevant intent here is the intent of the parties as to the operation of their policies in the NPS Program. The undisputed material facts concerning the history of the program and the express terms of AIG's policy demonstrate that the parties' intent was that AIG would have 100% responsibility for all amounts in excess of $250,000 per occurrence (including defense costs). VSC's involvement in the program was simply to insure the SIR obligation so that the policyholders would enjoy the $1 million first-dollar primary protection that Chicago Insurance had previously provided.

AIG wrote policies and accepted premium on the assumption that it would be responsible for all expenses above the $250,000 SIR. At the time AIG joined the program, established its premium rates, and issued its first master policy in the NPS Program, AIG did not know that VSC would participate in the program. *See* Eddows Dep. at 51-53, 122-123. It did not know the terms of VSC's policies. It did not know that defense costs would be outside of VSC's limits, and it did not know if any of the NPS Program participants would insure the SIR.

VSC's decision to enter into the NPS Program was based on the understanding and agreement with NPS that VSC would pay no more than $250,000 for claims arising out of any one occurrence. *See* Eddows at 67-68. After the regulator's decision, VSC agreed to participate expecting that the AIG Policies would attach in any case involving more than $250,000 in defense and indemnity payments.

If the program operated as actually intended by NPS, VSC, the policyholders, and AIG (as evidenced by its policy), AIG would have a 100% obligation for all amounts above

the SIR.  Thus, to permit AIG to escape its obligations by pointing to the modification of VSC's policies, something wholly fortuitous from AIG's standpoint, is entirely inconsistent with the clear intent of the parties and results in a windfall for AIG.  AIG should be ordered to do precisely what it agreed to do when it joined the NPS Program – pay all expenses above $250,000 on a per-occurrence basis for past, pending, and future claims.

### C.    Absolving AIG Of Its Obligation To Pay Or Share Equally In The Defense Of Its Insureds Beyond The SIR Grants AIG A Windfall At VSC's And the AIG Policyholders' Expense.

Under AIG's interpretation, the only cases where AIG would ever have a duty to defend – a fundamental feature of the primary CGL policy it sold to the NPS Program participants – would be either (a) those cases where the policyholder did not insure the self-insured retention; or (b) those cases that included multiple claimants relating to the same occurrence, where one claimant settled earlier than the other for $250,000 or more.  *See* Eddows Dep. at  83-85.

The refusal of certain regulators to approve VSC's $250,000 policy unless defense costs were outside of limits may have created additional rights for VSC's *policyholders*, but did not alter AIG's obligations under its policies or the intended structure of the NPS Program.  AIG seeks to co-opt this benefit to VSC policyholders by forcing VSC to pay sums that are AIG's obligation.

Moreover, under AIG's view of its coverage obligations, AIG will almost never have to pay any defense costs, even when those costs and indemnity amounts far exceed the SIR upon which AIG's premium was based.  The impact of AIG's position would be to relieve AIG of virtually any obligation to pay defense costs, imposing on VSC the full amount of defense costs even in cases that result in settlements or judgments that far exceed the SIR upon which AIG's premium was based.

In addition to being contrary to the express language of the AIG policy, this is inconsistent with the structure and intent of the NPS Program, is grossly inequitable, and would grant AIG a massive windfall at VSC's expense and the expense of AIG's policyholders. There is no evidence that AIG reduced or rebated premium to policyholders to reflect this greatly-reduced exposure and, thus, AIG has also been unjustly enriched by extracting premium payments from program participants on the assumption of an entirely different risk transfer. Nothing in the insurance policies, logic, fairness and, most importantly, the law, permit this result. *See Insurance Co. of North Am. v. Protection Mut. Ins. Co.*, 939 F. Supp. 79, 87 (D. Mass. 1996) ("INA bargained for a policy which had what was essentially a $100,000 annual deductible. Transforming the policy into one in excess of potentially limitless other insurance would inequitably relieve INA of its contractual obligations.")

### D.    AIG Cannot Rely On Language In The VSC Policies While Ignoring The Language In Its Own Policies.

AIG argues that it should not share in the payment of defense costs because defense costs are not within the limit of the VSC policies (*i.e.*, there is no upper limit on the amount of defense costs that VSC might be liable to pay under its policies). That may be an argument as to why VSC continues to have coverage obligations to the policyholder even though AIG's policy is also triggered; it does not mean that AIG is relieved of its coverage obligations. To argue that AIG has no obligation to pay defense or indemnity costs in connection with any underlying claim simply because other primary insurance may also be available is to completely ignore the plain language of AIG's policies and the history, structure, and intent of the NPS Program.

