# EXHIBIT A

Page 1

1                                    VOLUME 1

2                                  PAGES 1 - 186

3                                 EXHIBITS 1 - 11

4              IN THE UNITED STATES DISTRICT COURT

5              FOR THE DISTRICT OF MASSACHUSETTS

6                                  No. 04-11109 RGS

7    - - - - - - - - - - - - - - - - - - - - - - - -

8    LEXINGTON INSURANCE COMPANY and NATIONAL UNION FIRE

9    INSURANCE COMPANY OF PITTSBURGH, PA,

10   VIRGINIA SURETY COMPANY, INC.,

11                              Plaintiffs

12            vs.

13   VIRGINIA SURETY COMPANY, INC.,

14                              Defendants

15   - - - - - - - - - - - - - - - - - - - - - - - -

16   RULE 30(b)(6) DEPOSITION OF LEXINGTON INSURANCE COMPANY

17        BY AND THROUGH WILLIAM R. EDDOWS, ESQUIRE

18            Thursday, June 8, 2006 10:05 a.m

19                        Mintz Levin

20        One Financial Center, Boston, MA 02111

21        Reporter:  Janet M. Konarski, RMR, CRR

22                   LegaLink Boston

23        320 Congress Street, Boston, MA 02210

24                    (617)542-0039

William R. Eddows, Esq.

06/08/2006

Page 10

1   testifying on behalf of both companies, as well? Do
2   you know?
3        MR. COHEN:  Yes.
4   BY MR. BLUTE:
5        Q.  Could you tell me what you've done to
6   prepare for today's deposition?
7        A.  I met with Mark a couple of weeks ago,
8   just prior to when this depo was originally scheduled,
9   reviewed the deposition notice and some of the
10  pleadings in the case.
11       Q.  Had you had any involvement in the case
12  prior to that?
13       A.  On a monitoring level, yes.
14       Q.  All right.  In connection with the facts
15  underlying the case, these program policies and post
16  program policies, were you involved at all with that
17  work at that time?
18       A.  No.
19       Q.  Do you know why you were designated to
20  testify, as opposed to somebody else?
21       MR. COHEN:  Objection.
22       A.  Not specifically.
23       Q.  Okay.  Do you have personal knowledge of
24  any of the subject matters listed in the notice that

Page 11

1   you're testifying on today?
2        A.  Yes.  In my position as claims counsel, I
3   think I have personal knowledge of -- probably more
4   personal knowledge than others in the company would of
5   the broad array of subjects spelled out in the
6   deposition notice.
7        Q.  Did you review any documents in
8   preparation for the deposition?
9        A.  I reviewed the notice and pleadings, and I
10  believe that was it.
11       Q.  Did you review any insurance policies?
12       A.  I've seen some of the policies in the
13  past.
14       Q.  Okay.  Did you have discussions with any
15  other Lexington employees in connection with your
16  preparation for this deposition?
17       A.  No.  Just in passing and actually talking
18  about the fact that it was scheduled.
19       Q.  Okay.  And how about employees of National
20  Union Fire Insurance Company?
21       A.  No.
22       Q.  Did you do anything else to prepare for
23  the deposition?
24       A.  No.

Page 12

1        Q.  Were you involved at all in the collection
2   of documents to produce in response to the document
3   requests that we submitted in this case?
4        A.  No.
5        Q.  Could you tell me what the relationship is
6   between Lexington Insurance Company and National Union
7   Fire Insurance Company, if any?
8        A.  They are both sister insurance companies
9   of American International Group.
10       Q.  Are they in different lines of business?
11       A.  Lexington is an excess surplus lines
12  company.  National Union is an admitted carrier.
13       Q.  And could you just describe what an
14  admitted carrier and what a surplus lines carrier is?
15       A.  An admitted carrier is a carrier admitted
16  to do business in various states and has to comply with
17  the rules and regulations that apply to admitted
18  carriers.  An excess, surplus carrier would be
19  considered non-admitted, and separate rules apply in
20  instances such as that.  There is a difference between
21  what forms have to be preapproved and things like that.
22  I don't know all of the differences, but that is the
23  main one.
24       Q.  All right.  In terms of the types of

Page 13

1   insurance policies that Lexington sells and National
2   Union sells, and, by the way, just for ease, if I refer
3   to it as National Union or NUFIC, can we agree that is
4   National Union Fire Insurance Company?
5        MR. COHEN:  Sure.
6        A.  Yes.
7        Q.  In terms of the types of insurance
8   policies that are issued or underwritten by Lexington
9   and NUFIC, are there any differences?
10       A.  No.
11       Q.  Are they all in the same lines?
12       A.  Pretty much.
13       Q.  Does Lexington write primary general
14  comprehensive general liability insurance or commercial
15  general liability insurance?
16       A.  Yes.
17       Q.  And it writes excess policies?
18       A.  It does.
19       Q.  Does NUFIC write primary commercial
20  general liability coverage?
21       A.  Yes.
22       Q.  And does it write excess policies, as
23  well?
24       A.  I believe so.

4 (Pages 10 to 13)

William R. Eddows, Esq.

06/08/2006

Page 14

1    Q. And NUFIC and Lexington are sister
2  companies within the AIG corporate group?
3    A. That is correct.
4    Q. In this case, some of the policies were
5  issued by NUFIC and some were issued by Lexington. Do
6  you know why that was the case?
7    A. I can't give you all of the specifics, but
8  Lexington was approached to initially provide the
9  coverage that was initially going to be provided to
10  AIMCO, as I understand it. At some point, and I don't
11  know where the request came from, but a request
12  apparently was made to use an admitted carrier to issue
13  the policies, as opposed to an excess surplus, that
14  being Lexington. So, that is why National Union became
15  involved.
16    Q. And the switch, there was a switch at some
17  point from NUFIC to Lexington policies. Do you know
18  why that switch took place?
19    A. As I understand it, when the "program" was
20  cancelled, then at that point some policies were issued
21  on National Union paper, and some were issued on
22  Lexington paper.
23    Q. And any particular reason why one would be
24  issued on National Union versus Lexington?

Page 15

1    A. I can't give you the specifics on that.
2    Q. Do National Union and Lexington use the
3  same policy forms?
4    MR. COHEN: Objection.
5    Q. Let's start with --
6    MR. COHEN: They probably each issue
7  hundreds of different types of policies, so --
8    Q. Let's just start with commercial general
9  liability insurance policies. Let's start with primary
10  policies. Do you know if NUFIC and Lexington use the
11  same forms?
12    A. They may, but I would say that both
13  companies extensively use manuscript forms.
14    Q. As well as the standard forms?
15    A. That's correct.
16    Q. And is that also true with the excess
17  insurance?
18    A. Yes.
19    MR. COHEN: Just a couple of points.
20    MR. BLUTE: Sure.
21    MR. COHEN: One is I wanted to tell the
22  stenographer AIMCO is A-I-M-C-O, all caps, and the
23  second, just as point of clarification, by "the
24  standard forms," are you talking about the ISO forms?

Page 16

1    Q. ISO. Did you understand ISO, Insurance
2  Service Offices?
3    A. Yes.
4    Q. So, in terms of preparation for
5  deposition, you spoke to counsel. You spoke to in
6  passing some people at Lexington, reviewed some of the
7  pleadings. Anything else that you did in preparation
8  for today's deposition?
9    A. No.
10    Q. Do you believe that you are prepared to
11  testify as to the company's knowledge as to the matters
12  that you're designated to testify on?
13    A. Yes.
14    MR. BLUTE: Mark this as the second
15  exhibit, which is a copy of the Plaintiff's Amended
16  Complaint.
17    (Plaintiff's Amended Complaint
18    marked Exhibit 2.)
19    Q. I've marked as the next exhibit the
20  Amended Complaint in this case. Have you read that
21  complaint before?
22    A. I have.
23    Q. Okay. Could you turn to Page 8 of the
24  exhibit, Exhibit 2. If you look at the first

Page 17

1  paragraph -- sorry, Paragraph 8 on Page -- I misspoke.
2  If you turn to Page 3, Paragraph 8, in Paragraph 8 it
3  states, "Beginning in May of 2000, National Union began
4  participating with an insurance broker, National
5  Program Services, Inc. or NPS in providing certain
6  excess general liability insurance policies to various
7  real estates owners and property managers who were
8  members of the National Coalition of Property Owners
9  and Managers/Insurance Purchasing Group Association."
10    Let me ask you this: Prior to May, 2000,
11  had NUFIC or Lexington, to your knowledge, done work
12  with National Program Services?
13    A. I don't know for sure.
14    Q. Do you know whether either Lexington or
15  NUFIC had any written agreements with National Program
16  Services concerning the National Coalition of Property
17  Owners and Managers Insurance Purchasing Group
18  Association program?
19    A. I don't.
20    Q. Prior to the May, 2000, participation in
21  this program, can we just for shorthand use "program"
22  to refer to the National Coalition of Property Owners
23  and Managers Insurance Purchasing Group Association
24  policies?

5 (Pages 14 to 17)

William R. Eddows, Esq.                                                                    06/08/2006

Page 18

1    A. Yes.
2    Q. And what, exactly, was the program that
3  National Union began participating in in May, 2000?
4    A. Well, as I explained earlier, we were
5  initially approached to provide insurance to AIMCO,
6  which is a specific insured which has, as I understand
7  it, thousands of different properties all over the
8  country.
9        Then at some point there was a proposal
10  to increase the scope to provide coverage to the
11  National Coalition of Property Owners, which would be a
12  much larger group, representing various insureds.
13    Q. So, this would be sort of an established
14  program, where members of this organization could get
15  their insurance through National Union?
16    A. I don't know if it's an established
17  program. It's an established group.
18    Q. Group. Right. Is that something that
19  Lexington and NUFIC do in the ordinary course of
20  business? In other words, have arrangements with
21  specific groups?
22    A. Lexington and National Union would provide
23  coverage to either individual insureds or, you know, a
24  group of insureds represented by such an entity.

Page 19

1  Certainly.
2    Q. But, this type of program, where you have
3  an organization and its members are getting insurance
4  through National Union or Lexington, is that something
5  that is done fairly regularly?
6    A. Certainly.
7    Q. And do you know who at AIMCO approached
8  Lexington, or who on behalf of AIMCO?
9    A. I understand that the initial broker might
10  have been a gentleman by the name of Rob Dowd.
11    Q. And who is Mr. Dowd affiliated with?
12    A. That, I'm not sure. I just remember he
13  was the insurance broker, as I understand it.
14    Q. Do you know the name of his company?
15    A. I don't.
16    Q. Prior to that initial contact, do you know
17  whether Lexington or NUFIC wrote insurance for the
18  National Coalition of Property Owners and Managers
19  Insurance Purchasing Group Association? In other
20  words, was this a new program?
21    A. I'm not aware that they did.
22    Q. It says in Paragraph 8 that you began,
23  Lexington began participating -- excuse me, National
24  Union began participating with an insurance broker,

Page 20

1  National Program Services, Inc., NPS. Do you know
2  whether Mr. Dowd worked for NPS?
3    A. I don't believe so.
4    Q. Do you know where Mr. Dowd was based?
5    A. No.
6    Q. Do you have any idea what state he was
7  living in or working in?
8    A. I do not.
9    Q. What is National Program Services, Inc. or
10  NPS?
11    A. As I understand it, NPS was Virginia
12  Surety's managing general agent.
13    Q. Did National Program Services, Inc., do
14  you know -- strike that. Do you know if NPS had any
15  role in connection with the program?
16    A. I'm sure it had some role in the program.
17  I can't tell you specifically more than that. You'd
18  have to rephrase the question.
19    Q. Did Lexington or NUFIC have any agreements
20  with National Program Services, Inc.?
21      MR. COHEN: You already asked that, but go
22  ahead.
23    A. I don't believe so.
24    Q. Is there any affiliation at all between

Page 21

1  Lexington, NUFIC and NPS?
2    A. Not that I'm aware of.
3    Q. Did NPS act as a broker in the placement
4  of policies on behalf of insureds with NUFIC or
5  Lexington?
6      MR. COHEN: Objection.
7    A. I don't believe so.
8    Q. Okay. It states in Lexington and NUFIC's
9  complaint that National Union began participating with
10  an insurance broker, National Program Services, Inc.
11  What does that mean, "began participating with an
12  insurance broker, National Program Services, Inc.?"
13  What was the nature of that participation?
14    A. They began participating in what was
15  originally going to be the AIMCO coverage and then was
16  expanded to the NUCUPO coverage, what we've agreed to
17  refer to as the NUCUPO program.
18    Q. And when it states in the complaint that
19  NUFIC began participating with an insurance broker,
20  National Program Services, Inc., what was the role of
21  National Program Services, Inc., as you understand it
22  with respect to Lexington and NUFIC?
23    A. Again, my understanding was they were
24  Virginia Surety's managing general agent.

