# EXHIBIT B

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------x
LEXINGTON INSURANCE COMPANY and
NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA,

                    Plaintiffs,

        -against-          04-11109 (RGS)

VIRGINIA SURETY COMPANY,

                    Defendant.
-----------------------------------x


                    July 31, 2006

                    10:10 a.m.



        Deposition of CHARLES J. MESSERY,

pursuant to notice, at the offices of

Mintz, Levin, Cohn, Ferris Glovsky and

Popeo, PC, 666 Third Avenue, New York,

New York, before Gail F. Schorr, a

Certified Shorthand Reporter, Certified

Realtime Reporter and Notary Public

within and for the State of New York.




**CERTIFIED ORIGINAL
LEGALINK BOSTON**

Charles J. Messery                                    07/31/2006

11

1                  CHARLES J. MESSERY

2      companies?

3          A.     Yes.

4          Q.     How long were you at

5      Lexington Insurance Company?

6          A.     Two years.

7          Q.     And were you based in New

8      York?

9          A.     Yes.

10         Q.     There's reference in some of

11     the documents to Risk Specialists of

12     New York?

13         A.     Yes, Risk Specialist

14     Company, it's a wholly owned subsidiary

15     of Lexington Insurance Company.  It's

16     really the wholesale broker for

17     Lexington Insurance Company.

18         Q.     I see.  So if somebody --

19         A.     An MGA almost.

20         Q.     So if somebody wants to

21     place a policy with Lexington they

22     would approach Risk Specialists of New

23     York?

24         A.     Yes.

25         Q.     And technically you work for

Charles J. Messery                                    07/31/2006

14

1                 CHARLES J. MESSERY

2       for retailers around in the New

3       York/New Jersey area.

4            Q.    So --

5            A.    And also retailers and

6       wholesalers.

7            **Q.    Was there an existing book**

8       **of business that you managed?**

9            A.    A small existing book of

10      business.  I was really put there to

11      grow the book of business.

12           **Q.    So as the other brokers in**

13      **this area would go to Risk Specialists?**

14           A.    Yes.

15           **Q.    Is Risk Specialists a**

16      **wholesale broker?**

17           A.    No, it's technically I think

18      it's an MGA.

19           **Q.    A managing general agent?**

20           A.    It's either an MGA or a

21      wholesale broker for Lexington,

22      strictly just for Lexington Insurance

23      Company.

24                 MR. FRIM:  Can we go off the

25      record for a second.

Charles J. Messery                                    07/31/2006

20

1              CHARLES J. MESSERY

2    National Union?

3         A.    Now you're saying it, so

4    I'll follow you.

5              MR. FRIM:  Just to clarify,

6    that's National Union Fire Insurance

7    Company of Pittsburgh.  There are some

8    other National Unions.

9         Q.    So if we refer today to

10   either National Union or NUFIC, we're

11   referring to National Union Fire

12   Insurance Company of Pittsburgh.

13        A.    That's fine.  You got it.

14        Q.    In some earlier documents

15   provided to us by your counsel, you

16   were referred to as a former

17   underwriter, former Lexington

18   underwriter, negotiated the original

19   NCOPO policies and oversaw issuance of

20   all other related policies.  Is that a

21   fair description of what you did with

22   respect to the NCOPO?

23        A.    Yes.

24        Q.    And when we refer to NCOPO,

25   what does that mean to you?

Charles J. Messery                                    07/31/2006

21

1                   **CHARLES J. MESSERY**

2        A.    National Coalition of

3    Property Owners.

4        **Q.    Prior to joining Risk**

5    **Specialists had you had any involvement**

6    **with NCOPO?**

7        A.    No.

8        **Q.    Had you had any involvement**

9    **with a company called AIMCO?**

10       A.    No.

11       **Q.    And what is the National**

12   **Coalition of Property Owners as you**

13   **understand it?**

14       A.    It's a group of similar type

15   insureds with no financial relationship.

16       **Q.    And what was the purpose of**

17   **that group, do you know?**

18       A.    Is to buy insurance

19   collectively.

