# EXHIBIT C

Case 1:04-cv-11109-RGS    Document 37-4    Filed 09/29/2006    Page 1 of 11

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                      FOR THE
 3                DISTRICT OF MASSACHUSETTS
 4  LEXINGTON INSURANCE COMPANY    )
 5  AND NATIONAL UNION FIRE        )
 6  INSURANCE COMPANY OF           )  No. 04-11109 RGS
 7  PITTSBURGH,                    )
 8            Plaintiffs,          )
 9       vs.                       )
10  VIRGINIA SURETY COMPANY,       )
11  INC.,                          )
12            Defendant.           )
13          The deposition of JOHN GORING, called for
14  examination, taken pursuant to the Federal Rules of
15  Civil Procedure of the United States District Courts
16  pertaining to the taking of depositions, taken
17  before JENNIFER L. BERNIER, CSR No. 84-4190, a
18  Notary Public within and for the County of Cook,
19  State of Illinois, and a Certified Shorthand
20  Reporter of said state, at Suite 800, 200 East
21  Randolph Street, Chicago, Illinois, on the 14th day
22  of July, A.D. 2006, at 10:58 a.m.
23
24  Job No. 191493B
```

Esquire Deposition Services
(215) 988-9191

Page 2

1 PRESENT:
2    THE McCORMACK FIRM, LLC,
3    (One International Place,
4    Boston, Massachusetts 02110,
5    617-951-2929), by:
6    MR. ROBERT J. MASELEK,
7       appeared on behalf of the Plaintiffs;
8
9    MINTZ LEVIN COHN FERRIS
10   GLOVSKY AND POPEO, PC,
11   (One Financial Center,
12   Boston, Massachusetts 02111,
13   617-542-6000), by:
14   MR. JOHN M. STEPHAN,
15      appeared on behalf of the Defendant and
16      the deponent.
17
18
19 REPORTED BY: JENNIFER L. BERNIER, C.S.R.,
20       CERTIFICATE NO. 84-4190
21
22
23
24

Page 3

1       (WHEREUPON, the witness was duly
2       sworn.)
3    MR. MASELEK: John, same stipulations as
4 before?
5    MR. STEPHAN: Absolutely.
6    MR. MASELEK: So we've agreed to proceed in
7 accordance with the Federal Rules; and also that all
8 objections, except as to form, will be reserved
9 until the time of trial.
10      And the witness will read and sign; is
11 that correct?
12   MR. STEPHAN: That's correct.
13   MR. MASELEK: And if we don't receive it back
14 within 45 days from receipt, we'll leave it as
15 having been read and signed.
16   MR. STEPHAN: That is correct.
17       JOHN GORING,
18 called as a witness herein, having been first duly
19 sworn, was examined and testified as follows:
20       EXAMINATION
21 BY MR. MASELEK:
22   Q. Can you please state your name, sir?
23   A. John Goring.
24   Q. Mr. Goring, my name is Robert Maselek.

Page 4

1 And I represent the Plaintiffs in this action,
2 Lexington and National Union.
3    Q. Have you ever been deposed?
4    A. Yes.
5    Q. Have you been deposed in any National
6 Program Services related litigation?
7    A. Yes.
8    Q. Okay. What case was that?
9    A. It had to do with a dispute -- a return
10 premium dispute -- with AIMCO, one of the National
11 Program Services' accounts.
12   Q. And when did that deposition occur?
13   A. Maybe a year-and-a-half or two years ago.
14 I'm not sure, but something like that.
15   Q. And was Virginia Surety a party to that
16 litigation?
17   A. Yes.
18   Q. And where was that litigation pending?
19   A. Where?
20   Q. In what court, if you know?
21   A. I don't know.
22   Q. Okay. Do you know what the outcome of
23 that litigation was?
24   A. I don't.

Page 5

1    Q. Do you know if it's still pending?
2    A. I don't know that.
3    Q. Okay. Just a few ground rules before we
4 get going.
5       If you need to take a break at any time,
6 please let me know. That will be fine. If you
7 don't understand any of my questions, please let me
8 know as well. Okay?
