# EXHIBIT E

Page 1

1        UNITED STATES DISTRICT COURT

2                  FOR THE

3           DISTRICT OF MASSACHUSETTS

4  LEXINGTON INSURANCE COMPANY    )

5  AND NATIONAL UNION FIRE        )

6  INSURANCE COMPANY OF           ) No. 04-11109 RGS

7  PITTSBURGH,                    )

8            Plaintiffs,          )

9       vs.                       )

10 VIRGINIA SURETY COMPANY,       )

11 INC.,                          )

12           Defendant.           )

13           The 30(b)(6) deposition of VIRGINIA

14 SURETY COMPANY, INC., by WAYNE BALIGA, called for

15 examination, taken pursuant to the Federal Rules of

16 Civil Procedure of the United States District Courts

17 pertaining to the taking of depositions, taken

18 before JENNIFER L. BERNIER, CSR No. 84-4190, a

19 Notary Public within and for the County of Cook,

20 State of Illinois, and a Certified Shorthand

21 Reporter of said state, at Suite 800, 200 East

22 Randolph Street, Chicago, Illinois, on the 13th day

23 of July, A.D. 2006, at 10:10 a.m.

24 Job No. 191490

Page 62

1 referring to, the risk purchasing -- is it an
2 agreement?
3    A.   I believe an agreement has to be entered
4 into representing that a risk purchasing group
5 exists, and it's made up of these types of insureds.
6    Q.   And you recall reviewing that
7 specifically related to the NPS program?
8    A.   We reviewed it in conjunction with the
9 regulatory filings, yes.
10   Q.   And do you have a recollection as to
11 whether that agreement indicates that the Virginia
12 Surety policy would be capped at $250,000?
13   A.   That I don't recall.
14   Q.   Okay. The next paragraph, in the Answers
15 to Interrogatories, indicates:
16         "As of May 2005, VSC had paid,
17 approximately, 3.6 million in expense and indemnity
18 payments in excess of" -- it doesn't say "of," but I
19 believe it should -- "of the $250,000 self-insured
20 retention in Plaintiffs' policies.
21         Pursuant to the parties' policies and the
22 intent of all of the interested parties, Plaintiffs'
23 policies are triggered in every claim that exceeds
24 the $250,000 SIR. And Plaintiffs are liable for all

Page 63

1 amounts in excess of the SIR?"
2         Did I read that correctly?
3    A.   Yes.
4    Q.   And that's what you've testified earlier
5 is Virginia Surety's position in this matter?
6    A.   Yes.
7    Q.   Then it continues:
8         "At a minimum, Plaintiffs must share in
9 these expenses in accordance with the other
10 insurance clauses in the parties' policies."
11        Did I read that correctly?
12   A.   Yes.
13   Q.   So is that -- the part after "at a
14 minimum" -- a fallback position?
15   MR. STEPHAN: Objection.
16 BY THE WITNESS:
17   A.   Well, it's a potential alternative
18 interpretation of the other insurance clauses.
19 BY MR. MASELEK:
20   Q.   Okay. And am I correct that it's
21 Virginia Surety's position that its position that
22 its liabilities capped at $250,000 -- in cases where
23 there's both a National Union policy and a Virginia
24 Surety policy -- is also based in part on the other

Page 64

1 insurance clauses in the policies?
2    MR. STEPHAN: Objection to form.
3 BY THE WITNESS:
4    A.   Yes. That would enter into our analysis.
5 BY MR. MASELEK:
6    Q.   I'm just trying to clarify, because your
7 response to the prior question was that the last
8 sentence, in this paragraph, was an alternative
9 reading -- a potential reading -- of the other
10 insurance clauses. Is that correct?
11   MR. STEPHAN: Objection.
12 BY THE WITNESS:
13   A.   Yes. It's an alternative reading of the
14 clauses, correct.
15 BY MR. MASELEK:
16   Q.   With one of the alternatives being that
17 National Union would have to reimburse everything
18 above the $250,000; is that correct?
19   A.   That is one of the interpretations,
20 correct.
21   Q.   A number of the topics -- specifically,
22 Topics 4, 6, and 7 -- relate to Virginia Surety's
23 decision to participate in the NPS program.
24        I would like to review those now.

Page 65

1    MR. STEPHAN: R.J., are you referring back to
2 the Exhibit 1 now?
3    MR. MASELEK: Yes.
4    MR. STEPHAN: Do you have that?
5    THE WITNESS: Yeah.
6    MR. MASELEK: A lot of the topics are
7 repetitive. So we'll just do them in clumps.
8         Mark that as the next exhibit, please.
9         (WHEREUPON, a certain document was
10        marked Baliga Deposition Exhibit
11        No. 7, for identification, as of
12        07/13/06.)
13   MR. MASELEK: Do this one as 8, too, please.
14        (WHEREUPON, a certain document was
15        marked Baliga Deposition Exhibit
16        No. 8, for identification, as of
17        07/13/06.)
18 BY MR. MASELEK:
19   Q.   Mr. Baliga, have you had a chance to
20 review the document marked as Exhibit No. 7?
21   A.   Yes.
22   Q.   Okay. And the second e-mail, on the
23 document, purports to be an e-mail dated 9/12/2000,
24 from you to David Cole; is that correct?

Page 66

1  A.  Yes.
2  Q.  And the subject is the "Cananwill Client
3  Front." Is that correct?
4  A.  Yes.
5  Q.  Do you have a recollection of sending
6  this e-mail to Mr. Cole?
7  A.  Not a specific recollection, other than
8  what I'm seeing here.
9  Q.  Okay. Do you have any reason to doubt
10 that that's a copy of an e-mail that you sent to
11 Mr. Cole on or about that time?
12 A.  It appears to be.
13 Q.  When did NPS first present the
14 opportunity to enter into the program to Virginia
15 Surety?
16    MR. STEPHAN: Objection.
17 BY THE WITNESS:
18 A.  It was right about this time, September
19 of 2000.
20 BY MR. MASELEK:
21 Q.  And what was the proposal presented by
22 NPS?
23    MR. STEPHAN: Objection.
24 BY THE WITNESS:

Page 67

1  A.  They indicated to us they had a
2  habitational liability program; that they needed
3  somebody to insure a primary $250,000 layer --
4  specifically, the SIR, in this case -- and that they
5  gave us both the documents -- the actuarial
6  documents and other documents we reviewed -- in
7  conjunction with that proposal.
8  BY MR. MASELEK:
9  Q.  Okay. How was the proposal communicated
10 to Virginia Surety? Did it come in through
11 Cananwill?
12 A.  Yes. Cananwill was doing premium finance
13 agreements with NPS.
14 Q.  And what is the relationship between
15 Cananwill and Virginia Surety?
16 A.  They are both owned by Aon -- or were
17 both owned by Aon at the time. I don't know if
18 Cananwill is still a part of us or not.
19 Q.  Okay. In the e-mail, it indicates that,
20 "they -- which, I presume, is NPS --"are proposing
21 that VSC front the first 250,000 of general
22 liability exposure for this facility."
23    Did I read that correctly?
24 A.  Yes.

