# EXHIBIT F

VOLUME:  1    PAGES:  1 - 90    EXHIBITS: 1 - 14

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------ x

LEXINGTON INSURANCE COMPANY

and NATIONAL UNION FIRE

INSURANCE COMPANY OF

PITTSBURGH, PA,

      Plaintiffs,          Civil Action

 vs.                  No. 04-11109 RGS

VIRGINIA SURETY COMPANY, INC.,

      Defendant.

------------------------------ x

RULE 30 (b)(6) DEPOSITION OF

LEXINGTON INSURANCE COMPANY

(By its designee John B. Gould)

Tuesday, August 1, 2006

12:56 p.m.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.

One Financial Center

Boston, Massachusetts  02111


Reporter:  Dana Welch, CSR, RPR

Certified LiveNote Trainer

John B. Gould                                                      08/01/2006

Page 2

1  APPEARANCES:
2  For the Plaintiffs:
3      THE MCCORMACK FIRM, LLC
4      One International Place
5      Boston, Massachusetts 02110
6      617.951.2929 Fax: 617.951.2672
7      rmaselek@mccormackfirm.com
8  By: Robert J. Maselek Jr., Esq.
9
10 For the Defendant:
11     MINTZ, LEVIN, COHN, FERRIS,
12     GLOVSKY AND POPEO, P.C.
13     One Financial Center
14     Boston, Massachusetts 02111
15     617.542.6000  617.542.2241
16     ncramb@mintz.com
17 By: Nicholas C. Cramb, Esq.
18
19
20
21
22
23
24

Page 3

1              I N D E X
2  WITNESS:
3      JOHN B. GOULD
4
5  EXAMINATION:                    PAGE:
6  BY MR. CRAMB                    4
7  EXHIBIT NO. DESCRIPTION              PAGE:
8    1, Notice of Deposition        6
9    2, LU 19852 through LU 19853      22
10   3, LU 15644 through LU 15645      25
11   4, November 9, 2000 Fax         39
12   5, LU 11557             41
13   6, May 23, 2001 memo Messery to Jones   42
14   7, LU 01477 through LU 01479       43
15   8, ME 00448 through ME00550 and ME 03796  48
16      through ME 03843
17   9, LU 01485 through LU 01487      57
18   10, LU 11547 and LU 20850       61
19   11, LU 20321          64
20   12, LU 12149, 12136, 12137 AND 12273   66
21   13, LU 21733           72
22   14, E-mail chain beginning LU 22422,    79
23      non-sequential
24 Exhibits retained by Attorney Cramb.

Page 4

1          P R O C E E D I N G S
2            JOHN B. GOULD,
3  having been satisfactorily identified by the
4  production of his driver's license, and duly sworn
5  by the Notary Public, was examined and testified as
6  follows:
7          DIRECT EXAMINATION
8  BY MR. CRAMB:
9     Q. Can you please state your name for the
10 record.
11    A. John Gould.
12       MR. CRAMB: Mr. Maselek, do we agree to
13 reserve all objections except as to form until
14 trial?
15       MR. MASELEK: That's fine.
16       MR. CRAMB: And does your witness want
17 30 days to read the transcript?
18       MR. MASELEK: Yes.
19       MR. CRAMB: Waive notary.
20    Q. Mr. Gould, my name is Nick Cramb, and I
21 represent the defendant in this case, Virginia
22 Surety Company.
23     · I'm going to ask since we are creating a
24 record of your testimony that you answer my

Page 5

1  questions verbally instead of nodding or other
2  gestures like uh-huh, and that you answer all of my
3  questions, including when Mr. Maselek makes an
4  objection, unless he instructs you not to answer.
5       You can take a break at any time as long
6  as you've answered a pending question; just let me
7  know and I'll be happy to accommodate you.
8       And if there's anything that I've said or
9  asked that is unclear, please ask me to clarify so
10 that we do create a clear record. Is that fair?
11    A. Yes.
12    Q. What is your address, Mr. Gould?
13    A. Home address or business address?
14    Q. Let's do both.
15    A. Okay. 4 Burnham Lane, Danvers,
16 Massachusetts 01923.
17    Q. Okay. So that's home?
18    A. Home. And 100 Summer Street, Boston,
19 Mass.
20    Q. And who is your employer?
21    A. Lexington Insurance Company.
22    Q. What's your position there?
23    A. I'm a vice-president and underwriting
24 officer of Lexington Insurance Company.

