# EXHIBIT G

Elizabeth Viscione                                              08/01/2006

VOLUME: 1     PAGES: 1 - 77     EXHIBITS: 1 - 8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------- x

LEXINGTON INSURANCE COMPANY

and NATIONAL UNION FIRE

INSURANCE COMPANY OF

PITTSBURGH, PA,

    Plaintiffs,                    Civil Action

vs.                                  No. 04-11109 RGS

VIRGINIA SURETY COMPANY, INC.,

    Defendant.

------------------------------- x


DEPOSITION OF ELIZABETH VISCIONE

Tuesday, August 1, 2006

9:57 a.m.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.

One Financial Center

Boston, Massachusetts  02111


Reporter: Dana Welch, CSR, RPR

Certified LiveNote Trainer

### Page 2

```
 1  APPEARANCES:
 2  For the Plaintiffs:
 3      THE McCORMACK FIRM, LLC
 4      One International Place
 5      Boston, Massachusetts 02110
 6      617.951.2929  Fax: 617.951.2672
 7      mcohen@mccormackfirm.com
 8      By: Mark E. Cohen, Esq.
 9
10  For the Defendant:
11      MINTZ, LEVIN, COHN, FERRIS,
12      GLOVSKY AND POPEO, P.C.
13      One Financial Center
14      Boston, Massachusetts 02111
15      617.542.6000  617.542.2241
16      ncramb@mintz.com
17      By: Nicholas C. Cramb, Esq.
```

### Page 3

```
 1              I N D E X
 2  WITNESS:
 3  ELIZABETH VISCIONE
 4
 5  EXAMINATION:                          PAGE:
 6  BY MR. CRAMB                             4
 7
 8  EXHIBIT NO. DESCRIPTION               PAGE:
 9  1, LU 15644 through LU 15645             19
10  2, ME 00448 through ME00550 and ME 03796  28
11     through ME 03843
12  3, LEXCF 018007                          47
13  4, LEXCF 001293 through LEXCF 001294     49
14  5, May 8, 2003 letter from McNamara      51
15     to Lubin
16  6, LEXCF 003080 through LEXCF 003082     53
17  7, LU 06383 through LU 06384             62
18  8, LEXCF 047875 through LEXCF 047921     64
19
20  Exhibits retained by Attorney Cramb.
```

### Page 4

```
 1             P R O C E E D I N G S
 2             ELIZABETH VISCIONE,
 3  having been satisfactorily identified by the
 4  production of her driver's license, and duly sworn
 5  by the Notary Public, was examined and testified as
 6  follows:
 7      MR. CRAMB: Mr. Cohen, do we agree that
 8  we're going to reserve all objections except
 9  as to form until trial?
10      MR. COHEN: Sure.
11      MR. CRAMB: Do you want to allow your
12  witness to read the transcript, take 30 days?
13      MR. COHEN: Yes.
14      MR. CRAMB: And waive notary?
15      MR. COHEN: Yes.
16             DIRECT EXAMINATION
17  BY MR. CRAMB:
18      Q. Mrs. Viscione, my name is Nick Cramb, and
19  I represent the defendant in this case, Virginia
20  Surety Company.
21          I'm going to ask you a number of questions
22  about the lawsuit that brings us here today. And
23  since we're creating a transcript of your sworn
24  testimony, I just want to ask that you answer
```

### Page 5

```
 1  questions verbally instead of nodding your head or
 2  some other nonverbal gesture. And that if you ever
 3  do not understand a question, please ask me to
 4  clarify it so that we create a clear record of your
 5  understanding.
 6          Can you please state your name for the
 7  record.
 8      A. It's Elizabeth Viscione, or Betty
 9  Viscione.
10      Q. And what's your address?
11      A. Address? It's 77 Adams Street in Quincy.
12      Q. And who do you work for?
13      A. I work for Lexington Insurance Company.
14      Q. And that's one of the plaintiffs in this
15  case?
16      A. Yes.
17      Q. And what's your position there?
18      A. I'm a unit manager in the claims
19  department.
20      Q. Is there anything that would prevent you
21  from testifying accurately or truthfully today?
22      A. No.
23      Q. What did you do to prepare for the
24  deposition today?
```

