# EXHIBIT H

```
                                                          Page 1
 1              UNITED STATES DISTRICT COURT

 2                      FOR THE

 3              DISTRICT OF MASSACHUSETTS

 4 LEXINGTON INSURANCE COMPANY    )

 5 AND NATIONAL UNION FIRE        )

 6 INSURANCE COMPANY OF           ) No. 04-11109 RGS

 7 PITTSBURGH,                    )

 8          Plaintiffs,           )

 9     vs.                        )

10 VIRGINIA SURETY COMPANY,       )

11 INC.,                          )

12          Defendant.            )

13          The deposition of PATRICK JOPS, called

14 for examination, taken pursuant to the Federal Rules

15 of Civil Procedure of the United States District

16 Courts pertaining to the taking of depositions,

17 taken before JENNIFER L. BERNIER, CSR No. 84-4190, a

18 Notary Public within and for the County of Cook,

19 State of Illinois, and a Certified Shorthand

20 Reporter of said state, at Suite 800, 200 East

21 Randolph Street, Chicago, Illinois, on the 14th day

22 of July, A.D. 2006, at 1:54 p.m.

23

24 Job No. 191493C
```

Page 2

```
 1  PRESENT:
 2      THE McCORMACK FIRM, LLC,
 3      (One International Place,
 4      Boston, Massachusetts 02110,
 5      617-951-2929), by:
 6      MR. ROBERT J. MASELEK,
 7          appeared on behalf of the Plaintiffs;
 8
 9      MINTZ LEVIN COHN FERRIS
10      GLOVSKY AND POPEO, PC,
11      (One Financial Center,
12      Boston, Massachusetts 02111,
13      617-542-6000), by:
14      MR. JOHN M. STEPHAN,
15          appeared on behalf of the Defendant and
16          the deponent.
17
18  REPORTED BY: JENNIFER L. BERNIER, C.S.R.,
19              CERTIFICATE NO. 84-4190
20
21
22
23
24
```

Page 3

```
 1          (WHEREUPON, the witness was duly
 2      sworn.)
 3              PATRICK JOPS,
 4  called as a witness herein, having been first duly
 5  sworn, was examined and testified as follows:
 6              EXAMINATION
 7  BY MR. MASELEK:
 8  Q.  Could you please state your name for the
 9  record.
10  A.  Patrick Jops.
11      MR. MASELEK: And just to also, again, clarify
12  on the record, we've agreed with counsel to conduct
13  this deposition pursuant to the Federal Rules; and
14  also that all objections, except as to form, would
15  be waived until the time of trial.
16      Is that true?
17      MR. STEPHAN: That is true.
18      MR. MASELEK: The witness will read and sign.
19  If we don't receive a copy of the signature pages
20  within 45 days, we will deem it as having been read
21  and signed.
22      MR. STEPHAN: That is agreed.
23  BY MR. MASELEK:
24  Q.  Mr. Jops, my name is Robert Maselek. And
```

Page 4

```
 1  I represent the Plaintiffs in this action, National
 2  Union and Lexington Insurance Company. And I just
 3  want to lay out a few ground rules for you.
 4      If you at any time want to take a
 5  break -- this isn't an endurance test. I can't
 6  guarantee that you will get back in the room, but
 7  we'll let you go.
 8      And, also, if at any time you don't
 9  understand one of my questions, please let me know.
10  Okay?
11  A.  Okay.
12  Q.  The only other thing is that, because the
13  court reporter has to type everything that we say,
14  we can't use our hands, or nod our head, or things
15  like that, because it won't show up on the record.
16  A.  It's a little hard for an Italian like
17  me, but I'll do my best.
18  Q.  Exactly. Well, you know, speak along
19  with it.
20      Are you an employee of Virginia Surety?
21  A.  Yes.
22  Q.  Okay. And what is your job title?
23  A.  Claim manager.
24  Q.  And what are your duties as a claim
```

