UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LEXINGTON INSURANCE COMPANY and
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,

     Plaintiffs,

v.

VIRGINIA SURETY COMPANY, INC.

     Defendant.

Civil Action No. 04-11109 RGS

**VIRGINIA SURETY COMPANY, INC.'S**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

In support of its Motion for Summary Judgment as to all claims of Plaintiffs

Lexington Insurance Company ("Lexington") and National Union Fire Insurance Company

of Pittsburgh ("NUFIC") (collectively, "AIG") and as to Count I of its Counterclaim

(Declaratory Judgment), Defendant Virginia Surety Company ("Virginia Surety" or "VSC")

hereby submits this Statement of Undisputed Material Facts pursuant to Local Rule 56.1.

**The Parties**

     1.     Lexington and NUFIC are members of the AIG family of insurance

Companies. *See* June 8, 2006 Rule 30(b)(6) Deposition of AIG By and Through William R.

Eddows, Esq. ("Eddows Dep.") at 12.[1]

---

[1]     The cited potions of the Eddows Dep. are attached to the Affidavit of Nicholas C. Cramb, Esq., filed
herewith ("Cramb Aff."), as **Exhibit A.**  Mr. Eddows is a claims counsel for Lexington Insurance Company.
He was designated to testify on behalf of both Plaintiffs at a Fed. R. Civ. P. 30(b)(6) deposition.

2.      Virginia Surety is an admitted insurance carrier affiliated with Aon Corporation.

### The NPS Program

3.      National Program Services, Inc. ("NPS") is a New Jersey insurance broker. S*ee* Eddows Dep. at 154.  In the late 1990s, NPS set up and administered a specialty insurance program that provided commercial general liability insurance to owners and managers of multi-unit residential housing projects (the "NPS Program").  *See* July 14, 2006 Deposition of John Goring ("Goring Dep.") at 60-62; [2/] August 1, 2006 Rule 30(b)(6) Deposition of AIG By and Through John B. Gould ("Gould Dep.") at 17-18. [3/]

4.      The purpose of such specialty insurance programs is to permit program participants to obtain coverage on more favorable terms.  *See* July 31, 2006 Deposition of Charles J. Messery ("Messery Dep.") at 21-22.[4/]

5.      Prior to 2000, the entire primary layer of the NPS Program was underwritten by Chicago Insurance Company ("Chicago Insurance").  *See* Goring Dep. at 60-62.

6.      The policies issued by Chicago Insurance were primary commercial general liability policies with a $1 million per occurrence limit.  *See id.*

---

[2/]      The cited portions of the Goring Dep. are attached to the Cramb Aff. as **Exhibit C.**
[3/]      The cited portions of the Gould Dep. are attached to the Cramb Aff. as **Exhibit F.**
[4/]      The cited portions of the Messery Dep. are attached to the Cramb Aff. as **Exhibit B.**   Mr. Messery is a former employee of Lexington or, more specifically, an entity named Risk Specialists Company of New York, which is a wholly owned subsidiary of Lexington.  *See* Messery Dep. at 11, 14.  At all relevant times, Mr. Messery was the underwriter for the AIG policies at issue; he negotiated and oversaw the issuance of AIG's policies.  *See id* at 20.

7.      AIG wrote excess coverage in the layers above the Chicago Insurance policies for certain of the NPS Program participants. *See, e.g.,* Specimen Copy of a NUFIC Commercial Umbrella Liability Policy ("Specimen AIG Umbrella Policy"), attached to the Cramb Aff. at **Exhibit D,** at Schedule of Underlying Insurance (last page).

8.      Chicago Insurance was the only insurer involved in the primary layer of the NPS Program and provided the program participants "first-dollar" coverage, *i.e.,* there was no deductible or self-insured retention in the Chicago Insurance policies. *See id.;* Goring Dep. at 62.

9.      At some point in or around 2000, Chicago Insurance informed NPS that upon the lapse of its outstanding policies it would no longer participate in the NPS Program. *See* Goring Dep. 61-62.

### AIG Involvement In The NPS Program

10.     After learning of Chicago Insurance's planned departure from the NPS Program, NPS sought to find a replacement carrier to provide primary insurance coverage for the NPS Program insureds. *See* July 13-14, 2006 Rule 30(b)(6) Deposition of Virginia Surety By and Through Wayne Baliga ("Baliga Dep.") at 66-67.[5]

11.     Through two brokers, Rob Dowd and Associates and later First Capital, NPS approached AIG (Lexington) and asked if it would write a $1 million primary commercial general liability policy for the NPS Program. *See* Messery Dep. at 29, 34, 39.

