UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LEXINGTON INSURANCE COMPANY and
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,

      Plaintiffs,

v.

VIRGINIA SURETY COMPANY, INC.

      Defendant.

Civil Action No. 04-11109 RGS

## VIRGINIA SURETY COMPANY, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Virginia Surety Company, Inc. [1] submits this memorandum of law in opposition to plaintiffs' [2] motion for summary judgment. The plaintiffs' motion should be denied because as a matter of law the plaintiffs' policies are primary and not so-called "true excess" policies.

## INTRODUCTION

AIG's contention that its policies are so-called "true excess" policies is unsupported by the language of its policies or the case law upon which AIG relies, is contradicted by the testimony of its own witnesses, and is undermined by fundamental inconsistencies in AIG's argument. AIG claims that the mere presence of a self-insured retention endorsement converts what is admittedly a primary policy form subject to an SIR into a "true excess" policy subject to exhaustion of an underlying carrier's policy limits, but the case law does not support this conclusion. Moreover, the parties' intent as evidenced through the language of the policies, the history and structure of the NPS Program, and AIG's conduct since the

---

[1]      In this brief, the terms "VSC" and "Virginia Surety" are used to refer to Virginia Surety Co., Inc.

[2]      Plaintiffs Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh are referred to as "Lexington" and "NUFIC" respectively. Lexington and NUFIC are both corporate

inception of the program all support the conclusion that AIG's policies are not "true excess" policies. Indeed, it is undisputed that AIG's attempt to sell an excess policy structure for the NPS Program was expressly rejected by NPS and the policyholders, who insisted on the issuance of a primary CGL policy subject only to the SIR.

AIG's position is further undermined by the fundamental inconsistencies in its arguments. For example, AIG strenuously argues that its policies are "unambiguous" (to avoid consideration of evidence showing that AIG's intent was to issue a primary policy subject to an SIR), but then introduces "extrinsic" evidence of its own concerning the comparative premiums received by VSC and AIG, and asks the court to use the premium information as an aid in interpreting the "unambiguous" policies. AIG insists that it intended all along to be a "true excess" carrier, yet it used a primary CGL form and an SIR endorsement that nowhere mention either VSC or underlying insurance generally. AIG claims that it intended its policies to be excess of an underlying primary policy limit, but used an SIR endorsement that expressly provides that all defense expenditures erode the SIR without regard to exhaustion of another policy's limits. To accept AIG's argument, one must conclude that AIG was either incredibly careless or incredibly incompetent. It was neither. AIG is a large, sophisticated insurer that writes both primary and excess insurance. It knows how to structure a "true excess" over primary program. It did not do so here because NPS was seeking to substitute AIG in the *primary layer* of the NPS Program previously underwritten with $1 million first dollar coverage by Chicago Insurance.

---

subsidiaries of AIG and will be referred to as "AIG" collectively.

## ARGUMENT

I.    **THE POLICY LANGUAGE, THE CASE LAW AND THE TESTIMONY OF AIG'S OWN WITNESSES BELIE AIG'S ASSERTION THAT ITS POLICIES ARE "TRUE EXCESS" POLICIES.**

      A.    **AIG's Repeated Arguments That Excess Policies Are Excess And Primary Policies Are Primary Is A Mere Truism That Presumes The Issue In Dispute.**

In section five of its memorandum of law, AIG touts the axiom that "all liability insurance policies that are written on a lower level of coverage have to be exhausted before a higher level insurer can be called on to contribute."  Plaintiff's Mem. at 14.  This statement is self-evident and has no bearing on whether the AIG Policies are excess over VSC's policies. None of the cases AIG cites support its claim that it *is* a "higher level insurer."  That courts have held that "true excess policies are excess over primary coverage, regardless of the other insurance clause," as AIG purports, would be relevant here only if AIG had written a "true excess" policy that required exhaustion of VSC's limit before AIG's coverage obligations are triggered.  It did not do so and, as previously argued, could not have done so even if that were its preferred method for structuring its participation in the NPS Program.  This entire section of AIG's brief simply misses the point because it assumes the very issue that is in dispute in this case.

      B.    **AIG's Own Witnesses' Testimony Supports VSC's Position That AIG's Policies Are Not "True Excess" Over Policies Issued By VSC.**

AIG's assertion that its policies are "true excess" completely ignores the sworn and unanimous testimony of AIG's witnesses, including its lead underwriter for the NPS Program account and its Rule 30(b)(6) designee, that (a) AIG issued primary CGL policies written on a NUFIC primary form subject only to a $250,000 SIR; (b) NPS and the program policyholders expressly rejected AIG's attempt to structure its participation as an excess carrier using excess forms in the primary layer of the NPS Program; and (c) that after the

NPS Program collapsed, AIG began using an excess form, recognizing that the earlier Program Polices were primary policies subject only to satisfaction of an SIR. *See* Viscione Dep. at 23-24; Messery Dep. at 55-57; Eddows Dep. at 167.

