UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

LEXINGTON INSURANCE COMPANY AND NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA
                 Plaintiffs

v.

VIRGINIA SURETY COMPANY, INC.,
                 Defendant.

CIVIL ACTION NO.
04-11109 RGS

**MEMORANDUM OF PLAINTIFFS, LEXINGTON INSURANCE COMPANY AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, IN OPPOSITION TO THE CROSS-MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, VIRGINIA SURETY COMPANY**

I.     THIS CASE BOILS DOWN TO A SINGLE QUESTION: ARE THE NUFIC/LEXINGTON POLICIES ON THE SAME LEVEL OF COVERAGE AS THE VIRGINIA SURETY POLICIES, OR ARE THEY ON DIFFERENT LEVELS?

Virginia Surety asks the court to indulge in a complex analysis of the parties' unexpressed "underwriting intent" to reach the erroneous conclusion that the NUFIC/Lexington policies and the Virginia Surety policies are "co-primary." Virginia Surety misapprehends the applicable law. The issue before the court is not what policies the parties wanted to write, but did not write. Moreover, there is not any dispute that each of the insurers's policies, by themselves, are clear and unambiguous. The issue before the court is a simple legal question: What is the priority of coverage between the Virginia Surety policies, which have a $250,000 limit of liability, with defense costs outside the limits and which attach from dollar one, and the NUFIC/Lexington policies, which have a $250,000 attachment point? Virginia Surety does not dispute what the virtually unanimous case law and common sense make clear; that is, policies that provide dollar one coverage and state that the insurer has an immediate duty to defend, investigate and indemnify, do not provide the

same level of coverage as policies that only attach at a much higher layer of coverage. Therefore, all first layer policies must be completely exhausted before an insurer that has written an upper layer policy has any obligation to pay. As explained in the opening Summary Judgment Memorandum of NUFIC and Lexington at pp. 14-18 ("NUFIC/Lexington Summary Judgment Memorandum"), the rationale for this firmly established rule is that when there is overlapping coverage between policies that are written on entirely different levels, the lower level policy must be completely exhausted first, because the lower layer insurer has assumed more risk for a comparatively larger premium. Because it is clear that the NUFIC/Lexington policies were written on a layer <u>above</u> that of Virginia Surety's policies, NUFIC and Lexington have no obligation to their insureds until the Virginia Surety policies have been fully exhausted through payment of their $250,000 indemnity limits.

## II. THE DETERMINATION OF THE PRIORITY OF COVERAGE DEPENDS ON THE TERMS OF THE POLICIES THAT THE PARTIES ACTUALLY WROTE, NOT ON THE TERMS THAT THE PARTIES WANTED TO INCLUDE, BUT DID NOT DO SO

In its Summary Judgment Memorandum, Virginia Surety claims: "VSC included an endorsement in its policy that placed defense costs within its limits[.]" (Virginia Surety Memo. of Law at p. 9). The evidence is clear, however, that this endorsement was **never actually used in any of the Virginia Surety policies that was actually issued** to any NCOPO member, because (as Virginia Surety puts it), "certain" unnamed regulators in certain unnamed states would not let Virginia Surety write defense costs within limits general liability policies. Virginia Surety then decided to write all of the subject policies with defense costs outside the limits of liability (Virginia Surety Memo. of Law at p. 10; **Exhibit A**, Deposition of John Goring, p. 27).[1]

---

[1] Specifically, Mr. Goring, Senior Program Manager, for Virginia Surety, testified as follows:

> Q. If you look at the first page of the endorsement, under the heading, "Supplementary Payments-Coverages," after the seventh item, it reads, "These payments will reduce the limits of insurance," correct?
> A. Yes.
> Q. To your understanding, what is the intent of adding this endorsement to the policy?

The interpretation of insurance policies must be based upon what policies were actually issued to the insureds, not on the policies that an insurer wanted to write, or wished it could have written, but never did write.

If Virginia Surety had written its policies with defense costs inside the limits of liability, then there would not have been any overlapping coverage between Virginia Surety and NUFIC or Lexington. That is not what actually happened, however. In essence, Virginia Surety is asking the court to rewrite its policies to accomplish what it expressly decided not to do and what "certain regulators" told Virginia Surety it could not do. This court should not rewrite the Virginia Surety policies to accomplish what Virginia Surety did not and evidently could not itself do.

## III. NEW YORK LAW MUST BE APPLIED TO THIS DISPUTE

Virginia Surety argues that New Jersey law must be applied to this dispute, based solely upon the fact that one of the brokers involved in the issuance of its policies was located in New Jersey. Virginia Surety's position is not supported by either the facts or the law. Virginia Surety has not cited a single case that has ever found that the location of a broker for one insurer should determine the choice of law in a priority of coverage dispute between two insurers. As explained

---

| | |
|---|---|
| A. | That would amend the general liability coverage part to include those seven things within the limits. |
| Q. | Okay. So if this form were made part of an NPS program policy, for that policy, defense costs would erode the limits of insurance; is that correct? |
| A. | That's what this form would say, yes. |
| Q. | To your knowledge, was this form used on any NPS program policies? |
| A. | It was not used. |
| Q. | It was not used by NPS, correct? |
| A. | It was not used by NPS, nor Virginia Surety in their role after NPS went away. |
| * * * | |
| Q. | Okay. To your knowledge, was Endorsement 27 approved for use in any states? |
| A. | To my knowledge, it was not; and, therefore, it was not used. |
| Q. | I guess, to your knowledge, do you have an understanding as to why Endorsement 27 was not used? |
| A. | Because it was not approved by the states. |

(Deposition of John Goring, **Exhibit A**, pp. 24-25, 27).

in the NUFIC/Lexington Summary Judgment Memorandum at pp. 9-11, New York has the most significant interest in this dispute and its law should apply.

