# EXHIBIT C

Page 1

1                UNITED STATES DISTRICT COURT

2                        FOR THE

3                DISTRICT OF MASSACHUSETTS

4 LEXINGTON INSURANCE COMPANY    )

5 AND NATIONAL UNION FIRE        )

6 INSURANCE COMPANY OF           ) No. 04-11109 RGS

7 PITTSBURGH,                    )

8            Plaintiffs,         )

9       vs.                      )

10 VIRGINIA SURETY COMPANY,      )

11 INC.,                         )

12            Defendant.         )

13            The deposition of PATRICK JOPS, called

14 for examination, taken pursuant to the Federal Rules

15 of Civil Procedure of the United States District

16 Courts pertaining to the taking of depositions,

17 taken before JENNIFER L. BERNIER, CSR No. 84-4190, a

18 Notary Public within and for the County of Cook,

19 State of Illinois, and a Certified Shorthand

20 Reporter of said state, at Suite 800, 200 East

21 Randolph Street, Chicago, Illinois, on the 14th day

22 of July, A.D. 2006, at 1:54 p.m.

23

24 Job No. 191493C

Page 6

1    Q.    Okay.  And that entire period of time

2  have you been on the claims end?

3    A.    Yes.

4    Q.    If I use the term NPS program, what would

5  you understand that term to be?

6    A.    National Program Services.

7    Q.    Okay.  And is that a program that

8  Virginia Surety participated in?

9    A.    Yes.

10    Q.    Okay.  Can we agree during this

11  deposition that, if we refer to "NPS program," that

12  we're referring to the NPS program that Virginia

13  Surety participated in?

14    A.    That sounds fine to me.

15    Q.    Okay.  Did you have any involvement in

16  the NPS program?

17    A.    As a claims manager?

18    Q.    Correct.

19    A.    Yes.

20    Q.    And what was your involvement?

21    A.    I was assigned oversight when I became a

22  claims manager in 2003.

23    Q.    Okay.  Did you have any involvement in

24  the NPS program prior to 2003?

Page 7

1     A.    Peripherally, yes.  I was involved in

2 some initial claims that were reported.

3     Q.    **And when you say "initial claims," would**

4 **that be the first claims arising out of the program?**

5     A.    Yes.  The first claims that were reported

6 to us.

7     Q.    **Okay.  And when did the first claims that**

8 **were reported to Virginia Surety come in?**

9     A.    The specific date I can't recall; but it

10 was, probably, sometime in 1992.

11    Q.    **2002?**

12    A.    2002, excuse me.

13    MR. STEPHAN:  If I can just interpose an

14 objection or a clarification.

15          Did you mean when were they first

16 reported to VSC, or when were the underlying claims

17 first filed?

18    MR. MASELEK:  I can clarify.

19 BY MR. MASELEK:

20    Q.    **When were the first claims reported to**

21 **VSC arising out of the NPS program?**

22    A.    That was my understanding; and that's why

23 I said sometime, probably, in 2002.

24    Q.    **Okay.  Early, mid, late 2002, do you have**

Page 35

1 referring to the fact that you didn't handle many

2 claims that involved the indemnity payment in excess

3 $250,000; is that correct?

4      A.    Correct.

5      Q.    And are you aware that, at some point in

6 time, some of the claims that were being handled by

7 Cambridge were transferred to Tower?

8      A.    I'm aware, yes.

9      Q.    And do you know why that was done?

10      A.    It was another corporate decision.  Why?

11 I couldn't tell you.

12      Q.    Okay.  As far as you're aware, were any

13 issues or problems expressed by anyone within

14 Virginia Surety as to the handling of claims by

15 Cambridge?

16      A.    Again, we're talking about Aon who is

17 making the decision.  So I don't know where they

18 were coming from.

19      Q.    Okay.  And when you say "Aon making

20 decisions," do you know who made the decision to

21 transfer some claims to Tower?

22      A.    Who, personally, an individual?  No,

23 other than senior management.

