**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **LEXINGTON INSURANCE COMPANY AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA**<br>                    Plaintiffs<br><br>v.<br><br>**VIRGINIA SURETY COMPANY, INC.**,<br>                    Defendant. | **CIVIL ACTION NO.
04-11109 RGS** |

**RESPONSE OF PLAINTIFFS, LEXINGTON INSURANCE COMPANY AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., TO, STATEMENT OF UNDISPUTED FACTS OF DEFENDANT, VIRGINIA SURETY COMPANY, IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

_____

The following constitutes the response of the Plaintiffs, Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA (collectively, "NUFIC"), to the statement of undisputed facts that was filed by Virginia Surety Company in support of its Cross-Motion for Summary Judgment.

**GENERAL OBJECTION**

NUFIC objects to the factual statements contained in the statement of undisputed facts filed by Virginia Surety Company on the grounds that extrinsic evidence as to the unexpressed, subjective intent of the parties to the policies is not material, relevant, or admissible where, as here, the policies are unambiguous. The priority of coverage between the policies issued by NUFIC and Virginia Surety must be determined solely by the terms of the policies themselves. Thus, the factual allegations contained in the statement of undisputed facts filed by Virginia Surety Company do not constitute genuine issues of material fact. To the extent that a response is required, NUFIC responds as follows:

| | |
|---|---|
| Paragraph 1: | Lexington and NUFIC are members of the AIG family of insurance Companies. *See* June 8, 2006 Rule 30(b)(6) Deposition of AIG By and Through William R. Eddows, Esq. ("Eddows Dep.") at 12. |
| Response 1: | Disputed. The preamble to Virginia Surety's Statement of Undisputed Materials Facts defines "AIG" as, collectively, National Union Fire Insurance Company of Pittsburgh, PA and Lexington Insurance Company. Thus, as worded Paragraph 1 is incomprehensible. Nonetheless, NUFIC does not contest that Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA are member companies of the American International Group. |
| Paragraph 2: | Virginia Surety is an admitted insurance carrier affiliated with Aon Corporation. |
| Response 2: | Undisputed. |
| Paragraph 3: | National Program Services, Inc. ("NPS") is a New Jersey insurance broker. *See* Eddows Dep. at 154. In the late 1990s, NPS set up and administered a specialty insurance program that provided commercial general liability insurance to owners and managers of multi-unit residential housing projects (the "NPS Program"). *See* July 14, 2006 Deposition of John Goring ("Goring Dep.") at 60-62; August 1, 2006 Rule 30(b)(6) Deposition of AIG By and Through John B. Gould ("Gould Dep.") at 17-18. |
| Response 3: | NUFIC disputes the allegations contained in Paragraph 3. The deposition testimony proffered by Virginia Surety does not support the factual allegations contained in this paragraph. Specifically, there is insufficient support for the allegations that: (a) NPS is or was an insurance broker; or (b) that NPS "set up" or "administered" a specialty insurance program in the 1990s. Moreover, the evidence cited by Virginia Surety does not explain what were the parameters of the "specialty insurance program," that has |

been defined by Virginia Surety as the "NPS Program." Mr. Eddows did not testify that NPS was a New Jersey insurance broker. Rather, he testified as follows:

> Q. And it says, "First Capital, who was acting as a wholesaler, was responsible for invoicing NPS, the risk purchasing group, for the total premium." So, then if I understand this correctly, First Capital would take your invoice and turn around and submit an invoice to NPS?
>
> A. Correct.
>
> Q. And then it says, "It was NPS's responsibility to invoice each individual insured for their portion of the premium and send us a check for the total policy premium." Is that right?
>
> A. That is what this says.
>
> Q. What is a risk purchasing group?
>
> A. I'm not sure.
>
> * * *
>
> Q. And NPS is in New Jersey?
>
> A. I believe so.

(Eddows Deposition, **Exhibit A**, pp. 153-154). In addition, Mr. Gould testified only as follows:

> Q. So I think that you just answered this, but just to be clear, what is the National Coalition of Property Owners and Managers?
>
> A. That is a risk retention group.
>
> Q. What is a risk retention group?
>
> A. It's a group formed under federal law, federal insurance law, that allows common or homogenous grouping of similar businesses.
>
> Q. To do what?
>
> A. To place insurance.

