# EXHIBIT B

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      DISTRICT OF MASSACHUSETTS
 3    ---------------------------------x
      LEXINGTON INSURANCE COMPANY and
 4    NATIONAL UNION FIRE INSURANCE COMPANY
      OF PITTSBURGH, PA,
 5
                          Plaintiffs,
 6
            -against-          04-11109 (RGS)
 7
      VIRGINIA SURETY COMPANY,
 8
                          Defendant.
 9    ---------------------------------x
10
                    July 31, 2006
11
                    10:10 a.m.
12
13
14        Deposition of CHARLES J. MESSERY,
15    pursuant to notice, at the offices of
16    Mintz, Levin, Cohn, Ferris Glovsky and
17    Popeo, PC, 666 Third Avenue, New York,
18    New York, before Gail F. Schorr, a
19    Certified Shorthand Reporter, Certified
20    Realtime Reporter and Notary Public
21    within and for the State of New York.
22
23
24
25
```

```
                                                              Page 36
 1              CHARLES J. MESSERY
 2    a million dollar policy for?
 3         A.    Yes.
 4         Q.    And what type of company was
 5    the single insured?
 6         A.    A real estate portfolio.  It
 7    was a real estate owner.
 8         Q.    So a company that owned a
 9    lot of real estate?
10         A.    Yes, real estate
11    owner/manager.
12         Q.    These were residential
13    properties?
14         A.    Yes, mainly.
15         Q.    And they wanted a million
16    dollar policy?
17         A.    Yes.
18         Q.    Did they tell you that that
19    was to replace a policy that they had
20    previously had with another carrier?
21         A.    At that time, I'm not sure.
22         Q.    And you responded, we can't
23    do a million dollar policy?
24         A.    Right.  No, my response was
25    we couldn't do a million dollar first
```

Page 37

```
 1                CHARLES J. MESSERY
 2      dollar policy.
 3           Q.    And was that something you
 4      knew right off the bat --
 5           A.    Yes, because --
 6           Q.    Let me finish.  Was that
 7      something you knew as soon as they made
 8      the request or did you have to evaluate
 9      it and go to your management?
10           A.    No, I knew it as soon as
11      they made the request.
12           Q.    Why is that?
13           A.    Lexington doesn't write
14      first dollar real estate business.
15           Q.    So as a matter of policy
16      they wouldn't do it?
17           A.    Yes.
18           Q.    Why is that?
19           A.    There's too much frequency
20      and they want to be on an excess layer
21      to be excess of the burn layer they
22      call it.  The burn layer is the
23      frequency piece of it, so you want to
24      choose an attachment point that is high
25      enough you're not going to be hit on
```

```
 1              CHARLES J. MESSERY
 2    every slip and fall losses, you're
 3    there for catastrophic losses.
 4         Q.    Why is that?
 5         A.    You can't make money off of
 6    it.
 7         Q.    So the idea was if we have
 8    first dollar coverage we're going to
 9    have to defend and handle every slip
10    and fall claim?
11         A.    Yes.  You'd never be able to
12    collect enough premium to pay out your
13    losses.
14         Q.    And so how did you in this
15    case deal with that?
16         A.    So we told them that the
17    only way we'd look at the account is if
18    we were excess of a $250,000 SIR.
19         Q.    What is an SIR?
20         A.    Self insured retention.
21         Q.    And what does that mean?
22         A.    It means that the insured's
23    responsible for the first $250,000 and
24    then the insurance carrier sits excess
25    of the SIR.
```

Charles J. Messery                                                    07/31/2006

Page 44

```
 1              CHARLES J. MESSERY
 2     sitting over the stand alone you'd be
 3     expected to identify the primary?
 4          A.    Yes, definitely.
 5          Q.    So if you had a -- in this
 6     case did you have umbrella coverage
 7     above the Lexington piece?
 8          A.    I don't know.
 9          Q.    Based on your understanding
10     of the way the industry works, would
11     you expect --
12          A.    Yes.
13          Q.    -- the umbrella carrier to
14     identify all the underlying insurance
15     policies?
16          A.    Oh, yes, sure.
17          Q.    In any event, they were
18     seeking a primary policy and you ended
19     up writing a policy that was excess of
20     an SIR?
21          A.    Yes.
22          Q.    It was not excess of any
23     specific insurance policy, was it?
24          A.    We knew it was going to be
25     excess of an insurance policy.  We
```

```
 1            CHARLES J. MESSERY
 2    didn't know whose policy it was going
 3    to be.  We knew it was going to be
 4    called an SIR buy-back.
 5            Q.    But at the time you issued
 6    the -- in terms of the form that you
 7    used, that form did not identify a
 8    specific primary insurance policy?
 9            A.    Right.
10            Q.    Instead, you used an
11    endorsement, an SIR endorsement?
12            A.    We did use one, yes.
13            Q.    Let's go back to
14    chronologically.  You've told them
15    we're not going to write this primary
16    policy with first dollar coverage.
17    First Capital comes to you, what did
18    they seek?
19            A.    At that time they knew we
20    wouldn't do a primary policy, and then
21    we really -- we weren't going to quote
22    it because if you're in the industry
23    you know that a real estate portfolio
24    is not going to take a big SIR by
25    itself because there's all these
```

Page 46

1        CHARLES J. MESSERY
2    different entities that pay premium,
3    and you can't possibly allocate SIRs.
4    They want an ultimate cost program.
5            So if they weren't going to
6    accept the 250 SIR, which we didn't
7    think that was likely, we're not going
8    to do first dollar, we wouldn't be able
9    to quote the account. And that's when
10   they said don't worry about it, we're
11   going to get another carrier to write
12   that first 250 and then you would be
13   excess of that. So at that point we
14   knew it was an option, it was viable to
15   do.
16       Q.    At the time that First
17   Capital brought you the account for the
18   very first policy that was issued were
19   you aware of their intent to get a
20   primary policy?
21       A.    Yes.
22       Q.    Did you know who the primary
23   carrier would be?
24       A.    Not at that time, I don't
25   think.

Charles J. Messery                                          07/31/2006

Page 47

```
 1              CHARLES J. MESSERY
 2        Q.    When I say primary carrier
 3   you're referring to a policy that would
 4   cover the retention?
 5        A.    Yes.
 6        Q.    Did you know what the terms
 7   of that policy would be?
 8        A.    No.
 9        Q.    Did you have any idea who
10   the carrier was?
11        A.    Tell you the truth, I'm not
12   sure what I knew.
13        Q.    Do you believe at the time
14   the first policy was issued on this
15   program that you knew who the carrier
16   within the retention layer was?
17        A.    I really don't know.
18        Q.    Are you familiar with
19   programs generally where a retention is
20   insured?
21        A.    Say that again.
22        Q.    Well you referred earlier to
23   something called a buyback?
24        A.    Yes.
25        Q.    What's a buyback?
```