# EXHIBIT C

                                                            Page 1

1              UNITED STATES DISTRICT COURT

2                         FOR THE

3              DISTRICT OF MASSACHUSETTS

4  LEXINGTON INSURANCE COMPANY    )

5  AND NATIONAL UNION FIRE        )

6  INSURANCE COMPANY OF           ) No. 04-11109 RGS

7  PITTSBURGH,                    )

8            Plaintiffs,          )

9       vs.                       )

10 VIRGINIA SURETY COMPANY,       )

11 INC.,                          )

12           Defendant.           )

13          The deposition of JOHN GORING, called for

14 examination, taken pursuant to the Federal Rules of

15 Civil Procedure of the United States District Courts

16 pertaining to the taking of depositions, taken

17 before JENNIFER L. BERNIER, CSR No. 84-4190, a

18 Notary Public within and for the County of Cook,

19 State of Illinois, and a Certified Shorthand

20 Reporter of said state, at Suite 800, 200 East

21 Randolph Street, Chicago, Illinois, on the 14th day

22 of July, A.D. 2006, at 10:58 a.m.

23

24 Job No. 191493B

1    A.    We can.

2    MR. STEPHAN: I'm sorry. I don't mean to
3 interrupt.

4         Can we agree to Endorsement 27 so that
5 we're consistent with the term that we used in
6 Mr. Baliga's deposition?

7 BY MR. MASELEK:

8    Q.    Would you agree with that, sir?

9    A.    That's fine.

10   Q.    You said that you were familiar with that
11 form?

12   A.    I am.

13   Q.    Give me one moment.

14        If you look at the first page of the
15 endorsement, under the heading, "Supplementary
16 Payments-Coverages," after the seventh item, it
17 reads, "These payments will reduce the limits of
18 insurance," correct?

19   A.    Yes.

20   Q.    To your understanding, what is the intent
21 of adding this endorsement to the policy?

22   MR. STEPHAN: Objection.

23 BY THE WITNESS:

24   A.    That would amend the general liability

Page 25

1  coverage part to include those seven things within
2  the limits.
3  BY MR. MASELEK:
4      Q.    Okay. So if this form were made part of
5  an NPS program policy, for that policy, defense
6  costs would erode the limits of insurance; is that
7  correct?
8      A.    That's what this form would say, yes.
9      Q.    To your knowledge, was this form used on
10 any NPS program policies?
11     A.    It was not used.
12     Q.    It was not used by NPS, correct?
13     A.    It was not used by NPS, nor Virginia
14 Surety in their role after NPS went away.
15     Q.    Okay. So to your knowledge, all of the
16 NPS program policies -- whether issued by NPS or
17 Virginia Surety, itself -- excluded defense costs
18 from the limit of liability?
19     MR. STEPHAN: Objection. You're referring to
20 the policies written on Virginia Surety paper?
21     MR. MASELEK: Both. Yes, I'm sorry. Yes.
22 BY THE WITNESS:
23     A.    Well, you asked it in sort of a
24 roundabout way.

Page 26

```
 1              I would answer you by saying this form
 2  was not part of any of the NPS policies, either
 3  issued in New Jersey or in Fort Wayne.
 4  BY MR. MASELEK:
 5       Q.    And are you aware of any other forms that
 6  may have been endorsed to any NPS program policies
 7  issued, on behalf of Virginia Surety, that would
 8  have made defense costs be included within the limit
 9  of liability?
10       A.    There were none to my knowledge.
11       Q.    Okay.  To your knowledge, did the
12  Virginia Surety policies provide first-dollar
13  defense coverage?
14       A.    First-dollar defense coverage?
15       Q.    Do you know what I mean by that?
16       A.    Why don't you explain that?
17       Q.    To your knowledge, were there any
18  deductibles or self-insured retentions issued to any
19  insureds by NPS under the program?
20       A.    You're sort of asking a different
21  question now.
22       Q.    Yes.  Actually, I did.
23       A.    With respect to the Virginia Surety
24  policies, there were no deductibles or self-insured
```

Page 27

1 retentions.

