UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

LEXINGTON INSURANCE COMPANY AND NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA
                        Plaintiffs

v.

VIRGINIA SURETY COMPANY, INC.,
                        Defendant.

CIVIL ACTION NO.
04-11109 RGS

REPLY MEMORANDUM OF PLAINTIFFS, LEXINGTON INSURANCE COMPANY AND
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE
CROSS-MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, VIRGINIA SURETY
COMPANY

Plaintiffs, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and

Lexington Insurance Company ("Lexington") (collectively "NUFIC"), hereby submit this reply

memorandum in further support of their Motion for Summary Judgment and in Opposition to the

Cross Motion for Summary Judgment of Virginia Surety Company ("Virginia Surety").

I.     VIRGINIA SURETY NOW CLAIMS THAT THE NUFIC POLICIES ARE A HYBRID TYPE
       OF POLICY, PREVIOUSLY UNKNOWN IN THE LAW OR THE INSURANCE INDUSTRY:
       A PART EXCESS AND PART PRIMARY POLICY; THIS ARGUMENT IS ENTIRELY
       WITHOUT MERIT

       A.     Virginia Surety Has Taken Several Different and Inconsistent Positions During
              the Course of this Matter; None of Which Are Correct

       Undoubtably because of the overwhelming amount of authority that is contrary to its

positions, during the course of this matter, Virginia Surety has changed its position several times.

For more than three years after the inception of the NCOPO program that is at issue in this case,

and until long after the program already had been cancelled, Virginia Surety did not dispute that its policies have to be completely exhausted before NUFIC has to pay any defense or indemnity costs. During this period, Virginia Surety paid all defense costs until $250,000 in indemnity costs had been paid by it for each claim, without seeking any contribution from NUFIC (Viscione Affidavit, ¶ 4). In other words, for more than three years after inception of the program, Virginia Surety recognized that the position that has been taken by NUFIC in this litigation – that the upper level NUFIC policies are not triggered until the lower lever, dollar one, Virginia Surety policies are exhausted – is correct.

Virginia Surety now asserts, however, that when "certain regulators" advised it that it could not write its primary, first dollar, policies with defense costs inside the limits of liability, it nevertheless "agreed to participate [in the NCOPO program] expecting that the AIG policies would attach in any case involving more than $250,000 in defense and indemnity payments." Virginia Surety's opening Summary Judgment Memorandum (hereinafter "Virginia Surety's Summary Judgment Memorandum") at p. 24. Although what Virginia Surety wanted or expected is not of any relevance to the determination of the priority of coverage between NUFIC and Virginia Surety, Virginia Surety has not made any effort to explain why, if it always expected that NUFIC would pay all costs once defense and indemnity costs for a single claim exceeded $250,000, it proceeded to regularly pay all costs in excess of $250,000 per claim, for more than three years after the inception of the Virginia Surety program in December 2000, without seeking any contribution from NUFIC.

Because it was faced with huge losses in connection with the NCOPO program,[1] on March 12, 2004, Virginia Surety asserted, for the first time, that not only does NUFIC have to pay defense and indemnity costs before the Virginia Surety policy limits are exhausted, but, despite the self

---

[1] Indeed, Virginia Surety notes in its Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (hereinafter "Virginia Surety's Opposition") at pp.18-19, that, through June 2006, it had paid over $187 million in claim expenses in connection with the NCOPO program. Virginia Surety also was victimized by a fraudulent scheme by its managing general agent, NPS (Vito Gruppuso), who stole millions of dollars in premiums from Virginia Surety. See also Virginia Surety's Summary Judgment Memorandum 10-11.

insured retention endorsement in the NUFIC policies, NUFIC must share in the payment of all defense and indemnity costs from dollar one. See Deposition of Wayne Baliga of Virginia Surety, **Exhibit A**, pp. 38-39 and Exhibit 6 thereto (R. Conner Heist letter dated March 12, 2004, attached hereto as **Exhibit B**). Virginia Surety subsequently backed off of that position. Virginia Surety now admits that NUFIC does not have to pay any defense or indemnity costs until NUFIC's self insured retention amount is exhausted. See Virginia Surety's Opposition Memorandum at p. 4.

After Virginia Surety realized that its position, that the NUFIC self insured retention endorsement should be ignored, was untenable, it then asserted that, even though the NUFIC and Virginia Surety policies are written on completely different levels, and NUFIC did not assume an immediate duty to defend, investigate or settle claims, the Virginia Surety policies and the NUFIC policies are somehow, "co-primary." Virginia Surety maintained that, based on the other insurance clauses in the respective policies, NUFIC should pay 80% of all defense and indemnity costs, once $250,000 in defense and/or indemnity costs are incurred for any one claim ("the 80% argument"). Baliga Deposition, **Exhibit A**, p. 33. The 80% argument was based upon Virginia Surety's claim that there should be pro rata by policy limits contribution between it and NUFIC, once $250,000 in defense and indemnity costs are incurred in connection with any one claim (the NUFIC policy limits – $1 million per claim – are four times the Virginia Surety $250,000 limits of liability).

In making the 80% argument, Virginia Surety ignored that: (1) the language of the policies' other insurance clauses are not relevant, when two policies are written on entirely different levels; and (2) even if the other insurance clauses in the the NUFIC and Virginia Surety policies were somehow relevant to the present situation, the other insurance provisions in both policies explicitly

provide that, when there is other insurance that allows contribution by equal shares, the policies should contribute on an equal shares basis, not on a pro rata basis.[2]

In its answers to interrogatories and its original Summary Judgment Memorandum, however, Virginia Surety dropped the 80% argument and instead maintained that the court should entirely ignore the terms of its own policies (which explicitly state that defense costs are outside of the limits of liability). Apparently based upon some sort of equitable argument, Virginia Surety asserted at that time that NUFIC should pay 100% of all defense and indemnity costs, and that it should pay nothing, after $250,000 in defense and indemnity costs has been paid in connection with any one claim (the 100% argument).[3] See Virginia Surety's Summary Judgment Memorandum at pp.23-25; NUFIC's Statement of Undisputed Facts, ¶ 18.

Virginia Surety now seems to have jettisoned the 100% argument. It is apparently currently simply maintaining that it and NUFIC are "co-primary" and must contribute equally once $250,000 in defense and indemnity costs have been incurred in connection with any one claim ("the 50% argument"). Virginia Surety's Opposition at pp. 4, 17. Virginia Surety also now apparently admits that the NUFIC "post program" policies, most of which were written on stand alone excess forms, are "true excess" policies which cannot be triggered until the Virginia Surety policies are exhausted. See Virginia Surety's Summary Judgment Memorandum at pp. 22-23 ("These 'Post-Program Policies' are by their terms excess insurance policies.").

As with its other arguments, there is not any authority which would support Virginia Surety's current 50% argument. Notably, Virginia Surety has failed to cite a single case that has ever held

---

[2] As explained in detail in NUFIC's previous summary judgment memoranda, because the NUFIC and Virginia Surety policies are written on entirely different levels, the other insurance clauses in the policies are not relevant to the determination of the priority of coverage. Instead, the Virginia Surety first dollar, lower level policies must be completely exhausted before the NUFIC upper level policies come into play.

