UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,<br><br>    Plaintiffs,<br><br>v.<br><br>VIRGINIA SURETY COMPANY, INC.<br><br>    Defendant. | Civil Action No. 04-11109 RGS |

### VIRGINIA SURETY COMPANY, INC.'S REPLY TO PLAINTIFFS' OPPOSITION TO ITS MOTION FOR SUMMARY JUDGMENT

Virginia Surety Company, Inc.[1] submits this reply memorandum in further support of its motion for summary judgment.

**I.  The Undisputed And Unambiguous Terms Of The AIG Policies – Without More – Establish That The AIG Policies Are Co-Primary With The VSC Policies.**

Unable to respond to VSC's arguments directly or to offer affirmative support for its own claims, AIG resorts to the classic "straw man" strategy – it mischaracterizes VSC's position and then claims that refuting the mischaracterization proves its case. This is apparent from the very first paragraph of AIG's opposition brief. Contrary to AIG's assertions, VSC does *not* contend that the unwritten intent of the AIG Policies or the NPS Program trumps the unambiguous terms of the policies. *Contra*. Plaintiffs' Opp. at 1. Nor

---

[1] In this brief, the terms "VSC" and "Virginia Surety" are used to refer to Virginia Surety Co., Inc. Plaintiffs Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh are referred to as "Lexington" and "NUFIC" respectively. Lexington and NUFIC are both corporate subsidiaries of AIG and will be referred to as "AIG" collectively.

does VSC believe, as AIG implies, that the terms of the AIG Policies do not support VSC's position. *See* VSC's Br. at 14-23.

In fact, the unambiguous and undisputed terms of the AIG Policies alone establish that the AIG Policies are *not* "true excess" and the Court need not resort to any unwritten intent behind the NPS Program or the AIG Policies to conclude that the AIG Policies are co-primary with the VSC policies as a matter of law. The evidence concerning the NPS Program simply places the issue in context and bolsters VSC's position by explaining why AIG wrote the policy that it did.

The record indicates that AIG does not and cannot dispute the following material facts: (1) the AIG Policies were written on a standard, primary commercial general liability (CGL) form;[2] (2) the AIG and VSC policies were both purchased by NPS in order to replace with two policies the $1 million primary layer of the NPS Program previously underwritten by Chicago Insurance using a single policy;[3] (3) the NPS Program insureds flatly refused to accept an AIG excess policy in this primary layer because they needed to be able to represent to third parties that they had $1 million in primary insurance coverage;[4] (4) the AIG Policies do *not* state that they are excess policies;[5] (5) the AIG Policies do *not* state that they are excess over any other policy (much less over a VSC policy);[6] (6) the AIG Policies contain no schedule of underlying insurance;[7] (7) the AIG Policies contain no language that in any way limits, changes or conditions AIG's coverage obligations on the

---

[2] *See* Eddows Dep. at 17-18, 152-153; Viscione Dep. at 23-24; Messery Dep. at 55. (Unless otherwise noted, the cited portions of deposition transcripts are attached to the Affidavit of Nicholas C. Cramb, Esq., which was filed with VSC's Motion for Summary Judgment.)
[3] *See* Goring Dep. at 62; Messery Dep. at 34-35; Eddows Dep. at 45; Baliga Dep. at 67, 69.
[4] *See* Eddows Dep. at 51.
[5] *See* Eddows Dep. at 113; National Union Fire Ins. Co. Commercial General Liability Policy, Bates ME 00448-00551 ("Exemplar Program Policy"), attached to the Cramb Aff. as Exhibit I.
[6] *See* Eddows Dep. at 17-18, 82-83, 152-153; Viscione Dep. at 23-24; Messery Dep. at 55.
[7] *See* National Union Fire Ins. Co. Commercial General Liability Policy, Bates ME 00448-00551 ("Exemplar Program Policy"), attached to the Cramb Aff. as Exhibit I.

2

exhaustion of any other insurance policy;[8/] (8) the only language in the AIG Policies that references other insurance is the Other Insurance Clause in those policies, which expressly states that the AIG Policies are primary, not excess, insurance policies;[9/] (9) the AIG Policies obligate AIG to pay all Ultimate Net Loss in excess of its $250,000 self-insured retention;[10/] and (10) the AIG Policies provide that defense costs erode the AIG self-insured retention.[11/]

Moreover, AIG's own actions establish that the AIG Policies provide primary and not excess coverage. First, AIG initially offered the NPS Program insureds an excess policy, but the NPS insureds *rejected* that proposal, insisting that AIG issue a primary policy. *See* Messery Dep. at 54-55. Second, when the NPS Program collapsed giving AIG the opportunity to change the form on which its policies were issued it specifically changed to a "Stand-Alone Excess Liability" form. *See* Messery Dep. at 189-190; Eddows Dep. at 166-167; Viscione Dep. at 39-40. This form expressly makes AIG's coverage *excess* over any other available insurance. *See* Exemplar Stand Alone Excess Liability Policy, Conditions ¶ 8, ME 03808, attached to the Cramb Aff. as Exhibit J. If AIG's primary policy forms were sufficient to make its coverage excess of the VSC policies, AIG would have had no need to switch to an excess form.

