**EXHIBIT A**

```
                                                                        1
 1   UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
 2   _____

 3   LEXINGTON INSURANCE COMPANY and
     NATIONAL UNION FIRE INSURANCE
 4   COMPANY OF PITTSBURGH, PA,
                                              CIVIL ACTION NO.
 5                                            04-11109 RGS

 6             Plaintiffs,

 7
                                              Deposition of:
 8                                            PAUL O'DONNELL
          v.
 9
     VIRGINIA SURETY COMPANY, INC.,
10
               Defendants.
11   _____

12

13

14

15

16

17        Transcript of testimony as taken by and before

18   Francesca DiBella, RPR and a Certified Shorthand Reporter

19   and Notary Public of the State of New Jersey at the

20   offices of YORK & CO., 22 Paragon Way, Freehold, New

21   2Jersey, on Thursday, August 3, 2006, commencing at

22   2:00 a.m. in the forenoon.

23

24

25   Job No. 1803-80081
```

1    Q.   Did I read that correctly?

2    A.   Yes, you did.

3    Q.   Do you recall that telephone call with Ms. Perry?

4    A.   No, I don't.

5    Q.   Do you recall the caveat that you refer to in
6    your e-mail about reimbursement of defense costs?

7    A.   No, I don't.

8    Q.   In response to that e-mail, Betty Viscione writes
9    "It is my understanding that VS is obligated to pay
10   defense costs until their limit is paid.  Tendering their
11   limits does not relieve them of their obligation to pay
12   defense costs.  Would you agree?"  Did I read that right?

13   A.   Yes, you did.

14   Q.   In response to that question, you respond the
15   next morning with an e-mail that says, "Betty, I do
16   agree," and then there's a quote from the Virginia policy
17   language, Virginia Surety policy language, and then later
18   in the e-mail you write, "The one problem I do anticipate
19   is our self-insured endorsement number 28 provides a
20   $250,000 per occurrence SIR, including expenses.
21   Therefore, our defense obligation applies once indemnity
22   or expenses reach the $250,000 dollar threshold.  I am not
23   familiar with the history of this issue, but it must have
24   come up in other cases."  Do you see where that is
25   written?

1  A. Yes, I do.

2  Q. Why would that be a problem?

3  MR. FRIM: Objection. Why would what be a
4  problem?

5  Q. In your e-mail you say "the one problem I do
6  anticipate is our self insured endorsement."

7  A. It was probably a poor choice of words.

8  Q. Okay.

9  A. It's not really a problem. It's just more of an
10 issue rather than a problem. I should have said an issue,
11 perhaps.

12 Q. What would the issue be then? Why would it be an
13 issue?

14 A. Because we're discussing the obligations of
15 Virginia Surety and National Union to afford a defense, a
16 continuing defense, once the 250,000 self-insured
17 retention is exhausted or eroded.

18 Q. So you are noting there that the self-insured
19 retention is eroded in the National Union policy by
20 defense costs?

21 MR. FRIM: Objection.

22 A. Yes.

23 Q. Would that indicate to you that National Union
24 had a defense obligation once $250,000 was spent?

25 MR. FRIM: Objection.

30

1  A. That's what we were discussing.

2  Q. Is that the issue that you were identifying in
3  this e-mail?

4  A. That's the issue we were discussing in the
5  e-mail.

6  Q. In response to your e-mail, Betty Viscione
7  writes, and you will see this at the bottom of the first
8  page of the exhibit, "This issue has not come up. The
9  insured procured an insurance policy through Virginia
10 Surety to cover the self-insured retention. The VS policy
11 states that VS pays expenses in addition to the limits. I
12 believe they would have an obligation to pay expenses
13 until they exhausted the limit by payment of settlement
14 dollars." Do you see that?

15 A. Uh-hum.

16 Q. In response to that e-mail, you write, "I agree,
17 but based on the SIR, National Union has a defense
18 obligation as does Virginia once the $250,000 retention
19 has been reached. Since both carrier have a defense
20 obligation, perhaps the best resolution would be to split
21 defense costs 50/50 once this expense is paid, reached
22 $250,000. The point is the Virginia Surety policy covers
23 more than the self-insured retention." Did I read that
24 right?