AIG's interpretation of its policies rests entirely on the language in *VSC's* policies. Eddows Dep. at 181-183. AIG testified that the self-insured retention amount, and thus the

point at which the AIG Policies are triggered, is determined not by its policies, but by the bargain between VSC and the insured, even though AIG is not a party to that bargain[17]. *See id.* at 87-88. AIG argues that the point at which the AIG Policies are triggered depends on the coverage provided by VSC (and possibly other insurers) but it cannot point to any provision in its policies that states the $250,000 self-insured retention changes when the retention is insured. *See id.* There is no rule of insurance or insurance contract interpretation that permits an insurer to point to the terms of another insurer's policy to determine the operation of its own. Any such limitation would have to be set forth in AIG's policy, but it simply is not there.

### III.    AT A MINIMUM, UNDER THE OTHER INSURANCE CLAUSES, AIG MUST SHARE EQUALLY WITH VSC IN ALL LOSSES ABOVE THE $250,000 SIR, UP TO THE PARTIES' RESPECTIVE POLICY LIMITS.

When insurance policies overlap, the priority of obligations ordinarily is governed by applying the "other insurance" clauses in the policies. *See Moore v. Nayer*, 321 N.J. Super. 419, 729 A.2d 449, 456 (N.J. Super. 1999) (citing *Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co.*, 28 N.J. 554, 564 (1959)). *See also* APPLEMAN ON INSURANCE § 140.1[2].

VSC believes that to implement the intent of the NPS Program and to avoid a windfall to AIG, AIG should be ordered to pay *all* expenses above the SIR. At a minimum, however, AIG must contribute to the losses in the manner set forth in the "other insurance" clauses of the policies. Indeed, AIG's underwriter, Charles Messery, agreed that any conflicts as a result of overlapping coverage are resolved by looking at these clauses. *See* Messery Dep. at 121. Because Section 4.b. of the AIG Policies does not apply in this case, the AIG Policies are primary insurance policies which share with all other insurance by the method described in Section 4.c. *See* Exemplar Program Policy, Section IV Coverage at ¶

---

[17]    Nor did Lexington or NUFIC approve the VSC policy form or rebate premium to policyholders who

4.a., ME 00462.  Thus, Section 4.c. describes AIG's obligations.  That section provides as follows:

> **c. Method of Sharing**
> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes an equal amount until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

Exemplar Program Policy at ME 00462, Section 4.c.  Pursuant to this provision, in cases where an insured incurs an Ultimate Net Loss greater than $250,000, AIG must contribute with VSC to the payment of loss either by equal shares or limits.  Because the other insurance clause in VSC's Policies is identical to that in the AIG Policies, AIG must, at least, share in the payment of any loss equally with VSC after the exhaustion of the self-insured retention in the AIG Policies.

<u>Conclusion</u>

For all of the above-stated reasons, VSC requests that its Motion for Summary Judgment be allowed.

**WHEREFORE**, VSC is entitled to and hereby respectfully requests that the court enter judgment declaring:

    (a) That the AIG Policies are primary insurance policies and impose on AIG the coverage obligations of a primary insurer, including the duty to defend, in any case where defense and indemnity expenses combined exceed $250,000;

    (b) That the AIG Policies are not "true excess" policies, and that the terms of the AIG Policies do not require exhaustion of the limits of the VSC Policies before the AIG Policies are triggered;

---

insured the SIR.  *See* Eddows Dep. at 92, 111.

    (c)  That in any case where combined defense and indemnity payments exceed $250,000, AIG must pay 100% of all sums above the $250,000 SIR;

or, alternatively,

that as co-primary insurers, the respective obligations of VSC and AIG are governed by "other insurance" clauses in their respective policies, and AIG must share equally with VSC in all claim expenses that exceed $250,000, up to the parties' respective policy limits.

## **<u>Oral Argument Requested</u>**

VSC respectfully requests the opportunity to be heard in support of this motion.

Respectfully submitted,

VIRGINIA SURETY CO., INC.,

By its attorneys,


_____/s/  Nicholas C. Cramb_____
Joseph G. Blute (BBO 047300)
John M. Stephan (BBO 649509)
Nicholas C. Cramb (BBO 654368)
**MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, MA 02111
Dated: September 29, 2006          (617) 542-6000

29

## Rule 7.1(A)(2) Certification

The above-signed counsel hereby certifies that they parties have conferred in good faith pursuant to Local Rule 7.1(A)(2) regarding the issues in this Motion.

## Certificate of Service

I, Nicholas C. Cramb, Esq. hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on September 29, 2006.

_/s/  Nicholas C. Cramb_                    Dated:  September 29, 2006

LIT 1588373v.3