LegaLink Boston, a Merrill Company
(617) 542-0039

William R. Eddows, Esq.                                                                      06/08/2006

Page 22

1    Q.  You don't know whether they placed any
2  insurance policies with NUFIC or Lexington?
3    A.  I don't believe they would have done so
4  directly.
5    Q.  Do you know whether National Program
6  Services collected any premiums for NUFIC or Lexington?
7    A.  I believe they did.
8    Q.  And in what capacity would they be doing
9  that?
10    A.  I would assume in their capacity as
11  managing general agent.
12        MR. COHEN:  For Virginia Surety?
13    A.  For Virginia Surety.
14    Q.  Why would a managing general agent for
15  Virginia Surety be collecting premiums for Lexington
16  and NUFIC?
17    A.  I'm not sure, but I'm aware based on
18  subsequent events that is apparently what the
19  arrangement was.
20    Q.  Do you know who at Lexington or NUFIC, I
21  guess in the initial stages NUFIC, was involved in
22  setting up that arrangement?
23    A.  Not specifically.
24    Q.  Are you aware of any other instances where

Page 23

1  NUFIC or Lexington participated in such an arrangement?
2    A.  No.
3        MR. BLUTE:  Let me mark as the next
4  exhibit the Lexington Insurance Company's Answers to
5  Virginia Surety's First Set of Interrogatories.
6            (Lexington Insurance Company's
7            Answers to Virginia Surety's First Set of
8            Interrogatories marked Exhibit 3.)
9    Q.  If you could review the answer to
10  Interrogatory No. 3, which is on Page 5.
11            (Witness complies.)
12    Q.  It states in part in the answer to
13  Interrogatory No. 3 that Lexington's understanding is
14  that NPS acted in some sort of representative capacity
15  on behalf of the insureds with respect to the program
16  policies, as evidenced by the fact that NPS provided
17  lists of insured locations under the National Union and
18  Virginia Surety policies.  NPS also collected premium
19  payments and remitted them to National Union on behalf
20  of the insureds.  Is that your understanding?
21    A.  It is.
22    Q.  All right.  And was that something that
23  was done unilaterally by NPS or was that done with the
24  agreement, with the knowledge and agreement of

Page 24

1  Lexington and NUFIC?
2    A.  No.  I'm sure it was done with the
3  knowledge and agreement of both Lexington and National
4  Union.
5    Q.  And do you know who at Lexington, in this
6  instance at the beginning of the program, do you know
7  who at NUFIC would have been involved in setting up
8  this procedure for collecting premiums and getting
9  lists of insured locations?
10    A.  I would think Charles Messery or others at
11  the Risk office involved would have been involved in
12  that.
13    Q.  Do you know whether Lexington or NUFIC
14  compensated NPS in any way?
15    A.  I don't know.
16    Q.  Again, looking at answer to
17  Interrogatory No. 3 on Page 5 of Exhibit 3, there is a
18  listing of individuals, who were involved in obtaining
19  the policies issued by NUFIC and/or Lexington to
20  members or former members of NCOPO, which is the
21  program.  Do you see that list of names?
22    A.  I do.
23    Q.  Let's just run through it.  The first is
24  Charles Messery, M-E-S-S-E-R-Y.  Who is Charles

Page 25

1  Messery?
2    A.  Charles Messery was the person the risk
3  specialist's office, Risk Specialists of New York, who
4  worked on this program.
5    Q.  Was Mr. Messery involved from the outset,
6  as far as you know?
7    A.  I believe he was.
8    Q.  Was he the principal contact between, of
9  Lexington -- was he the principal contact on behalf of
10  NUFIC with respect to the program policies?
11    A.  Yes.
12    Q.  You mentioned a risk specialist's office?
13    A.  That's correct.
14    Q.  Is that an organization?
15    A.  It is.
16    Q.  And what is the title of that
17  organization?
18    A.  I believe it's Risk Specialists Companies
19  of New York.
20    Q.  And is Risk Specialty Companies of New
21  York an affiliate of AIG?
22    A.  Risk Specialists.
23    Q.  I'm sorry, Risk Specialists of New York an
24  affiliate of AIG?

7 (Pages 22 to 25)

William R. Eddows, Esq.                                                  06/08/2006

Page 38

1  such a program work more efficiently.
2      Q.  And just describe generally what those
3  ways are.
4      A.  Well, with the true program policy, as I
5  understand it, there is one master program policy
6  issued, and then for all of the participating insureds
7  in that program there would be individual certs,
8  certifications numbers issued, corresponding to an
9  individual policy for each of those participants.
10     Q.  And so you said you'd have one policy, and
11 then numerous insureds essentially listed on that
12 policy?
13     A.  That's correct.
14     Q.  All right.  And where -- in order to
15 account for that or to manage that type of work, is
16 that at both Lexington and NUFIC are there people who
17 do that?
18     A.  Yes.
19     Q.  And who was involved with respect to this
20 program in that capacity?
21     A.  The Risk office.
22     Q.  The Risk Specialists?
23     A.  The Risk Specialists office was involved
24 as the surplus broker.

Page 39

1      Q.  Anybody else that you know of?
2      A.  There would have been communication with
3  Lexington's home office with the Risk office, as well.
4      Q.  Who at Lexington's home office would have
5  been communicating with Risk Specialists about a
6  program policy?
7      A.  I can't tell you in general.  My
8  understanding as to this particular program was that an
9  individual by the name of Joe George may have been
10 involved.
11     Q.  What is Mr. George's position?
12     A.  Mr. George was an underwriting manager at
13 Lexington, has since left the company, I believe a
14 couple of years ago now.
15     Q.  Where does Mr. George work now?  Do you
16 know?
17     A.  I don't know.
18     Q.  Was he based in the Boston office of
19 Lexington?
20     A.  He was.
21     Q.  And what was his position, title?
22     A.  I don't know his specific title at the
23 time.  He was some manager in underwriting.
24     Q.  Was there a sort of a top level management

Page 40

1  person who had to approve participation in a program
2  like this?
3      A.  Underwriting in Boston would have to sign
4  off on this proposal being brought to them by the Risk
5  office.
6      Q.  How about with respect to NUFIC, who would
7  handle NUFIC?
8      A.  In this instance, it was simply a
9  situation of Lexington utilizing NUFIC's admitted
10 paper.
11     Q.  Okay.
12     A.  In this instance, it was applied to
13 Lexington's own profit center, so it would have been
14 the Lexington line of management dealing with the NUFIC
15 policy.
16     Q.  Okay.  So, essentially this was a
17 Lexington program, but at least in the first instance,
18 you used NUFIC paper, because it was an admitted
19 carrier?
20     A.  That is correct.
21     Q.  Okay.  Does NUFIC have employees?
22     A.  Oh, yes.
23     Q.  So, it's a separate company, operating
24 company?

Page 41

1      A.  It is.
2      Q.  Okay.  But, the decision makers with
3  respect to this program would have been Lexington?
4      A.  That's correct.
5      Q.  Does Mr. Messery's group, Risk Specialists
6  Company do work with both NUFIC and Lexington?
7          MR. COHEN:  I think you may have already
8  asked that, but go ahead.
9          MR. BLUTE:  Possible.
10     A.  I believe they would have primarily done
11 work with Lexington, but as in situations like this, I
12 have to believe this wasn't the only time that a
13 situation like this arose.
14     Q.  Let's go down a list of names on the
15 answer to Interrogatory No. 3.  There is Rob Dowd.  Who
16 is Mr. Dowd?
17     A.  As I think I mentioned earlier, Rob Dowd,
18 I believe, was the insureds' broker, who made the
19 original approach to AIG.
20     Q.  Have you ever met Mr. Dowd?
21     A.  I have not.
22     Q.  Have you ever spoken to Mr. Dowd?
23     A.  No.
24     Q.  Do you know whether Mr. Dowd had done

11 (Pages 38 to 41)

William R. Eddows, Esq.                                                                06/08/2006

Page 42

1   business with Lexington before?
2        A.   I do not.
3        Q.   I think you told me you don't know where
4   he resides or works?
5        A.   No.
6        Q.   Joe Davis, who is Joe Davis?
7        A.   Joe Davis was at the time an employee of
8   First Capital Group.
9        Q.   What is First Capital Group?
10       A.   First Capital Group, I believe was the
11  insured's wholesale broker.
12       Q.   When you say "insured's," you mean AIMCO?
13       A.   And/or the National Coalition.
14       Q.   Describe for me the process of placing an
15  insurance policy where you have a wholesale broker
16  involved.
17       A.   What would usually occur is a particular
18  insured would approach a retail broker.  A retail
19  broker would then approach a wholesale broker.  In an
20  instance such as this, that wholesale broker would
21  approach in this case our surplus lines broker, the
22  Risk office.
23       Q.   Is the wholesale broker typically used in
24  placing excess policies with non-admitted carriers or

Page 43

1   do they provide the service regardless of whether it's
2   admitted or not admitted?
3        A.   They would provide the service I think
4   regardless.
5        Q.   And is that the sort of standard practice
6   in the industry to use a wholesale broker, as opposed
7   to the retail broker approaching Lexington directly?
8        A.   I think in general it would be the
9   practice of insured's retail brokers to go through
10  wholesale brokers extensively.
11       Q.   Is First Capital Group related in any way
12  to Lexington or NUFIC?
13       A.   No.
14       Q.   It's not an AIG entity?
15       A.   No.
16       THE WITNESS:  May I take a quick break?
17       MR. BLUTE:  Yes.  Absolutely.  Let's go
18  off the record.
19       (A recess was taken.)
20  BY MR. BLUTE:
21       Q.   Mr. Eddows, other than what you've told
22  me, have you had any other communications with
23  Mr. Messery?
24       A.   No.

Page 44

1        Q.   Concerning this matter?
2        A.   No.
3        Q.   Have you communicated about other matters
4   in the course of your work at Lexington?
5        A.   I don't think so.
6        Q.   Okay.
7        MR. BLUTE:  Mr. Cohen, just so the record
8   is clear, I understand you're claiming privilege with
9   respect to what Mr. Messery said and what was said to
10  him.
11       MR. COHEN:  As to any legal advice, but as
12  to any facts he disclosed, you're free to ask about
13  that.  I'm not waiving any privilege.
14       Q.   Is there anything -- you mentioned that
15  you got sort of basic fact finding from Mr. Messery.
16  Some of the things you already told us.  Just if you
17  could just summarize for me specifically what factual
18  information Mr. Messery gave you?
19       Is he the one that told you about the
20  approach from Dowd?  Just sort of generally speaking
21  the actual facts that he told you?
22       A.   Again --
23       Q.   As best you can remember?
24       A.   As I've summarized earlier, the initial

Page 45

1   approach to AIG to provide coverage to AIMCO, followed
2   by the subsequent proposal to then provide coverage to
3   the National Coalition, as opposed to AIMCO, the
4   mechanics involved in setting up the account.
5        Q.   Anything else that you remember?
6        A.   The policies issued, how it was physically
7   set up, what policies were issued.
8        Q.   Describe for me that aspect.  How were the
9   policies issued?
10       A.   As I understand it, the initial approach
11  was for Lexington to provide a million dollars of
12  dollar one coverage.  The response by Mr. Messery and
13  the Risk office was that that would not be possible,
14  and the counterproposal was a million dollars of
15  coverage sitting over a 250,000 dollars self-insured
16  retention.
17       Q.   Just so I understand and it's clear on the
18  record, the initial proposal, initial request was for a
19  million-dollar policy in which the AIMCO -- or, excuse
20  me, the program participants would have insurance from
21  the first dollar; is that right?
22       A.   Correct.
23       Q.   And that request was rejected by somebody
24  at Lexington.  Who would have made that decision?

12 (Pages 42 to 45)

Page 46

1    A.  I'm not sure if Charlie would have made
2  that decision himself or whether or not that would have
3  been in conjunction with talking to Lexington's home
4  office underwriting department.
5    Q.  So, the proposal that went back was that
6  we'll write you a million dollars coverage, but only
7  after a $250,000 self-insured retention?
8    A.  That's correct.
9    Q.  Also known as an SIR?
10   A.  Yes.
11   Q.  You have used that logo, that short form
12 here today.  What is a self-insured retention?
13   A.  It's a retained dollar amount which the
14 insured first has to satisfy before there are any
15 coverage requirements under the policy sitting above to
16 respond by way of coverage.
17   Q.  Okay.  Do you know why Lexington, the
18 underwriters decided that they wanted a $250,000
19 self-insured retention?
20   A.  Not specifically.
21   Q.  Are there typical rationales that, as far
22 as you know, in terms of underwriting as to when you
23 would want a self-insured retention or why you would
24 want a self-insured retention?

Page 47

1    A.  In general, one possibility would be to
2  avoid having to be involved in the handling of a very
3  large number of small matters, which with an SIR in
4  place would be handled within that SIR and would not
5  involve insurance company resources to handle such
6  small claims.
7    Q.  So, essentially you'd be dealing with
8  larger claims?
9    A.  That's correct.
10   Q.  All right.  And is there, was there
11 anything about the business, this particular business
12 that led Lexington to have a concern about large
13 numbers of small claims?
14   A.  Only in that it would involve very large
15 numbers of coverage involving very large numbers of
16 properties located all over the country, as I
17 understand it.
18   Q.  Okay.  Anything else about an SIR, any
19 other reason why you'd want an SIR?
20   A.  That's the one that comes to mind.
21   Q.  All right.  And is it your understanding
22 that that was the reason why it was requested in this
23 case?
24   A.  I can't tell you specifically.