20       **Q.    Is there some advantage in**

21   **companies buying collectively?**

22       A.    Sure, it's usually because

23   of -- because it's a greater pot of

24   insureds in the same operations, they

25   usually get a cheaper, a cheaper price

Charles J. Messery                                    07/31/2006

22

1                  CHARLES J. MESSERY

2     to buy collectively.

3          Q.    So a number of different

4     companies in a particular industry?

5          A.    Yes.

6          Q.    Can come together and buy

7     policies together?

8          A.    Yes.   You know, there's

9     always a homogeneous group of insurers

10    come together and buy insurance

11    collectively.

12         Q.    Is that something that's

13    relatively common in the insurance

14    industry?

15         A.    Sure.

16         Q.    Is that referred to

17    sometimes as a program?

18         A.    Usually, yes.

19         Q.    So there might be a program

20    for nursing homes, a program for real

21    estate companies, a program for

22    something else?

23         A.    Yes.

24         Q.    And in the case of the NCOPO

25    program, and I may just refer to it as

Charles J. Messery
07/31/2006

24

1                   CHARLES J. MESSERY

2       request that was attached?

3            A.    No.

4            Q.    All right.  Have you done

5       anything in connection with appearing

6       at this deposition in terms of looking

7       for documents?

8            A.    No.

9            Q.    When you left Risk

10      Specialists did you take any documents

11      with you?

12           A.    No.

13           Q.    So you would not personally

14      have any documents dealing with the --

15           A.    No.

16           Q.    -- NCOPO?

17           A.    No.

18           Q.    When you were at Risk

19      Services, did you maintain files

20      concerning the NUFIC and Lexington's

21      participation in the NPS program?

22           A.    Yes.

23           Q.    What types of files did you

24      have there?

25           A.    The underwriting file.

Charles J. Messery                              07/31/2006

25

```
1              CHARLES J. MESSERY
2         Q.    What is an underwriting
3    file?
4         A.    It has the submission,
5    correspondence, the policy and
6    endorsements.
7         Q.    Everything is all in one
8    file?
9         A.    One file or a couple of
10   files.
11        Q.    Are these electronic files?
12        A.    No.
13        Q.    Or are they paper files?
14        A.    No, at that day it was all
15   paper files.
16        Q.    In response to some of our
17   document requests there was an
18   assertion that Mr. Messery had a file
19   but the file has since been lost.  Are
20   you familiar with that?
21        A.    That's what they told me.
22        Q.    Do you know what the file
23   was that's been lost?
24        A.    No, I don't know exactly
25   which one.
```

07/31/2006

29

CHARLES J. MESSERY

1
2  structure of the previous program was?

3      A.    No.

4      Q.    Do you know who the

5  participating insurers were?

6      A.    Yes, only from loss runs.

7      Q.    And who were the

8  participating insurers?

9      A.    I think it was Reliance was

10  one of the years and Chicago Insurance

11  Company was another year.

12      Q.    Do you remember what types

13  of policies they were issuing, in terms

14  of limits?

15      A.    I don't know.  It doesn't

16  say on the loss runs.

17      Q.    How did you first become

18  involved with the National Coalition of

19  Property Owners program?

20      A.    A submission was sent to our

21  office.

22      Q.    By whom?

23      A.    Dowd, Rob Dowd & Associates.

24      Q.    Do you know Mr. Dowd?

25      A.    Yes.

Charles J. Messery                              07/31/2006

34

1            CHARLES J. MESSERY
2    different people, I don't --
3         Q.    And that was because the
4    size of the program was beyond your
5    ability to write?
6         A.    Yes, authority.  It was
7    above our authority.
8         Q.    And what were you asked when
9    this submission was given to you by Mr.
10   Dowd, what did Mr. Dowd ask Lexington
11   to do?
12        A.    To put together a primary
13   policy.
14        Q.    Did he tell you what type of
15   limits they wanted?
16        A.    A million.
17        Q.    Did he want a million
18   dollars of first dollar coverage?
19        A.    Yes.
20        Q.    So the initial plan that
21   came to you was we'd like a million
22   dollar policy?
23        A.    Yes, a million dollar
24   primary policy.
25        Q.    Did you have discussions

Charles J. Messery                                    07/31/2006

35

1                    CHARLES J. MESSERY

2      with him as to --

3          A.    We told him absolutely no

4      way.