9    A. Okay.
10   Q. And the only other thing is, we have to
11 keep our responses -- and all questions have to
12 be -- verbal.
13      So we can't shake our head or things like
14 that?
15   A. All right. I'll keep that in mind.
16   Q. And are you an employee of Virginia
17 Surety?
18   A. Yes.
19   Q. And what's your title?
20   A. Senior program manager.
21   Q. And for how long have you worked for
22 Virginia Surety?
23   A. Four years.
24   Q. And what was your title when you began?

2 (Pages 2 to 5)

Page 22

1  Q. Okay. If you look at page 222 of
2  Exhibit 4, in the heading, under "Supplementary
3  Payments" -- are you familiar with this form, first
4  of all?
5  A. Yes.
6  Q. Okay. Is it your understanding that,
7  based on the language in this form, that defense
8  costs would be included or excluded from the
9  $250,000 policy limit?
10  MR. STEPHAN: Objection to form.
11 BY THE WITNESS:
12  A. Could you say that again?
13 BY MR. MASELEK:
14  Q. Sure.
15  A. You sort of --
16  Q. Sure. From the bottom of the first
17 column to the top of the second column, there's a
18 list of seven different categories of expenses,
19 correct?
20  A. Right.
21  Q. And immediately following that, there's
22 language that indicates that these payments will not
23 reduce the limits of insurance; is that correct?
24  A. Yes.

Page 23

1  Q. Okay. Does that lead you to believe
2  that -- at least, based on that language -- that
3  items, such as defense costs, would not reduce the
4  limits of insurance?
5  A. Yes. That's what this form -- that's
6  what this form means.
7  Q. And to your knowledge, was this form --
8  this part of that ISO form dated 1994 -- part of the
9  policies that were issued by NPS and also Virginia
10 Surety, itself?
11  A. Yes. This is the commercial general
12 liability form. January '96 is the edition date.
13 And this was the primary form for all of the NPS
14 policies.
15  Q. I would like to show you an exhibit that
16 was No. 15 at Mr. Baliga's deposition. I would ask
17 if you've seen that before.
18  A. I'm not 100 percent sure, but I think I
19 have seen this. I am familiar with the filing of
20 the VSC 27.
21  Q. And if you look at VSC 27 -- and
22 throughout this deposition today, if you or I use
23 the term "VSC 27," can we agree that we're referring
24 to that?

Page 24

1  A. We can.
2  MR. STEPHAN: I'm sorry. I don't mean to
3 interrupt.
4  Can we agree to Endorsement 27 so that
5 we're consistent with the term that we used in
6 Mr. Baliga's deposition?
7 BY MR. MASELEK:
8  Q. Would you agree with that, sir?
9  A. That's fine.
10  Q. You said that you were familiar with that
11 form?
12  A. I am.
13  Q. Give me one moment.
14  If you look at the first page of the
15 endorsement, under the heading, "Supplementary
16 Payments-Coverages," after the seventh item, it
17 reads, "These payments will reduce the limits of
18 insurance," correct?
19  A. Yes.
20  Q. To your understanding, what is the intent
21 of adding this endorsement to the policy?
22  MR. STEPHAN: Objection.
23 BY THE WITNESS:
24  A. That would amend the general liability

Page 25

1 coverage part to include those seven things within
2 the limits.
3 BY MR. MASELEK:
4  Q. Okay. So if this form were made part of
5 an NPS program policy, for that policy, defense
6 costs would erode the limits of insurance; is that
7 correct?
8  A. That's what this form would say, yes.
9  Q. To your knowledge, was this form used on
10 any NPS program policies?
11  A. It was not used.
12  Q. It was not used by NPS, correct?
13  A. It was not used by NPS, nor Virginia
14 Surety in their role after NPS went away.
15  Q. Okay. So to your knowledge, all of the
16 NPS program policies -- whether issued by NPS or
17 Virginia Surety, itself -- excluded defense costs
18 from the limit of liability?
19  MR. STEPHAN: Objection. You're referring to
20 the policies written on Virginia Surety paper?
21  MR. MASELEK: Both. Yes, I'm sorry. Yes.
22 BY THE WITNESS:
23  A. Well, you asked it in sort of a
24 roundabout way.