Page 68

1  Q.  Okay. "And AIG writes a 1
2  million/2 million policy over the $250,000 layer."
3     Did I read that correctly?
4  A.  Yes.
5  Q.  And that proposed VSC premium is
6  51 million; is that correct?
7  A.  Yes.
8  Q.  Okay. Were you aware, at this time, that
9  the AIG policy involved a retention amount?
10 A.  We knew that we were going to write --
11 insure a self-insured retention.
12 Q.  Okay. Does it say that in this e-mail?
13 A.  No. This is a brief summary e-mail,
14 though. It doesn't surprise me that I didn't point
15 all of that out to David.
16 Q.  When it says, "Proposed VSC premium is
17 $51 million," what does that mean?
18 A.  Well, whenever we do a program, we have
19 to estimate what the annual gross written premium
20 will be. So that's what that means.
21 Q.  Was that meant to be a cap?
22 A.  Typically, our agreements capped the
23 premium. I don't know, in this case, if we capped a
24 at 51,000 or not.

Page 69

1     MR. STEPHAN: 51,000? 51 million.
2  BY THE WITNESS:
3  A.  I'm sorry. 51 million.
4  BY MR. MASELEK:
5  Q.  Was it your understanding that there was
6  a program in place already?
7  A.  Yes.
8  Q.  What is your understanding of the program
9  that was in place?
10 A.  That he had a habitational liability
11 program very similar to the one being proposed to us
12 already in place.
13 Q.  And that was with Wausau; is that
14 correct?
15 A.  I don't recall if it was Wausau or
16 Chicago Underwriting Group at the time.
17 Q.  Now, what does it mean when you say that
18 the VSC would, "front the first 250 general
19 liability exposure"?
20 A.  The specific proposal by NPS would be
21 that we would take no risk on this program, that it
22 would be 100 percent reinsured to Excel Re.
23 Q.  Okay. And is that the eventual deal that
24 was entered into?

Page 70

1  MR. STEPHAN: Objection.
2 BY THE WITNESS:
3  A. That's the deal we entered into. It
4 ultimately didn't work out that way, but that's the
5 deal we entered into.
6 BY MR. MASELEK:
7  Q. "100 percent reinsurance agreement," does
8 that mean that any claims and expenses that were
9 paid would be reinsured paid by the reinsurer?
10  MR. STEPHAN: Objection. Form.
11 BY THE WITNESS:
12  A. Yes. I mean, all expenses and losses
13 would be passed to the reinsurer.
14 BY MR. MASELEK:
15  Q. And Virginia Surety takes no risk on that
16 layer?
17  MR. STEPHAN: Objection.
18 BY THE WITNESS:
19  A. Well, you always take the risk, as the
20 policy issuer, of being the primary respondent on
21 the policy regardless of whether reinsurance
22 responded or not.
23 BY MR. MASELEK:
24  Q. In theory, as VSC understood the manner

Page 71

1 in which the program would operate, though, VSC was
2 not taking any risks; is that correct?
3  MR. STEPHAN: Objection.
4 BY THE WITNESS:
5  A. Well, we never viewed any front that way
6 because of the risk of having our paper out there.
7     So risk free, in this case, is only as to
8 expenses and indemnity if the reinsurer paid. But
9 we always know that there's a possibility reinsurers
10 will not pay.
11 BY MR. MASELEK:
12  Q. Okay. The e-mail indicates that, "The
13 client's prior insurer, Wausau, was charging
14 8 percent with taxes, fees, and assessments included
15 in that fee; therefore, the proposed rate by the
16 client is 5 percent net return," and that, "VSC
17 estimates taxes, fees, and assessments at
18 3 percent."
19    Did I read that correctly?
20  A. Yes.
21  Q. So is that the manner in which Virginia
22 Surety would make money from the program?
23  MR. STEPHAN: Objection.
24 BY THE WITNESS:

Page 72

1  A. Yes. Our fee, in the proposal, would be
2 5 percent of the gross written premium.
3 BY MR. MASELEK:
4  Q. Okay. Did Mr. Cole give you any feedback
5 regarding this e-mail?
6  A. My recollection is, we ultimately set up
7 a meeting between David Cohen and Vito Gruppuso
8 based on this e-mail and other e-mails.
9  Q. Do you know when that meeting occurred?
10  A. I believe it was December of 2000.
11  Q. Okay. Did Mr. Gruppuso explain why he
12 was seeking to change carriers?
13  A. Yes. He indicated that Wausau and/or
14 Chicago Underwriting Group -- I remember, whichever
15 one he told us at the time -- was exiting that type
16 of business.
17  Q. Okay. What type of business was that?
18  A. Habitational liability.
19  Q. Okay. And do you have an understanding
20 as to the prior program, whether it involved two
21 carriers or just one?
22  A. I don't recall if we discussed who was
23 involved in the prior program as far as number of
24 carriers.

Page 73

1  Q. Specifically, whether the prior program
2 involved an SIR buyback?
3  MR. STEPHAN: Objection.
4 BY THE WITNESS:
5  A. That I don't recall discussing.
6 BY MR. MASELEK:
7  Q. Okay. If you look at Exhibit 8, do you
8 recognize this document?
9  A. It appears to be an e-mail from myself to
10 David Cole.
11  Q. It's dated September 27th, 2000; is that
12 correct?
13  A. Yes.
14  Q. And does this e-mail further discuss the
15 NPS opportunity?
16  A. Yes.
17  Q. At the beginning of the e-mail, it
18 indicates:
19     "David, in addition to your points made
20 below, in your memo to Paul, our meeting yesterday
21 with National Program Services emphasizes our need
22 for further diversification of capacity."
23     Did I read that correctly?
24  A. Yes.