2 (Pages 2 to 5)

**Page 22**

1 first began participating in the program in May of
2 2000; is that your understanding?
3    A. Yes.
4    Q. And what's that based on?
5    A. Based on the material that I was provided
6 that I reviewed before the deposition.
7    MR. CRAMB: Mark that as number two.
8    (Exhibit No. 2, LU 19852 through LU 19853,
9 marked for identification.)
10    Q. Have you seen this document before?
11    A. I believe so.
12    Q. In connection with preparation for the
13 deposition or before?
14    A. No. In connection with the preparation
15 for the deposition.
16    Q. This is or purports to be an account
17 summary for an insured by the name of Aimco, which
18 is, according to this, part of the National
19 Coalition of Property Owners Insurance Program.
20    There's a note here that says that at the
21 end of each year, we would charge a 100 percent
22 rate increase based on annual premium and the
23 number of units at the re rate.
24    Are you familiar with the premium

**Page 23**

1 structure for the NPS program?
2    A. No.
3    Q. Do you know what the 100 percent rate
4 increase refers to?
5    A. A rate increase would be doubling the
6 premium for a coverage period.
7    Q. But you're not familiar in the context of
8 the NPS program what this refers to?
9    A. No.
10    Q. According to this, I assume an AIG company
11 invoiced the broker, First Capital Group, for the
12 total premium. Do you have an understanding of how
13 that worked?
14    A. A general understanding, yes.
15    Q. Can you explain that, please.
16    A. Well, First Capital would be the broker or
17 producer for the risk specialist company and all
18 invoices would be to First Capital.
19    Q. So premium was collected by First Capital
20 and then sent to AIG?
21    A. Correct.
22    Q. Or whichever AIG company?
23    A. Correct.
24    Q. And according to this, First Capital was

**Page 24**

1 responsible for invoicing NPS, the risk purchasing
2 group for the total premium?
3    A. Correct.
4    Q. Is that your understanding?
5    A. Yes.
6    Q. And how does that work? So what role is
7 NPS playing with premiums for the NPS program?
8    A. NPS would be dealing with First Capital.
9 We would, the risk specialist company, would bill
10 First Capital; First Capital, in turn, would bill
11 NPS or their broker for the business.
12    Q. Did any of the AIG companies have any
13 contractual relationships with NPS?
14    A. Lexington did not. I don't know about
15 other AIG companies.
16    Q. And this is just in the context of the NPS
17 program, of course.
18    A. I still don't know. It could -- there are
19 many other AIG companies.
20    Q. Okay. The final line here is that, "It
21 was NPS's responsibility to invoice each individual
22 insured for their portion of the premium and send
23 us a check for the total policy premium."
24    Is it your understanding that NPS was

**Page 25**

1 sending premiums directly to one of the AIG
2 companies?
3    A. That would not be my understanding.
4    MR. CRAMB: Exhibit Number 3.
5    (Exhibit No. 3, LU 15644 through LU 15645,
6 marked for identification.)
7    Q. Have you seen this document before?
8    A. I don't believe so.
9    Q. When we have been referring to the NPS
10 program, is it your understanding that that
11 references National Union and Lexington's
12 participation in an insurance program, or are we
13 referring to National Union or Lexington and
14 Virginia Surety's participation in the program?
15    A. From our standpoint, it would be Lexington
16 and National Union.
17    Q. Do the, I guess just in the lines of
18 business lines class and the National Union carrier
19 section convey your understanding of the NPS
20 program and National Union's participation in the
21 NPS program?
22    MR. MASELEK: Objection.
23    THE WITNESS: You're referring to the
24 coverage section?