Page 22

1   Q. Can you explain your understanding of the
2   lawsuit that AIG brought against Virginia Surety
3   Company or National Union and Lexington Insurance
4   Company brought against Virginia Surety Company?
5   A. Uh-huh. I understand that it's a dec
6   action seeking a declaration that our policies are
7   excess policies.
8   Q. Do you know how many policies National
9   Union issued to the National Coalition of Property
10  Owners and Managers, NCOPO?
11  A. Not off the top of my head, I don't know
12  the number.
13  Q. Do you know what type of form the National
14  Union policies are written on?
15  A. A CGL form.
16  Q. What is that?
17  A. Commercial general liability form.
18  Q. What does that mean?
19  A. It outlines the terms and conditions of
20  coverage under a commercial general liability
21  policy.
22  Q. And what is a commercial general liability
23  policy?
24  A. A policy that provides general liability

Page 23

1   coverage.
2   Q. Were all of the NCOPO program National
3   Union policies written on the same form?
4   A. No.
5   Q. What different forms were they written on?
6   A. Let me clarify. The CGL form itself, I
7   don't know if the exact form was used or not. Some
8   of the policies were issued with a declarations
9   page that said it was a commercial general
10  liability policy; others were issued with a dec
11  page that said stand-alone excess policy.
12  Q. Okay. Was there -- do you know when or
13  why the stand-alone excess policies were used?
14  A. Not exactly sure why.
15  Q. Were all of the policies that were written
16  on the National Union paper that had the National
17  Union dec page that you just described on the same
18  CGL form?
19      MR. COHEN: Object.
20  Q. Yeah, that was a confusing question. Let
21  me ask it again.
22      Except for the stand-alone excess policies
23  that you just referred to, are all of the National
24  Union policies written on the same form?

Page 24

1   A. I believe they are.
2   Q. Is that an ISO standard form?
3   A. I don't recall.
4   Q. Is it a primary form?
5   A. I believe it is.
6   Q. Do the -- just so we can distinguish
7   between the National Union policies that you
8   referred to or the CGL policies and the stand-alone
9   excess policies, can we refer to the National Union
10  CGL policies as program policies and the
11  stand-alone excess policies as stand-alone or
12  post-program policies?
13      MR. COHEN: I think the problem with that
14  is not all the post-program policies were
15  written on the same forms.
16      MR. CRAMB: Fair enough.
17      MR. COHEN: Nor are the program policies,
18  for that matter.
19  Q. Just so we're clear about what we're
20  talking about, can I refer to -- will you
21  understand what I'm referring to if I refer to the
22  National Union CGL policies as that and the
23  stand-alone excess policies as a separate category
24  of policies?

Page 25

1   A. If I don't understand, I'll ask you to
2   clarify.
3   Q. Okay. Did the National Union policies,
4   National Union CGL policies have a deductible or a
5   self-insured retention?
6   A. They had a self-insured retention.
7   Q. And what is that?
8   A. Self-insured retention is where an insured
9   retains part of the loss. Our policy does not come
10  into play until or unless the underlying is
11  exhausted.
12  Q. And in the National Union CGL policies,
13  what is the amount of the self-insured retention?
14  A. $250,000.
15  Q. Does that include defense and indemnity
16  expenses?
17  A. Yes.
18  Q. What does that mean?
19  A. It means exactly what you said. It
20  includes defense and indemnity.
21  Q. So does that mean that as soon as $250,000
22  is spent by an insured on either defense or
23  indemnity or incurred by an insured on either
24  defense and indemnity expenses on a loss, that the

Page 26

1  National Union CGL policy attaches?
2       MR. COHEN: Object.
3       THE WITNESS: As soon as it is incurred by
4   an insured, because it's a self-insured
5   retention, our policy would attach.
6       Q. So as soon as an insured incurs $250,000
7   of defense or indemnity expenses, the National
8   Union CGL policies attach?
9       MR. COHEN: Object.
10      THE WITNESS: As soon as $250,000 is paid
11  by an insured, our policy would attach.
12      Q. Is there anything in the National Union
13  CGL policies that require that NCOPO insure the
14  SIR?
15      A. There's nothing in there that requires
16  that they insure their self-insured retention.
17      Q. Can you explain to me the difference
18  between a self-insured retention and a deductible?
19      A. Yes.
20      Q. Please do.
21      A. Well, I will explain the way Lexington
22  handles deductibles as opposed to self-insured
23  retentions.
24      Q. Okay.