Page 5

```
 1  manager?
 2  A.  To oversee claims that are being
 3  administered by various program managers on policies
 4  written by Virginia Surety.
 5  Q.  Okay. And for how long have you been a
 6  claims manager?
 7  A.  Since 2003. I think about three years,
 8  three-and-a-half years.
 9  Q.  Okay. And to whom do you report to
10  today?
11  A.  Wayne Baliga.
12  Q.  Okay. And prior to 2003, what was your
13  position?
14  A.  Senior claims analyst.
15  Q.  To whom did you report to at that time?
16  A.  Mr. Paul Bergmann. That's,
17  B-e-r-g-m-a-n-n.
18  Q.  And for how long have you been employed
19  by Virginia Surety?
20  A.  Since 1997. So that makes it ten
21  years -- almost ten years.
22  Q.  And for how long have you worked in the
23  insurance industry?
24  A.  Since 1992. So 15 years.
```

Page 38

1  A.  I don't know that they would be termed
2  primary or not. I wasn't involved in the issuance
3  of the policies.
4       I've seen them. It seemed unusual,
5  because it was a self-insured retention which was
6  being insured by Virginia Surety. So whether or not
7  they're considered primary, or what they're called,
8  I don't know. It seemed unusual as programs.
9  Q.  Okay. Prior to receiving a copy of the
10 National Union policy, did you have an understanding
11 as to when National Union was obligated, under its
12 policy, to pay defense costs?
13 A.  Did I have any what?
14 Q.  An understanding.
15 A.  Understanding? Well, I had, I guess, an
16 opinion that they would pick it up after we reached,
17 you know, 250,000 totaled incurred.
18 Q.  Okay. And was it your opinion that -- at
19 that period of time -- when you say "pick it up,"
20 that it would pick up all costs incurred above that
21 amount?
22      MR. STEPHAN: I'm sorry. When you say, "at
23 that period of time," you mean before he saw the
24 National Union policy?

Page 39

1       MR. MASELEK: I believe that's --
2       MR. STEPHAN: That's what we're talking about?
3       MR. MASELEK: -- that's what we're talking
4  about.
5  BY THE WITNESS:
6  A.  Yeah. Well, before I saw the policy, I
7  was unsure.
8  BY MR. MASELEK:
9  Q.  Okay. When did you first become aware of
10 the position that National Union was taking with
11 regards to the payment of defense costs?
12 A.  I believe it was right after we sent that
13 first tender letter. Again, I'm not sure if it
14 was -- I think it was around May of 2003.
15      And then Jay Maul, in some form or
16 another, responded that they did not concur with --
17 or I don't know if he said, initially, that he
18 didn't concur, but that he would be conferring with
19 his client.
20 Q.  Okay. Who was National Union --
21 A.  National Union.
22 Q.  -- or Lexington?
23      Do you have an understanding, today, of
24 what position National Union is taking in this

Page 40

1  matter?
2  A.  I don't know if I understand, totally,
3  their position. But I think they're trying to say
4  that the limits or the defense costs are outside the
5  250,000 SIR.
6       And I don't know if they're taking the
7  position not to pay anything at all or --
8  technically, I can't say what their position is. I
9  don't know if I understand what their position is.
10 Q.  And do you have an understanding as to
11 what the Virginia Surety position is?
12 A.  To be truthful, since it's in litigation,
13 I'm not focused on it.
14 Q.  Has anyone ever explained to you what the
15 Virginia Surety position is?
16 A.  Sat down and explained it to me, no.
17 Q.  Okay. What did you do to prepare for
18 today's deposition?
19 A.  In what way do you mean, "prepare"?
20 Q.  Did you review any of the documents?
21 A.  We looked at some of the pleadings for
22 the lawsuit, yeah.
23 Q.  Did you look at the pleadings in a black
24 binder?

Page 41

1  A.  Yes.
2  Q.  Okay. And when you reviewed those
3  pleadings, did they explain what the position was of
4  Virginia Surety in this matter?
5  A.  There was a reference made to the fact
6  that Lexington or AIG -- whoever -- was going to
7  have to, at some point, be responsible for
8  contributing towards the expenses. The detail --
9  I'm not sure exactly at what point, and what amount,
10 or what extent.
11 Q.  Okay. Do you know whether or not
12 Virginia Surety is taking the position that, once it
13 is paid $250,000 in either defense or indemnity,
14 that Lexington or National Union is obligated to pay
15 all costs above that amount?
16 A.  I don't know that we're asking that. I'm
17 not sure.
18 Q.  Okay. Are you able to estimate today how
19 many claims occurred where Virginia Surety paid its
20 $250,000 policy limit?
21 A.  Offhand, no.
22 Q.  Is there one person in the Chicago office
23 of Virginia Surety that's in charge of the claims
24 handling for the NPS program?