---

[5]      The cited portions of the Baliga Dep. are attached to the Cramb Aff. as **Exhibit E**.

12.    The brokers acted first on behalf of Apartment Investment and Management Company ("AIMCO"), the largest property manager participating in the NPS Program,[6] and then for the NCOPO.  *See* Eddows Dep. at 14, 18.

13.    In this way, NPS sought to substitute AIG for Chicago Insurance in the primary layer of program, *i.e.*, to provide a $1 million primary insurance policy under which the NPS Program insureds would have insurance from the first dollar of any loss.  *See* Messery Dep. at 34-35; Eddows Dep. at 45.

14.    AIG refused to underwrite the entire $1 million amount because it did not want to be responsible for the claims operation necessary to handle the large number of relatively small claims expected in such a program.  *See* Messery Dep. at 37-38, 41; Eddows Dep. at 46-47.

15.    Instead, AIG offered to provide a $1 million (per-occurrence) primary CGL policy subject to a $250,000 self-insured retention.  *See id.*

16.    With this retention, AIG sought to insulate itself from large numbers of small claims while providing the policyholder substantial coverage for large or catastrophic claims.  *See id.*

17.     Significantly, at the time AIG made this proposal, and indeed at the time it established its premium charge and issued its first policy, it was not aware of VSC's participation in the NPS Program.  *See* Eddows Dep. at 51-53, 122-123.

18.    Although it suspected that policyholders might seek to insure the SIR, such insurance was not required and AIG knew nothing about the terms and conditions of any such policy, including the VSC policy that ultimately was issued.  *See id.*

---

[6]    In fact, AIMCO is the nation's largest owner and operator of apartment communities, with nearly 1,370 communities including approximately 240,000 units all over the country.  *See* http://www.aimco.com/ CorporateInformation.

19.     AIG and VSC had no communications with each other concerning their participation in the NPS Program until after both of their policies were in place.  *See* Baliga Dep. at 121-122.

20.     AIG would have preferred to write the policy using an excess insurance form that would have made AIG's obligations excess over any other insurance that a policyholder might purchase.  *See* Messery Dep. at 54-55.

21.     AIG was unable to do so, however, because NPS and the policyholders would not accept anything but a primary insurance policy form.  *See* Messery Dep. at 55-57.

22.     Because the insureds refused to accept an excess policy, AIG issued a primary CGL insurance policy subject only to the SIR.  *See id.*

23.     Thus, when Lexington began writing policies in the NPS Program on June 1, 2000 (*see* Eddows Dep. at 17-18, 152-153), all of the program policies were written on a NUFIC standard-form primary commercial general liability form (the "AIG Policies").[7]  *See id.* at 167.

24.     Each of the AIG Policies included an endorsement providing it was subject to a $250,000 self-insured retention, expressly including expenses, *i.e.*, both indemnity and defense expenses would erode the retention.  *See* Eddows Dep. at 48, 66.

25.     Thereafter, AIG issued a new, but virtually identical, policy each month to account for the addition and subtraction of insured entities in the program.  *See id.* at 63-64, 152-153.

---

[7]     NUFIC was only involved in the NPS Program to the extent that the AIG Policies were written on its paper.  *See* Eddows Dep. at 40.  The results of the program are applied to Lexington's profit center and Lexington's management is responsible for the program.  *See id.* at 40-41.

**Virginia Surety's Involvement in the NPS Program**

26.     To continue the program business, NPS had to find an insurer willing to write a $250,000 first-dollar policy insuring amounts within the AIG SIR. *See* Baliga Dep. at 76.

27.     Thus, in September 2000, NPS approached VSC, explained the NPS Program and the situation confronted by NPS as a result of AIG's underwriting decisions, and asked Virginia Surety to insure the retained amounts in the AIG policies by writing first-dollar coverage up to a $250,000 limit. *See* Baliga Dep. at 67, 69.

28.     Virginia Surety agreed to participate and appointed NPS as its Managing General Agent with authority to place Virginia Surety policies covering the $250,000 self-insured retention in the AIG Policies (the "VSC Policies"). *See* Baliga Dep. at 145-146.

29.     VSC's original understanding and its agreement with NPS was that VSC's total liability for any one occurrence would be capped at $250,000, including defense costs, *i.e.*, the same amount as the AIG SIR. *See* Baliga Dep. at 79-80.