Nor can AIG escape the plain language of the other insurance clause in its policies, which specifies that AIG's policies are *primary* policies unless specific criteria apply (which they do not).[3/] AIG's policies are not "true excess" over VSC's policy limits and AIG's coverage attaches whenever an insured satisfies the SIR by incurring $250,000 in defense and/or indemnity expenses, not when the VSC policies are exhausted. *See* Exemplar Program Policy at Endorsement 28, ME 00534. Thus, viewed from the standpoint of the policyholder, both insurers have coverage obligations whenever a combination of defense and indemnity expenses exceed $250,000. It is a classic example of overlapping primary policy obligations, a situation dealt with expressly by the other insurance clauses of the policies.

### C.    The Affidavit of Charles J. Messery Is Misleading: NPS Did Not Accept AIG's Proposal of "Excess" Insurance.

Because the Affidavit of Charles J. Messery omits key facts concerning the issuance of the AIG Policies – facts to which Mr. Messery himself testified at his deposition – the affidavit is misleading. In his affidavit, Mr. Messery attests that he was approached by a broker on behalf of AIMCO "requesting . . . a primary liability insurance policy with limits of liability of $1,000,000 per occurrence." Messery Aff. at ¶ 2. He further attests that NUFIC "declined to issue AIMCO primary, first dollar, coverage, but instead offered to write excess coverage with limits of liability of $1 million and an attachment point of $250,000." *Id.* at ¶ 3. He then states that another broker renegotiated the submission so that

---

[3/]    *See* Exemplar Program Policy, Section IV - Conditions, ¶ 4, ME 00461, attached as Exhibit I (Parts I and II) to the Cramb Aff., filed with VSC's Motion for Summary Judgment.

it would cover NCOPO (a larger group of property owners including AIMCO), and NCOPO "accepted [NUFIC's] proposal." *Id.* at ¶¶ 3-4. This implies that NCOPO agreed to accept *excess* coverage. That is not what happened, and not what Mr. Messery testified to at his deposition.

In fact, Mr. Messery testified that AIG would have *preferred* to write the policy using an excess insurance form, but was unable to do because NCOPO *would not accept* anything but a primary insurance form:

> Q. Right. And why didn't you write an excess insurance policy?
> A. They wouldn't let us. We tried to and they said they wouldn't be able to sell it to the different contracts that they have, I guess lenders, that, you know, they had to show a full million dollar limit, they couldn't -- they had to show a primary policy.
> Q. And so you used a primary insurance policy?
> A. Yes.
>
> * * *
>
> Q. So as far as the – certainly as far as the policyholders were concerned, they had a primary CGL policy with $250,000 SIR?
> A. On the original policy?
> Q. On the original policy?
> A. Right.

Messery Dep. at 55, 130. *See, generally,* Messery Dep. at 54-57. Thus, at the outset of the NPS Program all of the AIG Policies were written on a standard primary commercial general liability form. *See* Messery Dep. at 55-57; Viscione Dep. at 23-24; Eddows Dep. at 167. Mr. Messery's affidavit plainly omits these key facts. Moreover, calling the coverage that AIG offered to write "excess" is legal argument, not a factual statement, particularly because AIG used a primary policy form.

**D.    The Mere Presence Of A Self-Insured Retention Does Not Convert AIG's Primary Policies Into Excess Policies.**

AIG contends, as if it were some general rule of insurance law, that "[p]olicies, like the Plaintiffs' Policies that are at issue in this case, that are written above a self insured retention amount, are true excess policies." Plaintiffs' Mem. at 18. But none of the cases AIG cites actually support this contention. The cases concerned different policy language and different facts. Thus, the courts' conclusions that those policies were "true excess" simply highlights the weakness of AIG's argument in light of the policy forms and language that it chose to use in the NPS Program Policies.[4/]

AIG first cites *Travelers Indemnity Co. v. American Cas. Co.*, 786 N.E.2d 582 (Ill. App. 3d 2003), for the proposition that a "true excess policy may be written above a self insured retention amount." Plaintiffs' Mem. at 19. That an excess policy *may* be written above an SIR does not mean that every policy written over an SIR *is* an excess policy. If it had been permitted by NPS, AIG could have written a policy above the SIR that by its terms was "true excess" over the SIR and any other available insurance. The mere presence of a self-insured retention does not convert an otherwise primary policy into an excess policy as to all other insurance, a fact which the *Travelers* case itself supports.