Under Massachusetts choice of law principles (which must be applied here), as well as the law in the vast majority of other jurisdictions, the choice of law in an insurance coverage dispute, that involves risks that are located in multiple states (such as the present case), depends upon the law of the state that has the most significant relationship to the dispute. Under this principle, the jurisdiction whose law is generally found to apply is the jurisdiction where the policy was issued and the policy terms were primarily negotiated. Here, New York is that jurisdiction.

The only connection that New Jersey has to this dispute is that a retail insurance broker (NPS), which was acting as **Virginia Surety's** managing general agent, but which had no contractual or other relationship with NUFIC or Lexington, was located in New Jersey. NUFIC and Lexington's only indirect connection with NPS, was that NPS collected premiums from the insureds and then forwarded them to a New York based wholesale broker, First Capital Group. In turn, First Capital paid the premiums to NUFIC and Lexington. NUFIC's business relationship was with First Capital, not NPS. Moreover, NPS had no involvement whatsoever with the Lexington policies; these "post program" policies were all issued after the "program" for which NPS was Virginia Surety's managing general agent was cancelled.

The essence of this case is that Virginia Surety is seeking to establish that, contrary to the explicit terms of Virginia Surety's own policies, the NUFIC/Lexington policies come into play before the Virginia Surety policies are exhausted. Therefore, the NUFIC and Lexington policies provide the nexus for this dispute. The NUFIC and Lexington policies were negotiated by a New York wholesale broker (First Capital) and a New York surplus lines broker (Risk Specialists Company of New York) and they were issued to the insureds, through NCOPO, in New York. NUFIC maintains its principal place of business in New York and issued its policies there. No other state has as significant an interest in the outcome of this matter.

IV.  **EXTRINSIC EVIDENCE IS NOT RELEVANT TO A DETERMINATION OF THE PRIORITY OF COVERAGE BETWEEN THE VIRGINIA SURETY AND NUFIC/LEXINGTON POLICIES; HOWEVER, EVEN IF SUCH EVIDENCE WAS DEEMED RELEVANT, IT SUPPORTS THE POSITION OF NUFIC AND LEXINGTON, NOT THAT OF VIRGINIA SURETY**

For the reasons explained in the NUFIC/Lexington Summary Judgment Memorandum at pp. 11-13, extrinsic evidence as to the subjective and unexpressed underwriting intent of the parties is not relevant to the determination of the priority of coverage. In construing insurance policies, New York courts first examine whether the policy is unambiguous. If so, extrinsic evidence as to the insurer's subjective underwriting intent is neither relevant nor admissible. The majority of other jurisdictions, as well as the First Circuit, also follow this rule. Furthermore, in cases, like the present case, where the issue was the priority of coverage between insurers, courts have ruled that extrinsic evidence concerning the insurers' unexpressed underwriting intent is neither relevant nor admissible to alter or explain the unambiguous terms of the respective policies.      See NUFIC/Lexington Summary Judgment Memorandum at p. 12.

Virginia Surety has not explained why it believes that extrinsic evidence should be relevant, but even assuming that extrinsic evidence is relevant, the extrinsic evidence, taken as a whole, clearly supports the position of NUFIC and Lexington, not Virginia Surety. Specifically, Virginia Surety itself, as well as the brokers, the insureds and their defense counsel, all recognized the true excess nature of the NUFIC and Lexington policies, by consistently referring to them as "excess" general liability policies.[2]

For instance, Patrick Jops, of Virginia Surety, was responsible for oversight of the claims arising from the policies that are at issue here, when he became Virginia Surety's Claims Manager in 2003. Jops Deposition, **Exhibit C**, pp. 6-7. Mr. Jops testified:

---

[2] See also, the certificates of insurance, attached as Exhibit "B," issued by various brokers, that refer to the NUFIC policies as "excess" general liability policies.

> Q. Do you consider the National Union policy to be an excess policy?
> A. I consider it to be excess of the self-insured retention.
> Q. In correspondence, have you, yourself, referred to the National Union layer as an excess layer?
> A. Yes. On some of the correspondence that I signed off on, I believe the reference was made to [NUFIC being an] excess carrier.

Id. at 90. Ron Steffel, the Virginia Surety home office claims handler responsible for overseeing some of the claims, also routinely referred to the NUFIC layer as "excess" insurance. See, e.g., **Exhibit C**, pp. 91-92 and Exhibit 13 thereto (CAMCF/PA 016759) (noting in a letter to AIMCO, a large Virginia Surety and NUFIC insured, that York Claim Service (NUFIC's third party administrator), is the "administrator for the **excess layer policies**.") (emphasis added).