24      Q.    And senior management at Virginia Surety?

Page 87

1                    (WHEREUPON, a certain document was

2                    marked Jops Deposition Exhibit

3                    No. 12, for identification, as of

4                    07/14/06.)

5 BY MR. MASELEK:

6      Q.    Mr. Jops, have you had a chance to review

7 Exhibit 12?

8      A.    Yes.

9      Q.    And it has a Bates Stamp of

10 CAMCF/PA 013065 and 010366, correct?

11     A.    Correct.

12     Q.    It's a letter from a Mr. Sullivan at

13 Marshall, Dennehey, Warner, Coleman & Goggin; is

14 that correct?

15     A.    Yes.

16     Q.    Do you recognize that firm name?

17     A.    I've heard the name.

18     Q.    Do you know if that's a firm that handled

19 claims under the NPS program?

20     A.    I believe so.

21     Q.    Did Virginia Surety have counsel that it

22 approved to handle the defense of claims?

23     A.    For the NPS program?

24     Q.    Correct.

Page 88

1     A.     I believe, not initially; but eventually

2 a panel listing was put together.

3     Q.     Okay.  And if you look at the second

4 page, it's copied to Joseph Meckwood, who was from

5 Cambridge, correct?

6     A.     Correct.

7     Q.     And Ron Steffel was Virginia Surety,

8 correct?

9     A.     Worked for Virginia Surety.

10     Q.     And Mr. Sullivan indicates:

11          "Please accept the following as a

12 supplement to our previously filed Answers to

13 Interrogatories dealing with the insurance coverage

14 in this matter?"

15          And this matter involves an entity known

16 as the Kossman Development Company; is that correct?

17     A.     Correct.

18     Q.     And do you have any knowledge as to

19 whether Kossman Development was an insured under the

20 NPS program?

21     A.     No, I don't know.

22     Q.     Okay.  And Mr. Sullivan goes on to

23 indicate:

24          "The information is as follows:   'Excess

Page 89

1 insurance carrier, National Union Fire Insurance

2 Company. Policy period 6/1/01 through 6/30/02.

3 Coverage, 1 million each occurrence?"

4          Did I read that correctly?

5    A.    Correct.

6    Q.    Have you been involved in any other

7 programs at Virginia Surety involving the buyback of

8 an SIR?

9    MR. STEPHAN:  Objection.

10 BY THE WITNESS:

11   A.    Not to my knowledge.

12 BY MR. MASELEK:

13   Q.    Does your claims handling responsibility

14 at Virginia Surety involve programs as opposed to

15 individual policies?

16   A.    If you can tell me what you mean by

17 "programs."

18   Q.    For example, this NPS was a program; is

19 that correct?

20   A.    Well, again, I don't know what you mean

21 by a "program." Policies were issued on Virginia

22 Surety paper, if that's a program.

23          I mean, you have to define "program" for

24 me. I don't know what you mean by "program."

Page 90

1    Q.    Do you consider the National Union policy

2 to be an excess policy?

3    A.    I consider it to be excess of the

4 self-insured retention.

5    Q.    In correspondence, have you, yourself,

6 referred to the National Union layer as an excess

7 layer?

8    MR. STEPHAN:  Objection.

9 BY THE WITNESS:

10    A.    Yes.  On some of the correspondence that

11 I signed off on, I believe the reference was made to

12 excess carrier.

13 BY MR. MASELEK:

14    Q.    And have you reviewed any correspondence

15 from Mr. Steffel where he referred to the National

16 Union layer as an excess layer?

17    MR. STEPHAN:  Objection.

18 BY THE WITNESS:

19    A.    I may have, but I can't answer that I can

20 recall specifically.

21         And I might add there was a lot of

22 correspondence from Mr. Steffel at the time he was

23 there.

24    MR. MASELEK:  Mark this as the next exhibit,

Page 91

1 please.

2                    (WHEREUPON, a certain document was

3                    marked Jops Deposition Exhibit

4                    No. 13, for identification, as of

5                    07/14/06.)