> Q. And what is the common or similar business between the members of this coalition?
>
> A. Real estate owners.
>
> Q. And are you familiar with Insurance Purchasing Group Association?
>
> A. I believe it's the same. I believe it refers to the national coalition.
>
> Q. Just another expression of that same group?
>
> A. I believe so.
>
> Q. Okay. How about Aimco?
>
> A. I believe Aimco is an individual account and I believe a member of the group as well.
>
> Q. And then, in turn, an insured under the NPS program?
>
> A. Yes.

(Deposition of John B. Gould , pp. 17-18).

| | |
|---|---|
| Paragraph 4: | The purpose of such specialty insurance programs is to permit program participants to obtain coverage on more favorable terms. *See* July 31, 2006 Deposition of Charles J. Messery ("Messery Dep.") at 21-22. |
| Response 4: | Undisputed. |
| Paragraph 5: | Prior to 2000, the entire primary layer of the NPS Program was underwritten by Chicago Insurance Company ("Chicago Insurance"). *See* Goring Dep. at 60-62. |
| Response 5: | NUFIC disputes the factual allegations contained in Paragraph 5. Mr. Goring testified that Chicago Insurance, an underwriting company that was part of the Interstate Insurance Group, "was ***the*** carrier for the NPS program prior to Virginia Surety." Mr. Goring also testified that, "Interstate was ***the*** insuring company for National Program Services at that time." (Goring deposition, **Exhibit C**, pp. 60, 62). NUFIC does not contest that Chicago |

Insurance issued primary, first dollar, policies, with limits of liability of $1,000,000, with no self-insured retention or deductible amounts, to various parties who later became insured by both Virginia Surety and NUFIC. Mr. Goring, however, never testified, and there is no supporting evidence in the record, that the program in which Chicago Insurance participated consisted of any "layer" of coverage other than the Chicago policies. Thus, Virginia Surety's reference to the Chicago Insurance policies as the "primary layer" of the NPS Program - which infers the existence of "excess" layers of coverage - mischaracterizes the record.

Paragraph 6.    The policies issued by Chicago Insurance were primary commercial general liability policies with a $1 million per occurrence limit. *See* id.

Response 6:    Undisputed.

Paragraph 7:    AIG wrote excess coverage in the layers above the Chicago Insurance policies for certain of the NPS Program participants. *See*, *e.g.*, Specimen Copy of a NUFIC Commercial Umbrella Liability Policy ("Specimen AIG Umbrella Policy"), attached to the Cramb Aff. at Exhibit D, at Schedule of Underlying Insurance (last page).

Response 7:    Disputed. NUFIC only admits that National Union Fire Insurance Company of Pittsburgh, PA issued the umbrella policy that was attached to the Cramb Affidavit at Exhibit D. Neither Mr. Goring, nor any other deponent, has testified that the program in existence while Chicago Insurance participated in the program consisted of "layers" of coverage. There has been no testimony or other evidence cited by Virginia Surety - and NUFIC denies - that the umbrella policy referred to in Paragraph 7 was issued as part of or in conjunction with the NPS Program or that National Union Fire Insurance Company of Pittsburgh, PA issued other umbrella policies in excess of the Chicago Insurance primary policies.

| | |
|---|---|
| Paragraph 8: | Chicago Insurance was the only insurer involved in the primary layer of the NPS Program and provided the program participants "first-dollar" coverage, i.e., there was no deductible or self-insured retention in the Chicago Insurance policies. *See* id.; Goring Dep. at 62. |
| Response 8: | NUFIC does not dispute that the policies issued by Chicago Insurance contained no deductible or self-insured retention amount. NUFIC, however, disputes Virginia Surety's characterization of the Chicago Insurance policies as insuring the "primary layer" of the NPS Program, as the NPS Program existed prior to Virginia Surety's involvement, because this factual allegation is unsupported by the materials proffered by Virginia Surety. Neither Mr. Goring, nor any other deponent, testified that the program that was in existence while Chicago Insurance participated in the program consisted of "layers" of coverage. Thus, Virginia Surety's reference to the Chicago Insurance policies as the "primary layer" of the NPS Program - which infers the existence of "excess" layers of coverage - mischaracterizes the record. |
| Paragraph 9: | At some point in or around 2000, Chicago Insurance informed NPS that upon the lapse of its outstanding policies it would no longer participate in the NPS Program. *See* Goring Dep. 61-62. |
| Response 9: | Undisputed. |
| Paragraph 10: | After learning of Chicago Insurance's planned departure from the NPS Program, NPS sought to find a replacement carrier to provide primary insurance coverage for the NPS Program insureds. *See* July 13-14, 2006 Rule 30(b)(6) Deposition of Virginia Surety By and Through Wayne Baliga ("Baliga Dep.") at 66-67. |
| Response 10: | Undisputed. |
| Paragraph 11: | Through two brokers, Rob Dowd and Associates and later First Capital, NPS approached AIG (Lexington) and asked if it would write a $1 million primary |