2          Now, obviously, I am aware that there
3 were AIG policies written that had that, but not
4 Virginia Surety policies.

5    Q.   Right.  And unless I indicate otherwise
6 today, if I refer to "the program policies," I'm
7 only referring to the ones issued on behalf of
8 Virginia Surety.

9    A.   Okay.

10   Q.   Do you know if NPS issued any policies on
11 behalf of National Union?

12   A.   I don't know if NPS issued them or they
13 were issued by National Union.  I know that there
14 were such things.  Who actually issued them, I'm not
15 aware of.

16   Q.   Okay.  To your knowledge, was
17 Endorsement 27 approved for use in any states?

18   A.   To my knowledge, it was not; and,
19 therefore, it was not used.

20   Q.   I guess, to your knowledge, do you have
21 an understanding as to why Endorsement 27 was not
22 used?

23   A.   Because it was not approved by the
24 states.

```
 1        MR. STEPHAN:  Objection.
 2  BY THE WITNESS:
 3        A.    We did not.
 4  BY MR. MASELEK:
 5        Q.    Have you ever spoken with Mr. Gruppuso?
 6        A.    Yes.
 7        Q.    And when was that?
 8        A.    That was prior to my employment with
 9  Virginia Surety.  Because ever since I had been
10  employed by Virginia Surety, NPS has failed to
11  exist.
12        Q.    Okay.  Did you have business dealings
13  with Mr. Gruppuso in your prior employment?
14        A.    Yes.
15        Q.    Okay.  And when was that?
16        A.    Well, of course, I can't remember the
17  exact day.  But that would have been between --
18  let's see -- in 2000 or 2001, sometime, I guess.
19        Q.    Okay.  And what was the nature of your
20  contact with Mr. Gruppuso?
21        A.    I was employed, as I mentioned to you
22  before, by Interstate Insurance Group, who -- which,
23  I guess, was the carrier for the NPS program prior
24  to Virginia Surety.
```

1   Q.   Is Interstate related to Chicago
2 Insurance at all?

3   A.   Chicago Insurance Company is one of the
4 underwriting companies in the Interstate Insurance
5 Company Group. So, yes, it is.

6   Q.   Are you familiar with an entity called
7 Coverage Services Group?

8   A.   No.

9   Q.   Were you involved in the NPS program
10 while employed by Interstate?

11   A.   Yes.

12   MR. STEPHAN:  Objection.

13 BY THE WITNESS:

14   A.   I'm sorry.

15   MR. STEPHAN:  We've been using the NPS program
16 to refer to the program that existed in which
17 Virginia Surety and the AIG companies were involved
18 in. So we should, perhaps, clarify.

19 BY MR. MASELEK:

20   Q.   What was your understanding of the NPS
21 program as it existed when Interstate was involved?

22   A.   What was my understanding of the program?

23   Q.   Right.

24   A.   I'm not sure what you're getting at.

```
 1    Q.    Well, what was Interstate's role?
 2    A.    Interstate was the insuring company for
 3 National Program Services at that time.
 4    Q.    Do you know if AIMCO was part of the
 5 program at that time?
 6    A.    It was.
 7    Q.    Okay.  What was the limit of liability of
 8 the Interstate policies?
 9    A.    1 million.
10    Q.    Okay.  So it was different from the
11 situation that Virginia Surety was involved in; is
12 that correct?
13    A.    Right.
14    Q.    And was there any deductible or
15 self-insured retention to the policies?
16    A.    No.
17    Q.    Do you have an understanding as to why
18 NPS stopped doing business with Interstate?
19    A.    Interstate terminated the program.
20    Q.    Okay.  And why did Interstate terminate
21 the program?
22    A.    They were not satisfied with the way it
23 was being handled or something.  I really -- even
24 though I handled that, that decision was made by
```