[3] As a fall back position, Virginia Surety argued in its Summary Judgment Memorandum that if the court did not agree with its 100% position, it should hold NUFIC responsible for 50% of all defense and indemnity costs in excess of $250,000 per claim. Summary Judgment Memorandum at p. 29.

that a policy that is written over a self insured retention and does not provide for a first dollar duty to defend, investigate and indemnify the insured, should be considered a primary policy, once the SIR is exhausted and, therefore, such a policy must be deemed to become at that time, "co-primary" with a first dollar, true primary policy.[4]

By contrast, NUFIC has consistently maintained from the beginning of this dispute that, because its policies were written on a higher level of coverage than the Virginia Surety dollar one, primary policies, the Virginia Surety policies must be completely exhausted before the NUFIC policies are triggered. NUFIC has cited numerous cases and commentary from all of the leading insurance treatises that support its positions that: (1) a policy written on a higher level of coverage is not triggered until all lower layer, dollar one, primary policies are completely exhausted,

_____

[4] Virginia Surety has also taken inconsistent positions concerning what are the differences between a deductible amount and a self insured retention. In an attempt to blur the differences between policies written above a self insured retention and first layer, dollar one policies, that sometimes are written with a deductible amount, in its Summary Judgment Memorandum, Virginia Surety asserted that a self insured retention is "essentially a large deductible amount." Virginia Surety's Summary Judgment Memorandum at p. 2. Virginia Surety also maintained "there is no functional distinction between a primary policy with a deductible and a policy excess of a self insured retention." Id. at p. 19. In its Opposition Memorandum, however, Virginia Surety said that it "does not contend that there is no difference between the operation of a deductible and an SIR." Virginia Surety's Opposition at p. 13. As pointed out in detail by NUFIC in its Summary Judgment Opposition at pp. 16-19, there are numerous functional differences between a deductible amount and a self insured retention. The fact that the NUFIC policies do not provide first dollar coverage (as policies written in excess of a deductible amount typically do), but instead are written over a self insured retention, demonstrates that the NUFIC policies are not on the same level the Virginia Surety policies.

Likewise, Virginia Surety has also changed its tune with regard to whether the NUFIC and Virginia Surety policies are ambiguous. In its opening Summary Judgment Memorandum at p. 3, Virginia Surety relied upon what it referred to as "the plain and unambiguous language of the AIG policies." But in its Opposition Memorandum, in order to support its claim that, under New York law, extrinsic evidence as to the intent of the insurers is somehow relevant, Virginia Surety asserted that there is a "latent ambiguity" in the policies. Virginia Surety Opposition Memorandum at p. 16. Virginia Surety has not cited any case law or commentary to support its theories that there is a "latent ambiguity" in the policies that are at issue in this case. In fact, there clearly is no latent ambiguity in the policies that are involved in this case. See, Leather Form S.R.L. v. Knoll, Inc., 2006 U.S. App. LEXIS 27363 *6 n. 1 (2d Cir. Nov. 2, 2006) ("Under well-established New York law, where a contract is unambiguous on its face, extrinsic evidence is not admissible to challenge its meaning. A 'latent ambiguity' is where you show the words apply equally to two different meanings or subject-matters, and then evidence is admissible to show which of them was the thing or subject-matter intended.") (internal citations omitted).

Additionally, while Virginia Surety urges the court to conclude that its subjective, unexpressed, underwriting intent is relevant to the determination of the priority of coverage, in its response to NUFIC's Statement of Facts, Virginia Surety repeatedly says, the policies "speak for" themselves. Virginia Surety's Response to Plaintiff's Statement of Undisputed Material Facts, Response Nos. 5,7,9-10, 14-15. This is precisely NUFIC's point: the policies speak for themselves and therefore it is not necessary or appropriate for the court to consider what policies the parties may have wanted to write, but did not write.

regardless of the wording of the other insurance clauses in the respective policies;[5] and (2) when a policy is written over a self insured retention and the policy provides that the insurer does not have an initial duty to defend, investigate or indemnify its insureds, the policy is a "true excess" policy that does not come into play until all primary coverage is completely exhausted.

**B.    Virginia Surety Has Conceded That: (1) Its Policies Are Primary, Dollar One, Policies That Were Designed to Immediately Apply to All Covered Claims Brought Against Virginia Surety's Insureds; and (2) the NUFIC Policies Are Upper Level Policies That Were Only Designed to Cover Catastrophic Losses**

The undisputed facts demonstrate that the NUFIC policies were written on an entirely different level that the NUFIC policies.  Indeed, all of the relevant facts have been explicitly conceded by Virginia Surety.

Specifically, Virginia Surety has acknowledged in its summary judgment memoranda that: (1) the first layer of coverage above a self insured retention is sometimes described as "excess insurance," and "an excess policy may be written above a SIR" (Virginia Surety Opposition Memorandum at pp. 3, 6); (2) "the AIG policies may loosely be described as 'excess' over a self insured retention" (Virginia Surety Opposition Memorandum at p. 10); (3) it "does not contend that AIG is 'co-primary' with respect to any amounts within the SIR; VSC does not dispute that AIG's policy is 'excess' of the SIR amount" (Virginia Surety Opposition Memorandum at p. 13); (4) NUFIC refused to write first dollar coverage for the insureds, but Virginia Surety agreed to do so (Virginia Surety's Summary Judgment Memorandum at pp. 7, 9-10); (5) the Virginia Surety policies provide for a first dollar duty to defend, investigate and pay claims, but the NUFIC policies do not provide any such first dollar coverage (Virginia Surety's Summary Judgment Memorandum at pp. 7-10); (6) the NUFIC policies were designed to cover only large, "catastrophic" losses, while the Virginia Surety policies were designed to cover all claims against the insureds that come within the terms

---

[5] Not only does Virginia Surety not now dispute that excess policies are not triggered until all primary coverage is exhausted, but it agrees that this position is "self evident." Virginia Surety Opposition Memorandum at p. 3.

of the policies (Virginia Surety's Summary Judgment Memorandum at pp. 7-10); and (7) a true

excess policy is excess over all first dollar, primary coverage (Virginia Surety Opposition

Memorandum at p. 3).

Based upon these undisputed facts, only one conclusion can be reached: the Virginia Surety

policies are dollar one, primary policies and the NUFIC policies are not dollar one, primary policies,

but instead are higher level, "true excess" policies. Therefore, the Virginia Surety coverage has to

be exhausted before NUFIC must pay any defense or indemnity costs.