Contrary to AIG's statements, VSC does dispute AIG's position that the mere presence of a self-insured retention magically converts what is otherwise admittedly a primary insurance policy into an excess policy. *See* VSC Br. at 19-22; *contra.* AIG Opp. at 1-2. In fact, AIG's claims are undermined by the testimony of its own underwriter, who testified that "a primary policy with an SIR is still a primary policy." Messery Dep. at 42-43.

---

[8/]   *See id. See also* Viscione Dep. at 31-34; Messery Dep. at 158; Eddows Dep. at 82-83.
[9/]   *See* Exemplar Program Policy, Section IV – Conditions at ¶ 4, ME 00461. *See also* Gould Dep. at 56; Messery Dep. at 126; Eddows Dep. at 120-122.
[10/]  *See* Exemplar Program Policy at ME 00534 (Endorsement #28).
[11/]  *See id.*

There is no support for AIG's "magic policy" theory. If a policy is written as a primary policy and imposes primary policy obligations without regard to the existence of other coverage, it is a primary policy.

## II. The AIG And VSC Primary NPS Program Policies Are On The Same "Level" With Respect To The Claims At Issue In This Case, All Of Which Exceed AIG's $250,000 SIR

In its Opposition, AIG introduces a new concept as supposedly the controlling consideration – whether the AIG and VSC policies are on the same "level." AIG claims that it is a "higher level" insurer (presumably because its policy has an SIR component) and that all "lower level" insurers must exhaust their policies until AIG pays. AIG Opp. at 1-2. The policies, however, are applied in accordance with their terms and it is the terms of the policies that determine what "level" the policy is on. AIG attempts through mere characterization to take advantage of a legal principle that has nothing to do with the issues in dispute in this case. The only underlying cases at issue in this dispute are claims where the policyholder has incurred more than $250,000 in defense and indemnity costs. By the unambiguous terms of AIG's policy, those claims are covered by AIG's primary CGL policy. VSC may also have obligations for such claims under the primary CGL policy that it issued, but that fact is fortuitous from AIG's standpoint and has nothing to do with AIG's policy obligations. Both insurers wrote primary policies on virtually identical primary CGL forms to comprise the primary layer of the NPS Program and to permit NPS policyholders to represent to third parties that they had $1 million in *primary* insurance. Although the two policies apply differently because of the SIR in AIG's policy, both policies expressly state that they are primary policies vis-à-vis any other insurance. As to all claims with incurred defense and indemnity expenses of more than $250,000, AIG and VSC quite clearly are insurers on the same "level."

4

### III. The History And Structure Of The NPS Program And The Parties' Expectations Bolster VSC's Interpretation Of The AIG Policies.

Because the plain terms of the AIG Policies do not support its claim, AIG urges the Court to ignore the language of its policies in favor of assessing their *function*. *See* AIG Opp. at 7-8. There is no rule of insurance contract interpretation that would permit a court's determination of "function" to override the express terms of the policies. But even if such an inquiry were appropriate, it gets AIG nothing because an examination of the "function" of the AIG Policies in the context of the structure and intent of the NPS Program simply confirms VSC's position in this case.

#### A. The Structure Of The NPS Program Shows That AIG Expected To Be Liable For All Costs In Excess Of Its Self-Insured Retention

The undisputed material facts concerning the function of the NPS Program as revealed through the express terms of the policies demonstrate that the parties' intent was for AIG to bear 100% responsibility of all amounts in excess of $250,000 per occurrence, including defense costs. VSC's role was limited to insuring the $250,000 retention obligation so that the NPS insureds would enjoy the $1 million of first-dollar primary protection that Chicago Insurance had previously provided.[12/]  That this was the intent of all concerned is reflected in several key, undisputed facts. First, AIG did not know when it issued its first master policy or established its premium rates whether or how any other insurer – much less

---

[12/]  To this effect, VSC sought to include an endorsement in its policy that placed defense costs within its limits and required NPS as VSC's managing general agent to issue policies only as long as they included the endorsement. *See* Baliga Dep. at 106-111. Although this endorsement was not adopted because of the objections of certain state regulators, it establishes that VSC unquestionably intended to limit its exposure to $250,000 combined in defense and indemnity costs. That this endorsement was not adopted is not disputed by VSC (contrary to the mischaracterization in AIG's opposition brief), a fact which VSC made plain in its motion for summary judgment. *See* AIG Opp. at 2; VSC Br. at 9.