25 A. Yes, you did.

1  Q. Okay. And it's fair to say that that was your
2  opinion when you wrote that e-mail to Betty Viscione?
3     MR. FRIM: Objection.
4  A. It's just a general discussion of how the
5  policies interacted vis-a-vis the self-insured retention
6  endorsement and the coverage provided by Virginia Surety.
7  Q. Okay. But when you wrote that e-mail, you meant
8  what you wrote, in essence?
9     MR. FRIM: Objection.
10 A. Based on what I had -- on what I was familiar
11 with the program, with the policy.
12 Q. Have you reviewed the Virginia Surety at this
13 policy at this point?
14 A. More likely than not I probably saw their --
15 yeah, as a matter of fact, I think I might have had a copy
16 of their policy. I might have. Probably.
17 Q. Okay. What did you mean when you say, "Since
18 both carriers have a defense obligation, perhaps the best
19 resolution is to split defense costs 50/50 once expenses
20 paid $250,000."
21 A. I think I was kind of referring to what is
22 commonly known as a coinsurance kind of situation.
23 Q. What distinguishes a coinsurance situation?
24 A. Where two policies may have the same obligation,
25 we duplicate the obligations under each.

                                                                    32

1    Q.    In other words, once $250,000 was spent, both the
2    National Union policy and the Virginia Surety policy would
3    answer?
4          MR. FRIM:  Objection.
5    A.    I think that's what we were discussing, yeah.
6    What I was suggesting might be a way to look at it.
7    Q.    In fact, you say it might be perhaps "the best
8    resolution"?
9    A.    Right.  Okay.
10   Q.    That's what it says?
11   A.    That's what it says.
12   Q.    In response to your e-mail, Betty Viscione says,
13   "I can't get my hands on our CGL coverage form right now.
14   I would check the other insurance clause of our policy."
15   Do you see that?
16   A.    Yes, I do.
17   Q.    Why was she suggesting that you refer to the
18   other insurance clause of the policy?
19         MR. FRIM:  Objection.
20   A.    Because that provision provides some guidelines
21   as to how indemnity, really indemnity payments are to be
22   made where two or more policies apply to the same loss.
23   Q.    In response you write, "Betty, I checked the
24   other insurance provision.  The National Union policy is
25   primary coverage with a 250 K SIR.  If that is correct,

33

1   the other insurance clause specifies how both damages and
2   defense costs under coverage A are to be shared." Did I
3   read that correctly?
4       A.   Yes, you did.
5       Q.   If I can direct your attention to a binder that
6   we've marked as Exhibit 3 for Mr. Maul's deposition, which
7   is this binder here.  If you would, turn to page ME 461,
8   please.
9       A.   Okay.
10      Q.   And if you look at the bottom of the page,
11  there's a paragraph that is numbered four.  Do you see
12  that?
13      A.   Uh-hum.
14      Q.   It says, "Four.  Other Insurance Period."
15      A.   Uh-hum.
16      Q.   And it includes three subparts, A, B, and C.  Do
17  you see those?  I think B and C are on the next page.
18      A.   Uh-hum.
19      Q.   Is this the other insurance provision that you
20  were referring to in your e-mail?
21      A.   Yes.
22      Q.   The other insurance provision provides, "If other
23  valid and collectable insurance is available to the
24  insured for a loss we cover under coverages A or B of this
25  coverage part, our obligations are limited as follows,"

34

1  and then it says "A, primary insurance," and then below
2  that after paragraph below that it says "B. Excess
3  insurance."
4       Under subparagraph A it reads, "This insurance is
5  primary except when B below applies.  If this insurance is
6  primary, our obligations are not affected unless any of
7  the other insurance is also primary.  Then we will share
8  with all of that other insurance by the method described.
9  See below."  Did I read that correctly?
10     A.   Yes.
11     Q.   Now, as in this instance with the Hopkins case
12  subparagraph B says, "Excess insurance."  Do any of the
13  criteria in subparagraph B apply to the Virginia Surety
14  policy?
15          MR. FRIM:  Objection.
16     A.   Can you repeat that?
17     Q.   Sure.  I can go through it, if you prefer.  The
18  subparagraph B states, "This insurance is excess over any
19  of the other insurance whether primary, excess,
20  contingent, or on any other basis.  One, that is fire,
21  extended coverage, builder's risk, installation risk, or
22  similar coverage for 'your work'."
23          Now, based on your familiarity with the Virginia
24  Surety policy, was the Virginia Surety policy covered by
25  that subparagraph B-1?