Page 48

1    Q.  All right.  Mr. Messery would be the one
2  to ask that?
3    A.  He would.
4    Q.  And so the proposal back to -- I assume to
5  Mr. Dowd; is that right?
6    A.  I don't know.
7    Q.  Okay.  The proposal back to whoever was
8  involved on the insured side was we'll write a million
9  with a $250,000 self-insured retention.  Is that right?
10   A.  That's correct.  It may have been
11 Mr. Dowd.  It may have been First Capital.  I can't
12 tell you.
13   Q.  Was that accepted?
14   A.  That is ultimately the way it was, the way
15 it was structured.
16   Q.  And were policies issued with that
17 structure?
18   A.  Yes.
19   Q.  I'll get back to that in a little bit, but
20 let me go through these names again.  Joe Davis, he was
21 at First Capital?
22   A.  That's correct.
23   Q.  You mentioned him.  Dennis Reilly, who is
24 Dennis Reilly?

Page 49

1    A.  I believe he was also at First Capital.
2    Q.  Also involved as a wholesale broker?
3    A.  Right.
4    Q.  So, in terms of the communications here be
5  the entity that would approach, would have been dealing
6  with Mr. Messery would have been the wholesale broker?
7    A.  I believe so.
8    Q.  And then the wholesale broker would deal
9  with whoever the retail broker was?  Is that typical?
10   A.  Yes.  Yes.
11   Q.  Do you believe that is what occurred in
12 this case?
13   A.  I believe so.
14   Q.  Have you had any discussions with either
15 Mr. Davis or Mr. Reilly concerning this matter?
16   A.  No.
17   Q.  Do you know whether anyone at Lexington
18 has?
19   A.  I do not.  I don't believe so.
20   Q.  Have you had any written communications
21 with either of those gentlemen concerning this matter?
22   A.  No.
23   Q.  In terms of the underwriting side of these
24 policies, of the original placement of the policies,

13 (Pages 46 to 49)

William R. Eddows, Esq.

06/08/2006

Page 50

1   we've got a retail broker, a wholesale broker, Charles
2   Messery, and then Mr. Messery, the actual underwriting
3   is somebody within underwriting at Lexington?
4       A.  That's correct.
5       Q.  Does Mr. Messery, is Mr. Messery involved
6   in the actual underwriting of the policies, the
7   assessment of whether to accept the risk, the
8   establishment of premium, any of those things?
9       A.  I believe he's a trained underwriter, and
10  he would make recommendations, but the final authority
11  comes from Lexington's underwriting department.
12      Q.  And the gentleman you mentioned earlier,
13  was he the one you think made the final decision on
14  this matter?  I forgot his name.
15      A.  Joseph George.
16      Q.  George.  Was he the one, you think --
17      A.  To the best of my knowledge.  There may
18  have been others involved in home office underwriting,
19  as well, but he would be the one.
20      Q.  Would the underwriters be the one to
21  decide what the premium would be?
22      A.  I believe in working with Mr. Messery.
23      Q.  Okay.
24      A.  Yes.

Page 51

1       Q.  And would it be the underwriters who would
2   decide what the structure of the policy would be, in
3   terms of the SIR and the limits?
4       A.  Yes.
5       Q.  Anybody else that we haven't talked about
6   that was involved in the underwriting or placement of
7   the program policies at the outset?
8       A.  Not that I can recall.
9       Q.  Prior to the placement of the first policy
10  under the program, did anyone at Lexington, to your
11  knowledge, have any communications with anyone at
12  Virginia Surety Company?
13      A.  When you say "Virginia Surety," are you
14  including or excluding National Program Services?
15      Q.  I'm talking about Virginia Surety
16  directly?
17      A.  Not that I'm aware of.
18      Q.  Did anyone at Lexington have any
19  communications directly with National Program Services
20  prior to the placement of these policies underwriting?
21      A.  I'm not positive on that, but they may
22  have.
23      Q.  When did Lexington first learn that
24  Virginia Surety Company was issuing primary policies to

Page 52

1   insureds under this program?
2       A.  After Lexington agreed to the structure
3   with the million dollars of coverage sitting above the
4   $250,000 SIR, sometime relatively shortly thereafter, I
5   believe, they learned that the insureds, whether it was
6   all or most of the insureds, intended to satisfy their
7   SIR by means of a buyback to provide coverage for that
8   $250,000 SIR.
9       Q.  When you say "buyback," what do you mean?
10      A.  Buying back insurance to replace what
11  would otherwise be their own dollar one responsibility
12  up to the $250,000.  Initially, they had been seeking
13  dollar one coverage.  So, Mr. Messery and Lexington
14  were not surprised that the insureds would then go out
15  and buy back that coverage to try to get to the
16  situation that they were originally looking for, which
17  was dollar one coverage.
18      Q.  Did National Union issue any policies in
19  connection with this program before it learned of the
20  existence of VSC and this buyback?
21      A.  I can't give you the specific dates, but I
22  believe -- I believe there would have been at least one
23  policy issued prior to that.
24      Q.  So, at the time the first policy was

Page 53

1   issued under this program, there was no knowledge of
2   the insureds' intent to insure the SIR?
3           MR. COHEN:  Objection.
4       A.  No knowledge that it would specifically be
5   done with Virginia Surety, I think is the way I would
6   characterize it.
7       Q.  Was there knowledge at the time the first
8   policy was issued that there was an intent to insure
9   the SIR?
10      A.  Not specifically.  I think, again, it
11  would be more of an educated guess.
12      Q.  And was there anything, to your knowledge,
13  in any of the NUFIC policies which prohibited an
14  insured from insuring the SIR?
15      A.  No.
16      Q.  Prior to issuing the NUFIC, the first
17  NUFIC policy, did anyone at Lexington, had anyone at
18  Lexington seen a VSC policy?
19      A.  I don't know.
20      Q.  Do you know when anyone at Lexington first
21  or anyone working with Lexington or NUFIC first
22  actually saw a VSC policy?
23      A.  I assume you mean a VSC policy related to
24  this program?

14 (Pages 50 to 53)

William R. Eddows, Esq.                                                          06/08/2006

Page 54

1     Q.   Absolutely.  Yes.
2     A.   Not specifically.  Again, it would have
3  been relatively soon after Lexington agreed to provide
4  the coverage.
5     Q.   Once Lexington and NUFIC -- Lexington in
6  this case became aware that under this program the
7  insureds were insuring the SIR, were there any changes
8  made in the policies issued by NUFIC in response to
9  that knowledge?
10     A.   I do not that I'm aware of.
11     Q.   Do you know whether in connection with
12  underwriting the NUFIC policies under the program,
13  there was any discussions with Mr. Gruppuso at NPS
14  concerning his role with respect to VSC policies?
15     A.   I don't know that.
16     Q.   Did Lexington or NUFIC know that NPS was a
17  managing general agent for VSC at the time that it
18  issued the NUFIC policies under the program?
19     A.   I would think so.
20     Q.   Did Mr. Messery tell you that?  Do you
21  know that that is the case?
22     A.   I know Mr. Messery was aware that NPS was
23  Virginia Surety's managing general agent.
24     Q.   When did they get that knowledge?

Page 55

1     A.   I can't tell you that specifically.
2     Q.   Do you know whether they had that
3  knowledge before the first policy was issued by NUFIC?
4     A.   I can't tell you for sure, but that
5  is my understanding.
6     Q.   Are you, have you ever seen policies that
7  prohibit an insured from insuring an SIR?
8     A.   No.  Policies may have some requirements
9  that are triggered if an insured does decide to insure
10  the SIR.
11     Q.   Do you know whether any of the NUFIC
12  policies issued under this program contained any
13  provisions dealing with the insurance within the SIR?
14     A.   I believe there may have been a
15  requirement for an approved TPA third-party
16  administrator to actually administer the bought back
17  SIR.
18     Q.   Was that specifically in relationship, in
19  relation to an insurer, or was it a requirement even if
20  the insured was going to bear the SIR?
21     A.   I'm not positive.  It may apply to both.
22  But, it certainly would apply in this instance.
23     Q.   Is it possible for you to determine from
24  any of the records the date on which NUFIC first

Page 56

1  learned of the VSC, that VSC was insuring the SIR
2  layer?
3     A.   I haven't seen any document or record that
4  I recall that would give me a specific date.  It would
5  have been -- again, it would have been shortly after
6  Lexington agreed to provide its coverage, though.
7     Q.   Do you know how many policies NUFIC wrote
8  before Lexington learned that VSC was insuring the SIR?
9         MR. COHEN:  Objection.
10     A.   I do not.
11     Q.   Or that NUFIC wrote?
12     A.   I don't know, because I don't know the
13  mechanics of what was actually triggering the issuance
14  of additional National Union policies.
15     Q.   Do you know how many policies were issued
16  by NUFIC under the program?
17     A.   I only know it was several.
18     Q.   More than one?
19     A.   Correct.
20     Q.   All right.  And so you don't know in terms
21  of the chronology of the placement of those policies
22  when Lexington first learned of the existence of VSC in
23  connection with this program?
24     A.   No.  I can't give you a specific date, no.

Page 57

1     Q.   When did NUFIC or Lexington learn that
2  defense costs were outside of the limits of the VSC
3  policy?
4     A.   Again, shortly after it put its coverage
5  in place, they did become aware that the buyback option
6  had been chosen and that Virginia Surety was providing
7  that coverage.
8     Q.   Do you know how many policies were issued
9  before NUFIC learned or Lexington learned that VSC had
10  issued policies with defense costs outside of limits?
11     A.   I think it would have been the first
12  policy.
13     Q.   Shortly after the first policy?
14     A.   That's correct.
15     Q.   Do you think any other policies were
16  issued prior to that knowledge?
17     A.   I can't say for sure.  Again, I'm not sure
18  of the mechanics which led, which triggered issuing of
19  additional policies.  The nature of this program, the
20  way it was set up with constantly insureds being added
21  and subtracted was driving, as I understand it, when
22  initial policies would be issued, but I can't give you
23  all of the mechanics on that.
24     Q.   With respect to at least the first policy

LegaLink Boston, a Merrill Company
(617) 542-0039

William R. Eddows, Esq.                                                    06/08/2006

Page 62

1    Q.  All right.  And the SIR is not referenced
2  in the declarations, but treated as an endorsement.  Is
3  that your understanding?
4    A.  That's right.  We have been discussing the
5  general form, itself.
6    Q.  Yes.
7    A.  Obviously, the endorsements would be
8  something different.
9    Q.  The endorsements tend to be, include
10  things that are individual to that particular
11  policyholder?
12    A.  That's correct.
13    Q.  Just so I understand this, the hazard
14  description is "real estate owner and/or management."
15  Is that a -- in terms of underwriting, is that sort of
16  a standard "hazard" or risk?
17    MR. COHEN:  Where it says "business of the
18  named insured?"
19    MR. BLUTE:  Under "hazard description,"
20  down about two-thirds of the way down.
21    MR. COHEN:  Okay.
22    A.  Yes.
23    Q.  And the premium basis, they list the
24  square feet and the number of units.  What is a premium

Page 63

1  basis?
2    A.  Well, I assume, I'm not an expert on how
3  they calculate premium, but I assume it's the factors
4  utilized in determining pricing.
5    Q.  In pricing?
6    A.  Yes.
7    Q.  Would Mr. Messery be the one to describe
8  for me how the premium was established in this case?
9    A.  Yes, sir.
10    Q.  Or Mr. Brown?
11    MR. COHEN:  Gould?
12    Q.  I'm sorry.  Gould?
13    A.  Yes.
14    Q.  So, if we turn over and look at the
15  Bates -- they're Bates stamped pages, so if you'd turn
16  over to Page ME, which is stamped at the bottom, 472?
17    A.  Endorsement No. 1?
18    Q.  Yes.  Am I correct that Endorsement No. 1
19  is the part of the policy that tells you who was
20  insured and what properties are insured?
21    A.  It lists both insureds and locations.
22    Q.  So, in other words, under the program you
23  have the basic policy and then looking at Endorsement 1
24  you have a fairly long list of insureds and locations,

Page 64

1  correct?
2    A.  Yes.  This is the way they made this work,
3  similar to what I described earlier as a true program
4  policy.
5    Q.  Okay.  On this particular endorsement,
6  there are -- it looks like if you go to ME497, at the
7  bottom, there are 25 entities insured by this policy?
8    MR. COHEN:  Lower left?
9    Q.  Very, very bottom?
10    A.  I've got it.  Yes.
11    Q.  And they also list a number of locations?
12    A.  That's correct.
13    Q.  So, in other words, if I understand
14  correctly, instead of issuing 25 separate policies to
15  these insureds, you issue one master policy and then
16  have an endorsement which just lists the 25 entities
17  that are covered by this policy; is that right?
18    A.  That appears to be the way it was done
19  here, yes.
20    MR. COHEN:  Some of the companies have
21  various different entities that they own.  I would just
22  note.
23    Q.  Right.  But, in other words, the entities
24  that are insured would be listed on Endorsement 1, as

Page 65

1  opposed to issuing separate insurance policies to each
2  of them?
3    A.  That's correct.
4    Q.  Do you know if there were originally more
5  than 25 entities?
6    A.  As I stated in the nature of this program,
7  there were constantly entities that were being added
8  and subtracted.
9    Q.  Okay.
10    A.  So, it's definitely a dynamic number.
11    Q.  Endorsement No. 1 could go up or down?
12    A.  Absolutely.
13    Q.  Depending on?
14    A.  My understanding is it was done on a
15  monthly basis.
16    Q.  Do you know whether there were particular
17  entities that Lexington or NUFIC refused to insure?
18    A.  I don't know.
19    Q.  And this monthly basis change of entities,
20  was that all done by Mr. Messery in working with the
21  underwriters in Boston?
22    A.  I believe it would have been Mr. Messery
23  and Risk office personnel.
24    Q.  And if you go over to ME00534, which is

LegaLink Boston, a Merrill Company
(617) 542-0039

William R. Eddows, Esq.