5          Q.    Before you get to that, did

6      you have discussions with him about --

7      in other words, did he explain to you

8      that this is part of the program?

9          A.    No.

10         Q.    Was it for a single insured

11     or was it for the program at that

12     point?

13         A.    I thought it was a single

14     insured.

15         Q.    Do you know who the single

16     insured was?

17         A.    I don't.

18         Q.    Do you think it might have

19     been at AIMCO?

20         A.    I'm not really certain.

21         Q.    But your understanding now

22     is that --

23         A.    Yes.

24         Q.    Is that you believed it was

25     a single insured that they were seeking

37

1                    CHARLES J. MESSERY

2       dollar policy.

3           Q.      **And was that something you**

4       **knew right off the bat --**

5           A.      Yes, because --

6           Q.      **Let me finish.  Was that**

7       **something you knew as soon as they made**

8       **the request or did you have to evaluate**

9       **it and go to your management?**

10          A.      No, I knew it as soon as

11      they made the request.

12          Q.      **Why is that?**

13          A.      Lexington doesn't write

14      first dollar real estate business.

15          Q.      **So as a matter of policy**

16      **they wouldn't do it?**

17          A.      Yes.

18          Q.      **Why is that?**

19          A.      There's too much frequency

20      and they want to be on an excess layer

21      to be excess of the burn layer they

22      call it.  The burn layer is the

23      frequency piece of it, so you want to

24      choose an attachment point that is high

25      enough you're not going to be hit on

Charles J. Messery

07/31/2006

38

CHARLES J. MESSERY

1

2  every slip and fall losses, you're

3  there for catastrophic losses.

4       Q.    **Why is that?**

5       A.    You can't make money off of

6  it.

7       Q.    **So the idea was if we have**

8  **first dollar coverage we're going to**

9  **have to defend and handle every slip**

10 **and fall claim?**

11      A.    Yes.  You'd never be able to

12 collect enough premium to pay out your

13 losses.

14      Q.    **And so how did you in this**

15 **case deal with that?**

16      A.    So we told them that the

17 only way we'd look at the account is if

18 we were excess of a $250,000 SIR.

19      Q.    **What is an SIR?**

20      A.    Self insured retention.

21      Q.    **And what does that mean?**

22      A.    It means that the insured's

23 responsible for the first $250,000 and

24 then the insurance carrier sits excess

25 of the SIR.

Charles J. Messery                                    07/31/2006

                                                              39
1                    CHARLES J. MESSERY

2         Q.      Was the policy -- what was

3    Mr. Dowd's reaction when you gave him

4    that news?

5         A.      Push-back that they said

6    they wouldn't be able to sell it.

7         Q.      What happened next?

8         A.      Then at that period of time

9    is when we -- brokers changed hands and

10   it went from Rob Dowd to Dennis Rielly

11   and First Capital.

12        Q.      Same account basically, same

13   insured?

14        A.      Same insured but they

15   resubmitted a whole new submission.

16        Q.      Through First Capital?

17        A.      Through First Capital, yes.

18        Q.      And who was First Capital?

19        A.      Al Moss and Dennis Rielly

20   and Joe Davis.

21        Q.      And what is First Capital?

22        A.      They're a wholesale broker.

23        Q.      What's a wholesale broker?

24        A.      A wholesale broker is --

25   gets business from a retailer and then

Charles J. Messery                                    07/31/2006

41

1                   CHARLES J. MESSERY

2     seeking a million dollar policy first

3     dollar coverage?

4          A.     Yes.

5          Q.     You informed Mr. Dowd you

6     could not do that because Lexington did

7     not want to --

8          A.     Right.

9          Q.     -- have what you referred to

10    as the burn layer?