7 (Pages 22 to 25)

Page 26

1    I would answer you by saying this form
2 was not part of any of the NPS policies, either
3 issued in New Jersey or in Fort Wayne.
4 BY MR. MASELEK:
5    Q. And are you aware of any other forms that
6 may have been endorsed to any NPS program policies
7 issued, on behalf of Virginia Surety, that would
8 have made defense costs be included within the limit
9 of liability?
10   A. There were none to my knowledge.
11   Q. Okay. To your knowledge, did the
12 Virginia Surety policies provide first-dollar
13 defense coverage?
14   A. First-dollar defense coverage?
15   Q. Do you know what I mean by that?
16   A. Why don't you explain that?
17   Q. To your knowledge, were there any
18 deductibles or self-insured retentions issued to any
19 insureds by NPS under the program?
20   A. You're sort of asking a different
21 question now.
22   Q. Yes. Actually, I did.
23   A. With respect to the Virginia Surety
24 policies, there were no deductibles or self-insured

Page 27

1 retentions.
2      Now, obviously, I am aware that there
3 were AIG policies written that had that, but not
4 Virginia Surety policies.
5    Q. Right. And unless I indicate otherwise
6 today, if I refer to "the program policies," I'm
7 only referring to the ones issued on behalf of
8 Virginia Surety.
9    A. Okay.
10   Q. Do you know if NPS issued any policies on
11 behalf of National Union?
12   A. I don't know if NPS issued them or they
13 were issued by National Union. I know that there
14 were such things. Who actually issued them, I'm not
15 aware of.
16   Q. Okay. To your knowledge, was
17 Endorsement 27 approved for use in any states?
18   A. To my knowledge, it was not; and,
19 therefore, it was not used.
20   Q. I guess, to your knowledge, do you have
21 an understanding as to why Endorsement 27 was not
22 used?
23   A. Because it was not approved by the
24 states.

Page 28

1    Q. Okay. Do you have an understanding as to
2 why the form was not approved?
3    MR. STEPHAN: Objection.
4 BY THE WITNESS:
5    A. I really don't know why the states did
6 not approve it. As to their reason, it would just
7 be conjecture on my part. I don't know. I never
8 saw anything that said why they didn't approve it.
9 BY MR. MASELEK:
10   Q. Do you know whether the MGA agreement,
11 between NPS and Virginia Surety, required NPS to
12 utilize Form 27 -- excuse me, I'm sorry,
13 Endorsement 27?
14   A. I don't know. And the agreement -- what
15 I can recall of it -- did not mention this form,
16 endorsement.
17   Q. But your understanding is that, because
18 it had not been approved in any states, that it
19 couldn't be used?
20   A. Correct.
21   Q. Did anybody from Virginia Surety inform
22 you that it was the intent of Virginia Surety to
23 have defense costs erode the policy limits?
24   MR. STEPHAN: Objection.

Page 29

1 BY THE WITNESS:
2    A. I don't believe that was discussed, as to
3 their intent, in that regard.
4 BY MR. MASELEK:
5    Q. Okay. Are you aware of any restrictions,
6 in any states, that would prohibit any primary GL
7 policy to have defense costs erode the policy limit?
8    MR. STEPHAN: Objection.
9 BY THE WITNESS:
10   A. I'm not aware. If there is, I don't
11 know.
12 BY MR. MASELEK:
13   Q. Okay.
14   A. But since the form was not approved,
15 somebody must object to it. But I don't know what
16 the details of that are.
17   Q. Okay. And the NPS program policies
18 issued by or on behalf of Virginia Surety, were they
19 issued on what's referred to as an admitted paper?
20   A. Yes.
21   Q. Okay. And as part of that process, would
22 that require the forms to generally be approved
23 before use?
24   A. Yes.

Esquire Deposition Services
(215) 988-9191

### Page 54

1  Q. Do you know whether that was issued by
2  NPS on any policies?
3  A. Yes, it was. I can only think that the
4  regulators must have been sleeping that day when
5  they approved that.
6  Q. And there was a copy of that form in the
7  Virginia Surety home office -- or wherever the
8  filings are kept for the program?