Page 74

1  Q.  Do you recall a meeting, in late
2 September, with NPS?
3  A.  Not specifically.
4  Q.  Okay. Do you recall the first meeting
5 that you had -- in-person meeting -- with
6 Mr. Gruppuso?
7  A.  I don't recall the first meeting, no. We
8 had several meetings, during that period, with him.
9  Q.  Okay. And if you look at Point No. 1 --
10 rather, the e-mail indicates that:
11     "During our meeting in New Jersey, NPS
12 offered VSC the following opportunity:
13     No. 1. The fronting of 50 to 90 million
14 of general liability at 5 percent, plus 3 percent up
15 front for taxes. The 50 to 90 million is based on
16 our capacity.
17     They would like to do the entire program
18 with one insurer. However, they are willing to
19 split the program between two insurers if we wished
20 to limit our participation?"
21     Did I read that correctly?
22  A.  Yes.
23  Q.  Is the discussion of splitting the
24 program between two insurers splitting just the

Page 75

1 number of insureds between different insurers, or is
2 it splitting the layers of coverage between
3 different insurers?
4  MR. STEPHAN: Objection.
5 BY THE WITNESS:
6  A.  It's not clear, from my memo, which one
7 we discussed. And I don't recall the discussion we
8 had.
9 BY MR. MASELEK:
10  Q.  Okay. When this opportunity was
11 presented by NPS to Virginia Surety, was the AIG
12 piece already in place?
13  MR. STEPHAN: Objection. I don't know if it
14 was in place or not.
15 BY MR. MASELEK:
16  Q.  Okay. Were you aware that it was an SIR
17 buyback, though?
18  MR. STEPHAN: Objection. If you understand
19 the term, "SIR buyback."
20 BY THE WITNESS:
21  A.  Yeah. We were aware that there was going
22 to be a self-insured retention involved.
23 BY MR. MASELEK:
24  Q.  Okay.

Page 76

1  A.  And that was what he was proposing.
2  Q.  Okay. Are you saying you just weren't
3 clear if it was National Union or both?
4  A.  We didn't know --
5  MR. STEPHAN: Sorry. Objection to form.
6     Do let him answer -- finish the question
7 before you begin your answer. If you want, ask the
8 question again. I'm sorry to interrupt you.
9  MR. MASELEK: That's okay.
10 BY THE WITNESS:
11  A.  Go ahead. I lost the question.
12 BY MR. MASELEK:
13  Q.  Yeah. You indicated earlier that you
14 weren't sure if the AIG piece was already in place
15 at this point in time.
16     Was it Virginia Surety's understanding,
17 at this point in time, that it would only be
18 insuring up to $250,000?
19  A.  Yes.
20  Q.  And that that represented a self-insured
21 retention amount?
22  A.  Yes.
23  Q.  Okay. Are you aware that the
24 policyholders -- that the insurance purchasing group

Page 77

1 was seeking to place a total of $1 million in
2 coverage?
3  A.  I don't know if we were specifically
4 aware of that or not.
5  Q.  Okay. Do you know what the coverage was
6 under the prior program that this was replacing?
7  A.  I don't recall, at this time, if we
8 discussed that or not.
9  Q.  Then Point No. 2 indicates that, "An
10 alternative proposal would involve Virginia Surety
11 participating on the risk above 70 million."
12     Did I read that correctly?
13  A.  Yes.
14  Q.  And is that a 70 million in aggregate
15 amount?
16  A.  It doesn't say one way or the other. So
17 I'm not sure what we were doing at that time.
18  Q.  It goes on to say, "NPS buys 70 million
19 of finite reinsurance for this program from Excel."
20 Is that correct?
21  A.  Yes.
22  Q.  And is that the reinsurance that you were
23 referring to earlier?
24  A.  No. Actually, the reinsurance I was

Page 78

1 referring to was for our gross written premium --
2 the 51 million in the last memo.
3    Q.   Okay. Do you recall there being a
4 discussion, while the NPS program proposal was being
5 discussed at Virginia Surety, in addition to the
6 fronting piece -- sort of a back piece -- on the
7 high end?
8        MR. STEPHAN:  Objection. Form.
9 BY THE WITNESS:
10   A.   Yes. I do recall we had some
11 discussions.
12 BY MR. MASELEK:
13   Q.   Okay. Do you know, did Virginia Surety
14 agree to participate in that additional component of
15 the program?
16   A.   We did not.
17   Q.   Okay. Is this reference to the
18 70 million a reference to the total amount of losses
19 that would occur under the NPS program?
20   A.   It may be. I'm not sure what exactly
21 we're referring to in that memo.
22   Q.   Okay. At the end of this e-mail, it
23 indicates:
24        "If we participate on the front and risk

Page 79

1 portions of the facility, projected income to VSC is
2 7,500,000, plus the float on, approximately,
3 3 million in prepaid taxes and assessments. I
4 indicated to NPS that we needed to discuss
5 internally before giving them any final
6 indications."
7        Did I read that correctly?
8    A.   Yes.
9    Q.   Was the issue of capping the policy at
10 250,000 mentioned at all during these discussions of
11 the policy while the program was being considered?
12   A.   Yes. Our indication to Vito was that
13 that was the layer we wished to participate on;
14 because we had premium constraints as to how much
15 gross written premium we could write for any one
16 program.
17   Q.   Was it VSC's understanding that its total
18 liability for any occurrence would be capped at
19 $250,000?
20   A.   That's how he presented it to us, yes.
21   Q.   Did he present that to you in writing or
22 verbally?
23   A.   He presented it to us both verbally and
24 through his actuarial studies. All of his actuarial

Page 80

1 studies were based on the maximum loss of $250,000.
2        And we got two large binders in which all
3 of the analysis was done on that basis.
4    Q.   And when you say "actual loss," does that
5 include defense costs as well?
6    A.   Yes.
7    Q.   Now, if you turn back to Exhibit 7, the
8 top e-mail indicates, "David, I spoke with Jack M."
9        Do you recall who "Jack M." is?
10   A.   Yeah. That was Jack McDonald. He was
11 our controller at the time.
12   Q.   "He indicated he passed some analysis to
13 you on the NPS' program impact on premium, surplus,
14 ratios, et cetera. I'd appreciate your thoughts on
15 whether we should do this program based on this
16 analysis. And if so, at what premium level?
17       I also have a call in to Chris G. for an
18 update on her analysis of accepting risk above the
19 $70 million aggregate. I'll let you know her
20 conclusion when received?"
21       Who is "Chris G."?
22   A.  Chris Gennett. She was one of our
23 actuaries.
24   Q.  Does this refresh your recollection as to