John B. Gould                                                                                    08/01/2006

Page 26

1  Q. No. Just the line of business, it was a
2  commercial general liability program; is that
3  correct?
4  A. Correct.
5  Q. And I think you had said property owners
6  before. The class of business is real estate
7  owners and managers for, I'm not sure what OL&T
8  means but apartments, shopping centers, condos and
9  light commercial; is that --
10  A. Correct.
11  Q. -- your understanding?
12  A. Correct.
13  Q. And it describes National Union as a
14  carrier, and generally describes the insurance,
15  it's my understanding provided by National Union as
16  1 million per occurrence, with a $2 million general
17  aggregate and a self-insured retention of $250,000
18  per occurrence?
19  A. Correct.
20  Q. Is that your understanding of the
21  insurance that National Union provided in the NPS
22  program?
23  A. Yes.
24  Q. The complaint -- in the complaint, the

Page 27

1  plaintiffs allege that National Union cancelled the
2  NCOPO program, National Coalition of Property
3  Owners and Managers program in mid-2002. What does
4  that mean, that they canceled the program?
5  A. It means that they initiated a
6  cancellation notice to the named insureds under the
7  program to retire from the program.
8  Q. And do you know why, what was the business
9  reason for that decision?
10  A. I believe it was -- had to do with premium
11  payment.
12  Q. And what had to do with premium payment?
13  A. Not being paid the full premium the
14  company was due for the coverage provided.
15  Q. And in a very general sense, do you have
16  an understanding as to where the problem was or
17  what the issue was?
18  A. No.
19  Q. Okay. After cancellation of the NPS
20  program, did NUFIC or Lexington continue to write
21  insurance to insureds who had been insured under
22  the NPS program?
23  A. I believe it continued to write insurance
24  or continued coverage provided to insureds that

Page 28

1  could prove that they had made payment to their
2  broker. And I believe that there were, some of the
3  individual accounts were provided coverage by
4  Lexington or National Union on an
5  account-by-account specific underwriting basis.
6  Q. Where new policies were issued to those
7  individual insureds?
8  A. Yes, some of them.
9  Q. We'll be clear then if I talk about the
10  NPS program as just involving the insurance
11  policies that were issued before cancellation in
12  mid-2002 and post program policies as any policies
13  issued to insureds from the NPS program after
14  cancellation?
15  A. Yes.
16  Q. Can you explain to me in layman's terms
17  everything that's involved in the underwriting
18  aspect as it relates to the NPS program, what --
19  MR. MASELEK: I'll let him answer. But
20  I'm going to object for the record that it's
21  beyond the scope of the topics for which
22  Mr. Gould's been designated. But I'll let him
23  answer.
24  THE WITNESS: Would you repeat the

Page 29

1  question, please?
2  Q. Yeah. What is included within the term
3  underwriting as it relates to the NPS program; what
4  does that mean?
5  A. Well, it would relate to the NPS program
6  or any other business opportunity. We would obtain
7  an application from the broker which would spell
8  out for us the scope of the coverage to be
9  provided, for example, the number of units, the
10  number of states the individual units might be
11  located in, the general -- the overall size of the
12  account, the loss history of the account, the
13  financial history of the account, particularly for
14  those accounts assuming self-insured retention,
15  competitor information, prior coverage, coverage
16  expectations from Lexington.
17  Q. And then using that information, the
18  underwriters do what?
19  A. The underwriters would then make an
20  evaluation of whether the risk was acceptable to
21  Lexington from, we call an underwriting standpoint,
22  that the risk met our underwriting criteria, it was
23  the type of business the company chose to write,
24  that the premium expectations were in line with

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 54

1    MR. MASELEK: Objection.
2    THE WITNESS: I don't see any wording in
3  this endorsement that prevents that, no.
4    Q. Is this a primary or excess insurance
5  policy?
6    MR. MASELEK: Objection.
7    THE WITNESS: In what context?
8    Q. Is the form a primary or excess form?
9    MR. MASELEK: Objection.
10   THE WITNESS: I'll answer that two ways.
11  The policy without the self-insured retention
12  endorsement would be considered a primary
13  policy form.
14   Q. Okay.
15   A. The same form with the self-insured
16  retention endorsement would be considered an excess
17  policy form.
18   Q. So the endorsement changes this into a
19  policy that is excess of a retention; is that
20  correct?
21   A. Yes, by the wording in number one, the
22  "shall pay the ultimate net loss in excess of the
23  self-insured retention."
24   Q. And it's not excess of another insurance