Page 27

1       A. When we have a deductible, we pay dollar
2   one, and then we request reimbursement from our
3   insured. When we have a self-insured retention, we
4   have no duty to investigate or defend or pay any
5   legal fees or anything else until $250,000 has been
6   paid by the insured.
7       MR. COHEN: Self-insured retention can be
8   any amount, right?
9       THE WITNESS: Well, in the case of the
10  National Union policies, it's 250, but it's
11  any amount.
12      Q. Okay. In an example where a policyholder
13  did not insure the self-insured retention under a
14  National Union CGL policy, when does that policy
15  attach?
16      MR. COHEN: Just to clarify, are you
17  talking about these particular policies or any
18  National Union CGL policy?
19      MR. CRAMB: No, the particular policies,
20  the NCOPO program policies.
21      THE WITNESS: When an insured has paid
22  $250,000.
23      MR. CRAMB: Mark this entire thing as
24  Exhibit 2.

Page 28

1       (Exhibit No. 2, ME 00448 through ME00550
2   and ME 03796 through ME 03843, marked for
3   identification.)
4       Q. What's just been marked as Exhibit
5   Number 2 is a binder that contains two policies.
6   At tab A is a National Union Fire Insurance Company
7   policy. This is a CGL policy.
8       Can you just tell me if this is the -- by
9   taking a quick look, if this is the type of policy
10  that we've been discussing, a National Union CGL
11  policy?
12      A. This does appear to be a National Union
13  CGL policy, yes.
14      Q. And who's the insured under this policy?
15      A. Well, this is a master policy. So on the
16  dec page, it says that it's National Coalition of
17  Property Owners and Managers. However, the
18  specific insureds are listed on endorsement number
19  one.
20      Q. The page number is cut off, but I believe
21  it's 534; you can find it, as 533 does show.
22      Did you find the endorsement? Can you
23  explain to me what this is?
24      A. That's a self-insured retention

Page 29

1   endorsement.
2       Q. Can you walk me through this or point out
3   the key provisions?
4       MR. COHEN: Object. You can answer if you
5   can.
6       THE WITNESS: Okay. Well, the number one
7   spells out that we are -- that we have no
8   obligation to pay on behalf of the insured, or
9   our obligation is only in excess of the
10  self-insured retention amount.
11      Number two are the reporting requirements
12  under the self-insured retention endorsement.
13      Number three is the requirement that the
14  insured have a TPA to handle claims on their
15  behalf.
16      And number four is explaining how the
17  coverage limits apply.
18      Q. And could you explain provision number
19  four?
20      A. "Self-insured retention shall apply to the
21  coverages afforded on a per occurrence basis."
22      (Interruption by court reporter for
23  clarification.)
24      THE WITNESS: I'm just reading, I'm sorry.

### Page 30

1   It's basically saying that it applies on a
2   per occurrence basis.
3   Q. What does that mean?
4   A. Each occurrence or each loss.
5   Q. That there's a self-insured retention for
6   each occurrence or each loss?
7   A. Yes.
8   Q. And the very last provision that's not
9   numbered?
10  A. It reflects the amount of the retained
11  limit.
12  Q. And how would this be different if the
13  self-insured retention did not include expenses;
14  what would be the result?
15  A. If it did not include expenses?
16  Q. Uh-huh.
17      MR. COHEN: Objection. You can answer if
18  you can.
19      THE WITNESS: It would only be eroded by
20  the insured's payment of indemnity.
21  Q. And does that mean, that it would only
22  attach after the insured paid $250,000 in
23  indemnity?
24  A. I'm not sure. I don't want to speculate.

### Page 31

1   Q. Okay. But in this case, this policy
2   attaches when?
3   A. Our policy was written with a self-insured
4   retention of $250,000 per occurrence on an ultimate
5   net loss basis.
6   Q. And it attaches when an insured does what?
7   A. When an insured has paid a retained limit
8   of $250,000, which includes indemnity and expense.
9   Q. This policy form is excess then of this
10  retention and not another policy; is that correct?
11      MR. COHEN: Objection.
12      THE WITNESS: The policy was written over
13  $250,000 self-insured retention.
14  Q. And there's nothing in this policy that
15  specifies that it's -- that it only attaches after
16  the exhaustion of some other policy; is that
17  correct?
18  A. Well, with a $250,000 self-insured
19  retention and the number one that explains that we
20  are in excess of -- it's meant that we are an
21  excess policy; we are not meant to step in from
22  dollar one with a duty to defend.
23  Q. But you're excess of a retention; is that
24  correct?