11 (Pages 38 to 41)

Page 42

1  A.  One person? No. No. There's not one
2  person.
3  Q.  And earlier today you've indicated that
4  currently there are, approximately, five or six
5  people involved?
6  A.  Correct.
7  Q.  Did they all report to one person?
8  A.  They would report to Wayne Baliga.
9  Q.  And are you involved in any oversight of
10 the NPS program today?
11 A.  Yes.
12 Q.  And do you also report to Wayne Baliga?
13 A.  Yes.
14 Q.  Have you had any discussions with
15 Jay Maul concerning the payment of defense costs?
16 A.  I think you asked that earlier. And
17 there was mention of a -- I don't know if it was a
18 discussion or an e-mail where he didn't agree with
19 the position of our initial tender letter.
20     And we said that we agreed to continue to
21 make the payments; but that it would be resolved
22 later in some way or in some manner; but that we
23 would continue to cover things so that the insured
24 would not be, you know, left out in the cold without

Page 43

1  costs being paid.
2  Q.  Is it fair to say that you agree to
3  disagree?
4  A.  Yes. I would say that. I was going to
5  use that expression.
6  Q.  You can use that expression.
7  A.  We agreed to disagree.
8  Q.  And the reason that you just explained
9  that Virginia Surety did that was just to make sure
10 the policyholders were protected?
11 A.  Correct.
12 Q.  Do you know how many conversations you
13 had with Mr. Maul about this subject?
14 A.  Maybe one or two.
15 Q.  Okay. Now, at some point in time, is it
16 true that -- when Virginia Surety tendered its
17 limits to National Union through York -- that it
18 began to do so by written tender letter?
19 A.  Yes. We issued a written tender letter
20 on occasion.
21     (WHEREUPON, a certain document was
22      marked Jops Deposition Exhibit
23      No. 1, for identification, as of
24      07/14/06.)

Page 44

1 BY MR. MASELEK:
2  Q.  Mr. Jops, for the record, Exhibit 1 is a
3 compilation of three letters. The first one is
4 dated May 15, 2003. The second one is dated
5 June 17, 2003. The third is dated July 8, 2003.
6     Have you seen these letters before?
7  A.  Yes.
8  Q.  Okay. And did you send these letters?
9  A.  I probably sent the first one. I know I
10 signed it. Actually, I signed it, and it was sent
11 by the person that handled the claim.
12 Q.  That would be the third-party
13 administrator?
14 A.  I can't recall if it was sent by the
15 third-party administrator or in our office.
16 Q.  So there may have been somebody other
17 than you, in the office, that was handling this
18 particular claim; is that correct?
19 A.  Yes.
20 Q.  Okay. At some point, did you have any
21 kind of supervisory authority over people handling
22 NPS-related claims?
23 A.  Yes.
24 Q.  Okay. Do you still have such authority?

Page 45

1  A.  No.
2  Q.  During what period of time did you have
3 supervisory authority over people handling the
4 NPS-related claims?
5  A.  From around March of 2003 -- I have to
6 think about until when, because it was -- we're in
7 July -- approximately, the middle of 2005.
8  Q.  Okay. Prior to May 15th, 2003, do you
9 have a recollection of sending similar tender
10 letters?
11 MR. STEPHAN: You mean in the NPS program?
12 MR. MASELEK: Correct. Sorry.
13 BY THE WITNESS:
14 A.  Not that I can recall.
15 BY MR. MASELEK:
16 Q.  Did you draft this letter yourself?
17 A.  No.
18 Q.  Do you know who drafted it?
19 A.  I think it was a combination of the
20 Cambridge manager, or senior analyst, and
21 Ron Steffel.
22 Q.  Okay. Did you have any supervisory
23 authority over Mr. Steffel?
24 A.  Yes.

12 (Pages 42 to 45)

**Esquire Deposition Services**
**(215) 988-9191**

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:   Lexington Ins. v. Virginia Surety Co.
Dep. Date:   July 14, 2006
Deponent:    Patrick Jops

### CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|-----|-----|-----------|-------------|-------------------|
| 77  | 5   | 'WE' HAD  | 'THEY' HAD  | I WAS REFERRING TO THE NATIONAL UNION POLICY, NOT VSC'S |

_Patrick F. Jops_
Signature of Deponent