30.     To that effect, VSC included an endorsement in its policy that placed defense costs within its limits and authorized NPS to issue VSC policies only if they that contained that endorsement. *See* Baliga Dep. at 106-111.

31.     AIG also continued to write excess and umbrella coverage over the AIG primary policy. *See* Eddows Dep. at 75-76.

32.     A problem arose when VSC submitted its policy form for approval by state regulators; certain regulators would not approve a $250,000 primary CGL policy form that included defense costs within limits. *See* Baliga Dep. at 108-110.

33.     Thus, the endorsement placing defense costs within the VSC limits could not be used by NPS. Goring Dep. at 27.

34.    There is no evidence that AIG was aware of the regulators' decision and the change in the form used by NPS and, it is undisputed that AIG agreed to participate in the program, established its premium rating and issued its first policy without any knowledge of VSC's participation in the program or the terms and conditions of the VSC policy.  *See* Eddows Dep. 51-53, 122-123.

35.    VSC issued its first policy in the NPS Program on December 31, 2000.  *See* Baliga Dep. at 88.

### Operation, Termination, and Run-Off of the NPS Program

36.    As a result of a massive fraud by NPS that ultimately resulted in felony convictions and a jail sentence for NPS's principal, AIG and VSC cancelled their participation in NPS Program.  *See* Messery Dep. at 99-100.[8/]

37.    Because of state insurance regulations, however, AIG (and VSC) had to continue insuring certain of the NPS Program participants.  *See* Gould Dep. at 27-28.

38.    Although AIG continued to issue some of these policies on the NUFIC CGL form,[9/] AIG began to issue other policies on Lexington paper, using an entirely different form called a "Stand Alone Excess Liability" form.  *See* Messery Dep. at 189-190; Eddows Dep. at 166-167; August 1, 2006 Deposition of Elizabeth Viscione ("Viscione Dep.") at 39-40. [10/]

---

[8/]    *See* $100 Million Scam Part of Growing Trend in Insurance Professional Fraud Uncovered by New Jersey Office of the Insurance Fraud Prosecutor, available at http://www.state.nj.us/lps/dcj/njinsurancefraud/report/2004/OIFP-AR-sec.5-p44.pdf at 45.

[9/]    "AIG Policies," as used herein, refers to all of the policies that AIG issued in the NPS Program and any AIG policy issued to individual insureds after its cancellation that was written the same or substantially similar commercial general labiality form.

[10/]    Elizabeth Viscione is the Primary Casualty Unit Manager for Lexington Insurance Company.  Eddows Dep. at 94.  Ms. Viscione was responsible for claims and coverage determinations under the AIG Policies.  *Id.* at 95, 98.  The cited portions of the Viscione Dep. transcript are attached to the Cramb Aff. as **Exhibit G**.

39.     Prior to canceling the NPS Program, however, all of the AIG Policies were written on the same *primary* NUFIC commercial general liability form.  *See* Viscione Dep. at 23-24; Messery Dep. at 55; Eddows Dep. at 167.

40.     There have been many claims filed against the NPS Program Participants and moreover, new claims will likely continue to be filed until all applicable statutes of limitation have run.   *See* Baliga Dep. at 111-112; July 14, 2006 Deposition of Partick Jops ("Jops Dep.) at 42-43.[11/]

41.     Notwithstanding AIG's refusal to comply with its NPS Program obligations under its policies, VSC has fully complied with its defense and indemnity obligations to NPS Program policyholders.  *See id.*

42.     To date, VSC has incurred defense and indemnity payments in excess of $185 million for claims submitted in conjunction with the NPS insurance program, including sums that should have been paid by AIG.  *See id.*

43.     It is AIG's erroneous "true excess" position that has resulted in the dispute now before the Court.  *See* Jops Dep. at 39-43.

Respectfully submitted by,

VIRGINIA SURETY CO., INC.


  /s/ Nicholas C. Cramb
Joseph G. Blute (BBO 047300)
John M. Stephan (BBO 649509)
Nicholas C. Cramb (BBO 654368)
**MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, MA 02111
 Dated: September 29, 2006             (617) 542-6000

---

[11/]     The cited portions of the Jops Dep. are attached to the Cramb Aff. as **Exhibit H.**

9

**Certificate of Service**

       I, Nicholas C. Cramb, Esq. hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on September 29, 2006.

  /s/  Nicholas C. Cramb                  Dated:  September 29, 2006

LIT 1588609v.1