In *Travelers*, the court was asked to determine priority of coverage between three sets of insurance policies covering medical malpractice claims made against three nurses, two physicians, and a hospital. *Travelers,* 786 N.E. 2d at 583-84. The nurses were covered by three American Casualty policies, two with limits of $50,000 and one with a limit of $1,000,000. *See id.* at 584. The hospital had two Travelers policies, which covered the nurses as additional insureds: a primary policy with a limit of $500,000 and a "*comprehensive excess*

---

[4/]    Notably, while AIG argues that New York law should apply in this case (in order to escape New Jersey's more liberal view of extrinsic evidence) it fails to cite any authority from New York as to this

*liability policy*" with a $10,000,000 limit and a $500,000 self-insured retention.  *See id.* (emphasis added).  Significantly, the Travelers "comprehensive excess liability policy" contained both an endorsement that scheduled the Travelers primary policy as underlying insurance and an excess "other insurance" clause, which provided "This insurance is excess over any other insurance available to the Insured."  *Id.*  At issue was whether the Travelers "comprehensive excess liability policy" was excess to the American Casualty policies.

AIG would have the Court believe that the *Travelers* court found the Travelers "comprehensive excess liability policy" to be excess because it was triggered after a self-insured retention and because of the premium Travelers received.  AIG's reading of the decision, however, is incomplete and overly simplistic.  It ignores the far different policy language at issue in that case and the overwhelming evidence of an intent to make the Travelers policy excess over any other available policy – precisely the language and evidence that is missing here.  *See* Plaintiffs' Mem. at 20.  In fact, the Travelers "comprehensive excess liability policy" was excess over the American Casualty policies for several different reasons. *See Travelers,* 786 N.E. 2d at 583-84.[5/]

First, the Travelers policy specifically included an endorsement that acknowledged that the Travelers Primary Liability Policy was underlying insurance and "deemed a part of the self insurance plan and retention." *Id.* at 589.  Second, the "other insurance" clause in the Travelers "comprehensive excess liability policy" stated that the policy is "excess over any such other insurance available to the Insured, *including a policy purchased by an additional insured hereunder.*" *Id.* (emphasis in original).  "The emphasized language explicitly states the

---

purportedly central issue in this case.

[5/]    The court did look at the self-insured retention in the Travelers "comprehensive excess liability policy" and the difference in premium for that policy as compared to the Travelers primary policy. *Travelers,* 786 N.E. 2d at 587-88.  The court found that it could not compare the premium of the Travelers "comprehensive excess liability policy" to the premium of the American Casualty policies, however, because

policy is intended to apply only *in excess* of any insurance obtained by the additional insureds, such as the nurses." *Id.* Third, looking to the "other insurance" clause again, the court noted that the clause in the Travelers "comprehensive excess liability policy" "explicitly stated it was excess *over* other applicable insurance." *Id.* at 589-90.

In this case, the AIG Policies are all written on a primary form, as demanded by the policyholders and NPS, and not an excess from. *See* Viscione Dep. at 23-24; Messery Dep. at 55-57; Eddows Dep. at 167. The "other insurance" clause in the AIG Polices *does not* provide that those policies are excess over any such other insurance available to the insureds. *See* Exemplar Policy, Section IV - Conditions, ¶ 4, ME 00461. The "other insurance" clause in the AIG Policies expressly provides that those polices are "primary," except under very specific conditions which are not applicable in this case. *See* Gould Dep. at 56; Messery Dep. at 126; Eddows Dep. at 120-122. Thus, the AIG Policies are distinguishable from the Travelers excess policy on each of the grounds on which the court relied.

AIG's reliance on *Monroe Guaranty Ins. Co. v. Langreck*, 816 N.E.2d 485, 493-94 (Ind. Ct. App. 2004) is also misplaced. The *Monroe* court was asked to determine whether a policy written by TIG was excess to a policy written by Monroe. According to AIG, the *Monroe* court held that the TIG policy "was a true excess policy that was excess over primary, first dollar coverage" because it was written over a self insured retention amount. Plaintiffs' Mem. at 20. While it is strictly true that the TIG policy contained a self-insured retention, the court's conclusion that the policy was excess was based on facts entirely different from those in our case.