Other individuals and entities involved in handling claims under the policies that are at issue in this case, such as defense counsel, brokers, and Virginia Surety's third-party administrators, also routinely referred to the NUFIC layer as "excess" insurance. For example, a "Large Loss Report," that was provided to Virginia Surety by its own third-party administrator, Cambridge Integrated Services Group, Inc., noted that, "***[t]he excess liability insurance coverage is with National Union Fire Insurance Company of Pittsburgh, PA/AIG***." **Exhibit C**, at 35, 95-97 and Exhibit 15 thereto (CAMCF/TX 000286-289) (emphasis added). A "Virginia Surety - NPS Claim Authority Request" form that was submitted to Virginia Surety, by Karen Montanus, of Tower Risk Management (another one of Virginia Surety's third-party administrators), noted that, "the limit of $250,000 ***has been tendered to Lexington, the excess carrier***." **Exhibit C**, pp. 35, 97-98 and Exhibit 16 thereto (TOWCF/NY 054535-36) (emphasis added). In connection with another one of the claims, the insured's answers to interrogatories noted that NUFIC was the "***excess insurance carrier***." **Exhibit C**, at pp. 87-89 and Exhibit 12 thereto (CAMCF/PA 013065-66) (emphasis added). A "Certificate of Liability Insurance Form" created by a broker, Hilb, Rogal & Hamilton, Co., regarding an NPS-related insured, refers to the National Union policy under the heading ***"excess***

*general liability coverages*." **Exhibit A**, at pp. 73-74 and Exhibit 7 thereto (VSCU/W 004859-004860) (emphasis added).

Virginia Surety's managing general agent, NPS, also routinely referred to the NUFIC coverage as "excess." In a memorandum to a broker, Art Cucuzzella, a NPS employee, referred to the NUFIC layer as, "'***XSGL National Union***[.]" **Exhibit A**, at pp. 68-70 and Exhibit 7 thereto (VSCU/W 00019) (emphasis added). An interoffice memo from Patty King of NPS to Cucuzzella noted that, "*[w]e bound the primary GL with Virginia Surety, excess GL with Lexington*." **Exhibit A**, at p. 70 and Exhibit 7 thereto (VSCU/W 003754) (emphasis added). In an April 22, 2002, facsimile from Mr. Gruppuso, of NPS, to Alliance Brokerage Corp., Mr. Gruppuso noted that although the broker had paid the premium for the "primary" liability [the Virginia Surety policy], it had not paid the premium for the "excess" liability policy [the Lexington policy]. " **Exhibit A**, at pp. 70-72 and Exhibit 7 thereto (VSCU/W 000169).

Clearly, at a minimum, even if it was relevant, the extrinsic evidence does not so favor Virginia Surety that it could be entitled to summary judgment based upon the extrinsic evidence.

V.  **THE NUFIC AND LEXINGTON POLICIES ARE TRUE EXCESS POLICIES; NEITHER NUFIC NOR LEXINGTON HAVE ANY DEFENSE OR INDEMNITY OBLIGATIONS UNTIL VIRGINIA SURETY PAYS ITS FULL $250,000 PER CLAIM INDEMNITY LIMIT**

   A.  **As it Must, since this Is Practically the Universal Rule, Virginia Surety Does Not Dispute That a Policy Written on a Higher Level Is Excess over All Lower Level Policies**

As explained in detail in the NUFIC/Lexington Summary Judgment Memorandum at pages 14-18, courts throughout the country are in agreement that all liability insurance policies that are written on a lower level of coverage have to be exhausted before a higher level insurer can be called upon to contribute to the insured's defense and indemnity costs. This fundamental rule has been followed in scores, if not hundreds, of decisions. An "other insurance" clause dispute cannot arise between excess and primary carriers, but only between insurers on the same level. The rationale for this rule is that when there is overlapping coverage between policies that are written

on entirely different layers, it is only fair to require the lower level insurer to fully exhaust its policy before the upper layer policy is triggered, because the lower layer insurer assumes more risk for a relatively higher premium amount (when compared to the amount of coverage that is provided by the two policies). See NUFIC/Lexington Summary Judgment Memorandum at p. 17.

This rule has been followed by the New York courts. In State Farm Fire & Cas. Co. v. LiMauro, 481 N.Y.S.2d 90 (N.Y. App. Div. 1984), for instance, the court explained that, "parties to insurance contracts may well bargain for different or several tiers of excess coverage, rendering the general rule [that the priority of coverage between policies covering the same risk is determined by the other insurance clauses in the policies] inapplicable in those cases." Id. at 93. The court added that the relative premium rates for the respective policies are a reason for holding that a true excess policy is excess over all primary coverage and said that use of the phrase, "ultimate net loss," (which is used in many of Plaintiffs' policies in the present case) demonstrated the true excess nature of the policy. Id. at 93-94. Finally, the court said: "***[F]orm should not be exalted over substance, and a functional analysis compels the conclusion that this policy in fact provided last resort coverage[.]***") (emphasis added). Id. at 94.