6 BY MR. MASELEK:

7       Q.    Mr. Jops, have you had a chance to review

8 Exhibit 13?

9       A.    Not all of it yet.  Okay.

10      Q.    Would you agree that this is an e-mail

11 from Ron Steffel to Eric Lucas of AIMCO?

12      A.    Yes.

13      Q.    And to your recollection, was AIMCO an

14 insured on the NPS program?

15      A.    Yes.

16      Q.    And you're copied on the e-mail?

17      A.    Yes.

18      Q.    In the second to last paragraph,

19 Mr. Steffel indicates:

20                    "Accordingly our loss limit tender letter

21 is attached for your review and file.  The letter is

22 addressed to York Claim Service, who is the

23 fiduciary administrator for the excess layer

24 policies."  Did I read that correctly?

Page 92

1      A.      Correct.

2      Q.      **Okay.  Do you agree that York claim**

3 **services is the fiduciary administrator for the**

4 **excess layer policies?**

5      MR. STEPHAN:  Objection.

6 BY THE WITNESS:

7      A.      Well, if Mr. Steffel meant the

8 third-party administrator, I agree, yes.  As you

9 say, he had a way with words.

10     MR. MASELEK:  Mark this as the next exhibit,

11 please.

12                   (WHEREUPON, a certain document was

13                   marked Jops Deposition Exhibit

14                   No. 14, for identification, as of

15                   07/14/06.)

16 BY MR. MASELEK:

17     Q.      **Mr. Jops, would you agree that Exhibit 14**

18 **appears to be an e-mail from Ron Steffel to**

19 **Linda Perry?**

20     A.      Yes.

21     Q.      **Dated 6/27/03; is that correct?**

22     A.      Correct.

23     Q.      **And you are one of the cc's on the**

24 **e-mail?**

**Esquire Deposition Services**
**(215) 988-9191**

Page 95

1    A.    I believe it reads how it is there.

2    Q.    **So you can't tell one way or the other?**

3    A.    I guess it reads for itself.  I mean,

4 he's talking about excess contingent and then

5 putting AIG in parentheses.  So I guess that's what

6 he means.

7                    (WHEREUPON, a certain document was

8                    marked Jops Deposition Exhibit

9                    No. 15, for identification, as of

10                   07/14/06.)

11 BY MR. MASELEK:

12   Q.    **Mr. Jops, have you -- in your duties with**

13 **Virginia Surety related to the NPS program -- seen**

14 **reports captioned, "Large Loss Reports," such as**

15 **Exhibit 15?**

16   A.    Yes.

17   Q.    **You're familiar with the format?**

18   A.    Yeah.  They vary, but I'm familiar with

19 the format.

20   Q.    **And would these be reports provided to**

21 **Virginia Surety by the third-party administrator?**

22   A.    Correct.

23   Q.    **And this one indicates the claim handler**

24 **is Robert Faison -- F-a-i-s-o-n.  Do you know who**

Page 96

1  Mr. Faison is?

2       A.      Another Cambridge adjuster, I believe,

3  out of the Texas office.

4       Q.      Okay.  At the beginning of the report,

5  under "Coverage" -- at least, this report indicates:

6               "This is a commercial insurance policy

7  with commercial general liability coverage, Form

8  CG 00010196.  The primary coverage is provided by

9  Virginia Surety Company."  It gives the policy

10 number and the effective dates.

11              "The limit of liability is 250,000 for

12 each occurrence.  The excess liability insurance

13 coverage is with National Union Fire Insurance

14 Company of Pittsburgh, PA/AIG.  Their Policy

15 No. 1073202 is effective 5/31/01 to 5/31/02.  The

16 limit of excess liability coverage is 750,000 for

17 each occurrence."

18              Did I read that correctly?

19      A.      Yes.

20      Q.      Is it your understanding that the

21 coverage issued by National Union was, in fact,

22 1 million, not 750,000?

23      A.      Coverage issued by National Union was a

24 million versus 750,000?

Page 97

1      Q.     Correct.

2      A.     No.

3      Q.     So it's your understanding that the

4 National Union policies provided $750,000 of

5 coverage?