|               | |
|---------------|---|
|               | commercial general liability policy for the NPS Program. *See* Messery Dep. at 29, 34, 39. |
| Response 11:  | NUFIC admits only that two wholesale brokers, Rod Dowd and Associates and later First Capital, proposed that NUFIC write a $1 million primary, first dollar, policy, first for AIMCO only and later for the National Coalition of Property Owners ("NCOPO"). By way of further response, NUFIC states that it refused to write policies on these terms and it also denies that it ever had any direct business relationship with NPS. |
| Paragraph 12: | The brokers acted first on behalf of Apartment Investment and Management Company ("AIMCO"), the largest property manager participating in the NPS Program, and then for the NCOPO. *See* Eddows Dep. at 14, 18. |
| Response 12:  | Undisputed. |
| Paragraph 13: | In this way, NPS sought to substitute AIG for Chicago Insurance in the primary layer of program, i.e., to provide a $1 million primary insurance policy under which the NPS Program insureds would have insurance from the first dollar of any loss. *See* Messery Dep. at 34-35; Eddows Dep. at 45. |
| Response 13:  | NUFIC admits only that two wholesale brokers, Rod Dowd and Associates and later First Capital, proposed that NUFIC write a $1 million primary, first dollar, policy, first for AIMCO only and later for the National Coalition of Property Owners. By way of further response, NUFIC states that it refused to write policies on these terms and it also denies that it ever had any direct business relationship with NPS. Virginia Surety has also failed to proffer evidence that there were multiple "layers" of the "NPS Program," as it existed prior to Virginia Surety's participation. |
| Paragraph 14. | AIG refused to underwrite the entire $1 million amount because it did not want to be responsible for the claims operation necessary to handle the |

|  |  |
|---|---|
|  | large number of relatively small claims expected in such a program. <u>See</u> Messery Dep. at 37-38, 41; Eddows Dep. at 46-47. |
| Response 14: | NUFIC admits only that it refused to write primary, first dollar, policies for either AIMCO or NCOPO and that one of the reasons why it refused to issue such policies was because Lexington lacked the claims organization necessary to handle a large number of relatively small claims. Mr. Messery testified that another reason why NUFIC did not want to write primary, first dollar, policies was because it did not want to have to pay defense and indemnity payments for high-volume low severity claims. Mr. Messery testified as follows: |

> Q. And they wanted a million dollar policy?
>
> A. Yes.
>
> Q. Did they tell you that that was to replace a policy that they had previously had with another carrier?
>
> A. At that time, I'm not sure.
>
> Q. And you responded, we can't do a million dollar policy?
>
> A. Right. No, my response was we couldn't do a million dollar first dollar policy.
>
> Q. And was that something you knew right off the bat –
>
> A. Yes, because –
>
> Q. Let me finish. Was that something you knew as soon as they made the request or did you have to evaluate it and go to your management?
>
> A. No, I knew it as soon as they made the request.
>
> Q. Why is that?
>
> A. Lexington doesn't write first dollar real estate business.
>
> Q. So as a matter of policy they wouldn't do it?

> A. Yes.
>
> Q. Why is that?
>
> A. There's too much frequency and they want to be on an excess layer to be excess of the burn layer they call it. The burn layer is the frequency piece of it, so you want to choose an attachment point that is high enough you're not going to be hit on every slip and fall losses, you're there for catastrophic losses.
>
> Q. Why is that?
>
> A. You can't make money off of it.
>
> Q. So the idea was if we have first dollar coverage we're going to have to defend and handle every slip and fall claim?
>
> A. Yes. You'd never be able to collect enough premium to pay out your losses.
>
> Q. And so how did you in this case deal with that?
>
> A. So we told them that the only way we'd look at the account is if we were excess of a $250,000 SIR.

(Messery Deposition, **Exhibit B**, pp. 36-38)

Paragraph 15: Instead, AIG offered to provide a $1 million (per-occurrence) primary CGL policy subject to a $250,000 self-insured retention. *See* id.