> **C.    There Is No Such Thing as a Policy That Is Partially Excess and Partially Primary, Depending on the Amount of Defense and Indemnity Costs That Are Incurred. A Policy Is Either a "True" Excess Policy or a True Primary Policy. Whether a Policy Is a True Excess Policy or a True Primary Policy Depends on Whether It Provides Coverage from Dollar One and Includes an Initial Duty to Defend, Investigate and Indemnify.**

Notwithstanding the clear authority supporting NUFIC's position, and Virginia Surety's

admission that the NUFIC policies are excess for amounts within the self insured retention, Virginia

Surety still maintains that once $250,000 in defense and indemnity costs are paid in connection with

one claim, the NUFIC policies change from excess policies into primary policies and become "co-

primary" with the Virginia Surety policies. Virginia Surety has not cited one shred of authority to

support its novel position that a policy can be both a primary policy and an excess policy,

depending upon the amount of defense and indemnity payments that have been made by or on

behalf of the insured.

Contrary to Virginia Surety's position, a liability insurance policy is either a "true" excess

policy or else it is a "true" primary policy.[6] It cannot be both a primary policy and an excess policy

for purposes of the same claim. As explained in detail in NUFIC's Memorandum in Opposition to

the Cross-Motion for Summary Judgment of Virginia Surety, at p. 10, the nomenclature, "true"

---

[6] "Umbrella" policies are one type of excess policies that typically expressly provide that they "drop down" and become primary if the claim is not covered by an underlying policy and is covered by the terms of the umbrella policy. See 26 Appleman on Insurance § 163.3 (2d ed. 2006). Virginia Surety is not contending that the NUFIC policies are this type of policy and the NUFIC policies do not include any such drop down provision.

excess, is merely meant to differentiate a policy that is always intended to provide excess rather than first dollar coverage (such as the NUFIC policies involved in the present case) from a coincidental excess policy, which is true primary policy, that is intended to usually provide first dollar coverage, but which may become excess in certain situations, due to the presence of other, first dollar, primary, insurance and the comparison of the other insurance clauses in the applicable policies.

Unable to cite any cases that have ever held that a policy that is written above a self insured retention amount and does not provide first dollar coverage is a primary policy and must contribute with a first dollar primary policy, Virginia Surety grasps at inconsequential distinctions between the NUFIC policies and the policies that were involved in the cases cited by NUFIC, that held that policies written over self insured retentions are true excess policies.

First, Virginia Surety claims that is important that the NUFIC policies are not labeled "excess." Apparently, Virginia Surety would agree that if the NUFIC policies had merely been labeled "excess" they would not be triggered until the Virginia Surety policies are exhausted. But as explained in detail in NUFIC's Memorandum in Opposition to the Cross-Motion for Summary Judgment of Virginia Surety, at pp. 9-11, it is the policy's function, not its label, that is determinative of whether the policy provides true excess or true primary coverage. Just like labeling a truly primary policy, "excess," would not make it a true excess policy, failing to label a true excess policy, "excess," does not somehow make it into a true primary policy.

The principle that, it is the function of the policy that determines whether it is a "true excess" second layer policy and not its label, has a direct correlation with the rationale for the rule that a upper layer policy is excess over all lower layer insurance. The point of the rule is that the upper layer insurer assumes less risk for less of a premium, while a primary, first dollar, carrier assumes more risk (including a duty to defend, investigate and pay all covered claims from dollar one). Therefore, it is only fair to require that the lower layer policy be completely exhausted before the

upper layer insurer's policy is triggered, when there is overlapping coverage between policies written on different layers. Consequently, it is the nature of the policies and not their labels that are determinative of whether this policy goal is fulfilled or not.

Second, Virginia Surety deems it significant that the NUFIC policies do not specifically refer to the Virginia Surety policies, nor do the NUFIC policies expressly say that they are excess over any other particular primary policy. But, as Virginia Surety admits, Virginia Surety's Summary Judgment Memorandum at p. 7, when the NUFIC policies were first written, NUFIC did not know about the existence of the Virginia Surety policies, nor was NUFIC aware of any other primary policies that had been purchased by the insureds.[7] Instead, as Virginia Surety acknowledges, NUFIC's insureds had two options: either self insure or else obtain primary insurance. Virginia Surety's Summary Judgment Memorandum at pp. 7-10. And although the NUFIC policies would have attached in excess of $250,000 in defense and indemnity costs if the insureds involved in this case, like some of the other insureds involved in the NCOPO program, had chosen to remain self insured,[8] the point here is that the policyholders involved in this case chose to purchase primary, first dollar, insurance from Virginia Surety, that provided them with more coverage than was required by the terms of the NUFIC policies. Because Virginia Surety chose to provide such insurance, it cannot now ask the court to rewrite its policies, in violation of the regulatory requirements that it chose to comply with and the well established rule that all primary, first dollar, coverage must be exhausted before an upper layer policy comes into play.

The policies that were found to be "true" excess policies, in the cases that Virginia Surety tries to distinguish, had many more similarities to the NUFIC policies at issue here than they had differences. For example, in <u>National Union Fire Ins. Co. v. Lawyers' Mut. Ins. Co.</u>, 885 F. Supp.

---

[7] On the other hand, as Virginia Surety acknowledges, when it wrote its policies, "it was cognizant of" NUFIC's policies. (Virginia Surety's Summary Judgment Memorandum at p. 7).

[8] Virginia Surety admits that not all of the NUFIC NCOPO insureds chose to purchase primary coverage from Virginia Surety. Virginia Surety's Opposition at p.18.

202 (S.D. Cal. 1995), the policy involved in that case, like the NUFIC policies at issue here: (1) was written on what originally was a primary form; (2) had an endorsement added to the form making the policy excess over a self insured retention amount; (3) did not include an "excess other insurance clause"; and (4) was not labeled as an "excess" policy. The court said that the language of the other insurance clause did not prevent the policy from being a true excess policy. It noted that the other insurance clause would apply only if there was other excess insurance on the same level that also covered the loss. Id. at 207. The court found that the policy was a true excess policy and was excess over a dollar one, primary policy.

Likewise, in Travelers Indem. Co. v. American Cas. Co., 786 N.E.2d 582 (Ill. App. Ct. 2003), the court's holding, that a policy written over a self insured retention was a true excess policy, was based upon its analysis that the Travelers policy was a true excess policy because it "is not intended to pay the first dollar of a loss. Rather, the policy is triggered after the self-insured retention limit, $300,000, is reached. . . . Moreover, the premium for the Travelers Excess Policy is comparatively smaller. . . . '[T]his disparity in premiums is indicative of the reduced risk assumed.'" Id. at 587 (internal citation omitted). The court noted that primary, first dollar, policies and excess policies "inherently serve different functions, cover different risks and attach at different stages." Id. at 586 (internal citation omitted).

## II.    PREMIUM AMOUNTS ARE NOT EXTRINSIC EVIDENCE. THE PREMIUM IS AN INTEGRAL PART OF THE POLICY AND THE PREMIUM AMOUNT IS STATED ON THE DECLARATIONS PAGE OF EACH POLICY.