VSC – would participate in the NPS Program.  *See* Eddows Dep. at 51-53, 122-123.  AIG could not have known the terms of VSC's policies and certainly could not have known that defense costs would be outside of VSC's limits.  Moreover, AIG could not have known if any of the NPS Program participants would elect to insure the retention.  AIG must have expected that at least some of the NPS insureds would elect to self-insure the $250,000.  Indeed, AIG acknowledges that this was the case.  Eddows Dep. at 51-52, 77.  Thus, AIG wrote its policies and accepted premium on the assumption that it would be responsible for all expenses above its $250,000 self-insured retention.

      **B.**     **AIG Argues That The Meaning Of Its Policies Is Changed By The VSC Policies.**

AIG claims that the mere presence of the VSC policies changes the nature of *its own* obligations to the NPS policyholders.  Indeed, AIG's interpretation of *its* policies rests entirely on the language in *VSC's* policies.  Eddows Dep. at 181-183.  This mode of contract interpretation, in which a contracting party says "you can determine my contractual obligations by looking at another contract I am not a party to, knew nothing about, and had nothing to do with," is odd to say the least.  It is also contrary to the express terms of the AIG Policy and inconsistent with the structure and intent of the NPS Program because it means that the *identical* AIG policy language means different things to different policyholders depending on whether they chose to insure the retention.  This is logically inconsistent.  AIG insureds purchasing an AIG Policy *for the same premium* would get different coverage depending on whether they elected to purchase a VSC policy or not.

It is of course possible to write a policy that would operate the way AIG suggests.  For example, in *Monroe Guaranty*, one of the cases AIG itself cites, the court found that a policy was excess because, among other things, it expressly provided that it applied in excess of a specific amount *or* underlying insurance.  *Monroe Guaranty Ins. Co. v. Langreck*, 816 N.E.2d

6

485, 493-94 (Ind. Ct. App. 2004).  The policy at issue stated that it applied in excess of a "Retained Amount."  *Monroe*, 816 N.E.2d at 494.  Unlike in the AIG Policies, however, "Retained Amount" was "defined in the policy as the 'amount retained by the insured *or the amount of underlying insurance for damages.*'"  *Monroe Guaranty*, 816 N.E.2d at 494 (emphasis added).  *See also Seats Inc. v. Nutmeg Ins. Co.,* 504 N.W.2d 613 (Wis. Ct. App. 1993) (addressing insurance policy which provided coverage for losses in excess of an underlying insurance policy, or where no underlying policy applied, the amount of a self insured retention).

AIG could have added language that its policy would be excess of the SIR *and* any other available insurance.  If AIG intended its policy to be a true excess policy sitting over VSC's primary policy limit (as opposed to over a self-insured retention) it could easily have scheduled the VSC Policy and made AIG's obligations expressly contingent upon its exhaustion.  If it intended to be excess even though NPS insisted it write a primary policy, it could easily have endorsed the policy to change the "other insurance" clause to make the policy "excess" over any other available primary insurance.  In other words, it could have done those things that lead the courts in the cases relied upon by AIG to find the policies at issue therein "true excess."  It did none of these things because, contrary to the "magic policy" theory AIG's lawyers have cleverly constructed in this litigation, that was not the intent.

> C. **AIG Ignores The Structural Evidence Concerning The NPS Program, Including The Testimony Of Its Own Witnesses, Relying Instead On Passing References To Its Policies As "Excess."**

Unable to contradict the clear intent evident in the language of its policies or the history, intent and structure of the NPS Program as established by the sworn testimony of its own witnesses, and notwithstanding its insistence that resort to extrinsic evidence is wholly unnecessary, AIG now attempts to inflate passing references by certain VSC

7

employees and third-parties to AIG's policies as "excess" as proof that AIG has no obligation for claim expenses even if its $250,000 SIR is eroded. This argument fails for several reasons.

First, how a policy operates is determined by reviewing the policy language in the context of the insurance program. How people informally characterize and refer to a policy in passing is irrelevant. This is particularly true with the word "excess," which even in the insurance industry has colloquial meaning wholly apart from its meaning as a legal term of art. There are many complex insurance arrangements involving deductibles, SIRs, multiple layers of insurance, umbrella policies, "stand alone" versus "follow form" policies, quota sharing arrangements among different insurers underwriting a single policy, and the like. And the word "excess" can and often is used as a shorthand to describe an insurer's relative position and the order and timing of coverage obligations. Here for example, it would not be unusual for a person to refer to AIG as "excess" of an SIR or even "excess" of VSC because VSC alone pays amounts within the AIG SIR. That people have referred to the AIG policy in this way informally has nothing to do with the legal question before the court. Indeed, that is precisely why the industry and the courts have felt the need in dealing with "excess" as a term of art with legal significance to use phrases such as "*true excess*" or "*specific excess*."