Case 1:04-cv-11109-RGS    Document 47-2    Filed 11/13/2006    Page 10 of 13
Paul O'Donnell                                                  8/03/2006

                                                                       35

```
 1    A.   No.
 2         MR. FRIM:  Objection.
 3    A.   No.
 4    Q.   And subparagraph two says that is "fire insurance
      for premises rented to you or temporarily occupied by you
      with the permission of the owner"?
 7    A.   No.
 8    Q.   And it does not apply?
 9         MR. FRIM:  Objection.
10    A.   No.
11    Q.   And subparagraph three says, "If the loss arises
      out of the maintenance of use of aircraft, autos, or
      watercraft to the extent subject to exclusion not in
      coverage A."  Did that apply in this situation?
15         MR. FRIM:  Objection.
16    A.   I don't believe so.
17    Q.   Are there any other circumstances identified in
      the other insurance provision which would make the
      National Union policy excess over any of the other
      insurance?
21         MR. FRIM:  Objection.
22    A.   I don't know.  I can't -- I don't know.
23    Q.   Well, in the other insurance clause, which is
      paragraph four and has A, B, and C, would you agree that
      there are no other factors in subparagraph B other than
```

Legalink Boston, A Merrill Company
(617) 542-0039

Paul O'Donnell                                              8/03/2006

36

1   the three that we read?
2           MR. FRIM:  Objection.
3       A.  I don't really have any comment on it.  I don't
4   know what the issue is.
5       Q.  So when you checked the other insurance
6   provision, which is what you wrote to Ms. Viscione, you
7   concluded the "National Union policy is primary coverage
8   with a 250 K SIR.  If that is correct, the other insurance
9   clause specifies how both damages and defense costs under
10  coverage A are to be shared."  So fair to say that you
11  concluded that the other insurance clause applied and that
12  both National Union's policy and Virginia Surety's policy
13  were primary under the other insurance clause?
14          MR. FRIM:  Objection.
15      A.  That seems to be what my conclusion was.
16      Q.  And you go on to write, "The Virginia policy is
17  written on the same form, CG 00101/16 and both provide
18  sharing by equal shares."  Do you see that?
19      A.  Right.
20      Q.  And when you say "both provide sharing by equal
21  shares, were you referring to subparagraph 4C which is
22  labeled "method of sharing" in the other insurance clause?
23      A.  Right, that's correct.
24      Q.  And that provides that "if all of the other
25  insurance permits contribution by equal shares, we will

37

1  follow this method also"?
2  　　A.　　Correct.
3  　　Q.　　"I will be sending a letter to VS stating
4  National Union has no defense obligation since their
5  policy has not paid its limits by settlement or judgment."
6  Do you see that --
7  　　A.　　Right.
8  　　Q.　　-- in your e-mail?
9  　　A.　　Uh-hum.
10 　　Q.　　Can you explain that to me?
11 　　MR. FRIM:　Objection.
12 　　A.　　I guess there was an agreement that National
13 Union has no defense obligation until there was a payment
14 of its limits.  Maybe off the record?  I don't know.
15 Maybe there could have been a phone -- I don't know.  I
16 have no idea.  Because it seems -- I don't know.  It's
17 written on the same form.  I guess, you know, I must have
18 reached a conclusion that there's no defense obligation.
19 It says what it says.  That's all I know.
20 　　Q.　　Did you have any telephone conversations with
21 Betty Viscione about this issue?
22 　　A.　　I have no idea.
23 　　Q.　　Do you recall if she spoke with you on the phone
24 between her 2:01 p.m. e-mail to you on the 9th and your
25 response almost an hour later?

```
 1  STATE OF NEW YORK      )      Pg__of__Pgs
 2                              ss:
 3  COUNTY OF NEW YORK     )
 4      I wish to make the following changes,
 5  for the following reasons:
 6  PAGE LINE
 7  ____ ____    CHANGE: _____
 8              REASON: _____
 9  ____ ____    CHANGE: _____
10              REASON: _____
11  ____ ____    CHANGE: _____
12              REASON: _____
13  ____ ____    CHANGE: _____
14              REASON: _____
15  ____ ____    CHANGE: _____
16              REASON: _____
17  ____ ____    CHANGE: _____
18              REASON: _____
19  ____ ____    CHANGE: _____
20              REASON: _____
21  ____ ____    CHANGE: _____
22              REASON: _____
23  ____ ____    CHANGE: _____
24              REASON: _____
25                               _____
                                 Paul O'Donnell, Deponent
```

LegaLink Boston, a Merrill Communications Company
(617) 542-0039