06/08/2006

Page 66

1  Endorsement No. 28, do you see that?
2      A.  I do.
3      Q.  To this particular policy?
4      A.  Yes.
5      Q.  This is titled "Self-insured Retention -
6  Per Occurrence."  Is this the document that established
7  the self-insured retention requirement?
8      A.  It is.
9      Q.  And the document speaks for itself, but am
10  I correct that essentially what this says is $250,000
11  must be spent by the policyholder before you have any
12  coverage obligations with respect to that individual
13  policyholder?
14      A.  Yes.
15      Q.  And down the bottom it says "$250,000 per
16  occurrence, including expenses."  What does that mean,
17  including expenses?
18      A.  That means indemnity and expenses combined
19  erode the SIR amount.
20      Q.  And just so I understand it, let's assume
21  one of the entities listed on Endorsement 1, just take
22  the first one listed, which is under the first named
23  insured location, there is Summit Properties, LLC, so
24  just let me give you a hypothetical.  Summit Properties

Page 67

1  owns certain residential real estate, and they buy this
2  policy to cover things that happen at that those
3  properties; is that right?
4      A.  That's right.
5      Q.  Somebody gets insured at one of those
6  properties and sues Summit Properties.  That is the
7  type of claim that this policy would respond to?
8      A.  Correct.
9      Q.  One of the types of claims?
10      A.  Yes.
11      Q.  All right.  So, let's say Summit
12  Properties get sued and the case meanders through the
13  courts, there is lot of discovery, and eventually
14  Summit Properties has spent $250,000 in legal fees and
15  expenses defending the claim which is still pending.
16  At that point, would NUFIC have an obligation to take
17  over that defense and defend the policyholder?
18          MR. COHEN:  Objection.
19      Q.  Assuming there is no other coverage
20  problems?
21          MR. COHEN:  Assuming there is no other
22  coverage.
23      Q.  I'm just asking this hypothetical there is
24  no other coverage.

Page 68

1      A.  Again, as it states, indemnity plus
2  expenses erode the SIR.
3      Q.  So, if I have, if I'm Summit Properties
4  and I spend $250,000 in legal fees, I've satisfied the
5  SIR?
6      A.  That's correct.
7      Q.  All right.  And is there anything that
8  you're aware of in this policy, and you can look at it
9  if you want, if you're aware, that limits the right of
10  Summit in this instance to insure the SIR?
11      A.  Not that I'm aware of.
12      Q.  Is there anything in this policy that
13  changes the operation of the policy based on whether or
14  not the SIR is insured?
15      A.  Not that I'm aware of.
16      Q.  Do you know whether in any of the NUFIC
17  policies that were issued in connection with this
18  program there were any changes to the policies to deal
19  with the fact that some of the insureds were insuring
20  the SIR?
21      A.  Not in the program period post program.
22      Q.  Let's talk program period right now.
23      A.  Okay.  No.
24      Q.  So, for the policies that were issued

Page 69

1  under the program, is it, I understand the language may
2  have changed, but with respect to the issue of changing
3  the policy to deal with the fact that the insureds
4  might be insuring the SIR, there is nothing in the
5  policies that deals with that.  Is that right?
6      A.  I don't think there was any change
7  limiting that right, and I don't think the SIR
8  endorsement, itself, was changed.
9      Q.  Let's change the hypothetical.  Let's
10  assume that Summit Properties bought an insurance
11  policy to cover the SIR, and defense costs were within
12  the limits of that policy.  So, at a $250,000, defense
13  costs within limits.  Do you understand that?
14      A.  Same situation as we have here.
15      Q.  Right.  So, in that situation, if the
16  insurance company hired the lawyer and defended Summit
17  Properties, once $250,000 in legal fees and expenses
18  was paid by the insurer, the Lexington or the NUFIC
19  policy in this instance would then have to respond.  Is
20  that right?
21      A.  I'm sorry.  Could you give me the
22  hypothetical again.
23      Q.  Sure.  The hypothetical is Summit
24  Properties, one of the insureds under Endorsement 1

18 (Pages 66 to 69)

William R. Eddows, Esq.                                                          06/08/2006

Page 74

1  laws, which vary from state to state, perhaps, dealing
2  with insurance company insolvencies and also would deal
3  with the drop down language in our policy, as well.
4  So, I can't give you a definitive answer on that.
5       The bankruptcy would -- the bankruptcy
6  wouldn't be an extraordinary event, which would have an
7  impact on whether or not we would be required to drop
8  down at that point.
9       Q.  What I'm saying is not -- I'm not
10 envisioning a drop-down situation. I'm envisioning a
11 hypothetical in which the $250,000 has been spent and
12 then that policy can no longer respond.
13      A.  I am envisioning a drop-down situation in
14 that, at that point under your scenario the insured has
15 again bargained for and received expanded coverage, and
16 the issue then is whether or not we would have to drop
17 down if because of insolvency that carrier couldn't
18 provide that expanded coverage.
19      Q.  Is there anything in this policy that
20 prevents dollars, that prohibits dollars being spent by
21 an insurance company on behalf of an insured from
22 applying against the $250,000 SIR?
23      A.  Not that I'm aware of.
24      Q.  Is there anything in this policy, to your

Page 75

1  knowledge, that refers to the VSC policy?
2       A.  No.
3       Q.  Have you ever seen a policy that has
4  something called a schedule of underlying insurance?
5       A.  Yes.
6       Q.  What is a schedule of underlying
7  insurance?
8       A.  A schedule of underlying insurance would
9  simply list any other insurance policies, which the
10 policy, the subject policy sits on top of.
11      Q.  So, there are situations where an excess
12 policy will actually identify the underlying insurance
13 policy that has to be exhausted before the policy is
14 triggered?
15      A.  It could be an umbrella policy. It could
16 be a primary policy. It could be an excess policy.
17      Q.  You've seen that before. That is fairly
18 common, is it not?
19      A.  I have.
20      Q.  And it is fairly common, is it not?
21      A.  I've certainly seen it before.
22      Q.  And in fact in this case with respect to
23 the NUFIC policies, do you know whether there are any
24 policies that sat above the NUFIC policy?

Page 76

1       A.  There was additional coverage above the
2  NUFIC policy.
3       Q.  And who underwrote that coverage?
4       A.  I think it varied from time to time, but I
5  know National Union, itself, issued an excess policy,
6  as well.
7       Q.  Have you ever seen the excess policy
8  issued by National Union that have sits over this
9  policy?
10      A.  I'm not sure I have.
11      Q.  Do you know whether that policy identifies
12 the Virginia Surety policy as a primary insurance
13 policy?
14      A.  I don't.
15      Q.  If the intent of this -- strike that. If
16 AIG, in this case, Lexington, understood that the
17 primary layer of this SIR was going to be insured, why
18 did it not identify VSC in the policy as an underlying
19 insurance policy?
20      A.  The policy may have been issued prior to
21 that point. I can't tell you specifically.
22      Q.  It could have done that, could it? That
23 could have been done as one possible structure of this
24 program if that was the intent, correct?

Page 77

1       A.  If it had known.
2       Q.  Yes.
3       A.  That's possible.
4       Q.  It could have said this policy sits above
5  a Virginia Surety policy and applies once that policy
6  is exhausted, correct?
7       A.  It may not have been that simple. My
8  understanding is that whereas our policy was issued to
9  the National Coalition, my understanding is that
10 Virginia Surety was issuing individual policies to
11 large numbers of the individual insureds, but not all
12 of those insureds were doing policy buyback. So, I'm
13 not sure what the mechanics would have been in trying
14 to add a single document, you know, to this policy to
15 make that happen, but --
16      Q.  Did Lexington and NUFIC change the premium
17 based on whether a particular policyholder was going to
18 insure the SIR?
19      MR. COHEN: You're asking if Lexington
20 took into account the --
21      MR. BLUTE: No. I'm asking whether
22 Lexington in establishing the premium for an individual
23 insured listed on the endorsement changed the premium
24 amount for that insured based on its knowledge that it

LegaLink Boston, a Merrill Company
(617) 542-0039

William R. Eddows, Esq.                                                              06/08/2006

Page 78

1    was insured by VSC.
2          MR. COHEN:  Meaning changed it from one
3    thing to another?
4          MR. BLUTE:  Yes.
5          MR. COHEN:  After it became aware?
6          MR. BLUTE:  Yes.
7    A.  I believe it would have.
8    Q.  You know that as a fact, that the policy
9    premium would change?
10   A.  My understanding is that at least early
11   on, the premium calculation was based on a percentage
12   of Virginia Surety's premium.  I recall that at one
13   point Lexington's premium was 12.2 percent of the
14   Virginia Surety premium.
15   Q.  How did you know the Virginia Surety
16   premium?
17   A.  I don't.  I don't know how they were aware
18   of that.
19   Q.  I think you testified --
20   A.  Through the program, they must have been
21   aware of it.
22   Q.  I think you testified earlier when the
23   first NUFIC policy was issued, Lexington was unaware of
24   VSC in particular as the insurer for this policy?

Page 79

1    A.  I think as I had mentioned to you, the
2    physical policy may have been issued, but certainly the
3    issue of — while the issue of pricing was being
4    hammered out, they became aware of the Virginia Surety
5    participation.
6    Q.  Did they know what the terms and
7    conditions of the VSC policy were?
8    A.  I would think they did.
9    Q.  If I find an insured under the first
10   policy that was issued, would the premium have changed?
11         MR. COHEN:  Objection.
12   A.  I think --
13   Q.  Should I see a change in premium?
14   A.  I don't -- I don't think your question
15   reflects what happened here.  I think the first
16   policy's premium was initially calculated based on the
17   Virginia Surety participation.
18   Q.  You believe that at the time that this,
19   this endorsement was issued, at least, because it
20   contains the premium, it's your understanding when this
21   premium was established on Endorsement 1, Lexington
22   knew the VSC was insuring these entities?
23   A.  I believe so.
24   Q.  Have you ever seen a document that

Page 80

1    reflects that?
2    A.  I seem to recall a document reflecting
3    again that the Lexington premium initially was
4    calculated as 12.2 percent of the Virginia Surety
5    premium.
6    Q.  And what document was that?  What document
7    was that?  Do you remember?
8    A.  I don't recall offhand.
9    Q.  Was it the underwriting files?
10   A.  Yes.  Charlie Messery would be the person
11   to --
12   Q.  Was that a document that was produced to
13   us?
14   A.  I believe so.
15         MR. BLUTE:  Do you know by whom that -- if
16   that has been produced?
17         MR. COHEN:  My understanding is it has.  I
18   didn't do the production myself.
19         MR. BLUTE:  Let's make a note to have
20   someone call you, follow up on it.
21   BY MR. BLUTE:
22   Q.  Would you agree with me that if a policy
23   were issued without knowledge of VSC, and then
24   subsequently Lexington learned that VSC had a policy,

Page 81

1    that given your understanding of how these policies
2    operate, you would expect a change in premium?
3    A.  No.  I don't agree.  That would only be a
4    valid assumption if pricing were always based, you
5    know, solely on the SIR buyback.
6    Q.  Would you agree with me that under
7    Lexington's interpretation of the SIR and how it
8    operates that you're substantially more exposed to
9    claims when there is no insurance insuring the
10   underlying claim?
11   A.  Could you repeat that?
12   Q.  Sure.  Would you agree with me that the
13   exposure, the risk undertaken by Lexington is
14   significantly greater if the SIR is not insured?
15   A.  Assuming that if it is insured that
16   insurance provides different coverage, I would agree.
17   Q.  So, if the insurance for the SIR has
18   defense costs outside of limits, you agree with me that
19   is a substantially lower risk for Lexington?
20   A.  If defense is outside of limits, as
21   opposed to inside of limits, I would agree with you.
22   Q.  And would you expect that change in risk
23   to be reflected in premium?
24   A.  You would need to know what the basis

21 (Pages 78 to 81)

William R. Eddows, Esq.                                                          06/08/2006

Page 82

1  being used to calculate the premium was. That may be a
2  factor. I don't know.
3      Q. And so I understand, Lexington's position
4  is that until Virginia Surety exhausted its indemnity
5  limits, it had no, it has no coverage obligation. Is
6  that right?
7      A. I think Lexington presumes that the
8  Virginia Surety policy speaks for itself.
9      Q. But, in terms of how you understand these
10 policies to operate, am I correct that it's your
11 understanding that until Virginia Surety pays its
12 indemnity limit out, you have no obligation?
13     A. Lexington's understanding is that under
14 the supplementary payment section of Virginia Surety's
15 policies, defense costs, expenses do not go towards
16 eroding the limits.
17     Q. So, your understanding is that until
18 Virginia Surety settles their case or pays a judgment
19 of $250,000, NUFIC has no obligation?
20     A. That is our understanding of the coverage
21 agreement that Virginia Surety provided to its
22 insureds.
23     Q. Is there anything in your policy that says
24 that, that you're aware of?