11         A.     Yes.

12         Q.     Lexington wanted to avoid

13    having exposure to frequent small

14    losses?

15         A.     Yes.

16         Q.     Is that fair to say?

17         A.     That's fair.

18         Q.     Lexington wanted to write a

19    policy that had an attachment point

20    that would limit its exposure to what

21    might be called catastrophic losses?

22         A.     Yes.

23         Q.     Why was $250,000 the

24    attachment point?

25         A.     At that time that's where we

Charles J. Messery                                           07/31/2006

42

1                       CHARLES J. MESSERY

2       felt that, you know -- all the slip and

3       falls would definitely be under that

4       and then the only thing that would be

5       under that would be something

6       catastrophic we felt.

7           Q.      The policy they were seeking

8       from you was a primary CGL or commercial

9       general liability insurance policy?

10          A.      Yes.

11          Q.      Does Lexington write primary

12      commercial general liability policies?

13          A.      Yes.

14          Q.      Is it correct that your

15      response was we can't write a primary

16      CGL policy with first dollar coverage

17      but we will do so if -- we will issue a

18      primary CGL policy excess of a

19      self-insured retention?

20          A.      It was more like an excess

21      policy not a primary policy.

22          Q.      What's the difference

23      between an excess policy and a primary

24      policy?

25          A.      An excess policy is over a

Charles J. Messery                                    07/31/2006

43

1          CHARLES J. MESSERY

2    primary policy where a primary policy

3    with an SIR is a primary policy.

4          Q.    I'm sorry?

5          A.    A primary policy with an SIR

6    is still a primary policy.

7          Q.    But what's the distinction?

8          A.    Usually on an excess policy

9    there's a primary policy that gets

10   triggered.

11         Q.    And is it typical in an

12   excess policy for the excess policy to

13   identify the primary policy?

14         A.    Yes.

15         Q.    And is there a difference

16   between --

17         A.    Sometimes though, sometimes,

18   sometimes you do and sometimes you

19   don't.  On an umbrella policy you

20   always schedule the underlying and

21   sometimes on a stand alone excess

22   policy you don't necessarily schedule

23   the primary policy.  You schedule an

24   excess.

25         Q.    Would an umbrella policy

Charles J. Messery                                    07/31/2006

44

1                    CHARLES J. MESSERY

2       sitting over the stand alone you'd be

3       expected to identify the primary?

4            A.    Yes, definitely.

5            Q.    So if you had a -- in this

6       case did you have umbrella coverage

7       above the Lexington piece?

8            A.    I don't know.

9            Q.    Based on your understanding

10      of the way the industry works, would

11      you expect --

12           A.    Yes.

13           Q.    -- the umbrella carrier to

14      identify all the underlying insurance

15      policies?

16           A.    Oh, yes, sure.

17           Q.    In any event, they were

18      seeking a primary policy and you ended

19      up writing a policy that was excess of

20      an SIR?

21           A.    Yes.

22           Q.    It was not excess of any

23      specific insurance policy, was it?

24           A.    We knew it was going to be

25      excess of an insurance policy.  We

53

1              CHARLES J. MESSERY

2        Q.      And how were defense costs

3    handled under that retention?

4        A.      Inside the SIR.

5        Q.      And what does that mean?

6        A.      That means that the defense

7    costs and indemnity erodes the SIR.

8        Q.      So if an insured spent

9    $50,000 in defense costs that would

10   apply against the $250,000?

11       A.      Yes.

12       Q.      If an insured did not insure

13   the retention and spent $250,000 on

14   legal fees, what would happen?

15       A.      Say that again.

16       Q.      Assume that the insured was

17   paying out of pocket for defense costs.

18       A.      There's no policy.

19       Q.      No policy.

20       A.      Okay.

21       Q.      And they spent $250,000 in

22   defense costs?

23       A.      Yes.

24       Q.      On a major claim, what would

25   happen at that point?