9  MR. STEPHAN: Objection. You can answer.
10 BY THE WITNESS:
11 A. A copy of, what, the pollution form?
12 BY MR. MASELEK:
13 Q. Correct.
14 A. I'm sure there was. It's part of the
15 packet of forms. It's probably on your thing right
16 here.
17 Q. How did you decide to deal with this lead
18 paint issue?
19 MR. STEPHAN: Objection.
20 BY THE WITNESS:
21 A. Well, the issue -- as you describe it --
22 I would interpret to mean when I was requested to
23 include VSC 99 forms on policies.
24     Referring back to the second paragraph

### Page 55

1 here that you referred to -- and read very well
2 earlier -- if the form was already on the policy, it
3 was my view we were probably stuck on that.
4     But I was not going to honor any requests
5 similar to the one that Naylee Womble made to put
6 this form on any other policies on which it was not
7 already on the policy.
8 BY MR. MASELEK:
9  Q. So if an insured or an insured's broker
10 produced some type of documentation from NPS -- a
11 binder or something else that showed that this
12 coverage had been promised to the insured -- would
13 Virginia Surety make good on that?
14 MR. STEPHAN: Objection.
15 BY THE WITNESS:
16 A. Well, because this was not a filed form
17 and was above our 250,000 limit, I didn't put it on
18 the policy. I declined to put it on the policy.
19 BY MR. MASELEK:
20 Q. Just with respect to Ms. Womble, or
21 across the board to any other requests as well?
22 MR. STEPHAN: Objection. Form.
23 BY THE WITNESS:
24 A. To anyone.

### Page 56

1 BY MR. MASELEK:
2  Q. Okay.
3  A. The rationale of the million-dollar
4 sublimit on the $250,000 policy would have been
5 good, in my view, for anyone, not just for her.
6  Q. So to your memory, Virginia Surety,
7 itself, did not issue any lead paint endorsements
8 with the sublimit of a million?
9  A. Right.
10 Q. Okay. Would you, if requested, delete
11 the lead paint liability exclusion from an NPS
12 program?
13 A. I don't know if that ever came up for me.
14 But there were, on NPS-generated policies,
15 endorsements which did remove the lead paint
16 exclusion.
17     Apparently, if NPS was requested to do
18 so, they would have done that. That was kind of a
19 separate issue from this million-dollar limit,
20 however.
21 Q. Okay. Are you aware of whether the NPS
22 program policies had a mold exclusion?
23 A. No. They did not, to my knowledge.
24 Q. Are you aware whether or not NPS had

### Page 57

1 issued policies on behalf of Virginia Surety with a
2 million-dollar policy limit?
3  A. Yes.
4  Q. And how many policies?
5  A. Three.
6 MR. STEPHAN: Object to form.
7 BY MR. MASELEK:
8  Q. Okay. And I believe, from memory, one of
9 them was Garden Homes; is that correct?
10 A. That's correct.
11 Q. Did you authorize the issuance of any
12 policies in the amount of a million dollars?
13 A. No.
14 MR. MASELEK: Mark this as the next exhibit,
15 please.
16     (WHEREUPON, a certain document was
17     marked Goring Deposition Exhibit
18     No. 6, for identification, as of
19     07/14/06.)
20 BY MR. MASELEK:
21 Q. Mr. Goring, have you seen the documents
22 that are collected as Exhibit 6 before?
23 MR. STEPHAN: I'll note, for the record, that
24 the Bates numbers -- in all of these pages -- are

Page 58

1 not necessarily sequential.
2        So, I assume, you're not representing
3 that this is one document.
4    MR. MASELEK: No. It's a compilation document
5 exhibit.
6 BY THE WITNESS:
7    A.   Yes. I'm familiar with this note.
8 BY MR. MASELEK:
9    Q.   If you look at the last page of this
10 exhibit, it's Bates Stamped 1104; do you see that?
11   A.   Yes.
12   Q.   There is a note, and it's from
13 Sally Martin. Do you know who she is?
14   A.   Yes.
15   Q.   Ms. Martin indicates:
16        "8/22," which I assume is August 2nd,
17 2002 -- "Per John's conversation, yes, will endorse
18 1 million/2 million limits at no additional premium
19 per binder?"