Page 81

1 what the $70 million was referring to?
2    A.  Yes. It indicates it's aggregate,
3 $70 million aggregate.
4    Q.  Can you explain what that means?
5    A.  Yeah. I mean, it was Vito's proposal
6 that he could cap aggregate exposure on this
7 program -- our aggregate exposure at 70 million --
8 if we entered into the various reinsurance
9 agreements.
10   Q.  And that this e-mail suggested there was
11 some discussion about accepting risk for the level
12 above the $70 million aggregate?
13   A.  Yes.
14   Q.  And would that be if the total losses
15 involving the NPS program policies exceeded
16 $70 million?
17   A.  Yes.
18       MR. MASELEK:  Mark this as the next exhibit,
19 please.
20       (WHEREUPON, a certain document was
21       marked Baliga Deposition Exhibit
22       No. 9, for identification, as of
23       07/13/06.)
24 BY MR. MASELEK:

21 (Pages 78 to 81)

Page 86

1  Q. Why not?
2  A. Because the program was being presented,
3 at the time, with our exposure being capped at the
4 $250,000. So other participants were important to
5 the program.
6  Q. Is the fact that the Virginia Surety
7 policies were to be capped at $250,000 a significant
8 component of the program?
9  A. Yes. It was significant to us that that
10 would be our limit of liability.
11  Q. And would that be significant to the
12 reinsurers as well?
13  MR. STEPHAN: Objection. Basis of knowledge.
14  You can answer if you know what the
15 reinsurers were thinking.
16 BY THE WITNESS:
17  A. Well, typically, reinsurers want to know
18 what the limit of liability is going to be for the
19 risks they're insuring.
20 BY MR. MASELEK:
21  Q. Did Virginia Surety ever explain to the
22 reinsurers that its policy was capped at $250,000?
23  A. I don't recall, specifically, if we
24 discussed it. But we would have put it in, as any

Page 87

1 presentation to a reinsurer. That would be part of
2 it.
3  Q. And in this program, did NPS already have
4 their reinsurer in place?
5  A. They had already proposed Excel as the
6 100 percent reinsurer.
7  Q. And in the negotiations leading up to the
8 participation of VS -- I'm sorry -- Virginia Surety
9 in the program, did Virginia Surety have discussions
10 with the reinsureds directly?
11  A. We did meet with Excel, yes.
12  Q. Okay. Do you recall, at this meeting, if
13 the issue of the policy being capped at $250,000
14 came up?
15  A. I don't recall, specifically.
16  Q. If you look at the last bullet point on
17 the second page, Mr. Suter indicates:
18  "Because a majority of AIMCO's policies
19 renewed on 5/31/00, NPS has requested of VSC that
20 the start date be backdated to 5/31."
21  Did I read that correctly?
22  A. Yes.
23  Q. And then the last sentence, in that
24 paragraph, reads:

Page 88

1  "To date everyone is still waiting to
2 hear from VSC as to the start date approved for
3 binding coverage."
4  Is that correct? Did I read that
5 correctly?
6  A. Where were you reading from?
7  Q. The last sentence of that bullet point.
8  A. Oh, okay. Yes.
9  Q. Do you know whether the coverage was --
10 whether Virginia Surety was able to backdate the
11 coverage?
12  A. I don't believe we backdated the
13 coverage, no.
14  Q. And do you know what the start date was
15 for binding coverage?
16  A. The first policy was issued on
17 12/31/2000.
18  MR. MASELEK: Mark this as the next exhibit,
19 please.
20  (WHEREUPON, a certain document was
21  marked Baliga Deposition Exhibit
22  No. 10, for identification, as of
23  07/13/06.)
24 BY MR. MASELEK:

Page 89

1  Q. Mr. Baliga, could you take a moment to
2 review No. 10, Document No. 10, please.
3  A. Okay.
4  Q. Now, do you recall receiving this letter
5 from Mr. Gruppuso?
6  A. I don't recall, specifically, no.
7  Q. It has a date stamp on it. I can't read
8 the date.
9  Is that your stamp for incoming mail?
10  A. It appears to be, yes.
11  Q. The first point on the letter indicates:
12  "Attached is the policy form that we
13 would like to utilize for the $250,000 limit with
14 Virginia Surety Co., Inc?"
15  Did I read that correctly?
16  A. Yes.
17  Q. Okay. Did Virginia Surety or NPS draft
18 the policies, the program policies?
19  MR. STEPHAN: Objection. Do you mean the
20 Virginia Surety policy?
21  MR. MASELEK: Right.
22 BY THE WITNESS:
23  A. It was a combination, because Virginia
24 Surety is a member of ISO. So some of the forms

23 (Pages 86 to 89)

### Page 106

1 correct?
2  A.  Yes.
3  Q.  And her Point No. 3 indicates:
4      "Additional new form. We wish to add
5 Form No. VSC-IPG-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, Changes in Commercial
6 General Liability Coverage Form. The purpose and
7 intent of this form is to clarify that all expenses
8 are included within the policy limit of $250,000?"
9       Did I read that correctly?
10  A.  Yes.
11  Q.  And attached to it is a two-page
12 endorsement; is that correct?
13  A.  Yes.
14  Q.  Okay. And is this the endorsement that
15 would put defense costs inside the policy limit?
16  A.  I would have to read it. It appears to
17 be, but I would have to read it.
18  Q.  If you look under Bullet Point 7, the
19 first column states, "These payments will reduce the
20 limits of insurance."
21      Did I read that correctly?
22  A.  Yes.
23  Q.  So do you believe this was the form that
24 would make defense costs reduce the limits of

### Page 107

1 liability?
2  A.  Yes.
3  Q.  And without this endorsement, would
4 defense costs erode the limit of --
5  THE REPORTER:  I'm sorry. I can't hear you.
6 BY MR. MASELEK:
7  Q.  Without this endorsement, would defense
8 costs erode the limit of liability on the Virginia
9 Surety policies?
10  A.  It depends on how the rest of the policy
11 is drafted.
12  Q.  But Ms. Feggins indicates that the point
13 of this endorsement is to clarify that all expenses
14 are included within the limit of $250,000, correct?
15  A.  Yes.
16  MR. MASELEK:  Mark this as the next exhibit,
17 please.
18      (WHEREUPON, a certain document was
19       marked Baliga Deposition Exhibit
20       No. 16, for identification, as of
21       07/13/06.)
22 BY MR. MASELEK:
23  Q.  Mr. Baliga, have you seen a copy of
24 Exhibit 16 before?