Page 55

1  policy's limits; is that correct?
2    A. No. It refers to the self-insured
3  retention amount.
4    Q. On page 461, can you tell me generally
5  what your understanding of the "other insurance
6  clause," what the purpose of the "other insurance
7  clause" is?
8    MR. MASELEK: Objection.
9    THE WITNESS: The purpose would be to
10  apportion the responsibility for coverage if
11  two policies or more than one policy provided
12  the same coverage for a client or insured.
13   Q. And can you explain how this "other
14  insurance clause" operates?
15   MR. MASELEK: Objection.
16   THE WITNESS: It stipulates how the
17  coverage is to be apportioned if the
18  company -- if the policy is viewed as primary
19  insurance or viewed as excess insurance.
20   Q. And does Section 4B dictate under what
21  circumstances this policy will be an excess
22  insurance policy --
23   MR. MASELEK: Objection.
24   Q. -- as compared to another insurance

Page 56

1  policy?
2    MR. MASELEK: Objection.
3    THE WITNESS: Yes.
4    Q. Are you familiar with the insurance
5  policies that Virginia Surety wrote to cover the
6  self-insured retention for insureds insured under
7  the NPS program?
8    A. No.
9    Q. Do you know if they are fire, extended
10  coverage, builders risk, installation risk, or
11  similar coverage?
12   A. They are not.
13   Q. Do you know if they are fire insurance?
14   A. They're not.
15   Q. And the third seems to relate specifically
16  or B3 here relates specifically to losses out of
17  the maintenance or uses of aircraft, autos or water
18  craft.
19   A. Uh-huh.
20   Q. Is it your understanding that with respect
21  to the Virginia Surety policies in the NPS program
22  that any of these provisions in 4B, 1, 2 or 3
23  apply?
24   A. I don't believe they apply.

Page 57

1    MR. CRAMB: Number nine.
2    (Exhibit No. 9, LU 01485 through LU 01487,
3    marked for identification.)
4    Q. Note for the record that the number nine
5  in the right-hand corner of this and the crossed
6  out "ten" is my handwriting.
7    MR. MASELEK: Make me wonder what that
8  other missing exhibit would have been.
9    Q. Do you know Carol DelloRusso is?
10   A. Yes.
11   Q. Who is that?
12   A. She works for Lexington, I believe as an
13  assistant vice-president in charge of our coding.
14   Q. What is coding?
15   A. Coding is documenting statistically the
16  risk being underwritten. We have to allocate it
17  for tax purposes, for annual statement purposes,
18  for our own loss record purposes, to give
19  production credit to various offices who produced
20  the business, to -- and to satisfy in some cases
21  the need for some detailed coding information for
22  actuarial purposes or reinsurance purposes.
23   Q. And specifically what is PPS coding?
24   A. That is a manual coding used by Lexington.

15 (Pages 54 to 57)

Page 58

1  Q. What does PPS stand for?
2  A. I think it's a Policy Processing System.
3  Q. What is manual coding distinguished from?
4  A. Machine coding. That is -- most of our
5 policies are done through the Lexis. It's an
6 automated policy issuance reinsurance cession
7 coding system. And once the information is typed
8 in, the system will produce the policy, produce the
9 coding documentation, produce the reinsurance
10 information.
11  Policies that for whatever reason don't
12 have -- don't fit the Lexis processing system, and
13 that system pertains only to Lexington Insurance
14 Company policies, a non-Lexington policy for
15 example would have to be coded manually by
16 Lexington personnel.
17  Q. This is a fax from Charles Messery of Risk
18 Specialists of New York, which is, as you've
19 testified, one AIG entity, to Lexington, another
20 AIG entity, regarding the National Coalition of
21 Property Owners Program.
22  Are you familiar with the attached form
23 that Messery sent to DelloRusso?
24  A. Yes.

Page 59

1  Q. And perhaps you just did, but could you
2 explain so it's clear what this form is used for?
3  A. This is a form completed by the
4 underwriter to indicate to the coders what
5 information to put, input to the system.
6  Q. And does this refer to one of the policies
7 that's a part of the NPS program?
8  A. I believe so.
9  Q. And why does it appear that way?
10  A. The issuing company is National Union Fire
11 Insurance Company of Pennsylvania. The name and
12 address of the insured is referred to as the
13 National Coalition of Property Owners and Managers,
14 Inc.
15  Q. On the line which actually has four
16 numbers, 9, 10, 11 and 12 --
17  A. Uh-huh.
18  Q. -- it appears that this policy was coded
19 as a primary policy.
20  A. It's indicated to be primary, yes.
21  Q. And is it your understanding that all of
22 the national -- the NPS program National Union
23 policies were coded as primary policies?
24  MR. MASELEK: Objection.