### Page 32

1   A. It was written excess of a retention,
2   correct.
3   Q. And not excess of another insurance
4   policy; is that correct?
5       MR. COHEN: Object.
6   Q. The way it's written?
7   A. The way it's written, it was written over
8   $250,000 self-insured retention.
9   Q. And are you familiar with policies that
10  are written over a specific insurance policy limit?
11  A. I have typically not handled those types
12  of policies.
13  Q. Are you familiar with them?
14  A. Not extremely familiar with them, no.
15  Q. Fair enough.
16      Do you know what it means to say that an
17  excess insurance policy follows form?
18  A. Yes.
19  Q. What does that mean?
20  A. It means it has the exact same terms and
21  conditions of the underlying policy.
22  Q. Is this an excess insurance policy that
23  follows form?
24  A. I do not believe it is.

### Page 33

1   Q. Is there anything in this policy that
2   would prevent an insurer's defense or indemnity
3   payments that are paid by another insurer from
4   applying against their retention?
5       MR. COHEN: Objection.
6       THE WITNESS: I don't understand your
7   question.
8   Q. Is there anything -- well, I believe that
9   you testified that this insurance policy attaches
10  after an insured, and you can clarify, but either
11  incurs or spends $250,000 on defense or indemnity;
12  is that correct?
13  A. Correct.
14  Q. And I'm wondering if there's anything in
15  this insurance policy that states that if another
16  insurance company were to pay that $250,000, if
17  that would not count towards exhausting the
18  retention?
19  A. The policy doesn't address that.
20  Q. So there's nothing in this policy that
21  says that that would not count; is that correct?
22      MR. COHEN: Objection. Asked and
23  answered.
24      THE WITNESS: There's nothing specifically

Elizabeth Viscione                                                                                08/01/2006

Page 34

1   worded in the policy.
2       Q. Does this policy refer to a schedule of
3   underlying insurance?
4       A. No.
5       Q. Does it require the existence of an
6   underlying primary policy?
7       A. No.
8       Q. Does it state that it applies in excess of
9   a primary policy?
10      A. It doesn't specifically state that it
11  applies in excess of a primary policy. It's excess
12  of a self-insured retention, which makes it excess
13  of underlying coverage or underlying limits.
14      Q. How does it make it excess of underlying
15  coverage or underlying limits?
16      A. Because we have no duty to do anything
17  until underlying limits have eroded.
18      Q. What do you mean by underlying limits?
19      A. Well, in this case, $250,000.
20      Q. So you're not referring to the limit of
21  another insurance policy, just the limit of the
22  self-insured retention?
23      MR. COHEN: Objection.
24      Q. I just want to clarify what you meant by

Page 35

1   limit.
2       A. Well, the limit specified in the policy.
3       Q. And what is the limit specified in this
4   policy?
5       A. $250,000 self-insured retention.
6       Q. It's not another insurance policy's limit?
7       A. It's not another insurance policy's limit.
8       Q. There's a term that's used throughout this
9   endorsement, that's "ultimate net loss"?
10      A. Yes.
11      Q. Is that defined somewhere in this policy?
12      A. No.
13      Q. What is that?
14      A. It's not defined in the policy. The usage
15  in the insurance industry is ultimate net loss is
16  the ultimate net loss, indemnity and expense.
17      Q. Are you familiar with the "other insurance
18  clause" in this policy?
19      A. I would have to look at it.
20      Q. Could you refer to the "other insurance
21  clause," which is on page 461. Can you explain the
22  effect of this provision?
23      A. In general?
24      Q. Yes.

Page 36

1       A. It just explains the -- how the insurance
2   cover is placed.
3       Q. And 4A, what does that explain?
4       A. It says that the insurance is primary
5   except when B below applies.
6       Q. Can you walk me through B?
7       MR. COHEN: Objection.
8       Q. Can you explain the circumstances under
9   which this would not be a primary policy?
10      A. Well, they added the self-insured
11  retention endorsement.
12      Q. So that the policy is excess of
13  self-insured retention?
14      A. Yes.
15      Q. But does that change it from being a
16  primary policy?
17      MR. COHEN: Objection.
18      THE WITNESS: I don't know.
19      Q. According to 4A, this insurance is primary
20  except when B below applies; is that correct?
21      A. That's what it states.
22      Q. Can you explain to me the circumstances as
23  they are spelled out in B under which this policy
24  would not be a primary policy?