In fact, the TIG policy had little else in common with AIG's Policies *other than* including a self-insured retention. First, on "the very first page of the TIG policy, the

---

they underlying risks were too different. *See id.* at 588. The American Casualty policies covered liability to the

'Certificate of Liability Insurance,' it is marked as an 'Excess Liability' policy, not a 'General

Liability,' . . . policy." *Monroe*, 816 N.E.2d at 494. The first page of each of the AIG's

Policies, on the other hand, provides that it is a Commercial General Labiality Insurance

Policy. *See* Exemplar Program Policy, Declarations, ME 00448. Second, the TIG policy

stated that "it applies in excess of a retained amount." *Monroe*, 816 N.E.2d at 494. However,

unlike the retained amount in the AIG Policies, which is defined simply as "$250,000 per

'Occurrence' including expenses," the "'Retained Amount' [in the TIG policy] is defined in

the policy as the 'amount retained by the insured *or the amount of underlying insurance for*

*damages*.'" *Id.* (emphasis added).

The TIG policy also "expressly disclaims any responsibility or duty to defend or

settle any claims made against an insured and simply reserves the right to participate in a

defense if it is anticipated that a claim may be so great as to exceed the $1 million amount

needed to trigger coverage under the TIG policy," whereas the AIG Policies provide that

AIG has "the right and duty to defend the insured[s]." *See* Exemplar Policy, Section I -

Coverages, ¶ 1.a., ME 00451.

Finally, the *Monroe* court recognized that the TIG policy essentially had two parts,

one of which referred to the $1 million retained amount as a "self-insured retention," and a

second that had a "schedule of underlying insurance." *Monroe*, 816 N.E.2d at 494-95. The

TIG policy specifically listed the Monroe policy and its limit as underlying insurance. *Id.* at

495. AIG's Program Policies contain no schedule of underlying insurance and make no

reference to the VSC Policies. *See* Viscione Dep. at 31-34; Messery Dep. at 158.

*Monroe* is distinguishable from the present case on every single one of these grounds.

Contrary to AIG's suggestion, and in contrast to the TIG policy, AIG's Polices are not

---

nurses whereas the Travelers "comprehensive excess liability policy" provided coverage to an entire hospital.

excess insurance policies.  The AIG Policies are not captioned "excess."  The AIG self-insured retention does not refer to "underlying insurance."  The AIG Policies do not expressly disclaim any responsibility or duty to defend or settle any claims.  And they do not identify any underlying insurance or even refer to the VSC policies, much less provide that they are true excess as to the VSC policies.[6]

The only support AIG finds in *Griewahn v. United States Fidelity & Guaranty Co.*, 827 N.E.2d 341, 347 (Ohio Ct. App. 2005), is that the *Griewahn* court quoted an unpublished Ohio Court of Appeals case for the proposition that, "the first layer of coverage above [a self-insured retention] is sometimes described as 'excess insurance."  Plaintiffs' Mem. at 20.  This might be true, but not it is germane to whether the AIG has an obligation before the VSC policies are exhausted by payment of settlement or judgment.  Indeed, it its decision, the *Griewahn* court noted that: "[a]n excess policy provides specific coverage above an underlying limit of primary insurance."  *Griewahn*, 827 N.E.2d at 347 (*quoting* Richmond, Rights and Responsibilities of Excess Insurers, 78 Denv. U. L. Rev. 29-31 (2000)).[7]  But the AIG Policies in this case do not provide coverage above an underlying limit of primary insurance, they provide coverage above a retention.  The AIG policies may loosely be described as "excess" over a $250,000 retention, but that does not convert them into "true excess" policies contingent upon the exhaustion of another insurer's policy limit.

---

[6]       The TIG Policy in *Monroe* actually closely resembles the Lexington Policy in *Executive Risk Specialty Ins. Co. v. Lexington Ins. Co.*, 106 F. Supp. 2d 181 (D. Mass. 2000) (Lindsay, J.), where Lexington argued that its policy, which in that case was titled "Follow Form Excess Professional Liability Policy," provided that Lexington was to pay the ultimate loss once a specified underlying insurance policy was exhausted, and contained an 'excess' other insurance clause, was "true excess" ).  *Executive Risk* is addressed in more detail in VSC's memorandum of law in support of its motion for summary judgment at pp. 17-19.