Notably, in its Summary Judgment Memorandum, Virginia Surety does not dispute this general rule. Instead, Virginia Surety's argument is that, even though its policies attach at dollar one and the NUFIC and Lexington policies attach after $250,000 is paid, the NUFIC and Lexington policies somehow were written on the same level as the Virginia Surety policies. This argument is incorrect for the reasons that are explained below.

  **B.** **The NUFIC/Lexington Policies and the Virginia Surety Policies Are on Different Levels of Coverage; the NUFIC/Lexington Policies Were Written over a Self Insured Retention and Must Be Considered "True Excess" Policies**

Virginia Surety admits that first dollar coverage was, "a particularly important feature of the NPS program," and that while NUFIC and Lexington refused to write first dollar coverage, Virginia Surety agreed to do so. Virginia Surety Memo. of Law at p. 9. Virginia Surety also correctly

acknowledges that, "[t]he purpose of an excess policy is to 'protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage.'" Virginia Surety Memo. of Law at p. 15. Virginia Surety also admits that it was the intent of NUFIC and Lexington to only cover catastrophic losses above the high frequency, "burn layer." Virginia Surety's Memo. of Law, p. 7; Virginia Surety's Statement of Undisputed Material Facts, Paragraph 16. By contrast, it was the intent of Virginia Surety's first dollar primary policy to cover high frequency, low dollar amount losses.  It is undisputed that NUFIC and Lexington issued policies that are not triggered until the exhaustion of a $250,000 self insured retention amount.  It is also undisputed that Virginia Surety provided insurance, that was intended to, and did, provide first dollar, primary coverage for this first, $250,000 layer.  NUFIC and Lexington did not assume a duty to defend or investigate claims or indemnify the insureds (or do anything else with respect to a claim) from dollar one.  These admissions by Virginia Surety concisely explain exactly why the NUFIC/Lexington policies and the Virginia Surety policies are not on the same level of coverage.

### C. A Functional Analysis Is Required to Determine Whether a Policy Is a Primary or True Excess Policy

As noted above at p. 8, in determining whether a policy is a first layer, first dollar, primary policy, or an upper layer, true excess policy, a functional analysis is required. See Barry R. Ostrager & Thomas R. Newman, Insurance Coverage Disputes, §11.03 [e][3] (13th ed. 2006) (A "functional analysis" should be applied to determining the priority of coverage between "separate lines of insurance, and an insurance policy should be read in light of the role it is to play."); Hon. H. Walter Croskey et al., California Practice Guide: Insurance Litigation, Ch. 8-C, §8:204 ("a functional analysis applies in determining the order of coverage.'); White v. Continental Ins. Co., 2006 WL 288366, **7-8 (M.D. Pa. Feb. 6, 2006) (when the nature of a policy demonstrates that it is intended to be "true excess," it shall be treated as such, even though the policy language is "difficult, cumbersome and unclear").

Virginia Surety urges the court to find that merely because the NUFIC forms are not labeled, "follow form" or "stand alone" excess policies, that means that they must provide primary coverage. The label on the policy, however, should not be determinative of whether the policy is a first layer, first dollar policy or not. If that was the case, an insurer issuing a policy that, by its terms, is clearly a first dollar, first layer primary policy, could change the rule, that a true excess policy is excess over all primary coverage, by simply labeling its policy "excess."

This potential result explains the distinction that the courts draw between 'true" excess policies and "coincidentally" excess policies (coincidentally excess policies are first dollar, primary policies that are made excess over other primary, first dollar policies due to the other insurance clauses in the respective policies). See, e.g., Bosco v. Bauermeister, 571 N.W.2d 509, 514-16 (Mich. 1997) (a coincidental excess policy is "a primary policy [which] . . . has an excess other insurance clause that becomes operative in certain limited circumstances," such as when "an non-owned vehicle was involved and no other primary insurance existed," "the defining character of a 'coincidental excess' policy is that liability attaches immediately upon the occurrence of an insured event."); Fireman's Fund Ins. Co. v. CNA Ins. Co., 862 A.2d 251, 265-66 (Vt. 2004) (noting the "fundamental" difference between a true excess policy and a coincidental excess policy and explaining that a coincidental excess policy is a primary policy with an other insurance clause that is used by the primary insurer to limit its liability when there is other primary insurance that applies).

In this case, the role of the NUFIC/Lexington policies was clearly to provide coverage for catastrophic losses in excess of the policies' $250,000 self insured retention amount. The insureds contracted with Virginia Surety to provide coverage for the first $250,000 of any covered claim and Virginia Surety expressly agreed to write its policies with an immediate duty to defend and to investigate all covered claims and with defense costs outside of its limits of liability. On the other hand, NUFIC and Lexington wrote their policies to provide that they had no duty to do anything: whether to defend, investigate claims or indemnify the insureds, until $250,000 first had been paid.

Therefore, the NUFIC and Lexington policies do not attach until the Virginia Surety coverage is exhausted by the payment of $250,000 in indemnity costs for each claim.