6      A.     Yes.

7                    (WHEREUPON, a certain document was

8                    marked Jops Deposition Exhibit

9                    No. 16, for identification, as of

10                   07/14/06.)

11 BY MR. MASELEK:

12     Q.     Mr. Jops, can you identify the document

13 that's been marked as Exhibit 16?

14     A.     It's entitled a "Claim Authority Request"

15 to Tower Risk Management.

16     Q.     Have you seen this type of form before?

17     A.     I've probably seen them, yes.

18     Q.     If you look at the claims handler

19 indicated on the second page, it is a

20 "Karen Montanus" -- M-o-n-t-a-n-u-s.

21     A.     Yes.

22     Q.     Do you know who she is?

23     A.     A Tower adjuster.

24     Q.     Okay.  And under the heading,

Page 98

1 "Strategy/Action Plan" -- in the last page, at the

2 bottom -- Ms. Montanus indicates, "the limit of

3 $250,000 has been tendered to Lexington, the excess

4 carrier."

5          Did I read that correctly?

6     A.    Yes.

7               (WHEREUPON, a certain document was

8                marked Jops Deposition Exhibit

9                No. 17, for identification, as of

10               07/14/06.)

11 BY MR. MASELEK:

12    Q.    Mr. Jops, do you know who Hilb, Rogal &

13 Hamilton Company of Metropolitan Washington is?

14    A.    No.

15    Q.    And this correspondence that's been

16 marked as Exhibit 17 -- and it bears a Bates stamp

17 of CAMCF/TX 005234 -- Ms. Karen Snyder is sending a

18 facsimile to Bunni Berman.

19          Do you have any idea who Bunni Berman is?

20    A.    No idea.

21    Q.    Ms. Snyder indicates:

22          "Please report as to Cambridge on the

23 primary, York for the excess, and American Guarantee

24 & Liability Insurance Co. for the umbrella?"

A REGION. DEFENSE LITIGATION LAW FIRM

# MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN

A PROFESSIONAL CORPORATION    www.marshalldennehey.com

PENNSYLVANIA
Bethlehem
Doylestown
Erie
Harrisburg
Newtown Square
Norristown
Philadelphia
Pittsburgh
Scranton
Williamsport

NEW JERSEY
Cherry Hill
Roseland

DELAWARE
Wilmington

OHIO
Akron

FLORIDA
Ft. Lauderdale
Orlando
Tampa

Suite 2900, 600 Grant Street · Pittsburgh, PA 15219
(412) 803-1140 · Fax (412)803-1188

Direct Dial: 412-803-1158
Email: VSullivan@mdwcg.com



July 6, 2004

Michael J. Bruzzese, Esquire
The Bank Tower, Suite 1008
307 Fourth Avenue
Pittsburgh, PA   15222

> **RE:**   *Philip C. Rudolph, et al. v. Kossman Development Company, et al.*
> *CCP, Allegheny County, No.: GD03-020024*
> *Our File No.: 3180.136*

Dear Mr. Bruzzese:

Please accept the following as a supplement to our previously filed Answers to Interrogatories dealing with the insurance coverage in this matter.

The information is as follows:

Excess insurance carrier:  National Union Fire Insurance Company

Policy period 6/1/01 through 6/30/02

Coverage $1,000,000 each occurrence.

If there are any questions, please contact me.

Very truly yours,

VICTOR J. SULLIVAN, JR.

VJS/mad

\I2_A\LIAB\VJS\STAT\324874\MXD\03180\00136

JOPS      DEP. EX. NO. 12
FOR ID., AS OF 7/14/06

CAMCF/PA 013065

Michael J. Bruzzese, Esquire
July 6, 2004
Page 2

_____

bcc:    Joseph Meckwood, CPCU, AIC
        Ron Steffel
        Paul O'Donnell

\12_A\LIAB\VJS\STAT\324874\MXD\03180\00136

CAMCF/PA 013066



**Ronald Steffel@CSG**
05/16/03 04:09 PM

To: Eric.Lucas@AIMCO.com
cc: Pat Jops/US/CSC, Bob Beltrami/Cambridge/US/ICENET@ICENET,
    Neil Laubach/Cambridge/US/ICENET@ICENET
Subject: Johnson matter policy limit tender  [Virus Checked]

Eric, this follows our discussion of last Tuesday. At that time, both you and defense counsel called from the Arizona mediation to report on the developments of the day's activities.