Response 15: NUFIC disputes Paragraph 15 because the factual allegations contained therein mischaracterize the cited deposition testimony and state conclusions of law. NUFIC admits only that it agreed to issue excess general liability policies, written over a $250,000 self insured retention amount, with a limit of liability of $1 million per claim. NUFIC disputes the legal conclusion that the NUFIC policies are "primary" policies.

Paragraph 16: With this retention, AIG sought to insulate itself from large numbers of small claims while providing the policyholder substantial coverage for large or catastrophic claims. *See* id.

| | |
|---|---|
| Response 16: | Undisputed. |
| Paragraph 17: | Significantly, at the time AIG made this proposal, and indeed at the time it established its premium charge and issued its first policy, it was not aware of VSC's participation in the NPS Program. *See* Eddows Dep. at 51-53, 122-123. |
| Response 17: | NUFIC admits only that at the time it issued the initial NCOPO policy, it was not specifically aware of Virginia Surety's involvement. NUFIC was nonetheless aware that most or all of the insureds would obtain primary, first dollar insurance coverage to "buy back" the self insured retention amount. Mr. Messery testified as follows: |

> Q. In any event, they were seeking a primary policy and you ended up writing a policy that was excess of an SIR?
>
> A. Yes.
>
> Q. It was not excess of any specific insurance policy, was it?
>
> A. We knew it was going to be excess of an insurance policy. We didn't know whose policy it was going to be [excess over]. We knew it was going to be called an SIR buy-back.
>
> * * *
>
> Q. At the time that First Capital brought you the account for the very first policy that was issued were you aware of their intent to get a primary policy?
>
> A. Yes.
>
> Q. Did you know who the primary carrier would be?
>
> A. Not at that time, I don't think.
>
> Q. When I say primary carrier you're referring to a policy that would cover the retention?
>
> A. Yes.

(Messery Deposition, **Exhibit B**, pp. 44-47)

| | |
|---|---|
| Paragraph 18: | Although it suspected that policyholders might seek to insure the SIR, such insurance was not required and AIG knew nothing about the terms and conditions of any such policy, including the VSC policy that ultimately was issued. *See* id. |
| Response 18: | NUFIC objects to this factual statement because it is vague as to the time period at issue. To the extent that a response is required, NUFIC does not contest that when it issued the initial NCOPO policy: (a) it did not require NCOPO insureds to obtain insurance for the self-insured retention amount, although it thought that most or all of the insureds would purchase such primary, first dollar, coverage; and (b) it was not aware of the terms and conditions of any such primary, first dollar, policy, including the VSC policies that ultimately were issued. |
| Paragraph 19: | AIG and VSC had no communications with each other concerning their participation in the NPS Program until after both of their policies were in place. *See* Baliga Dep. at 121-122. |
| Paragraph 19: | NUFIC admits only that it and Virginia Surety did not have any communications with each other concerning the policies issued to the NCOPO members, before it and Virginia Surety each first issued a policy to members of NCOPO. |
| Paragraph 20: | AIG would have preferred to write the policy using an excess insurance form that would have made AIG's obligations excess over any other insurance that a policyholder might purchase. *See* Messery Dep. at 54-55. |
| Response 20: | NUFIC admits only that Charles Messery, a former employee of Risk Specialists (a surplus lines broker and a sister company of National Union and Lexington) testified at his deposition that his preference would have been to use a stand alone excess form for the NCOPO policies. By way of |

-11-

|   |   |
|---|---|
|   | further answer, NUFIC states that the policies that it issued to NCOPO members provided excess coverage over all primary policies, including the Virginia Surety policies, due to the operation of the self insured retention endorsements in the NUFIC policies. |
| Paragraph 21: | AIG was unable to do so, however, because NPS and the policyholders would not accept anything but a primary insurance policy form. *See* Messery Dep. at 55-57. |
| Response 21: | Disputed. NUFIC objects to Paragraph 21 because it is inadmissible hearsay. By way of further answer, NUFIC admits only that Charles Messery, a former employee of Risk Specialists, testified that First Capital told him that the insureds did not want NUFIC to use a stand alone excess form. |
| Paragraph 22: | Because the insureds refused to accept an excess policy, AIG issued a primary CGL insurance policy subject only to the SIR. *See* id. |
| Response 22: | Disputed. NUFIC admits only that the NUFIC program policies were issued on a general liability form that was made into an excess policy by the addition of a self insured retention endorsement. |
| Paragraph 23: | Thus, when Lexington began writing policies in the NPS Program on June 1, 2000 (*see* Eddows Dep. at 17-18, 152-153), all of the program policies were written on a NUFIC standard-form primary commercial general liability form (the "AIG Policies"). *See id.* at 167. |
| Response 23: | Disputed. NUFIC admits only that the NUFIC program policies were issued on a general liability form that was made into an excess policy by the addition of a self insured retention endorsement. |
| Paragraph 24: | Each of the AIG Policies included an endorsement providing it was subject to a $250,000 self-insured retention, expressly including expenses, i.e., both |