Notwithstanding the inconsistent positions that it has taken all throughout the course of this litigation, Virginia Surety complains that NUFIC is being inconsistent by asserting that the relative premium amounts that were charged by NUFIC and Virginia Surety, are relevant to the determination of whether the NUFIC policies and the Virginia Surety policies were written on entirely different levels of coverage. Virginia Surety's Opposition at pp.17-18.

The premium amount charged by an insurer to an insured is not, however, extrinsic evidence. By definition, extrinsic evidence means evidence that is outside of the four corners of the policy, such as the unexpressed, alleged subjective intent of the parties, on which Virginia Surety relies in this case. See 15 Appleman on Insurance § 113.3 (2d ed. 2006) ("Extrinsic evidence is evidence beyond or outside the insurance policy . . . ."); Brunetto v. Massachusetts Mutual Life Ins. Co., 200 F. Supp. 2d 380, 382 (S.D. N.Y. 2002) ("When a court decides, after examination of the contractual language, that an insurance policy is ambiguous, it looks *outside the policy* to extrinsic evidence, if any, to ascertain the intent of the parties." ) (quoting Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999)) (emphasis added). The premium amounts charged by an insurer are not extrinsic evidence, because the premium amount is an integral part of the policy itself. Indeed, as a matter of common practice, the premium amount is stated in the declarations page of the policy or in a policy endorsement, as was the case with all of the policies that are at issue in this case. See previously filed Exhibits A and D to the Exhibits to Statement of Undisputed Facts and Supporting Affidavits of Lexington and National Union in Support of Their Motion for Summary Judgment.

III.    **THE RELATIVE PREMIUMS CHARGED BY THE INSURERS ARE RELEVANT TO THE DETERMINATION OF WHETHER A POLICY IS A TRUE PRIMARY POLICY OR A TRUE EXCESS POLICY. IT IS UNDISPUTED THAT NUFIC CHARGED RELATIVELY MUCH LOWER PREMIUMS FOR FAR MORE COVERAGE THAN VIRGINIA SURETY, EVEN THOUGH THE VIRGINIA SURETY AND NUFIC POLICIES COVERED SIMILAR TYPES OF RISKS**

It is undisputed that the NUFIC policies and the Virginia Surety policies generally provide the same type of general liability coverage (covering claims for bodily injury, property damage, personal injury and advertising injury, subject to the other terms, conditions and exclusions provided for by the policies; these terms are similar in both the Virginia Surety and NUFIC policies). Virginia Surety also does not dispute that NUFIC charged its insureds much smaller premiums, relatively speaking, for much higher limits of liability (the NUFIC limits of liability are $1 million per claim and

$2 million in the aggregate, while the Virginia Surety limits of liability are $250,000 per claim) than the premiums that were charged by Virginia Surety.

Virginia Surety incorrectly contends that, "there is no rule of insurance contract interpretation that permits a court to determine insurers' respective coverage obligations by looking at premiums." Virginia Surety's Opposition at p.18.   Numerous cases have held, however, that when performing the functional analysis that is necessary in order to decide whether a policy is a true excess policy or not, one of the factors that the court should examine is what are the premiums that are charged by the insurers. E.g., Reliance National Indem. Co. v. General Star Indem. Co., 85 Cal. Rptr. 2d 627, 638-39 (Cal. Ct. App. 1999) ("The risks involved in providing primary coverage are different from those involved in issuing an excess policy.   These differences are reflected in part by the premium costs. . . . The premium charged by the primary insurer supports more localized claims adjustment facilities than those of the excess carrier.   It takes into account costs of defense, including legal fees, which the primary carrier normally provides.   If we were to accept the arguments of [the primary insurer], the basic rules construing primary and excess policies would be altered.   A primary insurer would be allowed to charge a higher premium for insuring a greater risk; however, then the primary insurer would be allowed to shift the loss to an excess carrier which charged a lower premium. . . . While the loss at issue must be borne by [the primary carrier], it is nothing more than what is bargained for.") (internal citations omitted); Rivere v. Heroman, 688 So. 2d 1293, 1295 (La. Ct. App. 1997) ("The status of the [true excess] policy can be determined from two factors.   Of importance are the relative sizes of the premiums involved."); Bosco v. Bauermeister, 571 N.W.2d 509, 510, 515 (Mich. 1997) ("We conclude that a distinct difference exists between 'true' excess insurance coverage and excess 'other insurance' on the basis of the difference in policy types within the insurance industry, the premiums charged for and risks assumed by the policies, the language of the policies, and the reasonable expectations of all the contracting parties."   "[E]xamining the policy types involved within the insurance industry and the

-12-

premiums charged for such policies is helpful in determining the contractual intent of the insurance policies as evidenced by their language. . . . This distinction is not 'merely semantic. Rather, it is rooted in the fundamental differences in the nature and scope of the risks which the policies intend to cover.'"); Oelhafen v. Tower Ins. Co., 492 N.W.2d 321, 324 (Wis. Ct. App. 1992) (The intent of a true excess policy "to serve a different function from primary policies with excess clauses is reflected in the rate structure of the two types of policies. . . . [True excess] and primary policies are not of the same character and they do not supply coverage at the same level.").

This reasoning has been followed by courts applying New York law. See State Farm Fire & Cas. Co. v. LiMauro, 481 N.Y.S.2d 90, 94 (N.Y. App. Div. 1984) (relative premium rates for the respective policies are a reason for holding that a true excess policy is excess over all primary coverage. "[F]orm should not be exalted over substance, and a functional analysis compels the conclusion that this policy in fact provided last resort coverage[.]").

Indeed, this rule has been followed by New York's highest court, the Court of Appeals. In General Motors Acceptance Corp. v. Nationwide Insurance Co., 828 N.E.2d 959, 962, (N.Y. Ct. App. 2005) the Court explained:

> Primary insurance premiums are based, at least in part, on the insurer's consideration that it may be liable to defend an action. In this sense, "primary" policy premiums are higher, relatively speaking, than "excess" premiums, because the primary insurer contemplates defending a potential lawsuit when it contracts with the insured. A primary insurer's duty to defend is not diminished, however, nor is it entitled to defend an action less vigorously, simply because its policy limits are more easily exceeded in any given case. Relieving primary insurers of this duty to defend would provide a windfall to the [primary] carrier insofar as the costs of defense—litigation insurance—are contemplated by, and reflected in, the premiums charged for primary coverage. This is in contrast to a true excess, or "umbrella" policy, where the duty to defend is not as readily triggered.

Furthermore, Virginia Surety is wrong when it says:

> [T]o say that AIG received a much smaller premium than VSC proves nothing. AIG's policies all have a $250,000 SIR that must be satisfied, on a per-claim basis, before AIG's "Ultimate Net Loss" obligations are triggered. The nature of the liability risks at issue here (i.e., multi-unit residential housing) is such that all of the claims will trigger VSC's policy but that relatively few will reach AIG's policy. Indeed, that is why AIG insisted on a $250,000 SIR and why NPS and the policyholders insisted on insuring the SIR. It is logical and unremarkable that VSC received far more in premium than AIG. It tells us nothing, however, about AIG's

obligations for claims where the $250,000 SIR has been satisfied, and those are the only claims at issue in this case.