Second, in contrast to the testimony of the AIG and VSC witnesses who were directly involved in the NPS Program, these passing references were not made in the context of determining how the AIG and VSC policies should interact regarding the allocation of defense costs once AIG's SIR is exhausted.

Third, throughout its papers, AIG appears to conflate the "Stand Alone Excess Liability" policies that its Lexington subsidiary issued with the primary CGL policies issued

8

by National Union that are at the center of this dispute.[13] The Lexington Stand Alone Excess policies are materially different from the NUFIC CGL policies for all the reasons discussed previously. Thus, AIG's references to the *Lexington* policies as "excess" policies as an admission by VSC and others that the *National Union* policies were "excess" are irrelevant and immaterial. *See* AIG Opp. at 6.

Finally, AIG's assertions are contradicted by the testimony of its own claims administrator, Paul O'Donnell, whose assessment of how the AIG and VSC policies should cover defense costs mirrors *VSC's* assessment. In his deposition, Mr. O'Donnell testified that, after reviewing the policies, he determined that the "National Union policy is primary coverage with a 250 K SIR." August 3, 2006 Deposition of Paul O'Donnell ("O'Donnell Dep.") at 36. *See also* O'Donnell Dep. at 28-37.[14] Because the AIG Policy and the VSC policy were both primary, Mr. O'Donnell concluded that "the other insurance clause specifies how both damages and defense costs . . . are to be shared." *Id.* at 36. Mr. O'Donnell then reviewed the VSC policy and determined that the VSC policy was "written on the same form" as the AIG Policy and that "both provide sharing by equal shares." *Id.* Thus, Mr. O'Donnell applied the "other insurance" clause in the AIG Policy and concluded that AIG would share *equally* in the defense costs incurred in excess of the $250,000 self-insured retention. *Id.* at 36-37. AIG apparently decided to ignore Mr. O'Donnell's straightforward and correct reading of the policies, as when Mr. O'Donnell was pressed to

---

[13] As used in all of VSC's briefs, "AIG Policies" refers to the policies that AIG issued as part of the NPS Program as well as any other policy written on the same or substantially similar commercial general liability form. It does not include the so-called "post-program" "Stand Alone Excess" policies that Lexington issued.

[14] The cited portions of the O'Donnell Dep. are attached to the Second Affidavit of Nicholas C. Cramb, Esq., filed herewith, as **Exhibit A**.

9

explain why he nonetheless sent a letter to VSC stating that National Union had *no defense obligation*, Mr. O'Donnell testified:

> Q. Can you explain that to me?
>
> A. I guess there was an agreement that National Union has no defense obligation until there was a payment of its limits. Maybe off the record? I don't know. Maybe there could have been a phone -- I don't know. I have no idea. Because it seems -- I don't know. It's written on the same form. I guess, you know, I must have reached a conclusion that there's no defense obligation. It says what it says. That's all I know.

O'Donnell Depo. at 37.

None of the references or testimony that AIG cites is on the same footing as Mr. O'Donnell's testimony. Mr. O'Donnell is an AIG employee who was assessing the precise question at issue -- the interaction of the AIG and VSC policies in the context of defending a claim and determining how the AIG and VSC policies would cover the defense costs in cases where AIG's SIR was satisfied. In comparison, Mr. Jops' passing reference to the NUFIC policies as "excess layer policies" is underwhelming given that it was not made in the context of determining the proper relationship between the AIG and VSC policies regarding defense costs. The AIG Policies *are* excess in a manner of speaking: they are excess *of the retention*, and nothing more, a point which Mr. Jops makes clear in his testimony as cited by AIG: "Q. Do you consider the National Union policy to be an excess policy? A. I consider it to be excess of the self-insured retention." Jops Dep. at 90. *See also* Viscione Dep. at 38-39.

### Conclusion

For all of the above-stated reasons and for the reasons enumerated in VSC's other memoranda, VSC's Motion for Summary Judgment should be allowed.

Respectfully submitted,

VIRGINIA SURETY CO., INC.,

By its attorneys,

  /s/   Nicholas C. Cramb
Joseph G. Blute (BBO 047300)
John M. Stephan (BBO 649509)
Nicholas C. Cramb (BBO 654368)
**MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.**
One Financial Center
Boston, MA 02111
Dated: November 13, 2006            (617) 542-6000

<u>**Certificate of Service**</u>

  I, Nicholas C. Cramb, Esq. hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 13, 2006.

 <u>/s/  Nicholas C. Cramb</u>              Dated:  November 13, 2006

LIT 1593718v.2