Page 83

1      A. There is not.
2      Q. So, in terms of how your policy operates,
3  you're looking at the operation of VSC's policy?
4      A. That's correct.
5      Q. Okay. If that is correct, if it's correct
6  that VSC has to pay its indemnity limit in settlement
7  or judgment of a claim, are you aware of any instance
8  where Lexington or NUFIC would have any obligation for
9  defense expenditures?
10     A. Once the indemnity limit was used up.
11     Q. But, presuming the indemnity limit has to
12 be used up either by a settlement or a judgment ending
13 the case?
14     MR. COHEN: We can have more than one case
15 in the same occurrence, right?
16     Q. Let's talk about a single case, a single
17 claim. Is there any single claim that would result in
18 your view in Lexington or NUFIC ever paying any defense
19 expenses?
20     MR. COHEN: Objection under your
21 hypothetical. We're talking about one case.
22     A. There could also be a situation where
23 there was no coverage under the underlying buyback
24 policy.

Page 84

1      Q. So, if we had a policy that didn't buy
2  back the policy --
3      A. That policy or they had that policy in
4  place, but it did not for whatever reason provide
5  coverage.
6      Q. And Mr. Cohen mentioned a situation where
7  you had multiple occurrences, or you had multiple
8  claimants?
9      A. Multiple claimants? That is another
10 situation.
11     Q. One of those settles for 250, then the
12 other two get covered, and there are defense costs
13 there; is that correct?
14     A. That's correct.
15     Q. Any other situations you can envision
16 where Lexington or NUFIC would have to pay defense
17 expenses under this view of the policies?
18     A. Those are the two main ones that come to
19 mind.
20     Q. Let's assume that VSC settles, expends
21 half a million dollars in defense costs and the case,
22 eventually a judgment is eventually entered for
23 $250,000, and VSC pays that $250,000 judgment. In your
24 view, does Lexington or NUFIC have any obligation for

Page 85

1  any of the defense expenses above the 250?
2      A. No.
3      Q. You would say no?
4      A. Correct.
5      Q. So, in that case, even though VSC paid
6  $750,000, your view is your policies have no obligation
7  in that instance?
8      A. That's correct.
9      Q. Was there ever any discussion about
10 listing the VSC policy in a schedule of underlying
11 insurance in the NUFIC policies?
12     A. I don't know.
13     Q. Is there a difference between an SIR and a
14 listing of an insurance policy on a schedule of
15 underlying insurance?
16     MR. COHEN: Difference in what respect?
17     MR. BLUTE: In the operation of the
18 policies?
19     Q. Is there a difference between saying you
20 have a $250,000 per occurrence SIR and saying we
21 understand there is an insurance policy that sits under
22 ours that has a $250,000 limit? Is there any
23 difference in the operation of your policy in that
24 situation?

22 (Pages 82 to 85)

William R. Eddows, Esq.                                                                    06/08/2006

Page 86

1    A.  You may be talking about different types
2  of policies at that point. I'm not exactly sure what
3  your question is driving at. If you have -- as we
4  discussed earlier, you might have an umbrella or an
5  excess policy, which would reference, you know,
6  straight primary coverage beneath it and a schedule of
7  insurance.
8    Q.  Again, do you have any idea whether the
9  excess policies that were issued by Lexington sit over
10 this coverage referenced VSC as a primary carrier?
11   A.  I don't.
12   Q.  There was an objection to that. We should
13 talk about it, but that policy is clearly relevant, it
14 seems to me. The excess policy and what it says, the
15 ones issued by Lexington and NUFIC?
16        MR. COHEN: My understanding is there were
17 some.
18        MR. BLUTE: They weren't produced. There
19 was on objection to them. I would just like to, you
20 know, try to get you to rethink that, because I think
21 they are relevant.
22        MR. COHEN: You're welcome to that. My
23 understanding is the third-level NUFIC policies, policy
24 doesn't apply to all of these insureds. There are

Page 87

1  other insurers that also issued policies to insureds at
2  that level.
3        MR. BLUTE: Well, whatever you have. So
4  we don't have to sit here. We'll try to get the other
5  ones from Chubb.
6        MR. COHEN: I don't think we have any.
7  NUFIC presumably would. The McCormack firm I don't
8  believe has seen any such policies.
9        MR. BLUTE: You can look into it and let
10 me know. We'll follow up on it, but I do think we're
11 entitled to get any excess policies that Lexington or
12 NUFIC issued.
13        MR. COHEN: I'm not aware of any Lexington
14 third-layer policies. Are you, Bill?
15        THE WITNESS: I don't think Lexington
16 issued any third-layer policies. I'm pretty sure they
17 didn't.
18   Q.  So, just going back through this line of
19 questioning, the $250,000 SIR, under your view,
20 essentially changes depending on what the underlying
21 insurance says?
22   A.  I think it would be impacted by what the
23 underlying, the bargain between the insured and
24 underlying insurer is.

Page 88

1    Q.  Was Lexington or NUFIC involved at all in
2  that bargain?
3    A.  Not that I'm aware of.
4    Q.  Did Lexington or NUFIC at any time have
5  any discussions with VSC about this program, not about
6  claims, but about the structure of this program?
7        MR. COHEN: VSC, itself, or --
8        MR. BLUTE: Let's start with VSC, itself,
9  to start.
10        MR. COHEN: I assume you're talking about
11 other than letters we got from lawyers about coverage
12 issues?
13        MR. BLUTE: Yes.
14 BY MR. BLUTE:
15   Q.  I'm talking about in connection with the
16 placement of policies. Did you have any communications
17 directly with VSC?
18   A.  At the time of the placement?
19   Q.  Yes.
20   A.  I'm not aware of that.
21   Q.  Did you have communications, written
22 communications directly with National Program Services
23 at the time the policies were placed?
24   A.  I'm not aware of that.

Page 89

1    Q.  Do you know whether Mr. Messery had any
2  direct contact with National Program Services at the
3  time the policies were placed?
4    A.  I do not.
5    Q.  The phrase you have been using about an
6  insurance, a policy holder, who insures an SIR, you
7  call it a buyback?
8    A.  (Witness nodded.)
9    Q.  Is that a term of art used in the industry
10 or is that something that you, it's your word
11 selection?
12   A.  I believe it's a term that Mr. Messery
13 would use.
14   Q.  That a policy holder who insures within
15 the SIR, that is a buyback?
16   A.  It's a buyback in the sense that the
17 policyholder was originally in this case looking for
18 dollar one coverage, so they're basically buying back
19 to the situation they were looking for at the
20 beginning.
21   Q.  Okay. Do you know how many insureds there
22 were that did not have insurance with VSC, but did have
23 insurance under the NUFIC policy?
24   A.  I don't know the number.

23 (Pages 86 to 89)

William R. Eddows, Esq.

06/08/2006

Page 90

1    Q.  I tried to get this earlier, but let's
2  just hypothetically assume I have an insured, who is
3  trying to decide whether to get the VSC policy or not,
4  and he wants a quote from Lexington for coverage under
5  this program as to both with and without insurance,
6  would you expect in that instance a change, a different
7  premium?
8         MR. COHEN:  Objection.
9    Q.  Or do you know?
10    A.  I can't answer that.  I would need to know
11  what they at that point in time were basing their
12  premium calculations on.  That may be one of the
13  factors, but I don't know for sure.  I don't know what
14  the impact would be.
15    Q.  Okay.  Mr. Messery would be the one to
16  talk about that?
17    A.  He would.
18    Q.  Is there any provision in the policy that
19  you're aware of that states that that $250,000 amount
20  changes based on whether there is an insurance policy
21  within the retention?
22    A.  I'm not aware that there is.
23    Q.  Are you aware of any regulation or
24  restriction that would prohibit an insurance company

Page 91

1  from issuing a $250,000 policy with defense costs
2  within limits?
3    A.  That would vary from state to state.
4    Q.  All right.
5    A.  I understand that that is a restriction in
6  various states.
7    Q.  Do you know if it's a restriction in
8  Massachusetts?
9    A.  I don't offhand know if it's a restriction
10  in Massachusetts.
11    Q.  Do you know if it's a restriction in New
12  York?
13    A.  I don't know.
14    Q.  New Jersey?
15    A.  I don't.  I don't know for the specific
16  states.  I just know that in a number of states, it is
17  a specific restriction.
18    Q.  If VSC issued a policy in a state that
19  permitted defense costs within limits, and the defense
20  costs eroded the policyholder's limits, would you
21  anticipate the NUFIC policy responding at that point?
22    A.  If that's the way the Virginia Surety
23  policy was written, correct.
24    Q.  Did you make any -- do you know whether

Page 92

1  Lexington made any, charged any different premiums
2  based on the states where these policyholders were
3  located?
4    A.  I don't know that.
5    Q.  Did AIG have to approve the VSC form that
6  was used?
7         MR. COHEN:  Did AIG have to approve the
8  form?
9    Q.  Did NUFIC have to approve the form that
10  was used by VSC in connection with this program?
11    A.  I don't think Lexington or NUFIC or the
12  Risk office had any advance notice.
13    Q.  Do you know how much Lexington has paid
14  out or NUFIC or Lexington have paid out in lost
15  payments under its policies in connection with this
16  program?
17    A.  Based on the loss runs I've seen, it's
18  somewhere in the area of 19, 19-and-a-half million in
19  indemnities, and maybe a little more than half a
20  million in expenses.
21    Q.  So, 19 million in indemnity and a half
22  million dollars in expenses, approximately?
23    A.  (Witness nodded.)
24         MR. COHEN:  We did produce the loss runs.

Page 93

1         MR. BLUTE:  The loss runs?
2    Q.  If looking at the -- I forgot the exhibit
3  number, but the Amended Complaint, the first paragraph
4  says, "Lexington and National Union seek a declaration
5  that all of their policies are 'true excess policies.'"
6  What is a "true excess policy?"
7    A.  True excess policy would be a policy that
8  would be excess to any other primary coverages also
9  available.
10    Q.  Does a true excess policy have to identify
11  the underlying insurance policy that it sits over?
12         MR. COHEN:  Objection.
13    A.  Not that I'm aware of.
14    Q.  Do you know of any -- you said "true
15  excess."  Are there excess policies that are not true
16  excess?
17    A.  I think true excess is probably a legalese
18  reference, whereas an excess policy is simply an
19  insurance reference to differentiate between primary
20  umbrella excess, that type of thing.
21    Q.  I mean are there excess policies that are
22  not true excess policies?
23         MR. COHEN:  Objection.
24    A.  I can't answer that.  That is a legal

24 (Pages 90 to 93)

William R. Eddows, Esq.                                                                                                                06/08/2006

Page 94

1  question, I think.
2         MR. COHEN:  Off the record.
3         (Discussion off the record.)
4         Q.  Go back to the interrogatory answers.  I
5  don't know if you have them there, but I can read them
6  to you.  You identify a number of individuals, which
7  you also have on the list that is Exhibit 4.  The first
8  one listed is Betty Viscione.
9         A.  Viscione.
10        Q.  Viscione.
11        A.  Yes.
12        Q.  She's the primary casualty unit manager
13  for Lexington Insurance Company?
14        A.  She is.
15        Q.  What is a primary casualty unit manager's
16  responsibilities?
17        A.  At Lexington, we have in order to handle
18  our primary claims, we now have three separate primary
19  units set up to handle those claims, and Betty manages
20  one of those units and oversees the activities of a
21  number of examiners, who handle the individual claims
22  that come into that unit.
23        Q.  Of those three units, is it based on
24  subject matter of the claims or a value of the claims?

Page 95

1  What is the difference between those?
2         A.  No.  They all handle various types of
3  claims.
4         Q.  Why three units?  Just for efficiency?
5         A.  Volume-wise.
6         Q.  Volume?
7         A.  That's right.
8         Q.  What was Betty Viscione's role with
9  respect to the program policies?
10        A.  Again, she was the manager of that unit to
11  which these claims came into.
12        Q.  Who handles the claims when they come in?
13        A.  The claims examiner to which they're
14  assigned.
15        Q.  Is Lexington dealing directly with
16  lawyers, or is there a third-party claims administrator
17  handling this on behalf of Lexington and NUFIC?
18        A.  In this situation, York Claims is used as
19  a claims handling entity, and Lexington oversees their
20  activities, coordinates with them.
21        Q.  Is York Claims Service an AIG company?
22        A.  No.
23        Q.  It's an independent operation?
24        A.  It is.

Page 96

1         Q.  Does Lexington -- so Lexington pays them a
2  fee essentially for handling the claims?
3         A.  That's correct.
4         Q.  And what is it that determines whether you
5  would use York Claims Service rather than handle the
6  case directly?
7         A.  I'm not sure.
8         Q.  And you list JR Maul, unit manager, York
9  Claims Services.  Is he the person at York, who has
10  primary responsibility for the claims under this
11  program?
12        A.  Yes.  He would be the claims -- he
13  similarly to the way Betty would oversee activities of
14  examiners at Lexington in Boston, he would oversee York
15  examiners working on this account.
16        Q.  And Brenda Bouyer-Windley, general
17  liability manager, Risk Specialist Company of New York,
18  do you know what her responsibilities are?
19        A.  I know that she is an underwriter by
20  training, and I believe she's the custodian of the
21  files at issue.
22        Q.  Did she have any involvement with the
23  placement of these policies?
24        A.  I'm not aware one way or another.