Charles J. Messery                                    07/31/2006

54

1                    **CHARLES J. MESSERY**

2         A.      To tell you the truth,

3    I'm -- you have to read that particular

4    endorsement, but depending how it read,

5    if it was indemnity and defense, that I

6    don't know what triggers that erosion

7    for the excess policy to trigger if

8    it's actually paid expenses.  I don't

9    know if reserves count.  So I don't

10   know if you're talking about paying

11   reserves.

12        **Q.      Let's assume they paid**

13   **$250,000.**

14        A.    If they paid $250,000 then

15   that SIR would be eroded and then the

16   excess policy would have kicked in.

17        **Q.      In that instance,**

18   **Lexington's intent in that instance is**

19   **to make sure that there's a $250,000**

20   **buffer essentially between it and the**

21   **losses?**

22        A.      Right.  I think this case

23   was a little bit different because we

24   didn't look at it like a true SIR that

25   you would typically look at it.  We

55

1              CHARLES J. MESSERY

2      looked at it we were there sitting

3      excess of an insurance policy.  So our

4      policy would not be triggered until

5      that primary policy was exhausted.

6          **Q.     Right.  And why didn't you**

7      **write an excess insurance policy?**

8          A.     They wouldn't let us.  We

9      tried to and they said they wouldn't be

10     able to sell it to the different

11     contracts that they have, I guess

12     lenders, that, you know, they had to

13     show a full million dollar limit, they

14     couldn't -- they had to show a primary

15     policy.

16         **Q.     And so you used a primary**

17     **insurance policy?**

18         A.     Yes.

19         **Q.     And that was because they,**

20     **in order to sell the coverage to their**

21     **insureds, had to have a primary policy**

22     **form?**

23         A.     In order for us?

24         **Q.     In order for First Capital**

25     **to sell the policy to their insureds?**

Charles J. Messery                              07/31/2006

56

1                    CHARLES J. MESSERY

2          A.    Yes.

3          Q.    And by definition, in order

4    for Lexington to sell the policy you

5    had to issue it in a primary policy

6    form?

7          A.    You got it.

8          Q.    So when the First Capital

9    went to its client, NPS, who then went

10   to their client, these property owners,

11   what they were presented with was a

12   program which involved a $250,000

13   self-insured retention?

14         A.    Yes.

15         Q.    And a primary insurance

16   policy form, form issued by Lexington?

17         A.    I don't know how he

18   presented it.  I don't know how he did

19   it.  I just know how I issued it.

20         Q.    But it was clear to you that

21   they would not accept an excess insurance

22   policy?

23         A.    Yes, very clear.

24         Q.    So the only way you could

25   sell the policy was to issue a primary

Charles J. Messery                                        07/31/2006

57

1               CHARLES J. MESSERY

2       insurance policy?

3           A.    Yes, yes.

4               MR. FRIM:  Objection.  You

5       meant form, correct?

6           Q.    Form, yes.  And you

7       understood the difference between a

8       primary insurance form and an excess

9       insurance form?

10          A.    Yes.

11          Q.    Is there a difference

12      between a primary policy written over

13      an SIR and an excess policy written

14      over a specified underlying insurance

15      policy?

16              MR. FRIM:  Objection.

17          A.    Say that again.

18          Q.    Is there a difference

19      between a primary insurance policy with

20      an SIR and an excess insurance policy

21      written over a specified underlying

22      policy?

23          A.    Yes.  I mean the difference

24      meaning they use different forms or is

25      the coverage different?

Charles J. Messery                                    07/31/2006

65

1              **CHARLES J. MESSERY**

2      **determines how those defense costs**

3      **would apply?**

4           A.    No.

5                MR. FRIM:  Objection.  I

6      just want to make sure.  Can you

7      clarify whether we're talking about the

8      whole universe of policies he dealt

9      with or just with the NCOPO policies?