20        Did I read that correctly?
21   A.   Yes.
22   Q.   Do you know if that was done?
23   A.   It was.
24   Q.   Okay. And why was that done?

Page 59

1    A.   It was done because NPS had bound
2 coverage for a million dollars, which, of course,
3 was inappropriate based on their agreement with
4 Virginia Surety. But that's what they did.
5    Q.   And Virginia Surety made a determination
6 that it would honor the promise that had been made
7 by NPS?
8    A.   Yes.
9    Q.   Do you know of any occasions when
10 Virginia Surety decided that it would not honor any
11 promises for coverage that NPS had made to an NPS
12 program insured?
13   MR. STEPHAN: Objection.
14 BY THE WITNESS:
15   A.   Yes. And that would have been in the
16 area of the million-dollar lead paint situation,
17 which we described before -- which we discussed
18 before.
19 BY MR. MASELEK:
20   Q.   Okay. For policies that were issued by
21 Virginia Surety, after you became involved in the
22 program, did Virginia Surety make any attempt to
23 determine whether there was a layer above the
24 Virginia Surety policy?

Page 60

1    MR. STEPHAN: Objection.
2 BY THE WITNESS:
3    A.   We did not.
4 BY MR. MASELEK:
5    Q.   Have you ever spoken with Mr. Gruppuso?
6    A.   Yes.
7    Q.   And when was that?
8    A.   That was prior to my employment with
9 Virginia Surety. Because ever since I had been
10 employed by Virginia Surety, NPS has failed to
11 exist.
12   Q.   Okay. Did you have business dealings
13 with Mr. Gruppuso in your prior employment?
14   A.   Yes.
15   Q.   Okay. And when was that?
16   A.   Well, of course, I can't remember the
17 exact day. But that would have been between --
18 let's see -- in 2000 or 2001, sometime, I guess.
19   Q.   Okay. And what was the nature of your
20 contact with Mr. Gruppuso?
21   A.   I was employed, as I mentioned to you
22 before, by Interstate Insurance Group, who -- which,
23 I guess, was the carrier for the NPS program prior
24 to Virginia Surety.

Page 61

1    Q.   Is Interstate related to Chicago
2 Insurance at all?
3    A.   Chicago Insurance Company is one of the
4 underwriting companies in the Interstate Insurance
5 Company Group. So, yes, it is.
6    Q.   Are you familiar with an entity called
7 Coverage Services Group?
8    A.   No.
9    Q.   Were you involved in the NPS program
10 while employed by Interstate?
11   A.   Yes.
12   MR. STEPHAN: Objection.
13 BY THE WITNESS:
14   A.   I'm sorry.
15   MR. STEPHAN: We've been using the NPS program
16 to refer to the program that existed in which
17 Virginia Surety and the AIG companies were involved
18 in. So we should, perhaps, clarify.
19 BY MR. MASELEK:
20   Q.   What was your understanding of the NPS
21 program as it existed when Interstate was involved?
22   A.   What was my understanding of the program?
23   Q.   Right.
24   A.   I'm not sure what you're getting at.

Page 62

1  Q. Well, what was Interstate's role?
2  A. Interstate was the insuring company for
3 National Program Services at that time.
4  Q. Do you know if AIMCO was part of the
5 program at that time?
6  A. It was.
7  Q. Okay. What was the limit of liability of
8 the Interstate policies?
9  A. 1 million.
10  Q. Okay. So it was different from the
11 situation that Virginia Surety was involved in; is
12 that correct?
13  A. Right.
14  Q. And was there any deductible or
15 self-insured retention to the policies?
16  A. No.
17  Q. Do you have an understanding as to why
18 NPS stopped doing business with Interstate?
19  A. Interstate terminated the program.
20  Q. Okay. And why did Interstate terminate
21 the program?
22  A. They were not satisfied with the way it
23 was being handled or something. I really -- even
24 though I handled that, that decision was made by

Page 63

1 management. And I couldn't say exactly what the
2 details were.