### Page 108

1  A.  No.
2  Q.  It purports to be a facsimile from
3 Mr. Gatlin of the Illinois Department of Insurance
4 to Ms. Feggins, correct?
5  A.  Yes.
6  Q.  It's dated September 23rd, 2000; is that
7 correct?
8  A.  Yes.
9  Q.  Okay. And Mr. Gatlin indicates:
10     "We do not allow defense coverage to be
11 within the policy limits. Please withdraw the
12 Changes in Commercial General Liability Coverage
13 Form VSC-IPG-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. This is an industry
14 standard for general liability?"
15      Did I read that correctly?
16  A.  Yes.
17  Q.  Do you recall this issue occurring in
18 December of 2000?
19  MR. STEPHAN:  Objection. "This issue"?
20  MR. MASELEK:  I can rephrase the question.
21 BY MR. MASELEK:
22  Q.  Do you recall there being communications
23 from, at least, Mr. Gatlin that the proposed
24 endorsement was not allowed?

### Page 109

1  A.  I don't recall that specific issue. I do
2 recall that we would have periodic regulatory
3 meetings.
4      Janet and I would discuss the status of
5 the filings, and letters such as this would be
6 discussed.
7  Q.  Okay. You just don't recall this
8 particular letter being discussed?
9  A.  No, that I don't.
10  MR. MASELEK:  Okay. Next exhibit, please.
11      (WHEREUPON, a certain document was
12       marked Baliga Deposition Exhibit
13       No. 17, for identification, as of
14       07/13/06.)
15 BY MR. MASELEK:
16  Q.  Mr. Baliga, do you recall the e-mail
17 exchange documented in Exhibit 17?
18  A.  No.
19  Q.  The first e-mail, on 12/28/2000, to you
20 from Ms. Ryan indicates that:
21      "Illinois will not approve the
22 endorsement that causes LAE to be inside the policy
23 limits since it is against regulations," correct?
24  A.  Yes.

Page 110

1  Q.  Other than Illinois, do you recall any
2  other jurisdictions that would not allow an
3  endorsement that causes lost expense to be included
4  within the policy limit?
5  A.  I don't recall specific ones. I know
6  there's some out there.
7  Q.  Okay.
8  A.  I couldn't tell you which ones off the
9  top of my head.
10  Q.  I mean, are there some out there that
11 caused a problem with regard to the filings in the
12 NPS program?
13  MR. STEPHAN: Objection.
14 BY THE WITNESS:
15  A.  I don't recall, specifically, which ones
16 there were. But I know, generically, there's some
17 states that do not like expenses in the limit.
18 BY MR. MASELEK:
19  Q.  And you testified earlier that having
20 expenses in the limit was a significant component of
21 the NPS program; is that correct?
22  A.  I don't recall my precise testimony on
23 that.
24  Q.  Was it important to Virginia Surety that

Page 111

1 the policies issued by NPS -- the Virginia Surety
2 policies issued by NPS -- included an endorsement
3 that put defense costs within the policy limits?
4  A.  We preferred that approach, yes.
5  Q.  And more than preferred it, you required
6 it in the MGA agreement, correct?
7  A.  Yes.
8  Q.  And would having defense costs within the
9 limits impact the ultimate exposure of Virginia
10 Surety on the NPS-related policies?
11  MR. STEPHAN: Objection.
12 BY THE WITNESS:
13  A.  It might. It depends on the
14 circumstances of the claims and other available
15 insurance.
16 BY MR. MASELEK:
17  Q.  Do you have an estimate today as to how
18 much Virginia Surety has spent in defense costs in
19 indemnity payments totally?
20  MR. STEPHAN: Objection.
21 BY MR. MASELEK:
22  Q.  In regards to the NPS program?
23  A.  No. I don't have a specific recollection
24 of the expense component.

Page 112

1  Q.  Well, do you have a recollection as to
2 what the total loss amount is?
3  A.  I do know that the total incurred for the
4 program is 187 million as of June of this year.
5  Q.  Okay. Have you performed any analysis --
6 or has Virginia Surety performed any analysis to
7 determine of that amount what percent is involved in
8 claims where more than $250,000 has been incurred?
9  A.  Yes.
10  Q.  And what is that amount?
11  A.  I don't know. I didn't perform the
12 specific analysis.
13  Q.  Do you have an estimate as to what
14 percentage it is of the over 100 million?
15  A.  No, I don't.
16  Q.  As a general proposition, would you agree
17 that having the Virginia Surety policies capped at
18 250,000 each occurrence would impact Virginia
19 Surety's ultimate exposure significantly?
20  A.  As opposed to it being uncapped?
21  Q.  Correct.
22  A.  Yes.
23  Q.  Okay. Was it important to Virginia
24 Surety that the policies be capped?

Page 113

1  A.  Well, first, I should refer back to your
2 last question. I don't know that "significantly"
3 would be my term.
4  Q.  Okay.
5  A.  It was one component of the program that
6 we looked at.
7  Q.  Okay.
8  A.  But in the overall scheme of things, it
9 wasn't in the Top 10 of considerations, I would
10 think.
11  Q.  You testified earlier that all of the
12 actuarial analysis was based upon the exposure being
13 capped at 250 per occurrence; is that correct?
14  A.  Yes.
15  Q.  So was it important to you that the
16 policies that -- sorry -- important to Virginia
17 Surety that the policies that were issued by
18 Mr. Gruppuso reflected that exposure?
19  A.  Yes.
20  Q.  And the endorsement that we just
21 reviewed, can we call it Endorsement 27?
22     Is it fair to say it's -- 27 seems to be
23 the number that's significant in the Virginia Surety
24 form filing number system?

29 (Pages 110 to 113)

Esquire Deposition Services
(215) 988-9191

Page 118

1  Mr. Gruppuso.
2  Q. And where was he employed?
3  A. Burns & Wilcox.
4  Q. Okay. Were there issues with the
5  reinsurance structure of the program at this point
6  in time?
7  A. Well, it wasn't completed.
8  Q. Okay. And as of January 3rd, 2001, was
9  NPS issuing policies?
10 A. They had issued one policy at that point,
11 I believe.
12 Q. Okay. And did they do that with the
13 authorization from Virginia Surety?
14 A. Yes.
15 Q. Bullet Point No. 5 indicates:
16    "Regulatory compliance: We will need to
17 draft a response to those states that have not
18 agreed to expense costs within the limits of
19 liability?"
20    Did I read that correctly?
21 A. Yes.
22 Q. Can you recall what states would not
23 agree to defense costs within the limits of
24 liability?