Page 60

1  THE WITNESS: Well, from this -- this is
2 -- if I --
3  MR. MASELEK: You can answer.
4  THE WITNESS: Okay. This is a little bit
5 different. The way our reinsurance is set up,
6 there's a different meaning for the word
7 "primary." For reinsurance purposes, for
8 coverage purposes, any risk attaching at a
9 million dollars or less, notwithstanding the
10 type of policy used to write the coverage, are
11 considered primary by the system. In other
12 words, losses are ceded to the primary -- or
13 premium is ceded to the primary treaty and
14 losses are paid by our primary treaty.
15  Our excess treaties attach at limits of
16 greater than a million dollars. So it's not
17 the type of policy; it's the reinsurance
18 treaty cession of the premium that's being
19 dictated by the word "primary" in this case.
20  Q. Would an excess insurance policy or an
21 umbrella insurance policy that was specifically
22 excess to an underlying limit of insurance provided
23 for in the schedule of underlying insurance that
24 had a limit of a million dollars still be

Page 61

1 categorized as primary for this?
2  A. No. A million dollars or more -- an
3 umbrella policy -- and that is, the standard
4 minimum attachment point for an umbrella policy is
5 a million dollars, that would be considered an
6 excess policy.
7  Q. What about a policy that was excess of a
8 $500,000 underlying limit?
9  A. That would be considered a primary policy
10 from a systems reinsurance coding standpoint.
11  MR. CRAMB: We'll mark this as number ten.
12  (Exhibit No. 10, LU 11547 and LU 20850,
13  marked for identification.)
14  Q. There are two documents in Exhibit Number
15 10 which are unrelated. At any rate, I've stapled
16 them together because my line of questions are
17 going to be similar, not because they were attached
18 in the production for any reason.
19  Are you familiar with what is shown on the
20 first page of Exhibit Number 10?
21  A. Reasonably familiar, yes.
22  Q. What is this screen?
23  A. I think this is a PPS screen printed.
24  Q. And PPS is the coding system that someone

16 (Pages 58 to 61)

```
STATE OF NEW YORK        )    Pg__of__Pgs
                              ss:
COUNTY OF NEW YORK       )
```

    I wish to make the following changes,

for the following reasons:

PAGE LINE

11  23  CHANGE: *MAURICE H SAVAL*
        REASON: *Correct spelling of maurice*

12  10  CHANGE: *MAURICE H SAVAL*
        REASON: *Spelling correction*

39  12  CHANGE: *delete word "nates"*
        REASON: *Not part of hazard analysis*

46  3   CHANGE: *delete "individual and"*
        REASON: *to aid accuracy*

66  1   CHANGE: *replace P.I with B.I*
        REASON: *Bodily Injury is correct*

73  15  CHANGE: *delete "& I probably would*
16 17 18 REASON: *Rely on a series of coverage*
___ ___ CHANGE: *beneath them to help form*
        REASON: *the coverage provided by the*
___ ___ CHANGE: *umbrella policy "*
        REASON: *doesn't make sense*
___ ___ CHANGE: *in the context of said*
        REASON: *Above policies.*

                    _Jack Gould_
                    Jack Gould, Deponent

**LegaLink Boston, a Merrill Communications Company**
**(617) 542-0039**

John B. Gould

08/01/2006

89

1                    C E R T I F I C A T E

2

3           I, JOHN B. GOULD, do hereby certify that I

4    have read the foregoing transcript of my testimony,

5    and further certify that it is a true and accurate

6    record of my testimony (with the exception of the

7    corrections listed below):

8    Page   Line            Correction

9

10

11

12

13

14

15

16

17

18

19           Signed under the pains and penalties of

20    perjury this _22_ day of _August_ , 2006.

21

22                          _____

23                          JOHN B. GOULD

24