Page 37

1       A. When you say explain, you want me to walk
2   through the coverages?
3       Q. Well, under what circumstances -- my
4   understanding of this policy is there are certain
5   circumstances spelled out in 4B --
6       A. Right.
7       Q. -- that determine whether or not this is a
8   primary or excess insurance policy. And I want you
9   to explain to me what those circumstances are.
10      MR. COHEN: You want her to paraphrase
11      what 4B says?
12      A. THE WITNESS: Would you like me to read
13  4B?
14      Q. Do you have an understanding of what 4B,
15  the effect of clause 4B is?
16      A. I do.
17      Q. And what is that?
18      A. It states the circumstances under which
19  this policy is excess.
20      Q. I think you testified earlier today that
21  under some circumstances, Virginia Surety wrote an
22  insurance policy that insured -- that also provided
23  insurance to insureds under the National Union CGL
24  policies; is that correct?

10 (Pages 34 to 37)

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 38

1   A. Correct.
2   Q. What is the nature of their policy?
3   A. When you say nature, what do you mean?
4   Q. What type of policy is it?
5   A. It was a primary policy.
6   Q. And do you know what its limits were?
7   A. $250,000 indemnity, and they paid expenses
8   outside of the limits.
9   Q. Does the Virginia Surety policy fit within
10  any of the insurance described within 4B?
11  A. No.
12  Q. No?
13  A. No.
14  Q. In the circumstance where Virginia Surety
15  insured an insured that was also insured by the
16  National Union CGLs, there's nothing in 4B that
17  would make the Virginia Surety -- I'm sorry -- the
18  National Union policy excess; is that correct?
19  A. Not in 4B.
20  Q. But somewhere else in the policy?
21  A. Yes.
22  Q. And can you explain that?
23  A. In the self-insured retention endorsement.
24  Q. And does the self-insured retention

Page 39

1   endorsement say that it is excess of the Virginia
2   Surety policy?
3   A. No. It says it is excess of a
4   self-insured retention.
5   Q. Okay. Earlier you also referred to
6   something called a stand-alone excess policy.
7   Would you take a look at what's behind tab B.
8   Does this appear to be what you're
9   referring to when you described the stand-alone
10  excess --
11  A. Yes.
12  Q. -- policy?
13  In general, can you describe the
14  differences between this and the National Union CGL
15  policies?
16  A. I would have to review the policy forms.
17  Q. Are you generally familiar with the
18  differences between the CGL policies, the National
19  Union CGL policies, and the stand-alone excess
20  policies in a general way?
21  A. In a general way, I am.
22  Q. Can you describe to me in a general way
23  what the differences are?
24  A. Just the forms that they're written on are

Page 40

1   different.
2   Q. In what way?
3   A. It appears that there are different CGL --
4   a different CGL form attached and a different
5   declarations page.
6   Q. What does the term "stand-alone excess"
7   mean?
8   A. I believe it means it's not following
9   form.
10  Q. Can you explain to me when this policy
11  attaches?
12  Sorry. I believe my tabs have been
13  removed. I believe there's a self-insured
14  endorsement in here as well.
15  MR. COHEN: Should be endorsement five,
16  according to the schedule.
17  MR. CRAMB: I'm not sure they're in order.
18  MR. COHEN: 03836.
19  THE WITNESS: Would you please repeat the
20  question?
21  Q. Can you explain to me when the insurance
22  policy attaches to a loss?
23  A. As written, it was written with a $250,000
24  self-insured retention.

Page 41

1   Q. Does this appear to be the same
2   self-insured retention that we referred to in the
3   National Union CGL?
4   A. Yes.
5   MR. COHEN: Same form or same amounts?
6   Q. I would appreciate it if you answered both
7   of those questions. Is it the same form?
8   A. It appears to be.
9   Q. And is the self-insured retention the same
10  amount?
11  A. Yes.
12  Q. So explain to me how this policy is --
13  when it attaches.
14  A. As written, it was intended to attach over
15  a self-insured retention of $250,000.
16  Q. Why did you clarify your answer by "as
17  written"? What did you mean by as written, as
18  opposed to what?
19  A. As it is written.
20  Q. Is that as opposed to something else in
21  practice?
22  A. No. Just as written, it applies over a
23  $250,000 self-insured retention.
24  Q. And does this policy attach to a specific