[7]       Moreover, *Griewahn* is not factually analogous to our dispute.  The court was asked to determine whether an "excess insurance policy" was an "automobile policy" and therefore provided underinsured motorist coverage.  *Griewahn*, 827 N.E.2d at 343.  Under Ohio law, "automobile policy" is defined as an umbrella policy or a policy that provides proof of financial responsibility.  *Id.*  Although the court referred to the policy at issue as excess because it provided that the insurers would pay "Ultimate Net Loss" in excess of a self-insured retention, it did so only in distinguishing the policy at issue from an umbrella policy or a proof of financial responsibility.  *See Id.* at 348.

Nor does the unpublished case *Griewahn* cited afford AIG any shelter. In that case, *Tscherne v. Nationwide Mut. Ins. Co.*, 2003 WL 22724630 (Ohio Ct. App. 2003), the court found that "[e]xcess or secondary (as distinguished from primary) insurance coverage is a type of coverage where liability attaches only after a predetermined amount of primary coverage has been exhausted." *Tscherne*, 2003 WL 22744630, *3 (internal quotations omitted). Nothing in AIG's Policies provides that they attach only after a predetermined amount of primary coverage. Rather, they attach after the exhaustion of a specific dollar amount and are not tied to any other insurance policy, much less a VSC policy.

AIG also cites *Seats Inc. v. Nutmeg Ins. Co.,* 504 N.W.2d 613 (Wis. Ct. App. 1993), for the proposition that a "policy written over a [self-insured retention] was a true excess policy." At issue in *Seats* was whether an excess insurance policy required the insured to maintain an underlying insurance policy. *Seats*, 504 N.W. 2d at 614-615. Nutmeg issued an umbrella policy to Seats that provided $25 million in coverage for losses either in excess of an underlying insurance policy, or in excess of a $10,000 self-insured retention if no underlying policy applied. *Id.* at 615. Seats also carried a primary policy written by Holland America with a limit of $500,000. *Id.* A suit was filed against Seats in 1988 that was within the covered period of both policies. *Id.* Holland, however, became insolvent in 1987, a year before the suit. *Id.* Seats tendered defense of the action to Nutmeg. *Id.* Nutmeg declined, arguing that the underlying limit of $500,000 had not been exhausted. *Id.* The court found that, due to language in the Nutmeg policy which required Seats to maintain underlying coverage, the Nutmeg policy was excess to the $500,000 limit whether or not Holland was solvent. *See id.* at 617-18.

AIG's Policies do *not* require insureds to carry underlying insurance, nor do AIG's Program Policies specify that they provide coverage in excess of underlying insurance. Nor

can it be asserted that a self-insured retention is a form of insurance. *See Montgomery Ward & Co. v. Imperial Cas. & Indem. Co.*, 81 Cal. App. 4th 356, 97 Cal. Rptr. 2d 44 (2d Dist. 2000) (self-insured retentions in comprehensive general liability policies were not "underlying insurance" or "primary insurance" to which rule of horizontal exhaustion could be applied); *Carolina Cas. Ins. Co. v. Insurance Co. of N. Am.*, 595 F.2d 128, 143 n. 53 (3rd Cir. 1979) ("general rule" is that self-insurance does not constitute "other valid insurance"). *See also Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1048-49 (D.C. Cir. 1981) ("self-insurance" is not insurance insofar as it is not an insurance *policy* and court refused to create such a policy); 46 A.L.R. 4th 707 ("self-insurance against liability has generally been held not to be 'other insurance' within the meaning of a liability insurance policy"); 3 LAW AND PRAC. OF INS. COVERAGE LITIG. § 38:4 (same). Accordingly, as with the other cases cited by AIG, *Seats* not only fails to provide support for AIG's argument, it is another clear example of the type of policy language that *does* create a "true excess" situation, language that AIG failed to use (and indeed could not have used) in the policies at issue in this case.

Finally, AIG relies heavily on *National Union Fire Ins. Co. v. Lawyers Mut. Ins. Co.*, 885 F. Supp. 202, 206 (S.D. Cal. 1995) for the proposition that a "policy written over self insured retention amount is a true excess policy and other insurance clauses are therefore not relevant to the determination of the priority of coverage between the true excess policy and a primary policy." Plaintiffs' Mem. at 20-21. But *Lawyer's Mutual* dealt with an entirely different issue and is also distinguishable on its facts.