> D. **The Lack of a Specific Requirement That the Primary Layer Underlying the NUFIC and Lexington Policies Be Insured Does Not Negate the "True Excess" Status of the NUFIC and Lexington Policies. Policies, like the Lexington and NUFIC Policies, That Are Written above a Self Insured Retention Amount and Do Not Provide Dollar One Coverage Are True Excess Policies.**

NUFIC and Lexington gave their insureds the option of either self insuring or obtaining "buy back" primary insurance for the self insured retention under the NUFIC/Lexington policies. Virginia Surety has provided the court with no explanation as to why the priority of coverage should be any different under this scenario than would be the case if the NUFIC/Lexington policies specified that they were excess over a primary policy. When a policy does not provide first dollar coverage, but requires either another insurer or the insured to defend against and pay low dollar amount "burn level" claims, such policies clearly are on a different level than a first dollar policy. Even though the insureds were not required to buy primary, first dollar coverage, the fact is that they did do so from Virginia Surety.

As noted in the NUFIC/Lexington Summary Judgment Memorandum at pp.18-19, although true excess, second layer, policies are often written above a primary policy, a true excess policy may also be written above a self insured retention amount, such as was the case with the NUFIC and Lexington policies in the present situation. NUFIC and Lexington have cited numerous cases and commentary in leading insurance treatises that have explained that a policy written above a self insured retention amount, that does not have an immediate first dollar duty to defend, is also considered a true excess policy, and is excess over all primary, first dollar, coverage, such as the Virginia Surety policies. See, e.g., Travelers Indem. Co. v. American Cas. Co. of Reading, Pennsylvania, 786 N.E.2d 582, 590 (Ill. Ct. App. 2003); Monroe Guaranty Ins. Co. v. Langreck, 816 N.E.2d 485, 493-94 (Ind. Ct. App., 2004); Griewahn v. United States Fidelity & Guaranty Co., 827 N.E.2d 341, 347 (Ohio Ct. App. 2005); Tscherne v. Nationwide Mut. Ins. Co., 2003 WL 22724630

(Ohio Ct. App. 2003); Pacific Employer's Ins. Co. v. Domino's Pizza, Inc., 144 F.3d 1270, 1276-77 (9th Cir. 1998); National Union Ins. Co. v. Lawyers Mut. Ins. Co., 885 F. Supp. 202, 206 (S.D. Cal. 1995); Seats Inc. v. Nutmeg Ins. Co., 504 N.W.2d 613 (Wis. Ct. App. 1993).

None of the cases that Virginia Surety cites support the proposition that a policy written over a self insured retention cannot be considered a second layer, excess policy. None of these cases even deal with the priority of coverage between a first layer, dollar one insurer and an insurer that did not assume a duty to provide first dollar coverage, but instead wrote a policy that provided that the policy did not attach at all until a large self insured retention was exhausted.

Virginia Surety cites two New Jersey cases for the proposition that a true excess policy requires the existence of a specific primary layer insurance policy. CNA Ins. Co. v. Selective Ins. Co., 807 A.2d 247 (N.J. Super. Ct. 2002); Viacom Int'l, Inc. v. Admiral Ins. Co., 2006 WL 1060504 (N.J. Super. A.D. 2006).[3] Even if New Jersey law were applicable here, which it is not, these cases would be inapposite.

CNA did not involve any true excess policies, nor did it involve any policy that was written in excess of a self insured retention amount. Rather, it involved two primary, first dollar policies. The issue was whether one of the insurers owed a duty of good faith to the other.

Similarly, the Viacom opinion does not discuss whether a policy written over a self insured retention is a true excess policy or primary policy. Instead, the case involved the determination of whether policies have to be vertically or horizontally exhausted when more than one policy period is triggered by a continuous loss. Virginia Surety, taking a quote out of context, asserts that Viacom stands for the proposition that a true excess policy must be written over a specific primary policy. The court in Viacom actually merely explained in dicta:

---

[3] Courts in some cases have described true excess policies as policies that are written over primary coverage. In these cases, however, the courts were merely differentiating between true excess policies and coincidental excess policies, i.e., first dollar policies that become excess in certain circumstances, when there is other primary insurance, due to the operation of the other insurance clauses in the respective policies. These cases all have nothing to do with whether a policy that is written above a self insured retention amount can be a true excess policy.

> Excess insurance is . . . coverage above the primary amount of insurance. . . . Typically, the insured buys a primary policy that covers liability starting at the first dollar of loss or the first dollar above the insured's deductible amount. The insured may obtain additional coverage in the form of an excess policy, which by its terms will only provide coverage once the limits of the primary policy have been exhausted. Excess coverage is generally available at a lesser cost than the primary policy because the risk of loss is less than for a primary insurer. The purpose of the excess policy is to protect the insured in the event of a catastrophic loss in which the liability exceeds the available primary coverage. A true excess policy provides coverage conditioned on the existence of a primary policy; the coverage does not begin until the loss exceeds a specific level; and the insured is usually committed to maintaining the primary insurance.

Viacom, 2006 WL 1060504 at *2.