It was conveyed by defense counsel that the mediator's contention is that it was likely that the gate through which the child entered into the pool area was probably defective in some way. It is understood that evidence of this issue is at best circumstantial in scope. However, if the prevailing view is developed that this is the proximate cause, the mother's contributory negligence will probably not be taken sufficiently into account.

Moreover, Virginia Surety now believes this issue is likely to be given less weight by a jury in the event the case is tried, given the  type and severity of the damages involved, rendering a verdict of some proportion in favor of this plaintiff, probably at least in range of the VSC policy loss limit. The developing consensus of Virginia Surety is that to resolve this case by whatever means, is that it will take our layer and probably beyond to accomplish such. The end result is that the VSC layer will eventually be taken by means of either settlement disposition or trial resolution.

Accordingly, our loss limit tender letter is attached for your review and file. The letter is addressed to York Claims Service who is the fiduciary administrator for the excess layer policies.

Additionally, per your request, you will be faxed a signature copy of such.

If you wish to discuss, feel free to contact me on my direct line at 312-381-9513.

**W**

Johnson case tender letter.do

This message is for the designated recipient only and may contain privileged, proprietary, or otherwise private information.  If you have received it in error, please notify the sender immediately and delete the original.  Any dissemination, distribution, copying or any other use of this message is strictly prohibited.

Jops     DEP. EX. NO. 13
FOR ID., AS OF 7/14/2005

CAMCF/PA 016759

# LARGE LOSS REPORT

DATE OF REPORT
10/14/02

**CLAIM NUMBER: 27721903**          CLAIM( ) SUIT( X )
**INSURED: Raamco International, Inc.**
**VENUE: Harris County, Texas**
**CLAIMANT:   Brandon Wayne Phipps, April 4, 1996, Age 4**
**CLAIM TYPE: General Liability**

CURRENT RESERVE:
>       INDEMNITY: $24,000.00
>       EXPENSE: $3,012.41

PAID TO DATE:
>       INDEMNITY: None
>       EXPENSE: $17,669.29 – Legal

**DATE OF LOSS**: 12/23/01
**DATE OF NOTICE: 12/26/01**
**CLAIM HANDLER**: Robert Faison

**COVERAGE: Liability**
Policy Number: IPGA700000050040
Policy Term: 05/31/01 to 05/31/02
Policy Limits: $250,000

This is a Commercial Insurance Policy with Commercial General Liability Coverage
Form CG 00 0101 96. The primary coverage is provided by Virginia Surety Company
policy number IPGA700000050040 effective 05/31/01 to 05/31/02. The limit of liability
is $250,000 for each occurrence. The excess liability insurance coverage is with National
Union Fire Insurance Company of Pittsburgh, PA/AIG. There policy number 1073202 is
effective 05/31/01 to 05/31/02. The limit of excess liability coverage is $750,000 for each
occurrence.

**DESCRIPTION OF CLAIM:**

The incident occurred at approximately 10:00 a.m. on 12/23/01 at the Carriagewood
Apartment complex located at 1515 Wilson Road in Conroe, Texas. Brandon Wayne
Phipps, a minor, it is believed was either attempting to climb on top of the brick column
or was pulling loose bricks out of the brick column adjacent to the exit gate when the

column fell over onto him resulting in traumatic injuries. Brandon was rushed by ambulance to a Conroe hospital where he died from his injuries. The brick column involved in this incident had been damaged several months earlier they assumed from a car that had backed into the brick pillar. The maintenance personnel for the apartment complex visually inspected the damage pillar prior to the accident and had determine the pillar was safe. They covered the column with yellow tape to warn that it had been damaged until it could be repaired or replaced.