|||
|---|---|
| | indemnity and defense expenses would erode the retention. *See* Eddows Dep. at 48, 66. |
| Response 24: | Undisputed. |
| Paragraph 25: | Thereafter, AIG issued a new, but virtually identical, policy each month to account for the addition and subtraction of insured entities in the program. *See id.* at 63-64, 152-153. |
| Response 25: | NUFIC admits only that virtually identical (except for the identity of the insureds) policies were issued by it to NCOPO insureds, from the inception of the NCOPO program until its cancellation. |
| Paragraph 26: | To continue the program business, NPS had to find an insurer willing to write a $250,000 first-dollar policy insuring amounts within the AIG SIR. *See* Baliga Dep. at 76. |
| Response 26: | NUFIC disputes Paragraph 26 because the cited deposition testimony provides no support for the factual allegations therein. |
| Paragraph 27: | Thus, in September 2000, NPS approached VSC, explained the NPS Program and the situation confronted by NPS as a result of AIG's underwriting decisions, and asked Virginia Surety to insure the retained amounts in the AIG policies by writing first-dollar coverage up to a $250,000 limit. See Baliga Dep. at 67, 69. |
| Response 27: | Disputed.  NUFIC admits only that NPS asked Virginia Surety to write primary, first dollar policies to NCOPO insureds and that VSC wrote such policies, with limits of liability of $250,000 and with defense costs outside of the policy limits . |
| Paragraph 28: | Virginia Surety agreed to participate and appointed NPS as its Managing General Agent with authority to place Virginia Surety policies covering the $250,000 self-insured retention in the AIG Policies (the "VSC Policies"). *See* Baliga Dep. at 145-146. |

Response 28:	NUFIC admits only that: (1) Virginia Surety wrote primary, first dollar, policies to NCOPO insureds with limits of liability of $250,000 and with defense costs outside of the policy limits; and (2) NPS acted as Virginia Surety's managing general agent for the program involving the NCOPO insureds.

Paragraph 29:	VSC's original understanding and its agreement with NPS was that VSC's total liability for any one occurrence would be capped at $250,000, including defense costs, i.e., the same amount as the AIG SIR. *See* Baliga Dep. at 79-80.

Response 29:	NUFIC admits only that Virginia Surety claims that it wanted to write its primary, first dollar policies to NCOPO insureds with defense costs inside of the limits of liability, but Virginia Surety actually issued all of its policies with defense costs outside of the limits of liability.

Paragraph 30:	To that effect, VSC included an endorsement in its policy that placed defense costs within its limits and authorized NPS to issue VSC policies only if they that [sic.] contained that endorsement. *See* Baliga Dep. at 106-111.

Response 30:	Disputed. NUFIC does not contest that Virginia Surety drafted an endorsement that would have placed defense costs within the limit of liability, nor does NUFIC dispute that the managing general agent agreement between NPS and Virginia Surety purported to require that NPS include this endorsement as part of the policies that NPS issued on behalf of Virginia Surety. Virginia Surety, however, never actually issued any such policies to members of NCOPO. John Goring, Senior Program Manager, Virginia Surety, testified as follows:

> Q.    . . . If you look at the first page of the endorsement, under the heading, "Supplementary Payments-Coverages," after the seventh item, it reads, "These payments will reduce the limits of insurance," correct?