Virginia Surety Opposition Memorandum at pp. 18-19.

This is exactly why the Virginia Surety first dollar, primary policies and the NUFIC true excess policies should be treated differently.  Because NUFIC (as is typically the case with true excess insurers) assumed much less risk for a much lower premium amount than did the primary insurer, Virginia Surety, it is only fair that the lower level Virginia Surety policies must be completely exhausted before the higher level NUFIC policies come into play.  See NUFIC's opening Summary Judgment Memorandum at p. 3.

## IV.  VIRGINIA SURETY MISSTATES NUMEROUS FACTS THAT IT CLAIMS IN ITS SUMMARY JUDGMENT MEMORANDA ARE UNDISPUTED

Virginia Surety bases its claim that it is entitled to summary judgment on several facts that it claims are undisputed, but which are actually not correct or are disputed by NUFIC.

First, Virginia Surety maintains that its managing general agent, NPS, sought to "substitute" both NUFIC and Virginia Surety for Chicago Insurance Company, which Virginia Surety says had previously written a "primary layer," for what Virginia Surety refers to as the "NPS Program." Virginia Surety's Summary Judgment Memorandum at pp. 8-9.  But although Interstate Insurance, a subsidiary of Chicago Insurance, evidently wrote primary policies for some of the entities who later became insured by Virginia Surety and NUFIC, there is not any evidence that whatever was the nature of the "program," when Interstate/Chicago participated in it, the program consisted of multiple primary and excess layers of coverage.  Virginia Surety has provided no evidence that there were any excess layers of this program.  The fact that NUFIC issued an umbrella policy to one or more entities that were also insured by Interstate/Chicago does not demonstrate that there was any coordinated program in which NUFIC or any other excess carrier participated.  A party is free to participate in a program providing primary coverage and then, on its own, obtain whatever excess

coverage it sees fit to obtain.[9]  That is exactly what happened in this situation, some of the Chicago/Interstate insureds went out on their own initiative and obtained excess coverage over the Interstate policies, one or a few of these insureds obtained such excess coverage from NUFIC.

Moreover, as noted above, Virginia Surety provides no support for its position that a "primary layer" can be split into two parts.  Indeed, if, as is the situation in the present case, there are two layers of coverage and only the lower layer insurer has a first dollar duty to defend, investigate and pay claims, there is not one primary layer with two subparts, but rather there are two distinct layers; one primary and the other excess.  In such a situation, the policy issued by the lower layer insurer has to be completely exhausted before the upper level insurer's policy can be triggered.

Second, Virginia Surety repeatedly claims that it is undisputed that NPS and the policyholders refused to agree to NUFIC issuing its policies on a stand alone excess form.  But Virginia Surety has failed to present even one shred of documentary evidence that supports this supposedly undisputed fact.  Virginia Surety instead relies solely on the double or triple hearsay statement of Charles Messery, a former employee of Risk Specialists of New York, the surplus lines broker,[10] that an employee of the wholesale broker, First Capital, told him (apparently based on a conversation that the First Capital employee had with an employee of the retail broker, NPS) that the policyholders did not want NUFIC to use the stand alone excess form.  This testimony is not admissible.[11]

---

[9] Likewise, Virginia Surety incorrectly states that "AIG's participation in the program . . . pre dated VSC's participation in the program." Just because National Union issued one or more excess policies to program participants, that does not mean that it participated in some coordinated program.  In any event, the National Union umbrella policies to which Virginia Surety is referring were written directly by National Union and have nothing to do with the policies that are at issue in this case, which, as Virginia Surety itself acknowledges, were underwritten by Lexington, not National Union, and were credited to Lexington's "profit center."  Virginia Surety's Summary Judgment Memorandum at p. 8 n.8.

[10] Although Risk Specialists is a sister company of National Union and Lexington, it is a separate entity.  Mr. Messery never was an employee of either National Union or Lexington and, as such, any statements he made are not admissions of Lexington or National Union.

[11] Mr. Messery testified as to what another broker told him that the insured or a third broker said.  He did not identify the person who provided the original the information.  Moreover, the testimony is being offered by Virginia Surety to prove the truth of the matter asserted.  In its Opposition Memorandum, directly preceding the comment concerning Mr. Messery's testimony, Virginia Surety asserts that "NCOPO *would not accept* anything but a primary form."  Virginia

Even if the policyholders did not want NUFIC to use a stand alone excess form for whatever reason, this is not relevant to the determination of the priority of coverage between NUFIC and Virginia Surety.  Aside from the fact that there is not any evidence whatsoever that any desire of the policyholders to use a general liability form with a self insured retention endorsement was motivated by anything having to do with the priority of coverage between NUFIC and Virginia Surety, as explained in detail in NUFIC's earlier summary judgment memoranda, the determination of whether a policy is true excess or not depends on a functional analysis and not on the title of the policy.  See, NUFIC's Memorandum in Opposition to the Cross-Motion for Summary Judgment of Virginia Surety, at pp. 9-11.  Furthermore, by adding a self insured retention endorsement onto the policy, NUFIC converted what is often a primary form into an excess policy. See National Union Ins. Co. v. Lawyers 'Mut. Ins. Co., 885 F. Supp. 202, 206 (S.D. Cal. 1995).

Third, Virginia Surety incorrectly maintains that the NUFIC policies do not "expressly disclaim any responsibility or duty to defend or settle any claims."  But the self insured retention endorsements in all of the NUFIC policies explicitly state that NUFIC does not have any duty to defend, investigate or settle claims until such time, if ever, that the insured incurs $250,000 in expenses in connection with any one claim.   All of the NUFIC "program policies" policies included a Self Insured Retention endorsement which provides that::

> [NUFIC's]  obligation, under the coverages provided by this policy, to pay "Ultimate Net Loss" on behalf of the "Insured," applies only to the "Ultimate Net Loss" in excess of the Self Insured Retention stated below, and subject to the Limits of Liability stated in the policy.   The terms of this policy, including with respect to our rights and duties with respect to defense of suits apply in excess of the application of the Self Insured Retention amount.

---

Surety's Memorandum, at p. 5.  (emphasis in the original).  This testimony is inadmissible hearsay under Rules 801 and 802 of the Federal Rules of Evidence.  See, e.g., Air Turbine Technology, Inc. v. Atlas Copco Ab, 295 F. Supp. 2d 1334, 1345 (S.D. Fla. 2003) (In a false advertising case, in response to defendant's motion for summary judgment, the plaintiff wanted to introduce sworn testimony of its employees that customers told them that the customers would not buy the plaintiff's product, because the defendant's similar product did not work.  The court held that the statements of customers were hearsay because they were offered to prove the truth of the matter asserted.  In addition, those statements were not admissible under the "state of mind" exception to the hearsay rule, because they described why the declarants held a particular state of mind.  The court explained: "[T]he purpose of the exclusion from Fed. R. Evid. 803(3) admissibility is 'to narrowly limit those admissible statements to declarations of condition–'I'm scared'–and not belief–'I'm scared because someone threatened me.'" )

See NUFIC's Statement of Undisputed Facts in Support the Motion for Summary Judgment, ¶8; Affidavit of Charles Messery, ¶4; Affidavit of John B. Gould, ¶6. This is a crucial feature of the NUFIC policies, that clearly demonstrates that the NUFIC policies are not first dollar, true primary policies, as Virginia Surety claims they are.