Page 97

1         Q.  And Ira Ladd, who is Ira Ladd?
2         A.  JR Maul reports to Ira Ladd at York.
3         Q.  Have you had discussions with Betty
4  Viscione concerning this matter?
5         A.  I'm sure from time to time I have
6  discussed this with Betty.  I know that Betty and I did
7  discuss the deposition scheduling recently, and Betty
8  took part in the conversations with Mr. Messery, as
9  well.
10        Q.  What was the most recent conversation with
11  Mr. Messery?
12        A.  When?
13        Q.  Yes.  Approximately?
14        A.  Oh, a couple of months back, I would
15  guess.
16        Q.  I may have asked you this.  Is Ganatt
17  Associates in New York?
18        A.  I don't know where it is.
19        Q.  You don't know where it is?
20        A.  No.
21        Q.  Do you have Mr. Messery's phone number?
22        A.  I don't.  I'm sure counsel does.
23        Q.  When claims are being handled by York, do
24  coverage issues ever arise?

25 (Pages 94 to 97)

LegaLink Boston, a Merrill Company
(617) 542-0039

William R. Eddows, Esq.                                                                      06/08/2006

Page 98

1    A.  I'm sure they do.
2    Q.  And who is responsible for, at Lexington
3  or NUFIC or on behalf of NUFIC for making decisions
4  with respect to coverage?
5    A.  York may themselves obtain an outside
6  coverage opinion.  They would certainly consult with
7  Betty Viscione or Lexington examiners, as well.  It may
8  obviously at York also involve conversations between
9  examiners and supervisors there, as well.
10    Q.  Did York have the authority to make
11  coverage determinations itself?
12    A.  I would think that they would need
13  approval from Lexington.
14    Q.  Who at Lexington would ultimately be
15  responsible for coverage determinations?
16    A.  My guess on this account would be Betty
17  Viscione.
18    Q.  Are you aware that at some point a dispute
19  arose between VSC and Lexington concerning the
20  operation of this program?
21    A.  I am.
22    Q.  Did you become aware of that dispute at
23  the time?
24    A.  Yes, I did.

Page 99

1    Q.  How did you become aware of it?
2    A.  I'm sure it was brought up to me.  I can't
3  recall whether it was by Betty or Fred Owen, but it
4  would have been brought up to me at the time that it
5  arose.
6    Q.  All right.  And what was the nature of the
7  dispute, as you understood it?
8    A.  The nature of the dispute was over
9  exhaustion of the SIR.
10    Q.  And what was the dispute?
11    A.  The dispute was that despite the VSC
12  policy language, they were adopting the position for
13  the first time that $250,000 in expenses would erode
14  their obligation.
15    Q.  All right.  And did Betty Viscione perform
16  an analysis of that question?
17    A.  I would think that she did.
18    Q.  Do you know whether she put that analysis
19  in writing?
20    A.  I haven't seen a written analysis by her,
21  no.
22    Q.  Do you know what York's opinion of that
23  issue was?
24    A.  I have seen correspondence from York

Page 100

1  indicating that they disagreed with that position.
2    Q.  That they disagreed?
3    A.  Yes.
4    Q.  That York, you've seen communications
5  where York took the position, took a position
6  consistent with VSC's position?
7    A.  No.  Just the opposite.
8    Q.  Okay.  Are you aware of anyone at work,
9  who agreed with VSC's position?
10    A.  No.
11    Q.  Do you know whether work ever requested
12  information from VSC concerning claims expenses because
13  of the risk of the SIR being exhausted?
14    A.  I don't.
15    Q.  Did York make the coverage determination
16  in this case on this disputed issue?
17    A.  I'm sure that issue was referred to
18  Lexington.
19    Q.  And to Betty Viscione?
20    A.  Certainly initially to Betty Viscione.
21    Q.  Did Betty Viscione make a coverage
22  determination?
23    A.  She may have sought additional advice.
24    Q.  All right.

Page 101

1    A.  I would think she sought additional advice
2  from outside counsel, and maybe others in claims
3  management, as well.
4    Q.  Do you think she sought advice from
5  outside counsel?
6    A.  I believe so.
7    Q.  Do you know who the outside counsel was?
8    A.  I believe Mr. Cohen's firm.
9    Q.  Do you know when that request for outside
10  counsel assistance was made?
11    A.  Not specifically.
12    Q.  Was it before or after Lexington's
13  position was communicated to VSC?
14    A.  I can't tell you specifically the date of
15  both of those.  I'd have to review the correspondence
16  to figure that out.
17    Q.  Who had ultimate, who ultimately -- strike
18  that.  Who had the ultimate responsibility within
19  Lexington for determining the answer to this coverage
20  dispute from your perspective?
21    A.  I'm not sure it would be one person.  It
22  would be a collective claims department responsibility
23  to get it right.
24    Q.  Did you make the final decision?  Did you

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 110

1    this binder, which we've marked as Exhibit 5.
2    Something occurred to me over lunch I wanted to ask
3    you. If a policy holder purchased an insurance policy
4    that had $500,000 limits, indemnity limits, rather than
5    $250,000, is it your understanding that NUFIC and
6    Lexington would have no obligation until that $500,000
7    was exhausted?
8        MR. COHEN: You mean the first dollar
9    primary $500,000 policy?
10        MR. BLUTE: Yes.
11        A. Just a straight policy? It's not part of
12    your previous hypothetical, just a straight.
13        Q. No. Just one of these policyholders went
14    out and for whatever reason purchased a $500,000
15    primary insurance policy with first dollar coverage?
16        A. That's correct. I would assume that the
17    NUFIC policy would sit above that.
18        Q. And that's true regardless of the amounts
19    of limits? If I postulated a million-dollar limit,
20    your view would be your policy wouldn't, under your SIR
21    endorsement, you'd have no obligation until that
22    million dollars was paid out in indemnity?
23        A. Again, if there were an SIR under our
24    policy, that would get back more to the scenario you

Page 111

1    laid out in your hypothetical, whereby that policy was
2    retained to be an SIR buyback, since there is an SIR
3    under our policy.
4        Q. Let's assume, you know, for whatever
5    reason, a policyholder wants to buy a million-dollar
6    primary insurance policy. Is it your view that you
7    would have no obligation for a claim until a million
8    dollars was spent in that primary policy, in indemnity
9    dollars?
10        A. Yes. It would be my opinion that the
11    insured was expending its money purposefully to obtain
12    expanded coverage.
13        Q. Did you rebate any premium to any
14    insureds, who insured the SIR?
15        A. Not that I'm aware of.
16        Q. If you had an insured, if you had an
17    insured that participated in this program and did not,
18    did not insure the SIR, and then in a subsequent year
19    decided to insure the SIR, would you expect that that
20    premium would change? Based solely on that
21    hypothetical, would you expect a change in premium?
22        A. No. Again, as I said earlier, you would
23    need to know what the basis being used was for pricing
24    premiums.

Page 112

1        Q. Is the fact of insurance and the SIR, does
2    that have anything to do with your premium?
3        A. It may be a factor. I'm not sure.
4        Q. Do you know how many insureds under the
5    NUFIC program did not get policies from VSC?
6        A. I don't.
7        Q. Do you know whether there are any insureds
8    who did not get policies from VSC?
9        A. I know there were some, but I do not know
10    that number.
11        Q. Did Lexington and NUFIC anticipate at the
12    outset that certain of the policyholders would not buy
13    insurance to cover the SIR?
14        A. In general, I think the assumption was
15    that most would.
16        Q. Is there anything in the Lexington or
17    NUFIC policies issued in the program that would prevent
18    a policyholder from insuring the SIR layer with someone
19    other than VSC?
20        A. I don't think there is anything that
21    prohibits it, whether it's VSC or anybody else.
22        Q. And it doesn't matter to NUFIC or
23    Lexington what the terms of those policies are, in
24    terms of how you price your policies?

Page 113

1        MR. COHEN: Objection.
2        A. Again I believe, as I said early on, I
3    think that was at least early on one of the
4    considerations used in doing the initial pricing.
5        Q. But, wouldn't you want to know, in terms
6    of underwriting a policy, precisely what coverage the
7    policyholder had insuring the SIR?
8        A. Again, it depends at that point on what
9    specific criteria you're using to determine what the
10    premium will be.
11        Q. And you don't know the answer to that?
12        A. That's right.
13        Q. Were there any premium finance companies
14    involved in the placement of the, or funding of the
15    premiums for this program that you know of?
16        A. I don't know one way or another.
17        Q. If you would turn to on the -- if you look
18    at the first NUFIC policy under the program --
19        A. Tab 1?
20        Q. Yes. It's Tab A. Is there anything in
21    the declarations page of this policy which designates
22    it as an excess insurance policy?
23        A. No.
24        Q. Is there anything in the policy language,

William R. Eddows, Esq.

06/08/2006

Page 118

1      A.  No.  If that legal conclusion were
2  reached, I wouldn't then want to guess on what the
3  following conclusion would be on how you would resolve
4  that issue.
5      Q.  What is the purpose of having an "Other
6  Insurance" clause in one of your policies?
7      A.  For instance, if there were other
8  available insurance on a layer, for instance, if you
9  picked up an additional insured under your policy
10  through various means, whether it's additional insured
11  endorsement, and that party also had coverage at the
12  same layer, that would determine how you would split
13  most coverages.
14      Q.  And this clause would then determine how
15  you would split those coverages?
16      A.  That's correct.
17      Q.  And it says "A, primary insurance, this
18  insurance is primary, except when B below applies.  If
19  this insurance is primary, our obligations are not
20  affected unless any of the other insurance is also
21  primary, then we will share with all that other
22  insurance by the methods described in C below."
23      First of all, is it your understanding, is
24  it your position that this policy under the NUFIC, the

Page 119

1  NUFIC policy issued was not a primary policy?
2      A.  I don't want to try splitting hairs here.
3  As I said earlier, it's a primary policy form with an
4  SIR endorsement attached, which means it doesn't attach
5  at dollar one, so as opposed to the legalese argument
6  involving two excess, I would consider it an excess
7  policy because of the presence of the SIR endorsement.
8      Q.  But, this clause envisions a situation
9  where you could have, where this policy is deemed
10  primary and other insurance available to a policyholder
11  is also deemed primary, correct?
12      A.  That's correct.
13      Q.  So, when this policy was issued, it was
14  envisioned by Lexington and NUFIC that you could have a
15  situation where you would have another policy that
16  would be primary, as well as your policy being primary?
17      A.  Yes.
18      Q.  And in that situation, this clause permits
19  sharing how, as you understand it?
20      A.  It's set out in C, "Method of Sharing."
21      Q.  And that provides that it would be
22  contribution by equal shares, correct?
23      A.  That's right.
24      Q.  Assuming the other insurance permits that?

Page 120

1      A.  Yes.
2      Q.  If it doesn't permit that, you then have a
3  ratio based on applicable limits of insurance?
4      A.  That's correct.
5      Q.  Now, Subparagraph B defines the situations
6  in which your policy would be deemed excess, correct,
7  vis-a-vis other insurance policies?
8      A.  That's correct.
9      Q.  Let me just -- it says, "The insurance is
10  excess over any of the other insurance, whether
11  primary, excess, contingent or any other basis," and
12  then it lists three types.
13      Let me just go through those and ask you a
14  few questions.  Would you agree with me that the VSC
15  policy is not a fire insurance policy --
16      A.  You would --
17      Q.  -- as used in this clause?
18      A.  You would first, though, have to make the
19  assumption that, you know, I don't agree with, that VSC
20  coverage is on the same layer.
21      Q.  I understand.  I didn't ask you about that
22  assumption.  I'm asking:  Would you agree VSC's policy
23  is not a fire insurance policy?
24      A.  Yes.

Page 121

1      Q.  Would you agree with me that VSC's
2  insurance policy is not an extended coverage policy, as
3  used in this endorsement?
4      A.  I would agree.
5      Q.  Would you agree with me that VSC's policy
6  is not a builders' risk insurance policy, as used in
7  this endorsement?
8      A.  It is not.
9      Q.  Would you agree with me installation risk,
10  that the VSC policy is not an installation risk or
11  similar coverage for "your work" within the meaning of
12  this policy?
13      A.  Agreed.
14      Q.  Would you agree with me that the VSC
15  policy is not "fire insurance for premises rented to
16  you or temporarily occupied by you with permission of
17  the owner?"
18      A.  I agree.
19      Q.  And would you agree with me that, would
20  you agree that the claims under the NUFIC -- under the
21  program did not involve or do not involve maintenance
22  or use of aircraft, auto or watercraft?
23      A.  Not necessarily.  They could potentially
24  have involved special use of autos, I would think.