10     It's not clear to me.

11          **Q.    I'm referring to the NCOPO**

12     **policies.  Do you remember there being**

13     **a time when you used a different policy**

14     **form in the NCOPO program, where you**

15     **changed policy forms?**

16          A.    Yes, sure I do.

17          **Q.    And when was that?**

18          A.    I don't know exactly how

19     many policies into it, but we went to a

20     -- it was a different policy form and

21     it was on Lexington paper.  I just

22     don't -- I don't remember what the

23     split was.

24          **Q.    Can you tell me why that**

25     **change was made?**

Charles J. Messery                                    07/31/2006

66

1                   **CHARLES J. MESSERY**

2          A.     The market turned and we had

3     written the policy for awhile and it

4     continued to write the program.  We

5     were starting to try and change it to

6     the way we originally wanted to do it.

7          **Q.     You said the market had**

8     **turned, it was -- it was a more**

9     **difficult market?**

10         A.     It was a more difficult

11    market, you know, the losses had

12    developed from years past, and

13    Lexington's underwriting guidelines --

14    I think to tell the truth I'm probably

15    speculating right now.  I know that

16    there came a point where home office

17    said, enough is enough, we're issuing

18    it the way we want it, the way we

19    intended to issue it all along.  I

20    don't know what their thought process

21    was and why they, you know --

22         **Q.     You think part of it was**

23    **because the market had changed in what,**

24    **because then Lexington had more**

25    **leverage with the policy?**

Charles J. Messery                                          07/31/2006

99

1          CHARLES J. MESSERY

2               (Messery Exhibit 5 for

3      identification, copies of a memo dated

4      05/20/02.)

5          Q.    Mr. Messery, if you could

6      just read this exhibit and just tell me

7      when you're done.

8          A.    Sure.

9          Q.    It looks like copies of the

10     same, some have notations on them.

11         A.    Okay.

12         Q.    Are you aware that National

13     Union cancelled the NCOPO program

14     sometime in 2002?

15         A.    Yes.

16         Q.    And do you remember the

17     circumstances in which that

18     cancellation occurred?

19         A.    Yes.

20         Q.    Would you describe them for

21     me, please.

22         A.    That's when we found out

23     that premium payment had not been

24     collected or paid by First Capital, and

25     I think it's around this time that -- I

Charles J. Messery                              07/31/2006

100

1              CHARLES J. MESSERY

2    think it's around this time when

3    everything got blown up by NPS.

4         Q.    Did you have discussions

5    with First Capital about the nonpayment

6    of premium?

7         A.    Yes.

8         Q.    Who did you talk to?

9         A.    Dennis Rielly.

10        Q.    Could you tell me as best

11   you remember the substance of your

12   discussions with Mr. Rielly.

13        A.    I mean toward the end of the

14   program they were delinquent every

15   month on payments of premium so we had

16   threatened to cancel the program many

17   times and had finally come to the end.

18        Q.    What was Mr. Rielly -- did

19   Mr. Rielly explain the reason for

20   nonpayment?

21        A.    No.  He just said he would

22   try and get the money.

23        Q.    Did he explain that the

24   money had not come in from NPS?

25        A.    No.  Oh, yes, sure, I think

121

1                    **CHARLES J. MESSERY**

2     **policy or under this form that says**

3     **that we don't pay until a primary**

4     **insurance policy's liability limits are**

5     **paid out?**

6          A.    Well --

7               MR. FRIM:  Objection.  He

8     doesn't have the whole policy in front

9     of him.

10         **Q.    We could have him read the**

11    **whole thing.  Based on your understanding,**

12    **tell me if you don't remember --**

13         A.    In every policy there's

14    another insurance clause so depending

15    how the other insurance clause read.

16         **Q.    Why don't we turn to the**

17    **other insurance clause just to go**

18    **through that.  Which I believe is on --**

19    **I'll find it for you.  Turn to Page ME**

20    **00461.  If you look down, it says**

21    **paragraph 4, other insurance.  This is**

22    **the other insurance clause you refer**

23    **to?**

24         A.    Yes.

25         **Q.    It says, "If other valid and**

Charles J. Messery                               07/31/2006

126

1              CHARLES J. MESSERY

2      exactly what they were.  That was kind

3      of like toward the end of my tenure

4      there.