3      But they no longer felt that it was a
4 good business opportunity for Interstate, and they
5 terminated the program.
6  Q. Did Interstate appoint NPS as a Managing
7 General Agent?
8  A. They were an agent. I'm not sure if they
9 had quite the same agreement with Interstate that
10 NPS had with Virginia Surety.
11      But their operation -- or part of their
12 operation, at least -- was insured by Chicago
13 Insurance Company.
14  Q. Okay. Did NPS, when it dealt with
15 Interstate, collect premiums and issue policies?
16  A. Well, they collected premiums.
17 Interstate, actually -- let's see. Did Interstate?
18      I think Interstate actually created the
19 policies. I don't remember, now, whether the agent,
20 NPS, created the policies or whether Interstate did.
21 I can't remember now.
22  Q. Was there any question raised by
23 Interstate regarding NPS being in arrears of any
24 payments that it owed Interstate?

Page 64

1  MR. STEPHAN: If you know.
2 BY THE WITNESS:
3  A. I guess there are always accounting
4 issues, but not to the same extent that the problem
5 arose with Virginia Surety.
6      I think they generally have the
7 accounting issues reasonably well under control.
8 BY MR. MASELEK:
9  Q. Okay. Are you familiar with the claims
10 made by Virginia Surety in its counterclaim in this
11 lawsuit?
12  A. Not to any great extent. I mean, again,
13 I read over the black book. And I know there's
14 claims and counterclaims. But I'm not terribly
15 conversant with the details of it.
16  Q. Are you aware of the position taken by
17 National Union in this litigation?
18  A. I guess, all I know is that they,
19 National Union, believes they should not participate
20 in defense costs. That's sort of the extent of my
21 knowledge of it.
22  Q. Okay. In your review of the NPS files,
23 are you aware of circumstances where insureds, or
24 others, referred to the National Union layer of

Page 65

1 coverage as excess insurance?
2  MR. STEPHAN: Objection.
3 BY THE WITNESS:
4  A. No.
5 BY MR. MASELEK:
6  Q. Okay. Based on your experience, do you
7 believe that a policy written above an SIR is an
8 excess policy?
9  MR. STEPHAN: Objection. Speculation. Calls
10 for a legal conclusion by the witness.
11 BY THE WITNESS:
12  A. I can't offer an opinion on that.
13 BY MR. MASELEK:
14  Q. Do you have any opinion as to the merits
15 of the lawsuit?
16  MR. STEPHAN: Objection.
17 BY THE WITNESS:
18  A. I guess everybody has opinions on things.
19 There's really not much I had to do with this
20 issue -- either what was agreed to, or not agreed to
21 at the beginning, or what any of that is.
22      My role was to undo the administrative
23 disaster left by NPS.
24 BY MR. MASELEK:

17 (Pages 62 to 65)

Page 66

1  Q. Is that role continuing today?
2  A. Only to a small degree. All of the
3 policies have been run off finally. Three years is
4 a long time, three-year insurance policies.
5      So most of my activity with NPS no longer
6 exists. Occasionally, there may be some questions
7 that claims people have with respect to information
8 on the files, or additional insureds, or things like
9 that, which I provide that.
10      So there's still a little activity, but
11 not much compared to what there was before.
12  Q. Based upon your knowledge of the contents
13 of the NPS program policies, do you believe that --
14 once Virginia Surety has paid $250,000 in defense or
15 indemnity payments -- that it has no further
16 obligations towards the insureds?
17      MR. STEPHAN: I'm sorry. Did you say, "based
18 on your review of the" --
19      MR. MASELEK: NPS program.
20 BY THE WITNESS:
21  A. Well, based on policies, that issue
22 really isn't addressed.
23 BY MR. MASELEK:
24  Q. Okay. Is that because, based upon your

Page 67

1 review of the policies that you reviewed earlier
2 today, defense costs are outside the policy limits?
3      MR. STEPHAN: Objection.
4 BY THE WITNESS:
5  A. Are you asking me, is my comment that it
6 is not part of the -- could you go through that one
7 again?
8 BY MR. MASELEK:
9  Q. Sure. Sure.
10  A. You're more confusing when you ask
11 questions than when you read stuff.