Page 119

1  A. Not specifically, no.
2  Q. We read those documents earlier from
3  Illinois. You don't recall any other states?
4  A. I didn't handle the filings directly. So
5  I don't have primary knowledge.
6  Q. But, at least, on January 3rd, 2001, you
7  were aware that some states -- at least, more than
8  one -- were not agreeing to have expense costs
9  within the limit of liability; was that correct?
10 A. That's what this indicates, yes.
11 Q. And then the bullet point indicates:
12    "Alternatively, we will need to discuss
13 AIG's response if VSC cannot change its primary
14 policy language to accommodate expenses inside the
15 limit?"
16    Did I read that correctly?
17 A. Yes.
18 Q. Do you recall what the -- was this topic
19 discussed at a meeting with Mr. Gruppuso?
20 A. I don't know if we discussed it or not in
21 a meeting outside the memorandum.
22 Q. Okay. Did you ask Mr. Gruppuso to
23 contact AIG with respect to this issue?
24 A. Well, according to this, I indicated that

Page 120

1  we needed to discuss it. We didn't discuss it
2  directly with AIG. So it would have to be Vito that
3  would approach them.
4  Q. Now, if you look at your notes on the
5  following page, do these notes reflect any
6  discussion of the topic of the regulatory issues?
7  A. No. I don't see any notes indicating
8  that one way or the other.
9  Q. Okay. Now, you indicated that there was,
10 at least, a possibility that VSC could not change
11 its primary policy language to accommodate expenses
12 inside the limit, correct?
13 A. I indicated we would go back and present
14 our position to regulators and see what their
15 response was.
16 Q. And then it goes on, "Alternatively, we
17 will need to discuss AIG's response if VSC cannot
18 change its primary policy language to accommodate
19 expenses inside the limit," correct?
20 A. Yes, I did say that.
21 Q. Did you have any expectation as to what
22 AIG would do if that were the case?
23 A. No.
24

Page 121

1      (WHEREUPON, a certain document was
2      marked Baliga Deposition Exhibit
3      No. 19, for identification, as of
4      07/13/06.)
5  BY MR. MASELEK:
6  Q. Mr. Baliga, do you recall the e-mail
7  exchange reflected in Exhibit 19?
8  A. No.
9  Q. Okay. Who was Mr. Zitin, Z-i-t-i-n?
10 A. He was president of Cananwill.
11 Q. Okay. Joe Schlosser?
12 A. He was an employee of Cananwill.
13 Q. Okay. And you indicate to them:
14    "The latest update is my call from AIG
15 this morning. They are reviewing financing on the
16 AIMCO deal.
17    Long story short, AIG is faxing me a
18 document which would guarantee VSC's responsibility
19 for return premium in the event of
20 cancellation/nonrenewal. Since VSC is not prepared
21 to sign a document at this time, you may be
22 receiving a call from NPS regarding AIMCO?"
23    Did I read that correctly?
24 A. Yes.

Page 122

1  Q. Do you know what issue this is referring
2 to?
3  A. No. I mean, other than what's there, it
4 looks like it's a return premium issue.
5  Q. Do you recall if it has anything to do
6 with the defense cost issue?
7  A. It doesn't appear that it has anything to
8 do with the defense cost issue.
9  Q. Do you know who you spoke to from AIG?
10  A. No.
11  Q. Do you know if this was your first
12 contact with anybody from AIG related to the NPS
13 program?
14  A. This would have been my first contact,
15 yes.
16      (WHEREUPON, a certain document was
17       marked Baliga Deposition Exhibit
18       No. 20, for identification, as of
19       07/13/06.)
20 BY MR. MASELEK:
21  Q. Mr. Baliga, do you recall seeing
22 Exhibit 20 before?
23  A. No.
24  Q. You'll note, on the second page, it

Page 123

1 indicates that you're cc'd on the document; is that
2 correct?
3  A. Yes.
4  Q. Do you have any reason to believe that
5 you did not receive it?
6  A. No.
7  Q. This appears to be a status report from
8 Ms. Feggins to Mr. Gruppuso dated January 26th,
9 2001, correct?
10  A. Yes.
11  Q. This is related to the status of the
12 filings for the program; is that correct?
13  A. Yes.
14  Q. You indicated earlier that Ms. Feggins
15 was handling the actual regulatory filing process;
16 is that true?
17  A. Yes.
18  Q. Do you know, when she indicates that the
19 program is approved in the following states, whether
20 that approval included Endorsement 27?
21  A. I do not know.
22  Q. Okay. And does Ms. Feggins indicate, in
23 this letter anywhere -- or separately discuss --
24 Endorsement 27?

Page 124

1  A. I don't see it, no, other than some
2 references to the endorsements at our table. But
3 not specific endorsements, no.
4  Q. Right.
5  A. So I don't know if that's the one or not.
6  Q. Do you believe that Endorsement 27 was
7 approved by any states?
8  A. I believe it probably was approved in
9 some states, yes.
10  Q. Do you have any knowledge which states
11 approved it?
12  A. No, not specifically.
13      (WHEREUPON, a certain document was
14       marked Baliga Deposition Exhibit
15       No. 21, for identification, as of
16       07/13/06.)
17 BY MR. MASELEK:
18  Q. Mr. Baliga, have you seen Exhibit 21
19 before?
20  A. No.
21  Q. Okay. Exhibit 21 purports to be a letter
22 from Ms. Feggins to Mr. Gatlin, at the Illinois
23 Department of Insurance, dated March 30, 2001;
24 correct?

Page 125

1  A. Yes.
2  Q. And Ms. Feggins indicates, in the second
3 paragraph:
4     "This is to formally advise your office
5 that we, Virginia Surety Company, Inc., wish to
6 withdraw Endorsement VSC-IPG-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 for Changes
7 in Commercial General Liability Coverage Form."
8     Did I read that correctly?
9  A. Yes.
10  Q. So is it true that the form was not
11 approved for use in Illinois?
12  A. It appears that way from this letter,
13 yes.
14  Q. Are you aware of any other states in
15 which the form was not approved for use?
16  A. Not off the top of my head. I wouldn't
17 know.
18  Q. And by "the form," I meant Endorsement
19 27. Is that what you meant as well?
20  A. Yes. That's what I'm responding to.
21  Q. Do you know why it was decided by
22 Virginia Surety to withdraw the form in Illinois?
23  A. Not specifically, no.
24  Q. Did you have any role in that decision?