Page 42

1  loss once an insured has incurred $250,000 of
2  defense expenses or indemnity expenses?
3      A. Yes.
4      Q. Does this policy refer to a schedule of
5  underlying insurance?
6      A. I have not reviewed the entire policy. I
7  see no reference to a schedule of underlying
8  insurance.
9      Q. Does this policy state that it applies in
10 excess of a primary insurance policy?
11     A. It states that it applies in excess of a
12 self-insured retention.
13     Q. Does it mention any other insurance
14 policies?
15     A. No.
16     Q. All right. If you could please just jump
17 back to the National Union CGL policy.
18         As you testified earlier, some of the
19 insureds that were insured by this type of policy
20 were also insured by Virginia Surety.
21     A. Yes.
22     Q. And you're familiar with the Virginia
23 Surety policy or the coverage that Virginia Surety
24 provided in those examples?

Page 43

1      A. I'm familiar with the limits, and I have
2  seen a copy of the policy.
3      Q. When did you first see a copy of the
4  policy?
5      A. It was quite some time ago.
6      Q. Under what circumstances?
7      A. I don't recall.
8      Q. Do you recall when you first received
9  notice of a claim over $100,000 from York in
10 connection with the NCOPO program?
11     A. I don't recall.
12     Q. In an example where both National Union
13 and Virginia Surety wrote insurance policies to a
14 given insured, does that change when the National
15 Union policy attaches?
16         MR. COHEN: Objection.
17         THE WITNESS: I don't understand the
18     question.
19     Q. Well, if -- you explained at some length
20 when the National Union CGL policy attaches,
21 correct?
22     A. Correct.
23     Q. And in the example of when Virginia Surety
24 also insured an insured, does that change when this

Page 44

1  policy attaches?
2      A. Yes.
3      Q. How does that change?
4      A. Because we were excess and they were
5  primary, and they had the obligation to pay defense
6  costs until they paid the limit of their indemnity.
7      Q. Where in this policy does it say that you
8  were excess and Virginia Surety was primary?
9      A. It doesn't state that in the policy.
10     Q. How do you come to that conclusion?
11     A. By practice.
12     Q. Can you explain that?
13     A. We are excess; we don't have a duty to
14 defend.
15     Q. You don't have a duty to defend under this
16 policy?
17     A. Until the self-insured retention is
18 exhausted. However, in the case of Virginia
19 Surety, their policy provides defense payment in
20 excess of their indemnity, so they had the
21 continuing obligation to pay defense costs.
22     Q. So at a certain point, would National
23 Union have a shared obligation to pay defense
24 costs?

Page 45

1          MR. COHEN: Objection.
2          THE WITNESS: That's not the way it was
3      handled from the outset by Virginia Surety.
4      Q. Well, how would Virginia Surety affect
5  whether or not National Union would have a defense
6  obligation?
7          MR. COHEN: Objection.
8          THE WITNESS: Do I answer?
9          MR. COHEN: If you can.
10         THE WITNESS: Based on what their policy
11     provisions state, based upon their -- the duty
12     that they had under their policy.
13     Q. They have a continuing obligation for
14 defense costs without limit?
15     A. Until they pay the indemnity limit under
16 their policy.
17     Q. But why wouldn't National Union have a
18 shared defense obligation after $250,000 was spent?
19     A. Because we were written to be -- even
20 though we're on primary paper, we're excess of the
21 self-insured retention. The fact that there was a
22 buy-back on the SIR, we were still considered to be
23 excess of whatever was underlying our policy.
24     Q. What do you mean by a buy-back of the SIR?