In *Lawyers Mutual*, NUFIC issued a policy with a $250,000 Self Insured Retention endorsement that substituted the SIR concept for the word "deductible" everywhere it appeared in the policy. 885 F. Supp. at 204. Lawyers Mutual issued a $250,000 primary policy (defense costs within limits). *Id.* at 203-204. The dispute involved a claim that

ultimately settled for an amount that exhausted the Lawyers Mutual policy as well as the SIR and thus required a contribution from NUFIC. *Id.* at 204. The issue in the case was not, as here, whether NUFIC had coverage obligations once its SIR had been satisfied. To the contrary, the issue was NUFIC's claim that Lawyers Mutual had unnecessarily and unreasonably exhausted its policy (and thus the SIR) through unreasonable defense payments and by refusing to settle within its policy limits, thus unreasonably exposing NUFIC to a loss within its policy limits. *Id.* Lawyers Mutual argued that the SIR should be treated as a deductible and that NUFIC's defense and indemnity obligations were triggered immediately upon the filing of a claim with an amount in controversy that exceeded the SIR (subject presumably to billing the insured for the SIR amounts), and that as a co-primary insurer, NUFIC had no standing to complain about Lawyers Mutual's handling of the defense of the case. *Id.* In other words, Lawyers Mutual argued that notwithstanding the SIR, NUFIC had "first dollar" coverage obligations. By characterizing the SIR as a deductible, Lawyers Mutual sought to read the SIR endorsement out of the NUFIC policy. *Id.* at 206. The court correctly rejected this argument, holding that the NUFIC policy was excess of the SIR and therefore "[NUFIC was neither obligated to participate in or contribute to the defense of its insured *prior to the exhaustion of the $250,000 self-insured retention*, nor responsible for any part of the loss *within that amount*." *Id.* at 207 (emphasis added).

The holding in *Lawyers Mutual* is both unremarkable and irrelevant to the issue before the Court. VSC does not contend that there is no difference between the operation of a deductible and an SIR. It does not contend that AIG is "co-primary" with respect to any amounts within the SIR. VSC does not dispute that AIG's policy is "excess" of the SIR amount. AIG is entitled to the full benefit of the SIR and is obligated by the express terms of its policy only to pay all "Ultimate Net Loss" in excess of that amount. But it is entitled

to nothing more. It is one thing to say that the AIG policy is "excess" of an SIR, or even excess of a policy that insures only the SIR amounts (defense and indemnity). It is quite another thing to say that the mere fact of a self-insured retention transforms the policy into a "true excess" policy (what the *Lawyers Mutual* court referred to as a "specific excess" policy in describing a policy different from the one before it) *vis-à-vis* any other insurer. Nothing in the AIG policy can be read as changing or limiting its policy obligations based on the terms of another insurer's policy.

In addition, as the *Lawyers Mutual* court itself acknowledged, the issue ultimately is one of the intent of the contracting parties and the "reasonable expectations" of the insured. *Id.* Here, the policies were not issued in a vacuum. They were issued in connection with the NPS Program. AIG's participation in that program as an excess and umbrella liability insurance carrier pre-dated VSC's involvement in the program and continued after VSC began its participation. The record is clear that what changed in the program was the substitution of the NUFIC and VSC policies for the lapsing Chicago Insurance policy in the *primary* layer of the program. Here, the "reasonable expectation" of the insureds is not a matter of conjecture or supposition. It is undisputed that NPS flatly rejected AIG's proposal that its policies be written as excess insurance, *i.e.*, a "true excess" policy. NPS insisted that AIG must write a primary insurance policy subject only to a $250,000 SIR. This is an entirely different factual record than that presented in *Lawyers Mutual* and the policy obligations cannot be determined, as AIG would have it, without looking at the policies in the context of the NPS Program and the history of AIG's and VSC's participation in it.

Finally, *Lawyers Mutual* was decided under California law, which neither of the parties here asserts is applicable. To the extent that *Lawyers Mutual* can be read as stating a broad legal principle that *all* policies written above an SIR are "true excess" as to any other policy

limit, there is no support for such a principle in the governing New Jersey law or even in the New York law relied upon by AIG. Such a broad generalization, divorced from the actual policy language and the circumstances in which the policies were issued, is not justified by the particular and very different issue addressed in *Lawyers Mutual*, and as a principle of law should not be adopted by this court.

## II.    IT IS APPROPRIATE AND NECESSARY FOR THE COURT TO CONSIDER THE HISTORY, STRUCTURE, AND INTENT OF THE NPS PROGRAM IN DETERMINING HOW THE POLICIES INTERACT.

As detailed in VSC's memorandum of law in support of its motion for summary judgment, to the extent that there is any conflict of law concerning the introduction of evidence concerning the structure and intent of the NPS Program, New Jersey law should apply because it has the most significant relationship with *all* of the parties and with the underlying insurance program. Evidence concerning the nature and structure of the NPS Program is unquestionably relevant and admissible under New Jersey law, especially where, as here, there is no privity of contract between the parties. *See Cooper Labs, Inc. v. International Surplus Lines Ins. Co.*, 802 F.2d 667, 672 (1986) (New Jersey follows the rule that a contract shall "be construed in context of the circumstances under which it was entered into") (quoting *Tessmar v. Grosner*, 23 N.J. 193, 201 (1957)).