Other than the fact that the NUFIC and Lexington policies gave the insureds the option of either self insuring the first $250,000 or buying primary insurance for this layer, which for the reasons that are explained above is a distinction without any difference, the Viacom opinion concisely explains why the Virginia Surety policies are primary policies and the NUFIC and Lexington policies are true excess policies.

The cases from other jurisdictions that are cited by Virginia Surety likewise do not provide any support for its position. Executive Risk Specialty Ins. Co. v. Lexington Ins. Co., 106 F. Supp. 2d 181 (D. Mass. 2000), involved the determination of the priority of coverage (under Arizona law) between a primary policy that was written by Executive Risk and a follow form excess policy that was issued by Lexington. This case involved an unusual situation in which both insurers issued $10 million in the same type of claims made coverage to the same insured, but for different, overlapping, policy periods. The policies for both of the insurers were in effect when the claim was made (the insured neglected to cancel the Lexington policies when the Executive Risk policies took effect, prior to the end of the Lexington policy period). Lexington's $10 million of coverage was split between a $1 million primary policy and a $9 million excess policy, while Executive Risk issued a single $10 million primary policy. Both sides agreed that the Lexington primary policy was first in priority before the Executive Risk policy (because of the other insurance clauses in the two primary

policies). The question before the court was, which policy came next: the Lexington excess policy or the Executive Risk primary policy. Executive Risk argued that, pursuant to the terms of the Lexington excess policy, that policy became a primary policy once the underlying Lexington primary policy was exhausted as a result of the settlement of the underlying claim. After conducting a functional analysis of these policies (looking at the total insuring intent), the court concluded that the Lexington excess policy was, in fact, a true excess policy. Therefore, the court applied the rule, followed in Arizona and elsewhere, that a true excess policy is excess over all primary coverage. The court noted that, "there is certainty and simplicity in a rule which holds insurers who issue residual protection only are the last to pay." Id. at 189. Unlike the present case, the Executive Risk case did not involve any policies written over a self insured retention amount.

Without any authority, Virginia Surety seizes upon the difference between the Lexington policy in the Executive Risk case and the NUFIC policies herein, jumping to the conclusion that, because the NUFIC policies do not use the same form as the Lexington policy involved in Executive Risk, the NUFIC policies must necessarily be primary, dollar one policies. Just because a follow form excess policy is written on a different form than the NUFIC policies at issue here, however, it does not follow that both types of policies cannot be considered to be true excess policies.[4]

Finally, Virginia Surety cites a statement in §2.16 of the Appleman treatise, that says that a primary policy may be written over a self insured retention. This treatise goes on to explain, however, that: "Primary insurance is typically the first layer of coverage . . . **Large businesses or**

---

[4] The other cases cited by Virginia Surety are likewise are not on point. Insurance Co. of North Am. v. Protection Mut. Ins. Co., 939 F. Supp. 79, 87 (D. Mass. 1996) involved two first party property insurance policies and not third party liability policies, like the present case. Metlife Capital Corp. v. Westchester Fire Ins. Co., 224 F. Supp. 374 (2002 ), actually supports the position of NUFIC and Lexington. The court in that case explained: "Primary insurance is that which provides the insured's initial layer of protection against liability and loss, and its premiums are commensurate with the high degree of risk that the insurance covers. Excess or secondary coverage is coverage whereby, in accordance with the terms of the policy, liability attaches only after the policy limits or the primary coverage have been exhausted." Id. at 382.

**municipalities often self insure to a limit with their self insured retentions (SIRs) acting as primary coverage. The second layer of coverage is excess insurance.** Most courts have held that the true excess policy is triggered on the exhaustion of the primary policy." Allison E. Butler, Appleman on Insurance Law and Practice, §145.1 (2d ed. 2006). This is exactly the situation that occurred in the present case.

> E.  A POLICY THAT IS WRITTEN ON AN OTHERWISE PRIMARY FORM CAN BE CONVERTED INTO A TRUE EXCESS SECOND LAYER POLICY BY MEANS OF A SELF INSURED RETENTION ENDORSEMENT, SUCH AS THAT PROVIDED BY THE NUFIC AND LEXINGTON POLICIES

It is an elementary principle of insurance policy interpretation that an endorsement to a policy controls over any conflicting printed terms in the body of the original insurance contract. Pan American World Airways v. Port Authority of New York & New Jersey, 1988 U.S. Dist. LEXIS 10730 (E.D.N.Y. 1988); Appleman, supra, §5.1, n. 233 (2d ed. 2006).

As discussed above, it is not necessary for a policy to bear the label, "excess," in order for it to function as a true excess policy. The nature of the policy is determined by its function, not its form. The Self Insured Retention Endorsements attached by NUFIC and Lexington to their policies, had the effect of transforming the NUFIC and Lexington forms into true excess policies that were not triggered until a primary layer of $250,000 was exhausted.

National Union Ins. Co. v. Lawyers Mut. Ins. Co., 885 F. Supp. 202 (S.D. Cal. 1995), involved a situation that was very similar to that involved in the present case. In Lawyers Mutual, the court found that a NUFIC policy endorsement, making the policy subject to a $250,000 self-insured retention amount, transformed a policy that was otherwise written on a primary form into a true excess policy, that was excess over all primary, first dollar insurance. Id. at 206.