**IDENTIFICATION OF KEY ISSUES:**
Identify all relevant issues impacting on liability and damages analysis.

**LIABILITY:**

Based on the investigation of this loss, there is liability exposure on the part of the apartment complex. The lease contract does stipulate that the tenant has responsibility to watch their children on the property and a couple of maintenance employees did warn this boy on several prior occasions to stay away from the electronic gate. Regardless, no one had contacted the mother to advise her that this had become a problem. Caution tape was wrapped around the pillar after it was damaged by this unknown vehicle, but the claimant attorney would likely argue that this had little meaning to a five year old child and that this damaged brick pillar had become an attractive nuisance. The claimant attorney will likely argue that steps should have been taken to temporarily shore up the brick pillar to make sure it was safe until the repairs could be completed. It is unlikely a jury would consider the maintenance personnel simply pushing this damaged pillar with their hands as a sufficient means to determine whether it was structurally sound.

**DAMAGES:**

This claim involves two separate lawsuits, each now pending in Harris County, Texas. The first suit involves, Donald Carl Phipps, who has sued as a wrongful death beneficiary of the deceased, Brandon Wayne Phipps. Mr. Phipps was the natural father of the decedent. The second lawsuit involves the decedent's mother, Ms. Leffring, who has filed a wrongful death and survival action. The defendants in both of the lawsuits are the same.

**LEGAL:**

The father of the decedent is Donald Carl Phipps. He is represented by John Choate and J. D. Lambright out of Conroe, Texas. Mr. Lambright is a relatively young attorney who is more experienced in criminal defense and family law than personal injury litigation. He has deferred the handling of this matter to his co-counsel, Mr. Choate, who is more experienced in this area of law. The mother of the decedent is Tammie L. Leffrin. She is represented by Kevin Prendergrast and Greg Eidman out of Houston, Texas. They are competent and well respected in the legal community, and have been diligent in their investigation and the development of their claim in this matter. We have retained Jeromy D. Hughes with Brown Sims, P. C., to handle the defense for our insured. He is a very competent and experience trial attorney. We expect Mr. Hughes who will work in

CAMCF/TX 000287

conjunction with G. Byron Sims, senior partner for the firm to do an excellent job in handling the defense of the lawsuit for our insured. Both lawsuits have now been filed in Harris County, Texas. This is a conservative venue more favorable to us because of the larger jury pool there is a greater chance for a non-biased jury. The defenses available to our litigation strategy lie with determination of forseeability, and whether Sheng-Raamco acted reasonably at all times in connection with their handling of the damaged concrete pillar. This will be difficult for us to do because of the two-month delay between the time the damage occurred and the time that the repairs were conducted. Our defense will likely turn on what measures Sheng-Raamco took to determine the true nature and extent of the dangerous condition, and whether the measures were reasonable enough to defeat the element of forseeability in a negligence cause of action. There are no contracts and indemnification agreements between the defendants. The only potential party we may be able to obtain indemnification from is the co-defendant Inco, Inc.  It is unclear as to whether Sheng-Raamco was an additional insured under Inco's policy. Inco was contacted in October of 2001 to conduct the repairs, yet failed to do any actual work until after the accident occurred in December. We are conducting further investigations into these issues, to determine same. The total estimated legal budget inclusive of work already done to handle this matter through trial is $61,010.00.

**EVALUATION:**

The settlement value of this case is high, with full liability. Due to the nature and extent of the alleged damages involving the death of a four year old boy, and the manner in which he died, settlement may exceed seven figures, possibly up to $1,500,000. We do not expect that a comparative responsibility argument against the parents will significantly lower the settlement value of this case, because the consequence of this argument is that it supports forseeability on the part of Sheng-Raamco. Yet, applying a percentage of responsibility upon Inco, if the facts so warrant, and if sufficient insurance is available, we may expect the settlement value to be as low as $800,000.

**RESERVE RECOMMENDATIONS:**

Because of the potential exposure in this lawsuit it is recommended the indemnity reserve be set at the Virginia Surety policy limit of $250,000 and the legal reserve be increased by $25,000.