> A. Yes.
>
> Q. To your understanding, what is the intent of adding this endorsement to the policy?
>
>   [*Objection*]
>
> A. That would amend the general liability coverage part to include those seven things within the limits.
>
> Q. Okay. So if this form were made part of an NPS program policy, for that policy, defense costs would erode the limits of insurance; is that correct?
>
> A. That's what this form would say, yes.
>
> Q. To your knowledge, was this form used on any NPS program policies?
>
> A. It was not used.
>
> Q. It was not used by NPS, correct?
>
> A. It was not used by NPS, nor Virginia Surety in their role after NPS went away.
>
>   * * *
>
> Q. Okay. To your knowledge, was Endorsement 27 approved for use in any states?
>
> A. To my knowledge, it was not; and, therefore, it was not used.
>
> Q. I guess, to your knowledge, do you have an understanding as to why Endorsement 27 was not used?
>
> A. Because it was not approved by the states.

(Goring Deposition, **Exhibit C**, pp. 24-25, 27).

Paragraph 31:   AIG also continued to write excess and umbrella coverage over the AIG primary policy. *See* Eddows Dep. at 75-76.

Response 31:   NUFIC disputes Paragraph 31. NUFIC admits only that, unrelated to its participation in the NCOPO Program, National Union Fire Insurance Company of Pittsburgh, PA issued an umbrella policy to at least one entity that was also insured by Virginia Surety pursuant to its NPS Program.

-15-

| | |
|---|---|
| Paragraph 32: | A problem arose when VSC submitted its policy form for approval by state regulators; certain regulators would not approve a $250,000 primary CGL policy form that included defense costs within limits. *See* Baliga Dep. at 108-110. |
| Response 32: | NUFIC admits only that certain regulators advised Virginia Surety that it could not write primary, first dollar, general liability policies with defense costs inside the limits of liability and that all of the policies that were issued by Virginia Surety to NCOPO members had defense costs outside of the limits of liability. |
| Paragraph 33. | Thus, the endorsement placing defense costs within the VSC limits could not be used by NPS. Goring Dep. at 27. |
| Response 33: | NUFIC does not dispute that all of the Virginia Surety policies provide first dollar, primary coverage and state that defense costs are outside of the limits of liability. |
| Paragraph 34. | There is no evidence that AIG was aware of the regulators' decision and the change in the form used by NPS and, it is undisputed that AIG agreed to participate in the program, established its premium rating and issued its first policy without any knowledge of VSC's participation in the program or the terms and conditions of the VSC policy. *See* Eddows Dep. 51-53, 122-123. |
| Response 34: | Disputed. NUFIC admits only that, at the time that it first issued policies to NCOPO members, it was not aware of the existence of the Virginia Surety policies at all, although it was aware that most or all of the NCOPO members were going to purchase first dollar, primary coverage. Mr. Messery testified as follows: |

> Q. In any event, [the NCOPO members] were seeking a primary policy and you ended up writing a policy that was excess of an SIR?

|   |   |   |
|---|---|---|
|   | A. | Yes. |
|   | Q. | It was not excess of any specific insurance policy, was it? |
|   | A. | We knew it was going to be excess of an insurance policy. We didn't know whose policy it was going to be. We knew it was going to be called an SIR buy-back. |

\* \* \*

|   |   |   |
|---|---|---|
|   | Q. | At the time that First Capital brought you the account for the very first policy that was issued were you aware of their intent to get a primary policy? |
|   | A. | Yes. |
|   | Q. | Did you know who the primary carrier would be? |
|   | A. | Not at that time, I don't think. |

(Messery Deposition, **Exhibit B**, pp. 43-47).

Paragraph 35:   VSC issued its first policy in the NPS Program on December 31, 2000. *See* Baliga Dep. at 88.

Response 35:   Undisputed.

Paragraph 36:   As a result of a massive fraud by NPS that ultimately resulted in felony convictions and a jail sentence for NPS's principal, AIG and VSC cancelled their participation in [the] NPS Program. *See* Messery Dep. at 99-100.

Response 36:   Undisputed.

Paragraph 37:   Because of state insurance regulations, however, AIG (and VSC) had to continue insuring certain of the NPS Program participants. See Gould Dep. at 27-28.

Response 37:   Undisputed.