## V. VIRGINIA SURETY FAILS TO EXPLAIN UNDER WHAT LEGAL THEORY IT BELIEVES IT IS ENTITLED TO OBTAIN REIMBURSEMENT FOR AMOUNTS THAT IT HAS ALREADY PAID

Even if, contrary to NUFIC's position, Virginia Surety could establish that it is entitled to a declaratory judgment that, from this point forward, NUFIC has to share in the defense and indemnity costs, once $250,000 in defense and indemnity costs are incurred in connection with any one occurrence, Virginia Surety has not explained under what legal theory it could be entitled to reimbursement of amounts, in excess of $250,000 per claim, that it has already paid.  Although Virginia Surety pled counts for contribution, indemnification and subrogation in its counterclaim, it cannot recover from NUFIC under any of these theories.

There is not any basis for Virginia Surety to assert an indemnification claim against NUFIC, because it is undisputed that there is not any contract, much less a contract containing an indemnification provision running in favor of Virginia Surety, between Virginia Surety and NUFIC.

And, as explained in detail in NUFIC's Summary Judgment Memorandum at p. 18, there is no legal basis for Virginia Surety to assert an equitable contribution or subrogation claim against NUFIC.  Insurers on different levels are not entitled to contribution from each other and a right to subrogation does not exist, when, as here, the insured has not lost any money.

Rather than explain on what legal basis it is entitled to recover reimbursement from NUFIC, Virginia Surety is left to assert that, "if the court renders declaratory judgment in either party's favor, the parties should be able to resolve any remaining issues through a straightforward accounting. "Virginia Surety's Summary Judgment Memorandum at p. 1 n.1: Because there is no legal grounds

pursuant to which Virginia Surety can obtain reimbursement from NUFIC, however, a declaratory judgment in Virginia Surety's favor would not resolve Virginia Surety's claim for reimbursement.

## VI.    CONCLUSION

Because the NUFIC and Lexington policies were written on a higher level than the primary, first dollar, policies that were issued by Virginia Surety, under the well established law that a true excess policy is excess over all primary coverage, the NUFIC and Lexington policies do not come into play until the Virginia Surety policies are exhausted by the payment of $250,000 per occurrence in indemnity costs.  Therefore, the court should allow the Plaintiffs' motion for summary judgment and deny Virginia Surety's motion for summary judgment.


**Dated:**    November 13, 2006

Respectfully submitted,
**Lexington Insurance Company and**
**National Union Fire Insurance Company of**
**Pittsburgh, PA**
by their attorneys,

*/s/ Mark E. Cohen*

Mark E. Cohen          [BBO #089800]
Robert J. Maselek      [BBO #564690]
Gerald S. Frim         [BBO #656204]
THE MCCORMACK FIRM, LLC
One International Place
Boston, MA    02110
**Ph:**       617•951•2929
**Fax:**      617•951•2672
**E-mail:**   mcohen@mccormackfirm.com

## CERTIFICATE OF SERVICE

I, Gerald S. Frim, hereby certify that I have served this document and all exhibits thereto by hand upon counsel of record and that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 13, 2006.


**Dated:** November 13, 2006                    */s/ Gerald S. Frim*

90322.1



Page 1

1              UNITED STATES DISTRICT COURT

2                      FOR THE

3              DISTRICT OF MASSACHUSETTS

4  LEXINGTON INSURANCE COMPANY    )

5  AND NATIONAL UNION FIRE        )

6  INSURANCE COMPANY OF           ) No. 04-11109 RGS

7  PITTSBURGH,                    )

8           Plaintiffs,           )

9       vs.                       )

10 VIRGINIA SURETY COMPANY,       )

11 INC.,                          )

12           Defendant.           )

13           The 30(b)(6) deposition of VIRGINIA

14 SURETY COMPANY, INC., by WAYNE BALIGA, called for

15 examination, taken pursuant to the Federal Rules of

16 Civil Procedure of the United States District Courts

17 pertaining to the taking of depositions, taken

18 before JENNIFER L. BERNIER, CSR No. 84-4190, a

19 Notary Public within and for the County of Cook,

20 State of Illinois, and a Certified Shorthand

21 Reporter of said state, at Suite 800, 200 East

22 Randolph Street, Chicago, Illinois, on the 13th day

23 of July, A.D. 2006, at 10:10 a.m.

24 Job No. 191490

Page 30

1 then we'll seek reimbursement through this action
2 from other policies that might apply.
3     Q.   Is Virginia Surety seeking reimbursement
4 in cases where NPS did not include that endorsement
5 referred to earlier?
6     A.   Yes.
7     Q.   Okay.  And in those cases, when NPS did
8 not include the endorsement that you referred to
9 earlier, is it still Virginia Surety's position that
10 its obligations to the policyholder are capped at
11 250,000?
12     MR. STEPHAN:  Objection.
13 BY THE WITNESS:
14     A.   Well, our position to date has been that
15 we're paying those expenses because we want to be in
16 good faith with the policyholder.
17        So from our actions, we have currently
18 paid those matters.  And as I indicated before, we
19 seek reimbursement in this action.
20 BY MR. MASELEK:
21     Q.   Okay.  So in this action, is Virginia
22 Surety seeking reimbursement of all defense and
23 indemnity payments it made above $250,000 --
24     A.   Yes -- I'm sorry.

Page 31

1     Q.   I'm sorry -- in the situations where NPS
2 did not include the endorsement?
3     A.   Yes.
4     Q.   Why does Virginia Surety believe that it
5 does not have an obligation to pay any additional
6 defense costs or indemnity payments above $250,000
7 in those policies that don't include the endorsement
8 that you referred to?
9     MR. STEPHAN:  Objection.
10 BY THE WITNESS:
11     A.   Based on our review of the National Union
12 policy and our review of when that policy should
13 assume paying defense and/or lost costs.
14        Specifically, we believe the National
15 Union policy should start paying defense and lost
16 costs when we exhaust our first $250,000 of payment
17 under our policy.
18 BY MR. MASELEK:
19     Q.   And is it Virginia Surety's position that
20 Lexington and National Union are responsible for
21 paying all defense costs in addition to any payments
22 above the $250,000?
23     A.   Yes.
24     Q.   And is that in all NPS program policies?