LegaLink Boston, a Merrill Company
(617) 542-0039

William R. Eddows, Esq.                                                                06/08/2006

Page 122

1  Potentially.
2       Q.  So, if this clause applied and if a claim
3  arose out the maintenance, use of aircraft, autos or
4  watercraft, this clause would in that instance deem
5  this to be an excess insurance policy?
6       A.  Correct.
7       Q.  Are you aware of any endorsement which
8  alters the "other insurance policy" language of this
9  policy?
10      A.  No.
11      Q.  Do you know why this policy form was used?
12      A.  Only that the initial request was for
13  dollar one coverage, so it may have been the form that
14  was being contemplated to be used, and when the issue
15  of the SIR requirement was broached by Lexington, that
16  it was done by means of adding the SIR endorsement.
17      Q.  Is that your understanding or knowledge as
18  to what happened, or is that a guess or informed
19  speculation?
20      A.  I think it's informed speculation as to
21  what happened.
22      Q.  Okay.  Do you know whether any
23  consideration was given to writing these policies on a
24  form that would be specifically excess of the VSC

Page 123

1  policy limits?
2       A.  It specifically wasn't in that -- the
3  policy form, as I understand it, was issued prior to
4  finding out about the VSC policy.
5       Q.  But, there are subsequent policies issued
6  after the company learned of VSC, correct?
7       A.  That's correct.
8       Q.  And do you know whether there was any
9  consideration given under the program policies after
10 learning of the VSC insurance policy to issuing a
11 policy which was specifically excess of the VSC policy?
12      A.  Not that I'm aware of one way or another.
13      Q.  After VSC raised this issue of the
14 relative obligations, was there any discussion of
15 changing the policy to a different form that would be
16 specifically excess of VSC's policy?
17      MR. COHEN:  After what?
18      Q.  After VSC raised the issue of the relative
19 obligation of the parties?
20      MR. COHEN:  After the program is over.
21      A.  The answer is no, because the policies had
22 lapsed at that point.
23      Q.  So, at the time that these policies were
24 being issued, AIG, Lexington, NUFIC were unaware of any

Page 124

1  issue concerning the application of VSC's policies
2  vis-a-vis these policies?
3       A.  Lexington assumed based on the language of
4  the VSC policy that it understood how it would operate.
5       Q.  When you say they assumed that, is that a
6  guess, an informed speculation, or is that actually
7  what happened?
8       A.  I believe that is what happened.
9       Q.  When you say you believe that, based on
10 what?
11      A.  Based on the course of dealings.
12      Q.  And who -- did somebody tell you?  Did any
13 of the underwriters tell you that in fact was the
14 understanding?
15      A.  Charlie Messery, I believe, was of that
16 opinion, yes.
17      Q.  Did he tell you that in your discussions
18 with him?
19      A.  Yes.
20      Q.  Were any policies issued, any post-program
21 policies issued after this issue came up with VSC?
22      A.  Yes.  After the program was cancelled,
23 there were a large number of post-program policies
24 issued to a large number of the individual insureds.

Page 125

1       Q.  And that was after VSC had raised the
2  issue under the program policies of the respective
3  obligations of the parties?
4       A.  I don't believe so.  I think that was
5  before.  Yes.  That was before.
6       Q.  Even those policies were before Lexington
7  was aware?
8       A.  That's correct.
9       MR. BLUTE:  Mark that as the next exhibit.
10      (E-mail chain
11  marked Exhibit 6.)
12 BY MR. BLUTE:
13      Q.  Exhibit 6 is an e-mail chain that was
14 produced to us concerning treatment of a particular
15 claim.  If you look at Page Lexington, LEXCF003081, and
16 look at the bottom of that page, this e-mail, this
17 e-mail chain concerns a claim which the exposure was
18 deemed to exceed the VSC limits, and there was a
19 question as to whether VSC should tender its limits.
20      Are you familiar with a practice of
21 Lexington or NUFIC or York accepting a tender of limits
22 by VSC in connection with the resolution of claims?
23      A.  That would be either accepting or
24 demanding a tender of limits, yes.

32 (Pages 122 to 125)

William R. Eddows, Esq.                                                           06/08/2006

Page 150

1    Q.  And have you ever, does NUFIC or Lexington
2    have a form that is a retained amount form, where the
3    retained amount, insured or self-insured is expressly a
4    dollar amount plus ALAE?
5        A.  No.  I actually think what he, what he may
6    have been referring to is a shorthand way of saying a
7    specific amount plus defense, in addition.
8        Q.  Are you familiar with a -- any form?
9    She's referring to a type of form.  She says, "I
10   thought these policies were all written on a retained
11   amount form."
12       First of all, is that an expression that
13   you've heard or used, "retained amount form?"
14       A.  A retained limit form, correct.
15       Q.  Where the "retained amount insured or
16   self-insured" -- let me ask you this.  Have you ever
17   seen or are you aware of forms used by NUFIC or
18   Lexington that refer to a "retained amount insured or
19   self-insured?"
20       A.  I'm sure in the past I've seen such forms.
21   Yes.
22       Q.  Are these pre -- forms that are, what do
23   you call it, you know, pre-printed forms?
24       A.  I think, as we discussed earlier, we

Page 151

1    utilize so many manuscript forms.  Whether one
2    previously existed or one was newly drafted, I wouldn't
3    be surprised at seeing one.
4        Q.  Do you know whether there are any
5    pre-printed forms that have a retained amount plus --
6    that expressly state that the retention is a retained
7    amount plus ALAE?
8        A.  Not specifically.  No.
9        Q.  All right.  If you wanted to check that
10   question, how would you go about doing it?
11       A.  I would ask underwriting.
12       MR. BLUTE:  All right.  We'll follow up
13   with a letter, Mark, but I'm going to request
14   production of the forms, the self-insured retention
15   forms used by NUFIC and Lexington, any pre-printed
16   forms, and, specifically, any SIR form where there is a
17   retained, where it specifically requires a retained
18   amount plus ALAE.
19       MR. COHEN:  Well, you know, I think as you
20   see in this case, the forms are generally manuscript
21   and written for a particular policy.  There could be a
22   zillion of them.
23       MR. BLUTE:  I think if there is a
24   pre-printed form that could be accessed, then we're

Page 152

1    entitled to it.
2        MR. COHEN:  I don't know if there is such
3    a thing.
4        MR. BLUTE:  We'll follow up with a formal
5    request.  Make this the next exhibit.
6        (Two-page policy document
7    marked Exhibit 10.)
8    BY MR. BLUTE:
9        Q.  Have you had a chance to review that
10   exhibit, sir?
11       A.  Okay.
12       Q.  Have you ever seen this document before?
13       A.  No.
14       Q.  Do you know what it is?
15       A.  I don't.
16       Q.  Okay.  The middle part of this document,
17   if I direct you to it, it talks about the structure of
18   the program.  This is a document, by the way, produced
19   to us by Lexington.  I'm assuming it came from
20   Lexington's files.  It states that Lexington began
21   writing the program on June 1, 2000, that master policy
22   was issued per month; i.e., June, July, August.  And
23   was that because the addition and subtraction of
24   insured entities in Endorsement 1?

Page 153

1        A.  It was.
2        Q.  Do you know as the master policies issued
3    there were ever any other changes made to the forms?
4        A.  I don't.
5        Q.  Was the master policy negotiated with
6    anybody?  In other words, was it the result of any
7    negotiation or was it simply the form that was
8    submitted by Lexington and NUFIC?
9        A.  Well, I'm sure at some point there was
10   negotiation and agreement on the policy form.
11       Q.  And that would have been the wholesale
12   broker and Mr. Massery, presumably?
13       A.  And perhaps individual insureds, as well.
14       Q.  It says, "Three various unrelated entities
15   were scheduled to the policy endorsement."  That is the
16   Endorsement No. 1 we talked about earlier?
17       A.  That's correct.
18       Q.  "We invoiced the broker, First Capital
19   Group, for the total premium."  So, Lexington would
20   submit an invoice for premium to the wholesale broker?
21       A.  Yes.  They would add up all of the premium
22   for all of the individual insureds and send one total
23   bill to First Capital.
24       Q.  And it says, "First Capital, who was

39 (Pages 150 to 153)

Page 154

1  acting as a wholesaler, was responsible for invoicing
2  NPS, the risk purchasing group, for the total premium."
3  So, then if I understand this correctly, First Capital
4  would take your invoice and turn around and submit an
5  invoice to NPS?
6      A.  Correct.
7      Q.  And then it says, "It was NPS's
8  responsibility to invoice each individual insured for
9  their portion of the premium and send us a check for
10 the total policy premium."  Is that right?
11     A.  That is what this says.
12     Q.  What is a risk purchasing group?
13     A.  I'm not sure.
14     Q.  Do you know whether this structure of the
15 program was in place from the beginning?  In other
16 words, was this the negotiated structure at the time of
17 the issuance of the first policy under the program?
18     A.  This would be my understanding.
19     Q.  So, if I understand this correctly, the
20 premiums would be paid by the policyholders to NPS.
21 Correct?
22     A.  Correct.
23     Q.  And NPS is in New Jersey?
24     A.  I believe so.

Page 155

1      MR. COHEN:  Was.
2      MR. BLUTE:  Was.
3      (Discussion off the record.)
4      Q.  I take it from this form that at some
5  point premiums that made it to NPS never made it up,
6  over to Lexington; is that right?
7      A.  I believe that's the case.  By the way, do
8  we have Page 2 to this document?
9      MR. BLUTE:  Do we have Page 2?
10     MR CRAMB:  I don't.
11     A.  It may shed more light on what it is and
12 who wrote it.
13     MR. BLUTE:  Why don't you take a look.
14     (Discussion off the record.)
15     Q.  It refers to AIG litigation against
16 National Program Services.  Are you familiar with that
17 at all?
18     A.  Yes.
19     Q.  Do you know what the status of that
20 litigation is?
21     A.  No.
22     Q.  Do you know whether any of the premium was
23 ever recovered?
24     A.  I don't know.  I know a large amount was

Page 156

1  not.
2      Q.  Okay.  Do you know what the total loss
3  was, in terms of premium, as a result of the NPS
4  situation?
5      A.  It was in the millions.  I know that.
6      Q.  I may have asked you this earlier.  If I
7  did, I apologize.  Where is First Capital based?
8      A.  I don't know.
9      Q.  Do you know where York is based?
10     A.  No.
11     Q.  And there is a company in the files,
12 Cambridge.  Are you familiar with a company called
13 Cambridge?
14     A.  Cambridge Integrated Services.
15     Q.  Yes.  What is Cambridge Integrated
16 Services?
17     A.  I believe they followed Countryside as the
18 TPA for the SIR.
19     Q.  For the SIR.  And do you know where
20 Countryside is based?
21     A.  No.
22     Q.  Do you know where Cambridge is based?
23     A.  I do not.
24     MR. BLUTE:  Okay.  We'll get the other

Page 157

1  page, and we'll add that, so the record is complete.
2      Q.  The earlier form that, or e-mail that
3  referred to that retained form with the retained limit
4  plus ALAE, is it correct to state that the form that
5  was actually used is, has ALAE; in other words, it
6  would not be correct to say plus ALAE, right?  The form
7  that was actually used?
8      A.  Not only that, the form that was actually
9  used is a primary form with an SIR endorsement.
10     Q.  Right.
11     A.  When I hear the term "retained limit
12 form," that may refer to an excess policy that
13 regardless of whether or not there is an underlying
14 primary policy or an SIR, nonetheless specifies that
15 there is a retained limit in that policy that needs to
16 be satisfied regardless.
17     Q.  And does it sometimes state plus allocated
18 loss, the adjustment expenses?
19     A.  That, I don't know.
20     Q.  You've never seen such a form?
21     A.  I've seen retained limits forms, but I
22 can't tell you one way or another whether it
23 specifically referenced including or excluding loss
24 adjustment expenses.

40 (Pages 154 to 157)

William R. Eddows, Esq.                                          06/08/2006

Page 162

1    Q.   Was there any time under the program where
2 you threatened to cancel, but didn't cancel?
3         MR. COHEN:  The entire program or --
4         MR. BLUTE:  Yes.
5    A.   I'm not aware.
6    Q.   In other words, was it sort of a
7 deterioration relationship over time, or was it
8 something sudden?
9    A.   I believe once we became aware of the
10 theft issue, it was sudden.
11   Q.   Was there ever a time during the program
12 where Lexington stated that it wanted to change the
13 terms of its policies, either in terms of SIR or limit?
14   A.   Not that I'm aware of.
15   Q.   When the program was cancelled by
16 Lexington, was VSC informed by Lexington of its
17 cancellation of the program?
18   A.   I can't tell you specifically.  I would
19 certainly assume so, since VSC was in the same boat.
20   Q.   Now, with respect to the post-program
21 policies, were those written on all different types of
22 forms, or how did you go about insuring the individual
23 policyholders once the program was cancelled?
24   A.   Various forms.  Some were National Union.