5          Q.    Is there anything under

6      subsection b here, one, two and three

7      that you believe based on what you do

8      know would apply to the VSC policies in

9      order to make this policy excess over

10     it?

11         A.    One, two and three?

12         Q.    Yes.

13         A.    No.

14         Q.    So if we go back to

15     subparagraph (a) it says, "In the event

16     b doesn't apply, we will share with all

17     that other insurance by the method

18     described in c below."  Why don't we go

19     down to c:  "If all of the other

20     insurance permits contribution by equal

21     shares we will follow this method

22     also."  Do you know what that means?

23         A.    I guess it's just talking

24     about they'll do it in equal shares.

25         Q.    So as it says in the next

130

1                    CHARLES J. MESSERY

2      Lexington as to why under this program

3      you were going to be switching to a

4      different form?

5              A.     The reason why?

6              Q.     Yes.

7              A.     I don't remember exactly the

8      exact reason why.  I could just say

9      like I said from the beginning, was,

10     you know, always our intent to use this

11     form.

12             Q.     But you didn't use it for

13     some period of the program?

14             A.     Yes.

15             Q.     So as far as the --

16     certainly as far as the policyholders

17     were concerned, they had a primary CGL

18     policy with $250,000 SIR?

19             A.     On the original policy?

20             Q.     On the original policy?

21             A.     Right.

22             Q.     And then at some later date

23     you used something called a stand alone

24     excess liability policy; is that right?

25             A.     Yes.

Charles J. Messery                                  07/31/2006

158

1              CHARLES J. MESSERY
2    policy forms.
3         Q.    And this one was properly
4    coded as a primary policy?
5         A.    Yes.
6         Q.    Then we have premium, that's
7    the amount that you charged?
8         A.    Yes.
9         Q.    8 percent went to First
10   Capital?
11        A.    Yes.
12        Q.    And the $2 million aggregate
13   limit?
14        A.    Yes.
15        Q.    And then down below you have
16   circled monoline policies and other
17   policies not listed.  What does that
18   refer to?
19        A.    I don't know.  I guess it's
20   policies, I don't know.
21        Q.    Go to the next page, you've
22   circled under 19, you circled A rate.
23   What does that refer to?
24        A.    A rate, that's how you
25   rated.  It was -- A rate in ISO is --

Charles J. Messery

07/31/2006

189

CHARLES J. MESSERY

1

2    sell a stand alone excess policy with

3    an SIR of 250 to their policyholders?

4         A.    I guess it was not just sell

5    them, but they, you know, for different

6    -- people have lenders and different

7    requirements.  So it was a combination

8    of things.

9         Q.    Whatever reason, it wouldn't

10    work for what they were trying to put

11    together?

12         A.    It wouldn't work, wouldn't

13    fit, yes.

14         Q.    So to accommodate that you

15    used a primary policy form, a primary

16    commercial general liability policy

17    form?

18         A.    Yes.

19         Q.    And then at some point in

20    the future when the market had changed

21    and you decided to use the form that

22    was a better statement of your intent

23    by using the true excess form, the

24    stand alone excess form?

25         A.    It was the form that we

Charles J. Messery                                           07/31/2006

190

1                    CHARLES J. MESSERY

2        originally wanted to use.

3            Q.     But you couldn't use?

4            A.     We couldn't use.  We didn't

5        use.

6            Q.     You didn't use.  But you

7        originally wanted to but you couldn't

8        so you had to use the primary CGL form?

9            A.     Yes.

10           Q.     But at some later date you

11       felt you had the ability to enforce

12       your intent to use the stand alone

13       excess; is that right?

14           A.     Yes, that's correct.

15               MR. BLUTE:  I have no

16       further questions.  Thank you.

17               (Time noted:  1:08 p.m.)

18

19       _____

20           CHARLES J. MESSERY

21

22       Subscribed and sworn to before me

23       this _____ day of _____, 2006.

24

25       _____