12  Q. Okay. I've been accused of that before.
13 I'll take that as a fair criticism.
14      Do you have an understanding as to
15 whether defense costs erode the policy limits in any
16 of the NPS program policies?
17  A. Well, I can answer that. And the answer
18 is that defense costs do not erode the limits,
19 because -- as we read the CGL form -- where it says
20 that it does not.
21      And the Endorsement 26 -- 27, excuse me,
22 is not part of any of the policies. So, yes, in
23 answer to your question, the policies' limits are
24 not eroded by defense costs.

Page 68

1  Q. Okay. Are you aware that, in this
2 litigation, Virginia Surety is taking the position
3 that, once defense costs or indemnity payments equal
4 $250,000, that it has no further obligation to pay
5 any expenses above that amount?
6      MR. STEPHAN: Objection.
7 BY THE WITNESS:
8  A. I'm sort of, basically, aware of what the
9 disagreement is. But I can't speak to the details
10 of what Virginia Surety's exact position is on this.
11      MR. MASELEK: Give me a moment. I think I'm
12 done.
13      MR. STEPHAN: Absolutely. No problem.
14      (WHEREUPON, a recess was had.)
15      (WHEREUPON, a certain document was
16      marked Goring Deposition Exhibit
17      No. 7, for identification, as of
18      07/14/06.)
19 BY MR. MASELEK:
20  Q. Mr. Goring, I'd ask you to take a look at
21 Exhibit 7, which is another compilation exhibit of
22 some different documents.
23  A. Okay.
24  Q. In your review of the NPS program files,

Page 69

1 you've seen documents similar to this?
2  A. Yes.
3  Q. And as to the first document, do you know
4 who Art Cucuzzella was?
5  A. He was an NPS account exec, or an
6 employee of some kind.
7  Q. Okay. And this first document purports
8 to be an interoffice memorandum from Mr. Cucuzzella
9 to a Wes at Barclay Program Services?
10  A. Mm-hmm.
11  Q. Do you know who Barclay Program Services
12 was?
13  A. That's a more difficult question than it
14 might seem, because -- in some respects -- they were
15 a broker just like many brokers that did business
16 with NPS. But there was something more to it than
17 that.
18      They were actually in the same building
19 as NPS. And I think they had some greater
20 relationship than the normal broker. I couldn't
21 tell you what that was, but that's what it seemed.
22  Q. It seemed based upon your review of the
23 documents?
24  A. Based upon the fact that they were in the

Page 76

1              UNITED STATES DISTRICT COURT

2                        FOR THE

3              DISTRICT OF MASSACHUSETTS

4  LEXINGTON INSURANCE COMPANY    )

5  AND NATIONAL UNION FIRE        )

6  INSURANCE COMPANY OF           )  No. 04-11109 RGS

7  PITTSBURGH,                    )

8              Plaintiffs,        )

9       vs.                       )

10 VIRGINIA SURETY COMPANY,       )

11 INC.,                          )

12              Defendant.        )

13       I hereby certify that I have read the

14 foregoing transcript of my deposition given at the

15 time and place aforesaid, consisting of Pages 1 to

16 75, inclusive, and I do again subscribe and make

17 oath that the same is a true, correct and complete

18 transcript of my deposition so given as aforesaid,

19 and includes changes, if any, so made by me.

20                                    NO CHANGES

21  _John Goring_  8-7-06      JOHN GORING

22 SUBSCRIBED AND SWORN TO before me

23 this  7th  day of  August          , A.D. 2006.

24          _Julieanne Barbuto_
            Notary Public
            My Commission Expires: 02/18/2011

**Esquire Deposition Services**
**(215) 988-9191**


JULIEANNE BARBUTO
Notary Public
Commonwealth of Massachusetts
My Commission Expires February 18, 2011

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:   Lexington Ins. v. Virginia Surety Co.
Dep. Date:   July 14, 2006
Deponent:    John Goring

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| | | | | |

*NO CHANGES*

_____
Signature of Deponent

8-7-06