Page 142

1   Q.  Mr. Baliga, do you recall receiving
2 Exhibit 24?
3   A.  No.
4   Q.  Okay. And Exhibit 24 has your,
5 "Received," mail stamp on it; does it not?
6   A.  Yes.
7   Q.  It's a letter dated February 12th, 2001,
8 from Mr. Gruppuso to you; is it not?
9   A.  Yes.
10  Q.  In the second paragraph, it indicates:
11      "Kindly favor me with your further
12 advices and comments as to how you would like to
13 proceed with the 750,000" -- I believe, it's --
14 "X/O" -- which is excess over -- "$250,000 layer."
15      Is that correct?
16  A.  Yes.
17  Q.  And is that what you understand the term,
18 "X/O," to mean, excess over?
19  A.  Or excess of, either one.
20  Q.  Okay. Do you know what Mr. Gruppuso is
21 referring to in that sentence?
22  A.  He appears to be referring to coverage
23 above the $250,000 layer up to a million.
24  Q.  Do you recall National Program Services

Page 143

1 seeking Virginia Surety -- seeking authority, from
2 Virginia Surety, to write that layer of coverage on
3 behalf of Virginia Surety?
4   A.  No. My only recollection, on this issue,
5 was that Mr. Gruppuso was complaining that AIG was
6 overcharging for the layer of coverage over the 250;
7 and that it might be attractive for us to look at
8 because they were getting substantial premium for
9 the risk assumed.
10  Q.  And it appears, on Exhibit 24, that he
11 was exploring that additional coverage with Virginia
12 Surety at that time; is that correct?
13  A.  That's what it appears.
14         (WHEREUPON, a certain document was
15         marked Baliga Deposition Exhibit
16         No. 25, for identification, as of
17         07/13/06.)
18 BY MR. MASELEK:
19  Q.  Do you recall receiving the packet of
20 documents marked Exhibit 25?
21  A.  Not specifically.
22  Q.  Were you involved in the negotiation of
23 the terms of the managing general agency agreement?
24  A.  Yes.

Page 144

1   Q.  And were you involved in the negotiation
2 of the terms of the hold harmless agreement?
3   A.  Yes.
4   Q.  And were you involved in the negotiation
5 of the Excel Reinsurance Placement Slip?
6   A.  Somewhat, but less so than the MGA hold
7 harmless.
8   Q.  Were you involved in the negotiation of
9 the Excel trust?
10  A.  Somewhat, but less than the MGA and the
11 hold harmless agreements.
12  Q.  Okay. The last sentence indicates, "I
13 will send a copy of the Excel contract wording in
14 due course."
15      Do you see that?
16  A.  Yes.
17  Q.  Is that the Excel trusts?
18  A.  No. At this point, we had placement
19 slips for the reinsurance. But the slips needed to
20 be followed up by a contract evidencing completion
21 of the slip in contractual form.
22  Q.  Okay. Is a slip similar to a binder?
23  A.  Similar, yes.
24  Q.  If you look at page 3, the VSC 000624 --

Page 145

1   A.  Yes.
2   Q.  -- is that your signature?
3   A.  Yes.
4   Q.  With the date of April 10, 2001; is that
5 correct?
6   A.  Yes.
7   Q.  And Mr. Gruppuso signed it on April 11th,
8 2001; is that correct?
9   A.  Yes.
10  Q.  Do these packet of documents reflect the
11 finalization of the contract, the documents related
12 to the participation in the NPS program?
13      MR. STEPHAN: Objection.
14 BY THE WITNESS:
15  A.  Yes. These appear to be the final
16 copies.
17 BY MR. MASELEK:
18  Q.  Okay. And between the fall of 2000 and
19 April of 2001, were these terms and agreements being
20 negotiated?
21  A.  Yes.
22  Q.  Okay. And even though it was signed in
23 April of 2001, Mr. Gruppuso and NPS had been issuing
24 policies before the finalization of these documents?

37 (Pages 142 to 145)

Esquire Deposition Services
(215) 988-9191

Page 146

1  A. Yes.
2  Q. And they had done that with the authority
3 of Virginia Surety?
4  A. Yes.
5  Q. Now, the next page, VSC 625 --
6  A. Yes. Yes.
7  Q. -- and I believe it extends through
8 650 --
9  A. Yes.
10  Q. -- what is this document?
11  A. The managing general agency agreement.
12  Q. Okay. Between which parties?
13  A. Virginia Surety Company, Inc., and
14 National Program Services, Inc.
15  Q. Who proposed that NPS become an MGA of
16 Virginia Surety?
17  A. Vito Gruppuso, when he came to us with
18 his initial proposal, indicated that he wanted to be
19 a managing general agent for habitational risk
20 business.
21  Q. At the time, how many other managing
22 general agency agreements have Virginia Surety
23 agreed to?
24  MR. STEPHAN: Objection. What time frame?

Page 147

1 BY THE WITNESS:
2  A. Do you mean in force?
3 BY MR. MASELEK:
4  Q. In force.
5  A. Approximately, a dozen.
6  Q. And does this document set forth the
7 scope of the authority that Virginia Surety gave to
8 National Program Services?
9  A. Yes, along with other documents.
10  Q. Okay. And what other documents would
11 those be?
12  A. Well, there's the hold harmless and
13 indemnity agreement, which also was signed by NPS, I
14 believe.
15  Q. Other than the hold harmless agreement
16 and the managing general agency agreement, were
17 there any other agreements -- written agreements or
18 contracts -- between Virginia Surety and NPS?
19  A. No. That would be it.
20  Q. If you would, turn to page 637, please.
21  A. Okay.
22  Q. No. 8 is entitled, "Books and Records."
23   Does this provision require NPS to
24 maintain books and records concerning the NPS

Page 148

1 program?
2  A. Yes.
3  Q. And during the course of discovery in
4 this matter, your attorney permitted the Plaintiffs
5 to review files at Virginia Surety; do you recall
6 that?
7  A. Yes. I think some folks came by our
8 office.
9  Q. And I'll represent that there was a set
10 of documents -- a set of boxes that were captioned,
11 "Original Documents," and then a second set which
12 indicated, "Working Files."
13   Did you have any role in the maintenance
14 of the NPS program files?
15  A. Only those that I kept in my office.
16  Q. Okay. Are you aware, at some point, the
17 files were transferred from the NPS facility to
18 Virginia Surety?
19  A. Yes.
20  Q. And would those be the files captioned,
21 "Original," if you know?
22  A. I don't know how they were captioned.
23  Q. Okay. And although executed in April of
24 2001, am I correct that the managing general agency

Page 149

1 agreement was made effective in December of 2000?
2  A. I believe so. There is a provision in
3 here indicating the effective date.
4  Q. Do you have a memory of it being
5 backdated a period of time?
6  A. Yeah. I believe that's what we did. It
7 was entered the first day of December 2000 according
8 to page 1 of the agreement.
9  Q. If you would, turn to VSC 647, please.
10   What do you recognize Exhibit A to be?
11  A. It's a schedule of the MGA's authority.
12  Q. Okay. And does this set forth the
13 authority that NPS has to issue policies on behalf
14 of Virginia Surety?
15  A. Yes.
16  Q. And the first topic, "Gross Net Written
17 Premium," indicates, "A maximum of 45 million for
18 each 12-month period commencing December 1, 2000,
19 unless agent obtains the prior written consent of
20 company."
21   Did I read that correctly?
22  A. Yes.
23  Q. And does that accurately depict the
24 maximum net written premium for an NPS?