12 (Pages 42 to 45)

**Page 46**

1  A. It appears that the coverage was placed,
2  and the insureds chose to place coverage, instead
3  of retaining that exposure, out of their own
4  pocket.
5  Q. And you said that because they bought back
6  the SIR, National Union is then excess of whatever
7  was underlying the National Union policy?
8  A. Yes.
9  Q. And why would the fact that an insured
10 insured the SIR change National Union's
11 obligations?
12    MR. COHEN: Objection.
13    THE WITNESS: I don't know.
14 Q. Is there something in the policy that says
15 when an insured insures the SIR, that it changes
16 National Union's obligations?
17 A. There's nothing in our policy.
18 Q. Is there anything in that policy that says
19 that when an insured insures the SIR, that the
20 attachment point changes?
21 A. There's nothing in the policy that
22 addresses insurance coverage placed on an SIR in
23 the policy.
24 Q. So there's nothing in the policy that says

**Page 47**

1  that your attachment point changes when the insured
2  insures the SIR?
3  A. It's not addressed in the policy at all.
4  Q. Can you explain what happens under the
5  stand-alone excess policies when an insured insures
6  or when Virginia Surety insured the SIR, insured an
7  insured's SIR? I'm sorry. Going to start that one
8  over.
9     Can you explain under the stand-alone
10 excess policies what happens when Virginia Surety
11 insures an insured's SIR?
12 A. Are you asking me to speak for what
13 Virginia Surety does under their policy?
14 Q. No. What are National Union's
15 obligations?
16 A. I believe they are the same as they were
17 under the other policy.
18    MR. CRAMB: Mark this, please.
19    (Exhibit No. 3, LEXCF 018007, marked for
20    identification.)
21 Q. Would you please read the e-mail to
22 yourself that's been marked as Exhibit Number 3.
23    Are you familiar with this e-mail?
24 A. It's a long time ago. Vaguely familiar.

**Page 48**

1  Q. Are you the Betty that it's addressed to?
2  A. I am the Betty that it's addressed to.
3  Q. Can you explain -- the e-mail says, "I
4  spoke with Pat Jops at VA Surety," which I assume
5  is Virginia Surety. "He confirms that he will
6  honor the same arrangement that we had on Hunjak
7  where Virginia Surety fronted the full 250,000
8  indemnity payment."
9     What did he mean by "the same
10 arrangement"?
11 A. That they would tender the full 250
12 indemnity limit for purpose of settlement. I'm not
13 clear which case that's in reference to.
14 Q. Did Virginia Surety reserve rights to
15 raise the defense cost issue in cases where it
16 fronted the 250,000 indemnity payment or tendered
17 it, as you say?
18    MR. COHEN: At what point in time? At any
19    point in time; this particular point in time?
20 Q. Did it always?
21 A. No.
22 Q. When did it start?
23 A. I don't remember the specific point in
24 time when it started.

**Page 49**

1  Q. At some point before January 22nd, 2004?
2  A. If that's what this e-mail is referring
3  to, then it would be; but I can't say for sure.
4  Q. And who's Pat Jops? Do you know who Pat
5  Jops is?
6  A. He's someone who works at Virginia Surety.
7  I'm not sure what his title is.
8  Q. How about Mr. O'Brien?
9  A. I don't know who that is.
10 Q. And Chuck?
11 A. Chuck would -- where is that?
12 Q. Third paragraph, last sentence.
13 A. The only Chuck that I am aware of is Chuck
14 Gillis, who works for York. I'm not speculating
15 that that's who they are referring to here.
16    MR. CRAMB: This will be Exhibit 4.
17    (Exhibit No. 4, LEXCF 001293 through LEXCF
18    001294, marked for identification.)
19 Q. Exhibit Number 4 is a chain of e-mails
20 that you were involved in, at least in the middle
21 of the first page.
22    In your e-mail from June 27 at 10:46 a.m.,
23 which is in the middle of the first page of this
24 exhibit, you demanded that Virginia Surety tender

```
 1    STATE OF NEW YORK        )        Pg__of__Pgs
 2                                 ss:
 3    COUNTY OF NEW YORK       )
 4        I wish to make the following changes,
 5    for the following reasons:
 6    PAGE LINE
 7    _13_ _22_   CHANGE:  LGA should be MGA
 8               REASON:  _____
 9    ____ ____  CHANGE:  _____
10               REASON:  _____
11    ____ ____  CHANGE:  _____
12               REASON:  _____
13    ____ ____  CHANGE:  _____
14               REASON:  _____
15    ____ ____  CHANGE:  _____
16               REASON:  _____
17    ____ ____  CHANGE:  _____
18               REASON:  _____
19    ____ ____  CHANGE:  _____
20               REASON:  _____
21    ____ ____  CHANGE:  _____
22               REASON:  _____
23    ____ ____  CHANGE:  _____
24               REASON:  _____
25                              _Betty Viscione_____
                                Betty Viscione, Deponent
```