By arguing that New York law applies, AIG seeks to preclude the Court's consideration of all of the testimony concerning the NPS Program and AIG's failed attempt to structure its participation as a "true excess" carrier. To support its claim, AIG relies on cases that involve contract disputes between *insurers* and *insureds*, *i.e.*, between contracting parties. *See Brunetto v. Massachusetts Mut. Life Ins. Co.*, 200 F. Supp. 2d 380 (S.D.N.Y. 2002); *Canada Life Assur. Co. v. Guardian Life Ins. Co.*, 242 F. Supp. 2d 344 (S.D.N.Y. 2003); *New York Marine & Gen. Ins. Co. v. Tradeline*, 266 F.3d 112, (2d Cir. 2001); *Fairchild v. Genesee*

*Patrons Coop. Ins. Co.*, 656 N.Y.S. 2d 544 (N.Y. App. Div. 1997). But even if the Court were to rule that New York law applies, the Court should still consider the nature and structure of the NPS Program in determining how the VSC and AIG policies interact because there is no contract between AIG and VSC and because there is a latent ambiguity inherent in the interaction of the policies which cannot be resolved by examining the policy terms apart from their context.

VSC does not seek to alter any of the terms of the parties' insurance policies. The general prohibition on extrinsic evidence to vary terms in the policies does not bar the introduction of evidence concerning background of the transactions so that the issues presented can be evaluated in context. It is particularly important to consider evidence concerning the history, structure of the insurance program in cases such as this where the question is how the policies *interact* as part of a specialized insurance program. This is a point which AIG's own authorities bolster. *See Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709, 714 (Tex. Ct. App. 1987) ("Where provisions of applicable insurance policies appear to conflict, this court has resolved the antagonism by examining the overall pattern of insurance and construing the policy as a whole.").[8/]

Examining the NPS Program as a whole and focusing on AIG's own conduct undermines any claim that the AIG Policies are so-called "true excess" policies. First, if AIG actually meant to issue an excess form, AIG would have written the policies entirely differently. For example, AIG now contends that it knew or at least suspected that NPS or certain of the policyholders might seek to insure amounts within the SIR (what AIG refers to as a "deductible buyback") and AIG intended its policies to be "true excess" as to any such policies. Then why did AIG use a primary CGL form? Why not use an excess form

---

[8/]    In any event, neither party believes that *Texas* law is relevant to the facts at issue in this case.

and specifically identify the actual or potential existence of an underlying policy either by name or by limits in a schedule of underlying insurance? Why would AIG use an endorsement providing that defense costs erode the retention without saying anything about the possibility that another insurer might be defending claims? Finally, if AIG actually believed that the policies it issued at the outset of the NPS Program were sufficient to limit its exposure to that of a "true excess" insurer, *i.e.*, subject to exhaustion of another policy's limits and not just the SIR, then why did AIG need to change to an excess form after the collapse of the NPS Program?

AIG has no answers to these questions because it is trying to re-write history. The record establishes beyond any possible dispute that NPS rejected AIG's attempts to write a true excess insurance policy. AIG could only sell the policy and get the NPS business (and the substantial premium involved) by issuing a broad primary CGL policy subject not to the exhaustion of another insurer's limits but only to the exhaustion of a $250,000 SIR. It is possible that the policy forms and language used by AIG in connection with the NPS Program imperfectly implemented what it now claims was its underwriting intent, but if, as AIG contends, VSC must live with the consequences of having to issue a policy to comply with the wishes of certain state insurance regulators that placed defense costs outside limits, so too must AIG live with the consequences of the policy that it issued. It cannot point to language in VSC's policy to fundamentally alter its obligations in the program, thereby obtaining an unfair windfall at the expense of VSC and the policyholders.