As Virginia Surety is claiming in the instant case, Lawyers' Mutual argued that its first dollar policy was co-primary with National Union's policy, pointing out that the National Union policy was not labeled as an "excess" policy; it did not specifically refer to any underlying primary policies over

which it was written, and it contained a clause giving it the right and duty to defend its insured. Id. at 205. Reasoning that the NUFIC policy nevertheless was an, "excess policy with a $250,000 self-insured retention," while the Lawyers' Mutual policy was unquestionably a primary policy, the court concluded that the NUFIC policy was excess over the Lawyers' Mutual policy. Id. at 206-07. The court added that because the two policies were written on different levels, the other insurance clauses in the policies did not control the priority of coverage. Finally, the court observed that, "a deductible is distinguishable from a self-insured retention because unlike a deductible, 'the excess insurer's obligations do not arise until after the amount of the self-insured retention has been paid.'" Id. at 206 (internal quotations omitted).

### F.    A POLICY THAT IS WRITTEN OVER A SELF INSURED RETENTION AMOUNT IS NOT THE SAME AS A POLICY WRITTEN OVER A DEDUCTIBLE AMOUNT

In attempting to blur the lines between a primary and a true excess policy, Virginia Surety asserts that the only difference between a self insured retention and a deductible is that with a deductible, unlike a SIR, the insurer would have to "drop down" to provide "dollar one" coverage in the event of the insured's bankruptcy. See Virginia Surety's Summary Judgment Memorandum, p. 19, n. 15, That is not, however, the only difference between a policy that is written with a deductible amount and a policy that is written over a self insured retention amount.

An insurer whose policy does not attach until a self insured retention amount has been exhausted (like the NUFIC and Lexington policies) does not have any obligation to defend or investigate claims until the retention is satisfied, nor does it have to support a claims handling organization (in the present case, all claims were all administered by Lexington, which is an excess and surplus lines carrier and therefore does not have any local claims handling organization) (Eddows Deposition, **Exhibit D**, pp. 12-13, 95-96; Viscione Deposition, **Exhibit E**, pp. 9-10). These differences in the risks assumed by NUFIC/Lexington and by Virginia Surety were reflected by the relatively much lower premiums that were charged by NUFIC and Lexington for the policies written

subject to a substantial self insured retention amount, as compared to Virginia Surety's primary, first dollar policies.

Notwithstanding the two New Jersey cases cited by Virginia Surety, which are not on point in any event,[5] the overwhelming majority of courts in other jurisdictions (including New York), and the leading insurance commentators, all recognize that a self insured retention is not (as Virginia Surety claims) "essentially" the same thing as a deductible. See In re September 11th Liability Ins. Coverage Cases, 333 F. Supp.2d 111, 124 n.7 (S.D. N.Y. 2004) ("A SIR differs from a deductible in that a SIR is an amount that the insured retains and covers before insurance coverage begins to apply. Once a SIR is satisfied, the insurer is then liable for amounts exceeding the retention, less any agreed deductible. . . . In contrast, a deductible is an amount that an insurer subtracts from a policy amount, reducing the amount of insurance. With a deductible, the insurer has liability and defense risk from the beginning and then deducts the deductible amount from the insured coverage."); Monroe Guarantee Ins. Co. v. Langreck, 816 N.E.2d 485, 495 (Ind. Ct. App. 2004) ("There are key differences between a deductible, which generally exists in primary policies, and retained amounts, which generally are found in umbrella policies or policies designed to be excess of a self-insured amount. One difference is while a deductible is subtracted from a policy's limits, thereby reducing an insurer's total obligation to the insured, the full limits of the policy, including the

---

[5] In Moore v. Nayer, 729 A.2d 449, 460 (N.J. Super. Ct. 1999), the question was whether a self insured retention was, from the insured's perspective, the same as an insurance policy or whether it was more like a deductible. Relying upon New Jersey statutes defining deductible and self insured retention, the court concluded that, for these purposes, the self insured retention should be treated, "much like the term deductible." Id. at 460. Notably, in the course of the opinion, the court said: a "self insured retention effectively transforms what is labeled a primary policy into an excess policy covering only amounts in excess of the self insured retention." Id. at 458-59 (internal citations and punctuation omitted). In the other case cited by Virginia Surety, Owens- Illinois v. United Ins. Co., 625 A.2d 1 (N.J. Super. Ct. 1993), the policy provided a per occurrence SIR and the court was faced with the question of whether there was one or multiple occurrences. The court noted in passing that the SIR was "essentially" a deductible, but the case had nothing to do with the differences between these two forms of risk retention, nor did the court further explain why it felt that the SIR was "essentially" like a deductible. Id. at 7