**CURRENT STATUS OF RESOLUTION ACTIVITY:**

There have been no demands or offers made in this litigation to date. We have informally attempted to solicit information of what Plaintiff's expectations may be, but we have not been successful in this regard. This is because of the problems existing between the plaintiff's respective interests in this case. The decedent's father and mother are both seeking recovery on behalf of the estate, and although we expect that the mother will prevail, the father still has a claim as a wrongful death beneficiary, as does the mother.

**INTENDED ACTIONS AND RECOMMENDATIONS:**

CAMCF/TX 000288

The additional investigation that needs to be conducted includes primarily fact witness discovery at this time. We need to take the depositions of Ms. Leffring and Mr. Phipps. We also need present Heather George, Jose Cisneros, Kathy Reed, Liliana Robledo and Donald Yeager for deposition. Other depositions will include that of the investigating police officers, Joe Oldner and Chris Lehman. Also, responding fire department personnel may be deposed by Plaintiffs, including Lt. Leon Martin, Steve Coogler, Ericcson H. Cullen and Jonathan Wyatt. Numerous residents of the apartment complex have given statements, and they will likely be deposed, as well, to develop not only the facts leading up to the accident, but the activities of the decedent and his family at the complex, and the management's prior knowledge of same. These individuals include Kimberly Hillard, John Hodges, Martha Nancy Whittle, Bodio Dwayne Collins, Louis Williams and Dana Dillon. The only essential depositions that must be taken in this case prior to mediation are those of the Plaintiffs and the employees of the apartment complex, along with the corporate representative of Inco, and any of Inco's employees which either conducted the repairs or had dealings with Sheng-Raamco concerning same.

Other investigation that needs to be completed is discovery as to the relationship between the four Raamco defendants, and the determination of which ones are proper parties to this suit, and what insurance is available to each. We believe that the only proper party to this suit is the management company, Sheng-Raamco Management, Inc. Our plans for the continued handling of this matter, and case strategy including settlement are to take the depositions of Ms. Leffring, Mr. Phipps, Ms. George, Mr. Cisneros, Ms. Reed, Mr. Robledo, and Mr. Yeager, and then proceed to the expert witness phase of this matter. We need to retain a liability expert on apartment complex maintenance and premises liability, along with an expert economist to testify as to alleged economic losses. We also need to retain a psychologist expert to testify as to the alleged grief and mental anguish suffered by the plaintiffs as a result of the loss of their son.

Additionally, a new docket control order was entered by the court, with the following dates. The deadline to join new parties is November 11, 2002. The parties' agreement to object or submit to alternative dispute resolution is due on February 26, 2003, which is the deadline for Plaintiffs to designate expert witnesses. Defendants' experts must be designated by March 28, 2003. The pleadings amendment deadline is April 4, 2003, and challenges to expert testimony must be filed by April 19, 2003. The deadline for mediation to take place is April 25, 2003, which is also the deadline to file motions for summary judgment not subject to an interlocutory appeal. Motions for summary judgment which are subject to an interlocutory appeal must be filed by May 2, 2003. The discovery deadline is May 1, 2003. The trial is set for May 19, 2003, and all vacation letters for the two week period beginning this date must be waived.

**ATTACHMENTS:**
None.

CAMCF/TX 000289



**TOWER
RISK
MANAGEMENT**

## VIRGINIA SURETY – NPS
## CLAIM AUTHORITY REQUEST

| Initial Report | ☐ | Supplemental Report | ☒ |
|---|---|---|---|

### Claim Information

| | | | |
|---|---|---|---|
| Claimant | PAULA CARELA<br>590 WEST 204TH<br>STREET<br>NEW YORK, NY 10034 | TRM Claim Number | VS 00159 |
| Insured | LSL SERVICES AND<br>IVORY HOLDINGS | Handling Examiner | KAREN MONTANUS |
| Date of Loss | 7/1/02 | Examiner Phone | |
| Date Loss Reported | 9/16/02 | Examiner Email | |