Paragraph 38.   Although AIG continued to issue some of these policies on the NUFIC CGL form, AIG began to issue other policies on Lexington paper, using an entirely different form called a "Stand Alone Excess Liability" form. *See* Messery

|  |  |
|---|---|
|  | Dep. at 189-190; Eddows Dep. at 166-167; August 1, 2006 Deposition of Elizabeth Viscione ("Viscione Dep.") at 39-40. |
| Response 38: | NUFIC does not dispute that it issued post program policies on Lexington paper to certain former NCOPO insureds on a "Stand Alone Excess Liability" form. NUFIC, however, denies that *all* of the post program policies it issued to former NCOPO insureds were issued on "Stand Alone Excess Liability" forms. |
| Paragraph 39. | Prior to canceling the NPS Program, however, all of the AIG Policies were written on the same primary NUFIC commercial general liability form. *See* Viscione Dep. at 23-24; Messery Dep. at 55; Eddows Dep. at 167. |
| Response 39: | Disputed. NUFIC admits only that all of the program policies were issued on a general liability form, that was made excess due to the addition of a self insured retention endorsement. |
| Paragraph 40: | There have been many claims filed against the NPS Program Participants and moreover, new claims will likely continue to be filed until all applicable statutes of limitation have run. *See* Baliga Dep. at 111-112; July 14, 2006 Deposition of Patrick Jops ("Jops Dep.") at 42-43). |
| Response 40: | NUFIC objects to Paragraph 40 to the extent that what may, or may not, occur in the future is speculative. To the extent a response is required, NUFIC does not contest that there have been a large number of claims made to date against NCOPO members and it is possible that additional claims may be made against NCOPO insureds in the future. |
| Paragraph 41. | Notwithstanding AIG's refusal to comply with its NPS Program obligations under its policies, VSC has fully complied with its defense and indemnity obligations to NPS Program policyholders. *See id.* |
| Response 41: | No response is required to Paragraph 41 because it states conclusions of law. To the extent that a response is required, NUFIC asserts that it has |

|  |  |
|---|---|
|  | fully complied with its obligations under its policies, and that VSC is seeking herein to improperly limit its defense and indemnity obligations to its policyholders, contrary to the explicit terms of Virginia Surety's policies and the applicable law. NUFIC incorporates herein its Statement of Undisputed facts and all Exhibits thereto. |
| Paragraph 42: | To date, VSC has incurred defense and indemnity payments in excess of $185 million for claims submitted in conjunction with the NPS insurance program, including sums that should have been paid by AIG. *See id.* |
| Response 43: | NUFIC does not contest that VSC has made defense and indemnity payments in excess of $185 million for claims made against NCOPO insureds. No response is required to the remaining averment in Paragraph 41 (specifically, that the amount includes, "sums that should have been paid by AIG") because it states conclusions of law. To the extent that a response is required, NUFIC asserts that it has fully complied with its obligations under its policies, and that VSC is seeking herein to improperly limit its defense and indemnity obligations to NCOPO Program policyholders, contrary to the explicit terms of Virginia Surety's policies and the applicable law. NUFIC denies that Virginia Surety has any right to contribution against NUFIC. NUFIC incorporates herein its Statement of Undisputed facts and all Exhibits thereto. |
| Paragraph 43: | It is AIG's erroneous "true excess" position that has resulted in the dispute now before the Court. *See* Jops Dep. at 39-43. |
| Response 43: | No response is required to Paragraph 43 because it states conclusions of law. To the extent that a response is required, NUFIC asserts that it has fully complied with its obligations under its policies; denies that its position is erroneous; and states that it has no obligation to reimburse Virginia Surety |

for any portion of whatever amounts of defense and indemnity costs Virginia Surety has paid in connection with the policies that are at issue. Moreover, NUFIC states that VSC is seeking herein to improperly limit its defense and indemnity obligations to its policyholders. NUFIC incorporates herein its Statement of Undisputed facts and all Exhibits thereto.

**Dated:** October 30, 2006

Respectfully submitted,

*Lexington Insurance Company and*
*National Union Fire Insurance Company of Pittsburgh, PA*
by their attorneys,

/s/ *Robert J. Maselek*

| | |
|---|---|
| Mark E. Cohen | [BBO #089800] |
| Robert J. Maselek | [BBO #564690] |
| Gerald S. Frim | [BBO #656204] |

THE MCCORMACK FIRM, LLC
One International Place
Boston, MA   02110
**Ph:**   617•951•2929
**Fax:**   617•951•2672
**E-mail:**   mcohen@mccormackfirm.com

## CERTIFICATE OF SERVICE

I, Gerald S. Frim, hereby certify that I have served this document and all exhibits thereto by hand upon counsel of record and that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 30, 2006.

**Dated:** October 30, 2006                         _/s/ Gerald S. Frim_

89715.1