Page 32

1     MR. STEPHAN:  Objection.
2 BY THE WITNESS:
3     A.   There is a difference in language between
4 the Lexington policy and the National Union policy.
5 So it depends on which policy you're speaking about.
6 BY MR. MASELEK:
7     Q.   For now let's concentrate on the National
8 Union policies, what National Union --
9     THE REPORTER:  I'm sorry?
10 BY MR. MASELEK:
11     Q.   -- what National Union considers to be
12 the program policies.
13        Is it Virginia Surety's position that --
14 in all claims where there is a common insured under
15 the NPS program -- that National Union has an
16 obligation to pay all defense costs and all
17 indemnity payments above $250,000 for any one
18 occurrence?
19     MR. STEPHAN:  Objection.
20 BY THE WITNESS:
21     A.   Yes.  Under the National Union policy,
22 that's correct.
23 BY MR. MASELEK:
24     Q.   And that's regardless of whether NPS

Page 33

1 added the endorsement that you referred to earlier
2 about putting defense costs in a policy limit?
3     A.   Yes.
4     Q.   If the Court were to determine that both
5 Lexington -- I'm sorry -- both National Union and
6 Virginia Surety had duties to defend an insured,
7 what is Virginia Surety's position with regard to
8 how the defense costs or additional costs should be
9 shared?
10     MR. STEPHAN:  Objection.  Calls for
11 speculation.
12 BY THE WITNESS:
13     A.   Well, under that hypothetical, our review
14 of the policy indicates that they would be pro rata,
15 equal share, or share by limits -- depending on how
16 the Court decided it.
17 BY MR. MASELEK:
18     Q.   Okay.  Well, does Virginia Surety have a
19 position whether it should be pro rata or by limits?
20     A.   Our position is that it should be by
21 limits.
22     Q.   And what is that position based on?
23     A.   Our review of the other insurance clause
24 and consultation with counsel.

9 (Pages 30 to 33)

**Esquire Deposition Services**
**(215) 988-9191**

Page 38

1 take the position that Virginia Surety still had an
2 obligation to pay defense costs under those
3 circumstances.
4     A.    It hasn't come up, because we indicated
5 to them we would continue to do that.
6         So we, basically, assuaged any of their
7 fears that we were going to pull the defense in
8 mid-trial or mid-litigation by not paying additional
9 amounts to defense counsel. So it didn't really
10 come up.
11     Q.    Okay. Has Virginia Surety ever told a
12 policyholder that it would no longer provide a
13 defense after the $250,000 has been incurred?
14     A.    No, not that I can recall.
15     MR. MASELEK:  Mark this as the next exhibit,
16 please.
17         (WHEREUPON, a certain document was
18         marked Baliga Deposition Exhibit
19         No. 6, for identification, as of
20         07/13/06.)
21 BY MR. MASELEK:
22     Q.    Mr. Baliga, would you take a moment to
23 review Exhibit 6. And let me know if you've seen
24 that before.

Page 39

1     A.    Yes.
2     Q.    Who is R. Connor Heist, H-e-i-s-t?
3     A.    He is an attorney in Chicago.
4     Q.    And did he represent Virginia Surety?
5     A.    Yes.
6     Q.    Okay. And was he authorized to send this
7 letter on Virginia Surety's behalf?
8     A.    Yes.
9     Q.    Okay. I see, on the second to last page,
10 that you were copied on this letter.
11     A.    Yes.
12     Q.    Okay. Did you review this letter before
13 Mr. Heist sent it?
14     A.    I don't recall if I reviewed this or not.
15     Q.    Prior to this letter that's dated
16 March 12th, 2004, are you aware of any demands made
17 by Virginia Surety for reimbursement by National
18 Union or Lexington?
19     A.    Yes. We had sent some letters in 2003.
20     Q.    Were those letters that were sent when
21 Virginia Surety was tendering its $250,000 indemnity
22 limit?
23     A.    Yes. Those were tendered letters.
24     Q.    And they reserve the right to recoup

Page 40

1 defense costs; is that correct, or other costs?
2     A.    Yes.
3     Q.    Okay. Were those letters each limited to
4 that particular claim that they were sent?
5     A.    Yes. They were on one particular claim.
6     Q.    Are you aware of any demands, before
7 March of 2004, that related to the entire program as
8 a whole?
9     A.    No.
10     MR. STEPHAN: Objection.
11 BY THE WITNESS:
12     A.    Sorry. No.
13 BY MR. MASELEK:
14     Q.    As of March of 2004, was Virginia Surety
15 aware that the National Union policy had its
16 $250,000 self-insured retention amount?
17     A.    Yes.
18     Q.    Do you know if Mr. Heist -- anywhere in
19 this letter -- makes reference to the $250,000
20 self-insured amount?
21     A.    I'd have to read the entire letter to
22 answer your question.
23     Q.    I won't ask you to do that. If you turn
24 to page 5 of the letter, the second to last

Page 41

1 paragraph reads:
2         "The limits of the VSC policies were
3 $250,000 per occurrence. Litigation expenses and
4 defense costs -- including attorneys' fees -- do not
5 reduce the limits of insurance available to VSC'S
6 insured. However, VSC'S duty to defend is
7 terminated under its policy when the applicable
8 limits of insurance have been used in the payment of
9 judgments or settlements."
10         Did I read that correctly?
11     A.    Yes.
12     Q.    So Mr. Heist is saying, in this letter,
13 that Virginia Surety's duty to defend the insured
14 continues until its policy limits had been exhausted
15 by the payment of a judgment or a settlement; is
16 that correct?
17     MR. STEPHAN: Objection. The letter speaks
18 for itself.
19 BY THE WITNESS:
20     A.    He appears to indicate that VSC's duty to
21 defend is terminated under its policy when the
22 applicable limits of insurance have been used in the
23 payment of judgments or settlements.
24         So that's what he says in his letter.

11 (Pages 38 to 41)



# R CONNOR & ASSOCIATES, P.C.

120 S. Riverside Plaza, Suite 1605
Chicago, Illinois 60601
tel (312) 780-1976
fax (312) 780-1973
RConnorH@aol.com

222 E. Wisconsin Ave., Suite 309
Lake Forest, Illinois 60045
tel (847) 735-1772
fax (847) 735-2195
RConnorH@aol.com

March 12, 2004

York Claims Service
Attention: Jay Maul
2 Paragon Way, Suite 600
Freehold, NJ 07728

**Via Certified Mail/**
**Return Receipt Requested**

Re:     National Program Services, Inc.
        Pro Rata Sharing Policy Obligations

Dear Mr. Maul:

As you are probably aware, in approximately December 2000, National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC") commenced its participation with National Program Services, Inc. ("NPS") in providing insurance coverage to various real estate properties including habitational properties, shopping centers, and office buildings (the "NPS Program"). Consistent with its participation in the NPS Program, NUFIC issued a Form Commercial General Liability policy to thousands of insureds in various jurisdictions throughout the United States. The relevant portions of the NUFIC policy provide as follows:

SECTION I – COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.  **Insuring Agreement.**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for of [sic] "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

        (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B.

Confidential and Privileged
Communication for Settlement Purposes

Mr. Jay Maul
March 12, 2004
Page 2

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

\*        \*        \*

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.