Page 163

1 Some were Lexington.
2    Q.   And what would be the determining factor
3 as to the type of form that was used with a particular
4 account?
5    A.   I can't answer that.  That would be a
6 question for underwriting to answer.
7    Q.   You don't know as you sit here?
8    A.   I don't.
9    Q.   All right.  I have in the binder, and
10 you're free to look at them, some of the forms that
11 were used in the post-program policies, and a number of
12 them are what are referred to as standalone excess
13 policies.  Have you heard that phrase before?
14   A.   I have.
15   Q.   What is a standalone excess policy?
16   A.   A standalone excess is a reference which
17 would differentiate that policy from a following form
18 excess policy.
19   Q.   So, a standalone, following form policy
20 would mean that you've identified an underlying policy,
21 and you're essentially following the terms and
22 conditions of the underlying policy?
23   A.   That's correct.  Most likely in that
24 instance it would be an umbrella policy that you would

Page 164

1 be following form to.
2    Q.   And a standalone excess would be over
3 either a retention or a policy with different terms?
4    A.   Yes.  A standalone excess could be what I
5 was talking about earlier, a retained limit form that
6 we were discussing.
7    Q.   So, you could have an excess policy
8 sitting over retention?
9    A.   The policy would have a retained limit in
10 it, which would need to be satisfied regardless of
11 whether that retained limit was other coverage or just
12 an amount that the insured was responsible for.
13   Q.   Does a standalone form ever have a policy
14 below it?  Or you mean, in other words -- you say it
15 doesn't matter.  Is there sometimes where you have the
16 standalone form used where there is a primary insurance
17 policy?
18   A.   When I hear the term "standalone," I think
19 of standalone excess policy.
20   Q.   Meaning retained limit?
21   A.   Correct.  Again, standalone, as opposed to
22 following form.
23   Q.   I see.  Could you have a situation where
24 you have an underlying insurance policy with different

Page 165

1 terms and conditions than the excess?
2    A.   So as --
3    Q.   Would that be --
4    A.   So as to try not to confuse you further, I
5 equate standalone to excess, because it is the opposite
6 of follow form, and clearly follow form would
7 contemplate excess, because it follows form to
8 something.
9    Q.   Of an underlying.  Right.  But, I guess
10 what I'm getting at, I understand it may have retained
11 limits, but is there a middle ground where you have an
12 underlying policy but perhaps the terms of the
13 standalone are narrower, so it's called the standalone
14 excess, because it's not following form?
15   A.   The retained limit could either be, you
16 know, separate coverage or just a retained limit that
17 the insured, itself, has to satisfy.
18   Q.   Who is Yonathan Casilla?  Do you know that
19 person, offhand?
20   A.   It's a former employee of Risk
21 Specialists.
22        MR. BLUTE:  I'd like to mark that, if I
23 could.
24        (E-mail chain

42 (Pages 162 to 165)

William R. Eddows, Esq.

06/08/2006

Page 166

1    marked Exhibit 11.)
2        Q.   If I direct you to the last page, there is
3    an e-mail from Anna Tiemeyer of Hilb, Rogal and
4    Hamilton to Yonathan Casilla.  Do you see that?
5        A.   Yes.
6        Q.   It's concerning a policyholder called
7    Village Green and a meeting of August 7, '03.  Do you
8    see that?
9        A.   I do.
10       Q.   All right.  And as I understand it, the
11   purpose of this e-mail is Mr. -- excuse me,
12   Ms. Tiemeyer is confirming what was discussed at the
13   meeting with Mr. Casilla, and he says, "Your policy is
14   a standalone and not excess of the Virginia Surety
15   policy." Do you see that?
16       A.   I see that.
17       Q.   Does the fact that this references a
18   standalone and not excess tell you that this is a
19   post-program policy?
20       A.   No.  It goes back to Page 1, I believe.
21   In the middle of Page 1, where they say, "This is the
22   only entity that we were providing construction
23   coverage on our policy, but Virginia Surety is not
24   providing the coverage for this entity."

Page 167

1        Q.   Did Lexington issue any standalone excess
2    policies under the program?
3        A.   They may have.  I know they issued a
4    variety of forms for the post-program policies.
5        Q.   When you say they issued a variety of
6    forms for the post-program policies, do you know if
7    they issued a variety of forms for the program
8    policies?
9        A.   I think those were all National Union
10   policies.
11       Q.   And is it correct that there were no
12   standalone excess policies issued under the program?
13       A.   I don't believe so.
14       Q.   Okay.  Ms. Tiemeyer says, "Two, Your
15   policy does not follow form of the Virginia Surety
16   policy."
17       Is that correct with respect to the program
18   policies, that they did not follow form of the Virginia
19   Surety policy?
20       A.   No.  This is again going back to Page 1.
21   This talks about this specific instance --
22       Q.   Oh.
23       A.   -- where it says this is the only entity
24   that we were providing construction coverage on our

Page 168

1    policy, but Virginia Surety is not providing the
2    coverage for this entity.
3        Q.   Okay.  Let's talk about a different policy
4    that did have VSC.  Would you refer to your, those
5    NUFIC policy forms as following the form of the
6    Virginia Surety policy?
7        A.   No.
8        Q.   Okay.  And then the -- if you look above,
9    am I correct that Mr. Casilla has agreed with that
10   statement of what was discussed at the meeting?
11       A.   That's what it indicates.
12       Q.   Thank you.  Do you know if that insured,
13   which is Village Green, whether any payments were ever
14   made, loss or expense payments were ever made under
15   policies issued by Lexington to Village Green?
16       A.   I'd have to look at the loss run.  I don't
17   know, offhand.
18       Q.   Why following the cancellation of the
19   program was there a switch from NUFIC to Lexington in
20   terms of the issuance of policies?
21       A.   I can't answer that.
22       Q.   Do you know whether it was discussed, and
23   decision -- obviously someone decided at some point.
24   Do you know who made the decision?

Page 169

1        A.   No.
2        Q.   Do you know why following the cancellation
3    of the program instead of the NUFIC form that was used
4    in the program a standalone excess form was used in at
5    least a number of the post-program policies?
6        A.   I don't.
7        Q.   Do you know of any discussion, where a
8    decision was made as to that decision --
9        A.   No.
10       Q.   -- as to that issue?  And would that be
11   something that would be in underwriting, Mr. Messery?
12       A.   Yes.
13       Q.   Was Mr. Messery involved also with
14   post-program policies?
15       A.   I believe so.
16       Q.   Were there any other -- was Mr. Messery
17   there throughout the period that covered the program
18   and post-program policies, or is there some other
19   underwriter I should be concerned about?
20       A.   I'm not aware of any other.  I don't know
21   how long he was there.
22       Q.   Did all of the post-program policies
23   include the $250,000 self-insured retention?
24       A.   I believe so.

43 (Pages 166 to 169)

William R. Eddows, Esq.                                                    06/08/2006

Page 178

1    A.  Possibly Illinois.
2    Q.  Massachusetts?
3    A.  I don't recall.
4    Q.  When the decision was made, did Lexington
5    make a determination of what law it believed governed
6    the operation of the program policies?  I know you
7    looked at a bunch of states.  Did you as a company say
8    we think this state's law governed these policies, and,
9    therefore, X?
10   A.  I think we reached the conclusion that
11   several states' laws could potentially apply and that
12   as to this issue it wasn't going to be relevant as to
13   which one was ultimately decided.  That it would come
14   out the same.
15   Q.  You hadn't made -- you didn't feel the
16   need to narrow it down to a particular state's law?
17   A.  We believed it would come out the same, in
18   any event.
19   Q.  Let me just review some of these things,
20   see if you know the answer to them.  In the defense --
21   excuse me, the answer to our counterclaim, certain
22   affirmative defenses were asserted on behalf of
23   Lexington and NUFIC.
24   One of the claims is that the claim, that

Page 179

1    our claim would be barred by statute of limitations
2    and/or by laches.  Anything in particular that you
3    understood to be referred to there?
4    A.  Yes.  That there was basically no
5    objection by VS until I believe about three years after
6    the program began, that they were taking an
7    interpretation different than the language contained in
8    their policy.
9    Q.  It's your belief that VSC's interpretation
10   changed at some point?
11   A.  It is.
12   Q.  And how about, is that also the basis of
13   the assertion of waiver as a defense, as far as you
14   know?
15   A.  That's correct.
16   Q.  Is that also true with the estoppel
17   defense?
18   A.  Well, in general, I would think the --
19   through the course of dealing over that time period,
20   they would be estopped from then asserting something
21   otherwise.
22   Q.  Just to be clear, is it Lexington's
23   position that it relied on the issuance of a VSC policy
24   with defense costs outside of limits, when it issued

Page 180

1    these policies?
2    A.  As I discussed earlier, at least with
3    respect to the first one, I believe Lexington based its
4    initial premium calculation on that fact.  Yes.
5    Q.  On the fact of a VSC policy with defense
6    costs outside of limits?
7    A.  That's correct.
8    Q.  Do you know whether that issue was ever
9    discussed with the wholesale broker?
10   A.  I don't.
11   Q.  Do you know whether anyone ever discussed
12   that with VSC?
13   A.  I don't.
14   Q.  Do you know what VSC's understanding was
15   at the time it issued its policies?
16       MR. COHEN:  Understanding as to what?
17       MR. BLUTE:  As to the operation of the two
18   policies in this program.
19   A.  I think the, as set out in the
20   supplementary payment section, it couldn't be clearer,
21   so I would assume that they understood that.
22   Q.  Supplementary payments in the sense of
23   defense costs being outside of limits?
24   A.  That's correct.

Page 181

1    Q.  Is it your understanding -- let me ask you
2    this:  Is there any agreement between VSC and Lexington
3    or NUFIC as to how these policies would relate to each
4    other in this program?
5    A.  It's hard for me to answer that question.
6    I'm not entirely sure, as I sit here now, what VSC's
7    latest position is on just what.
8    Q.  My question is:  Was there any contract or
9    agreement between Lexington and NUFIC and VSC with
10   respect to the respective obligation of the parties
11   under this program?
12   A.  I'm not aware of any written agreement to
13   that effect.
14   Q.  So, your understanding is based on
15   pointing to the language of our policy as controlling
16   obligations under your policy.  Is that correct?
17       MR. COHEN:  His understanding as to what?
18   As to the priority of coverage?
19       MR. BLUTE:  Yes.
20   A.  That doesn't characterize my
21   understanding.  My understanding is based on the
22   contract entered into between Virginia Surety and its
23   insureds.
24   Q.  How does that possibly affect your

46 (Pages 178 to 181)

William R. Eddows, Esq.

06/08/2006

Page 182

1  obligations under your contract?
2      A.  To my --
3      Q.  And where in your policy does it say that
4  it does?
5      A.  To my way of thinking --
6      MR. COHEN:  Objection.
7      A.  -- Virginia Surety and its insureds
8  reached an agreement to provide additional coverage and
9  that that is controlling.
10      Q.  And that relieves you of your obligations
11  under your policy?
12      MR. COHEN:  Objection.
13      A.  Our policy sits above that SIR.  It's a
14  different layer of coverage.
15      Q.  What is the point of saying that defense
16  costs apply against the SIR if in all circumstances if
17  there is a policy you need to have indemnity limits
18  exhausted?
19      A.  That would --
20      MR. COHEN:  Objection.
21      A.  That would cover the instance where there
22  may not be coverage under the VS policy or where VS
23  didn't issue such a policy at all.
24      Q.  Can you point in the program policies, can

Page 183

1  you point me to any language anywhere which suggests
2  that the obligations of Lexington or NUFIC are based on
3  another policy?
4      A.  I would say that the additional insured --
5  I'm sorry, the SIR endorsement contemplates.
6      Q.  Is there anything in the SIR endorsements
7  that references Virginia Surety?
8      A.  No.
9      Q.  Is there anything in any of the
10  endorsements that references the existence of a primary
11  insurance policy under the 250?
12      A.  No.
13      Q.  Is there anything in the self-insured
14  endorsements that discusses the impact of insuring or
15  not insuring the SIR?
16      A.  No.
17      Q.  Is there anything in any of the SIR
18  endorsements that prohibits a policyholder from
19  insuring?
20      A.  There is not.
21      Q.  Is there anything in the SIR endorsements
22  that requires a policyholder to even inform Lexington
23  or NUFIC as to whether it has insurance within that
24  layer?

Page 184

1      A.  Not that I'm aware of.
2      (Discussion off the record.)
3      MR. BLUTE:  Let's take a short break,
4  review my notes.  I think we'll be over or just about
5  over.
6      Q.  Before we go off, let me ask this
7  question:  Exhibit 4, which Mr. Cohen was nice enough
8  to give to us, is, just to be sure, this is the listing
9  of the people who were in the interrogatory answers?
10      MR. COHEN:  Correct.
11      MR. BLUTE:  And your understanding or
12  knowledge as to who they worked for and what their role
13  was?
14      MR. COHEN:  Right.
15      (A recess was taken.)
16      MR. BLUTE:  Excuse me one second.  We have
17  nothing else, Mr. Eddows.  Thank you very much.  I
18  appreciate your time.
19      (Deposition concluded.)
20
21
22
23
24

Page 185

1      E R R A T A  S H E E T
2      I, WILLIAM R. EDDOWS, ESQUIRE, do hereby
3  certify that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception of
6  the corrections listed below).
7  PAGE LINE         CORRECTION
8  ____ ____  _____
9  ____ ____  _____
10  ____ ____  _____
11  ____ ____  _____
12  ____ ____  _____
13  ____ ____  _____
14  ____ ____  _____
15  ____ ____  _____
16  ____ ____  _____
17  ____ ____  _____
18  ____ ____  _____
19  ____ ____  _____
20  Signed under the pains and penalties this _____
21  day of _____, 2006.
22
23      _____
24      WILLIAM R. EDDOWS, ESQUIRE

47 (Pages 182 to 185)