Esquire Deposition Services
(215) 988-9191

Page 154

1  A.  We know of Illinois, yes.
2  Q.  Okay. To Virginia Surety, did that mean
3 that NPS could not write any risks in that
4 jurisdiction?
5  A.  Pursuant to this agreement, yes. He
6 should not write risk in that jurisdiction.
7  Q.  And the next provision indicates:
8      "No policy will be issued unless an AIG
9 company issues a general liability policy with
10 minimum limits of 1 million/2 million and the same
11 effective and expiration dates."
12  A.  Yes.
13  Q.  Was there any requirement, in the MGA
14 agreement -- or the attachment to it -- that the AIG
15 policy had to have a self-insured retention?
16  A.  No. I don't believe so.
17  Q.  And was there any requirement, in the MGA
18 agreement, that the AIG policy referred to had to
19 have defense costs inside of any self-insured
20 retention?
21  MR. STEPHAN: Objection to form.
22 BY THE WITNESS:
23  A.  No, not in the MGA agreement.
24 BY MR. MASELEK:

Page 155

1  Q.  So, hypothetically, if Mr. Gruppuso or
2 NPS had issued a Virginia Surety policy in the
3 program where there was an AIG company above it, and
4 that AIG policy had defense costs outside the
5 retention amount, would that be in conformance with
6 the managing general agency agreement?
7  A.  We didn't specify. So, yes, I think it
8 would work either way.
9  Q.  The next document, which begins at 651,
10 is that what you referred to as the placement slip?
11  A.  Yes.
12  Q.  Do you know whether the provision that
13 the Virginia Surety policy be capped at 250,000 is
14 mentioned anywhere in the reinsurance slip?
15  A.  That I don't know.
16  Q.  Okay. Is it something that you would
17 expect to find, in the reinsurance slip, in a
18 program such as this?
19  A.  Potentially. Oriana Bakka reviewed most
20 of the reinsurance, in this program, and is our
21 reinsurance expert. So she would be better
22 answering that question than I would.
23  Q.  Now, when it came time to actually begin
24 to issue policies in the NPS program, can you

Page 156

1 explain to me how the policies would be issued?
2  A.  The kind of policies that would be
3 issued?
4  Q.  Who would issue them, from where?
5  A.  Oh, okay. NPS would issue the policies
6 out of their New Jersey office and would do the
7 underwriting, policy issuance, billing,
8 collection -- basically, all of the administrative
9 duties of the underwriting department.
10  Q.  And they would solicit the insureds for
11 the program as well?
12  A.  Yes. NPS had the broker contacts for
13 this program.
14  Q.  Okay. And when NPS issued a policy, was
15 it required to send a copy of it to the Virginia
16 Surety home office?
17  A.  No. They were required to keep a copy on
18 their premises for inspection.
19  Q.  Okay. What was the reporting
20 requirements of the MGA agreement with respect to
21 the issuance of policies?
22  A.  It was the guidelines contained in the
23 MGA agreement -- the underwriting guidelines in
24 keeping books, and records, and things of that

Page 157

1 nature.
2  Q.  Was NPS required to send any type of a
3 spreadsheet or other report to the Virginia Surety
4 home office regarding its activities within a
5 certain period of time?
6  A.  Yes. My recollection is, we were
7 required to send monthly bordereaus of premium and
8 losses that would document their underwriting
9 activity, employment activity.
10  Q.  And were the claims administered by a
11 TPA?
12  A.  Yes.
13  Q.  And who was the TPA, at first?
14  A.  Countrywide.
15  Q.  Who selected Countrywide?
16  A.  NPS did.
17  Q.  And did Virginia Surety have any
18 oversight over Countrywide?
19  A.  Yes. We had the right to audit
20 Countrywide and the right to request individual
21 claim files.
22  Q.  Okay.
23  A.  And, typically, our MGAs had provisioned
24 a report at a certain dollar level.

40 (Pages 154 to 157)

**Esquire Deposition Services**
**(215) 988-9191**

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:   Lexington Ins. v. Virginia Surety Co.
Dep. Date:   July 13, 2006
Deponent:    Wayne Baliga

### CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 49 | 21 | HAS BUILT THAT | SHOULD BE REVIEWED | "HAS BUILT THAT" IS NOT WHAT WAS SAID. |
| 51 | 24 | OF PRIMARY IN NATURE | OF A PRIMARY NATURE | "OF PRIMARY IN NATURE" IS NOT WHAT WAS SAID. |
| 68 | 10 | WRITE | GOING TO INSURE | "WRITE" IS NOT WHAT WAS SAID. |
| 68 | 24 | $51,000 | $51,000,000 | THOUSAND SHOULD BE $MM |
| 72 | 7 | COHEN | COLE | WRONG LAST NAME |
| 87 | 5 | EXCEL | X.L. | CORRECT NAME IS X.L. (SHOULD BE CHANGED THROUGHOUT THE DOC.) |
| 101 | 7 | INTERMITTENT | ADMITTED | WRONG WORD |
| 152 | 14 | OF | OR | WRONG WORD |
| 212 | 16 | CAME CLEAR | IT BECAME CLEAR | WRONG WORDS |

_Wayne P. Baliga_
Signature of Deponent

8/1/06

```
 1              INSTRUCTIONS TO THE WITNESS

 2              Please read your deposition over

 3   carefully and make any necessary changes.  You

 4   should state the reason in the appropriate space on

 5   the errata sheet for any correction that is made.

 6              After doing so, please sign the errata

 7   sheet and date it.

 8              You are signing same subject to the

 9   changes you have noted on the errata sheet, which

10   will be attached to your deposition.

11              It is imperative that you return the

12   original errata sheet to the deposing attorney

13   within thirty (30) days of receipt of the

14   deposition transcript by you.  If you fail to do

15   so, the deposition transcript may be deemed to be

16   accurate and may be used in court.

17

18

19

20

21

22

23

24
```