III.    **AIG'S ARGUMENT THAT THE COURT CAN CONSIDER RELATIVE PREMIUM AMOUNTS IN DETERMINING INSURERS' COVERAGE OBLIGATIONS IS BOTH WRONG AND IRRELEVANT.**

Even as it protests VSC's introduction of evidence concerning the underwriting history and structure of the NPS Program and the parties' intent and understanding in

participating in the NPS Program, AIG points to extrinsic evidence in the form of premium amounts and asserts that "NUFIC charged their insureds a premium equal to only 12% of the premium that was being charged to the same insureds by Virginia Surety, even though Virginia Surety's indemnity limits were one-fourth ($250,000) as much as Plaintiffs' limits of liability ($1,000,000 in excess of the self insured retention)." Plaintiff's Mem. at 3-4. AIG evidently wants the court to infer from the premium differential in relation to liability limits that AIG must have been a "true excess" carrier and that it is not unfair to impose on VSC 100% of claim expenses above AIG's $250,000 SIR. This argument fails for several reasons.

First, there is no rule of insurance contract interpretation that permits a court to determine insurers' respective coverage obligations by looking at premiums, especially when one of those insurers is attempting to use the premium data to evade the express language in its policies. The Court has no specialized training or expertise in underwriting and does not have before it all of the information upon which AIG's premium determinations were based. Even if premiums were relevant, expert testimony would be necessary to put the premiums in the context of the policy language that was used, market conditions at that time, and all of the reasons why an insurer might or might not want to participate in a program business. AIG has not offered or disclosed any such expert testimony and clearly is precluded from doing so at this stage of the proceedings.

In addition, to say that AIG received a much smaller premium than VSC proves nothing. AIG's policies all have a $250,000 SIR that must be satisfied, on a *per-claim* basis, before AIG's "Ultimate Net Loss" obligations are triggered. The nature of the liability risks at issue here (*i.e.*, multi-unit residential housing) is such that all of the claims will trigger VSC's policy but that relatively few will reach AIG's policy. Indeed, that is why AIG insisted on a $250,000 SIR and why NPS and the policyholders insisted on insuring the SIR. As a

result, VSC has incurred in excess of $187 million in claim expenses through June 2006, while AIG has spent approximately $20 million for the same period. *See* Baliga Dep. at, 112; Eddows Dep. at 92. Under the circumstances, it is logical and unremarkable that VSC received far more in premium than AIG. It tells us nothing, however, about AIG's obligations for claims where the $250,000 SIR has been satisfied, and those are the only claims at issue in this case.

Moreover, AIG's argument assumes that the cost of liability insurance increases proportionately with policy limits and obligations. This assumption is simply wrong. As the New Jersey Supreme Court has noted, "It is commonly known that the cost of liability insurance does not increase proportionately with the policy limits. The cost of increased limits is relatively small when compared to the cost of minimum coverage." *Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co.*, 28 N.J. 554, 564, 147 A.2d 529 (1959). *See also American Nurses Ass'n v. Passaic Gen. Hosp.*, 98 N.J. 83, 484 A.2d 670, 674 (N.J. 1984) (upholding the *Cosmopolitan* court's analysis in rejecting a *pro rata* sharing of limits). Accordingly, it is fruitless to assert that a comparison of the premiums AIG and VSC received indicates anything about the scope of coverage for defense and indemnity costs incurred in connection with claims against mutual insureds.

AIG received the benefit of avoiding multiple small claims by imposing the self-insured retention, not as the result of writing a policy on the assumption that an underlying insurance policy with defense costs outside of limits would have to be exhausted before AIG had an insurance obligation. AIG's premium was set accordingly and it is entitled to nothing more. As AIG admits, not every participant chose to insure the SIR. *See* Eddows Dep. at 51-52, 77. Yet, according to AIG's reasoning, AIG's obligations to participants who elected to insure the SIR are different from those who did not. In the absence of a VSC policy,

19

AIG is required to pay everything over $250,000 but where the participant chose to insure

the retention, AIG's obligations to the insured would depend on the exhaustion of liability

limits of the other policy.  AIG would rarely have to pay any defense expenses because, in

AIG's view, there could be no obligation until the matter is settled or concluded by

judgment.  If that were the intent, then the premium logically should have been different for

those two categories of insureds because the risk transfers are entirely different.  Yet, as far

as the record shows, there was no downward adjustment of premium.

### Conclusion

For all of the above-stated reasons, AIG's Motion for Summary Judgment should be

denied.

Respectfully submitted,

VIRGINIA SURETY CO., INC.,

By its attorneys,


  /s/   Nicholas C. Cramb
Joseph G. Blute (BBO 047300)
John M. Stephan (BBO 649509)
Nicholas C. Cramb (BBO 654368)
**MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, MA 02111
Dated: October 30, 2006                    (617) 542-6000

**<u>Certificate of Service</u>**

I, Nicholas C. Cramb, Esq. hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on October 30, 2006.

 /s/  Nicholas C. Cramb                                   Dated:  October 30, 2006

LIT 1591937v.2