retained amount, are available to the insured once that amount has been satisfied. . . . Another key difference is that in a policy with a deductible, the insurer retains complete control of claims handling; in a policy with a retained amount, the insurer has no claims handling responsibility, particularly with respect to claims not exceeding the retained amount."); Ostrager & Newman, supra, §13.13[a] ("A self-insured retention differs from a deductible in several important respects. Where the insured has purchased coverage subject to an SIR, the insurer's full policy limits will be available to respond to a loss after the SIR has been satisfied. By contrast, the amount of a deductible is subtracted from the policy's limits, thereby reducing the amount of available insurance. . . . A policyholder with an SIR generally assumes the responsibility for handling claims . . . . On the other hand, under liability policies with a deductible, all claims are reported to the insurer for handling[.]") (citations omitted); Hon. H. Walter Croskey et al., California Practice Guide: Insurance Litigation, Ch. 7A-K, § 7:387 (**"The effect of a policy provision requiring the insured to retain the first portion of a loss is that the insurer is essentially providing *excess insurance*.** i.e., no coverage attaches unless and until the insured becomes legally obligated for a loss in excess of the SIR. Until then, the insurer has no duty to defend or indemnify." (internal citations omitted) (emphasis added); Rory A. Goode, Self-Insurance as Insurance in Liability Policy "Other Insurance" Provisions, 56 Wash. & Lee L. Rev. 1245, 1256 (Fall 1999) ("Several features distinguish deductibles from another category of risk retention—self-insured retentions. First, insurers subtract the deductible from the policy limits, thereby reducing the insurer's indemnity obligation. Second, the insurer is responsible for the amount of the deductible, up to the policy limit, in the case of an insolvent insured. Finally, the insured generally is not responsible for providing its own defense under a policy containing a deductible.").

As discussed above, there is considerable authority for the proposition that a true excess policy may be written as excess over a self insured retention, because of the special characteristics of a self insured retention. Importantly, Virginia Surety concedes that NUFIC wrote its policy with

a substantial self insured retention, precisely because it did not want to assume the obligation of a first dollar carrier, which is exactly the obligation that Virginia Surety did agree to assume.

### G. NUFIC AND LEXINGTON ARE NOT RECEIVING A "WINDFALL"; TRUE EXCESS POLICIES ARE NOT TRIGGERED UNTIL ALL PRIMARY INSURANCE IS EXHAUSTED

Virginia Surety argues that NUFIC and Lexington would be getting a windfall if the court were to require Virginia Surety to comply with the terms of its policies and pay all defense costs until its $250,000 per claim indemnity limit is exhausted. The case law is clear, however, that in a true excess/true primary situation, the true excess insurer gains the benefit of its true excess status and it does not have a duty to pay until the primary policy has been exhausted.[6] This is the result that has been reached in every one of the scores, if not hundreds, of true excess cases. See NUFIC/Lexington Summary Judgment Memorandum at pp. 14-18. It is always the situation in these cases that there is overlapping coverage, as a result of there being more underlying coverage available than the true excess insurer realized when it wrote the policy. If there is seamless insurance coverage, such that the excess policy picks up exactly where the primary policy ends, there will not be any dispute as to the priority of coverage in the first place.[7]

## VII. CONCLUSION

There is not any question that the NUFIC and Lexington policies were written on a different and higher level than the Virginia Surety policies. The Virginia Surety policies all provided first dollar coverage and Virginia Surety agreed to provide an immediate duty to defend and to investigate potentially covered claims made against the insureds, no matter how small the loss.

---

[6] Virginia Surety also fails to mention that if the court were agree with its position (that its defense obligations end when it has expended $250,000 for defense and/or indemnity costs), it would receive the same windfall that it complains NUFIC/Lexington is receiving.

[7] Virginia Surety complains that, "the impact of AIG's position would be [to impose] . . . on VSC the full amount of defense costs even in cases that result in settlements or judgments that far exceed the SIR." Virginia Surety Summary Judgement Memo. at 25. But doing so would merely impose on Virginia Surety the terms of the policies that it chose to write.

The attachment point of the NUFIC and Lexington policies is $250,000 and NUFIC and Lexington did not assume any duties to defend, investigate or provide any coverage under any circumstances whatsoever until the attachment point was reached. The premiums charged by NUFIC and Lexington and by Virginia Surety reflected the entirely different levels of risk assumed by the carriers. Therefore, this court simply needs to apply the well established rule – that all first dollar, primary policies have to be exhausted before a second layer policy comes into play – in order to find for NUFIC and Lexington in this case. Accordingly, this court should allow the Motion for Summary Judgment of NUFIC and Lexington and deny the Motion for Summary Judgment of Virginia Surety.

**Dated:** October 30, 2006

Respectfully submitted,
**Lexington Insurance Company and**
**National Union Fire Insurance Company of Pittsburgh, PA**
by their attorneys,

/s/ Mark E. Cohen

| | |
|---|---|
| Mark E. Cohen | [BBO #089800] |
| Robert J. Maselek | [BBO #564690] |
| Gerald S. Frim | [BBO #656204] |

THE MCCORMACK FIRM, LLC
One International Place
Boston, MA   02110
**Ph:**   617•951•2929
**Fax:**  617•951•2672
**E-mail:**  mcohen@mccormackfirm.com

## CERTIFICATE OF SERVICE

I, Gerald S. Frim, hereby certify that I have served this document and all exhibits thereto by hand upon counsel of record and that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 30, 2006.

**Dated:** October 30, 2006                                          /s/ Gerald S. Frim

90322.1