### Outstanding Reserve and TRM Paid To Date

| Loss Reserve | Expense Reserve | Loss Paid | Expense Paid | Total Incurred |
|---|---|---|---|---|
| $250,000.00 | $6,750.00 | $0.00 | $15,590.03 | $272,340.03 |
| **Recommended Reserve Change** | $35,000.00 | | | |
| **Total New Reserves** | | | | |
| $250,000.00 | $0.00 | $0.00 | $15,590.03 | $0.00 |

### Policy Information

| | | | |
|---|---|---|---|
| VS Policy Number | NPS 000088 | Policy Period: From 1/4/02 to 1/4/03 | |
| Insured | LSL Services and Ivory Holdings | | |
| Loss State | New York | | |
| Coverage Limits | $250,000 | | |

### Litigation Information

| | | | |
|---|---|---|---|
| In suit ? | ☒ Yes  ☐ No | Defense Counsel | John Bonanno of Weiner, Millo & Morgan |
| Venue | New York Supreme | Phone | 212-213-1220 |

### Alternate Coverage Notification ?

| | |
|---|---|
| Notification Sent | ☒ Yes  ☐ No |
| Carrier | Lexington; Joseph E. Boldand |

### Cause of Loss

This matter is one in which a 43 year old female tenant slipped and fell at approximately 8:10 am on July 1, 2002 on the landing between the second and first floors at 590 WEst 204th Street, New York, NY. At the time of the loss the insured's superintendent's father, 74 year old Manuel ROdriguez Sr., was mopping in the vicinity of the 4th floor landing. The plaintiff was descending the stairs in order to go to work. She testified that she passed the super's father mopping and noticed that the stairs were wet as she descended. As she approached the stairs leading from the second floor landing her left foot slipped out from under her and she fell backward onto her buttocks and slid down ten steps to the bottom of the first floor landing.

Non party witness Mariel Haciano testified that the floors were set and that the insured was mopping from

DEP. EX. NO. 10

FOR ID., AS OF 1/14/06

TOWCF/NY 054535



**TOWER
RISK
MANAGEMENT**

## VIRGINIA SURETY – NPS
## CLAIM AUTHORITY REQUEST

bottom to top and left a heavy resideue of water on the stairs. This witness also came from the fourth floor of the building and heard the plaintiff scream.

The insured witness Manuel Rodriguez Sr. verifies the accident but testified through a Spanish interpreter that he placed his bucket at the bottom stairway and carried the mop up to the floors to be mopped. His testimony was somewhat unbelievable as he claimed that in the process of mopping the stairs he immediately dried them.

Matter is on the trial list for November 29, 2004.

**Liability**
We will argue that the plaintiff saw the superintendent's father mopping and saw the water on the steps prior to the loss as she descended the stairwell on her way to work. We anticipate the jury awarding some degree of comparative in that the condition was open and obvious. Nevertheless, the superintendent and his father did not make good witnesses. The jury will likely conclude that the father negligently mopped the floor by creating the condition, failure to warn and choosing the unsafe time of morning rush-hour to mop the floors.

**Injury / PD Evaluation**
Plaintiff alleges $25,000 in medical specials and has not held a job since she was let go from Viewpoint Corporation in April of 2003. This was unrelated to the accident however she claims her increased pain from the accident and surgery has kept her from working. She claims a fractured right wrist and thumb, a herniated disc in her low back requiring surgery and claims a residual foot drop.

**Reserve Rationale**
Policy limits have been posted in accordance with carrier authority.
Expense reserves however need to be increased for continued legal expenses through trial as recommended above.

**Strategy / Action Plan**
The limit of $250,000 has been tendered to Lexington, the excess carrier. Negotiations are underway and the last unofficial demand was $475,000. The last offer was $175,000. Lexington has not placed any additional settlement authority on this case. Trial has been set for November 29, 2004. This is a firm date.

| Authority Request | | | | |
|---|---|---|---|---|
| Reserve increase for expense reserves by $28,250 to $35,000. | | | | |
| Submitted By: | Karen Montanus | Approved? | ☐ Yes | ☐ No |
| Date Submitted: | 10/20/04 | Approval By | | |

TOWCF/NY 054536