5. All costs taxed against the insured in the "suit."

These payments will not reduce the limits of insurance.

\*        \*        \*

4. **Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described c. below.

b. **Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

Confidential and Privileged
Communication for Settlement Purposes

Mr. Jay Maul
March 12, 2004
Page 3

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion 9. of Coverage A (Section 1).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

1. The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

2. The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

\*    \*    \*

The limits of the NUFIC policies issued in the NPS Program were One Million Dollars ($1,000,000) per occurrence with a Two Million Dollar ($2,000,000) general aggregate limit. Litigation expenses and defense costs, including attorneys' fees, do not reduce the limits of insurance available to NUFIC's insured. Because none of the prerequisites for excess coverage under the "Other Insurance" provision are satisfied, the NUFIC policy, by its express terms and conditions, is a primary policy of insurance.

At the same time that NUFIC was issuing its primary policy of insurance in the NPS Program, Virginia Surety Company ("VSC") was also participating in the NPS Program with its own policy of insurance. The relevant portions of the VSC policy provide as follows:

SECTION I – COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement.

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured

Confidential and Privileged
Communication for Settlement Purposes

Mr. Jay Maul
March 12, 2004
Page 4

against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for of [sic] "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

\*    \*    \*

SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.

5. All costs taxed against the insured in the "suit."

These payments will not reduce the limits of insurance.

\*    \*    \*

4. Other Insurance.

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described c. below.

Confidential and Privileged
Communication for Settlement Purposes

Mr. Jay Maul
March 12, 2004
Page 5

### b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(4) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(5) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

(6) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

⁂        ⁂        ⁂

The limits of the VSC policies were Two Hundred Fifty Thousand Dollars ($250,000) per occurrence. Litigation expenses and defense costs, including attorneys' fees, do not reduce the limits of insurance available to VSC's insured. However, VSC's duty to defend is terminated under its policy when the applicable limits of insurance have been used in the payment of judgments or settlements.

Because the NUFIC and VSC policies of insurance are primary, providing a total of One Million Two Hundred Fifty Thousand Dollars ($1,250,000) in coverage to their mutual insured,

Mr. Jay Maul
March 12, 2004
Page 6

both NUFIC and VSC are required to provide "ground level" coverage to their mutual insured. To date, there have been numerous claims filed by NUFIC and VSC policyholders in connection with the NPS Program. Attached hereto as Exhibit 1 is a copy of a State Summary Report for all claims previously submitted in the NPS Program. As reflected in Exhibit 1, through February 2004, VSC has paid approximately Forty-Four Million Six Hundred Twenty-Nine Thousand Six Hundred Eighty Dollars and Ninety-One Cents ($44, 629,680.91) in indemnity and expense payments for claims submitted in the NPS Program. As of this date, NUFIC has refused to share in those payments. Consequently, VSC is hereby making a formal demand that NUFIC honor its policy obligation to share on a total policy limits pro rata basis for all indemnity and expense payments on behalf of its policyholders in the NPS Program. In doing so, NUFIC should tender payment of Thirty-Five Million Seven Hundred Three Thousand Seven Hundred Forty-Four Dollars and Seventy-Three Cents ($35,703,744.73) to VSC. This amount represents eighty percent of the total payments made by VSC to date based on NUFIC's eighty percent share of the total insurance limits.

In addition to paying the aforementioned amount, NUFIC should be prepared to provide a written representation confirming NUFIC's commitment to satisfy its contractual obligations to share with VSC, on a pro rata basis, all future losses incurred for claims asserted under the NPS Program in accordance with the express terms and conditions of the applicable policies of insurance.

Due to the number of pending claims and the status of those claims with trial dates, discovery deadlines and settlement opportunities, your immediate attention, and timely response, to this request is expected and will be greatly appreciated. We will not attempt to establish an arbitrary deadline for your response. However, to the extent that your response is not forthcoming in a reasonable manner, please be assured that VSC is prepared to pursue recovery of sums due and owing from NUFIC under the NPS Program. In this regard, we look forward to hearing from you soon.

Respectfully,

R. Connor Heist

Enclosure
cc:   Wayne J. Buliga

Confidential and Privileged
Communication for Settlement Purposes

| INCIDENT STATE | LOSS PAID | EXPENSE PAID |
|---|---|---|
| AL | 70,911.96 | 12,490.92 |
| AR | 4,480.99 | 108 |
| AZ | 213,618.77 | 157,767.86 |
| CA | 576,557.34 | 1,227,703.50 |
| CO | 414,865.25 | 440,677.32 |
| CT | 515,238.66 | 83,786.25 |
| DC | 30,050.00 | 28,663.07 |
| DE | 18,500.00 | 62,956.16 |
| FL | 2,394,337.08 | 586,060.99 |
| GA | 542,155.54 | 227,569.66 |
| HI | 0 | 0 |
| IA | 55,613.00 | 12,627.30 |
| ID | 804.15 | 0 |
| IL | 325,491.22 | 374,120.18 |
| IN | 436,711.60 | 224,229.37 |
| KS | 148,590.00 | 40,364.03 |
| KY | 97,523.42 | 28,467.41 |
| LA | 188,803.94 | 134,850.14 |
| MA | 211,369.19 | 116,798.02 |
| MD | 827,623.92 | 281,012.36 |
| ME | 49,584.71 | 1,658.01 |
| MI | 1,174,648.95 | 761,372.09 |
| MN | 192,286.98 | 396,551.38 |
| MO | 315,823.50 | 23,623.71 |
| MS | 19,326.55 | 10,162.81 |
| MT | 58.1 | 0 |
| NC | 236,293.28 | 19,131.46 |
| NE | 81,427.26 | 28,552.47 |
| NH | 11,134.94 | 6,520.31 |
| NJ | 5,708,428.73 | 1,586,626.51 |
| NM | 22,639.05 | 2,273.82 |
| NV | 39,385.02 | 16,730.25 |
| NY | 8,530,773.42 | 6,325,864.91 |
| OH | 227,537.62 | 95,988.93 |
| OK | 26,075.45 | 5,189.11 |
| OR | 16,585.90 | 1,637.80 |
| PA | 1,800,461.81 | 595,908.54 |
| PR | 200 | 3,233.46 |
| RI | 8,792.02 | 899 |
| SC | 56,750.54 | 9,170.13 |
| SD | 4,956.00 | 0 |
| TN | 334,812.35 | 113,572.89 |
| TX | 3,260,521.70 | 955,955.06 |
| UT | 101,286.40 | 9,034.89 |
| VA | 163,199.03 | 127,590.06 |
| VT | 0 | 0 |
| WA | 21,944.94 | 9,518.97 |
| WI | 3,402.61 | 0 |
| WV | 0 | 918.37 |
| WY | 160.54 | 0 |
| Grand Total | 29,481,743.43 | 15,147,937.48 |

Exhibit 1
Confidential and Privileged Communication for Settlement Purposes