# EXHIBIT 1

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

LEXINGTON INSURANCE COMPANY AND NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA
                    Plaintiffs

v.

VIRGINIA SURETY COMPANY, INC.,
                    Defendant.

CIVIL ACTION NO.
04-11109 RGS

## SURREPLY OF PLAINTIFFS IN SUPPORT OF THEIR OPPOSITION TO THE CROSS-MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, VIRGINIA SURETY COMPANY

Plaintiffs, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and Lexington Insurance Company ("Lexington") (collectively "NUFIC"), pursuant to Local Rule 7.1(b)(3), hereby file, subject to leave of Court, a Surreply in further support of their Opposition to the Cross Motion for Summary Judgment of Virginia Surety Company ("Virginia Surety").[1]

I.     **PAUL O'DONNELL WAS NEVER AN EMPLOYEE OF NATIONAL UNION OR LEXINGTON; PLAINTIFFS ARE NOT BOUND BY O'DONNELL'S INITIAL IMPRESSION OF THE POLICY LANGUAGE**

In its Reply Memorandum, Virginia Surety states that Plaintiffs' position is contradicted by the deposition testimony of Paul O'Donnell, who Virginia Surety incorrectly claims was an "AIG employee who was assessing the precise question at issue." Virginia Surety's Reply Memorandum at 10. Virginia Surety attempts to use Mr. O'Donnell's testimony to bind National Union to a particular position regarding the interaction of the National Union and Virginia Surety policies.

---

[1] Other than the references to Mr. O'Donnell, Virginia Surety's Reply Memorandum simply rehashes its prior arguments.

However, in his deposition, Mr. O'Donnell clearly stated that he was not an employee of Plaintiffs or any company related to Plaintiffs. Rather, he was an employee of York Claims, an independent claims management agency, that monitored claims arising under the subject policies. Further, Mr. O'Donnell is a claims examiner, not an attorney, nor does he otherwise qualify as an expert in insurance coverage. Moreover, he had no involvement whatsoever in the underwriting or issuance of any of Plaintiffs's policies. See, Deposition of Paul O'Donnell, p. 7, attached hereto as Exhibit "A" ("O'Donnell Deposition"). Specifically, in describing his duties at York Claims, O'Donnell testified as follows:

> Generally I'm assigned new claims that come in, they are reported. I make initial contact with the insured, sign investigations, complete designated reporting forms, narrative type reports, recommend reserves. And send – assign defense counsel as needed, you know, monitor counsel, review bills, approve bills, update reports including any reserve changes. Make recommendations for settlement, resolution of cases, negotiate settlement. [Exhibit A, O'Donnell Deposition, pp. 10-11]

When asked what his responsibilities were as a claims examiner regarding the NCOPO program policies, O'Donnell testified as follows:

> Confirm coverage for the location, that it was a scheduled location on the policy, to recognize any potentially high exposure cases that might reach the National Union level, to report to my supervisor on all cases, to provide a summary of the case and potential exposure, to report to Lexington on cases that we were recommending reserves in excess of a certain amount. I guess it's 50 percent of self-insured retention. [Exhibit A, O'Donnell Deposition, p. 22]

Regarding O'Donnell's exchange with Betty Viscione of Lexington regarding the inception point of the National Union policy, as described in Virginia Surety's Reply Memorandum at p. 9, Virginia Surety latches on to an initial impression by O'Donnell that Lexington may have had concurrent defense obligations once Virginia Surety paid $250,000 in defense costs. However, Mr. O'Donnell did not purport to conduct a legal analysis of the coverage issue and would not have been qualified to have done so if he had. As Mr. O'Donnell explained in his deposition:

> This was just a conversation. I'm – you know, not a lawyer. I'm not familiar with how case law anywhere might affect it. I'm not an underwriter and I'm not – and I don't make the [coverage] decisions. [Exhibit A, O'Donnell Deposition, p. 38]

Contrary to Virginia Surety's assertions, Mr. O'Donnell was not responsible for making coverage determinations for Lexington or National Union. He was not employed by Lexington or National Union. He raised an issue regarding priority of coverage between National Union and Virginia Surety with his contact at Lexington. After a discussion, Lexington determined its position, that its policies do not attach until the Virginia Surety policy limits are exhausted, which was then reflected by correspondence that was sent by O'Donnell to Virginia Surety's representative.

Even if O'Donnell's testimony is considered to have some relevance to the issue of National Union's or Lexington's intent regarding their policies, O'Donnell clearly stated that part of his responsibilities was, "to recognize any potentially high exposure cases that might reach the National Union level." O'Donnell recognized that the National Union policies were on a different level than the primary Virginia Surety policies. Any attempt by Virginia Surety to show otherwise is pure sophistry.

## II. CONCLUSION

Virginia Surety has inappropriately inserted new evidence and argument into its Reply Memorandum. If the court determines not to simply ignore these new assertions, a full review of the evidence reveals that O'Donnell's testimony only shows that: he was a claims adjuster for an independent contractor and was not a lawyer; he discussed a coverage issue with Lexington; he was told by Lexington that his initial impression of the issue was wrong; and ultimately he communicated Lexington's position (which is the same position Lexington and National Union have taken throughout this litigation, namely that the NUFIC policies are true excess policies and are not triggered until the Virginia Surety policies are exhausted), to Virginia Surety.

For all of the reasons stated in Plaintiffs summary judgment pleadings, Plaintiffs's Motion for Summary Judgment should be allowed and Virginia Surety's Motion for Summary Judgment should be denied.

| | |
|---|---|
| **Dated:** November 27, 2006 | Respectfully submitted,<br>***Lexington Insurance Company and***<br>***National Union Fire Insurance Company of Pittsburgh, PA***<br>by their attorneys,<br><br>/s/ Mark E. Cohen<br>Mark E. Cohen          [BBO #089800]<br>Robert J. Maselek     [BBO #564690]<br>Gerald S. Frim         [BBO #656204]<br>THE MCCORMACK FIRM, LLC<br>One International Place<br>Boston, MA   02110<br>**Ph:**     617•951•2929<br>**Fax:**    617•951•2672<br>**E-mail:** mcohen@mccormackfirm.com |

## CERTIFICATE OF SERVICE

I, Gerald S. Frim, hereby certify that I have served this document and all exhibits thereto by hand upon counsel of record and that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 27, 2006.

**Dated:** November 27, 2006                    /s/ Gerald S. Frim

91478.1



# EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
 2   _____

 3   LEXINGTON INSURANCE COMPANY and
     NATIONAL UNION FIRE INSURANCE
 4   COMPANY OF PITTSBURGH, PA,
                                              CIVIL ACTION NO.
 5                                            04-11109 RGS

 6              Plaintiffs,

 7
                                              Deposition of:
 8                                            PAUL O'DONNELL
              v.
 9
     VIRGINIA SURETY COMPANY, INC.,
10
                Defendants.
11   _____
```

                        **CERTIFIED ORIGINAL**
                        **LEGALINK BOSTON**

```
17       Transcript of testimony as taken by and before
18   Francesca DiBella, RPR and a Certified Shorthand Reporter
19   and Notary Public of the State of New Jersey at the
20   offices of YORK & CO., 22 Paragon Way, Freehold, New
21   2Jersey, on Thursday, August 3, 2006, commencing at
22   2:00 a.m. in the forenoon.

25   Job No. 1803-80081
```

7

1    A.   54 Ward, W-a-r-d, Avenue, Rumson, R-u-m-s-o-n,
2    New Jersey.
3    Q.   And the zip code in Rumson?
4    A.   07760.
5    Q.   Where do you work?
6    A.   York Claims.
7    Q.   What is your position at York Claims?
8    A.   Claims examiner.
9    Q.   How long have you been a claims examiner for York
10   Claims?
11   A.   Three years and four months.
12   Q.   When did you start working at York Claims in any
13   position?
14   A.   That would have been in April of -- must be
15   2003.  Does that add up?
16        MR. FRIM:  Uh-hum.
17   Q.   Yeah.  So you started work at York Claims in
18   April of 2003 as a claims examiner?
19   A.   Right.
20   Q.   And you've been a claims examiner ever since?
21   A.   That's correct.
22   Q.   Were you employed before then?
23   A.   Yes, I was.
24   Q.   Where were you working then?
25   A.   Highlands Insurance.

10

1  like that?
2     A.  No.
3     Q.  Have you taken any courses toward any
4  professional designations?
5     A.  Yes, AIC.
6     Q.  Any others?
7     A.  RM 54, Risk Management, took two RM 54 courses.
8     Q.  Any others?
9     A.  No, that's all.
10    Q.  When did you first get into the insurance
11 business?
12    A.  1978.
13    Q.  So you've been in insurance then since
14 graduating?
15    A.  Right.
16    Q.  Let's talk a little bit about your work at York.
17 Can you tell me generally what you do as a claims
18 examiner?
19    A.  Generally I'm assigned new claims that come in,
20 they are reported.  I make initial contact with the
21 insured, sign investigations, complete designated
22 reporting forms, narrative type reports, recommend
23 reserves.  And send -- assign defense counsel as needed,
24 you know, monitor counsel, review bills, approve bills,
25 update reports including any reserve changes.  Make

                                                                        11

1    recommendations for settlement, resolution of cases,

2    negotiate settlements.

3        Q.   Who do you report to?

4        A.   Jay Maul.

5        Q.   How long have you reported to Jay Maul?

6        A.   Since I began.

7        Q.   Mr. O'Donnell, what did you do to prepare for

8    your deposition today?

9        A.   I met with Mr. Frim briefly, talked about what

10   the deposition was going to concern.

11       Q.   You don't need to tell me your conversations with

12   Mr. Frim?

13            MR. FRIM:  You saved me an objection.

14       Q.   It's privileged.  I didn't mean to pry into that,

15   but can you tell me about how long you spoke with

16   Mr. Frim?

17       A.   About half an hour.

18       Q.   Was that today?

19       A.   Yes.

20            MR. FRIM:  Off the record for a second.

21            (Discussion off the record)

22            MR. STEPHAN:  We can go back on the record.

23       Q.   Did you want to clarify your answer?

24       A.   Yeah, I met with him for about four hours.

25       Q.   When was that?

16

1   Q. What is this policy?

2   A. It's a general liability policy.

3   Q. Who is it issued by?

4   A. National Union Fire Insurance Company of
5   Pittsburgh.

6   Q. Is this a copy, to your knowledge, of one of the
7   policies that was issued as part of the NCOPO program?

8   A. Yes.

9   Q. So when you testified earlier that the policies
10  that National Union issued as part of that program, they
11  all used the same form, is it reasonable to assume that
12  they all looked like this one?

13  A. Pretty much.

14  Q. Pretty much?

15  A. Yeah.  Later years it changed.

16  Q. Okay.

17  A. There could be different endorsements.

18  Q. Do you recall any particular changes?

19  A. No.

20  Q. Do you know if that is a standard form policy?

21      MR. FRIM: Objection.

22  Q. You can answer, if you know?

23  A. (No verbal response).

24  Q. Do you know if it's a standard form policy?

25  A. ISO?

                                                                        17

1     Q.   Yes.

2     A.   I would say no.

3     Q.   Can you describe generally the risks that the
4  policy covers?

5     A.   Operations premises.  They are incidental to the
6  business.

7     Q.   Do you know the limits of liability on that
8  policy?

9     A.   One million.

10    Q.   Do you know the attachment point for the policy?

11         MR. FRIM:  Objection.

12    A.   250,000 SI.  It's got a 250,000 self-insured
13 retention.

14    Q.   What does that mean?

15    A.   That the policy doesn't respond until $250,000
16 has been exhausted by the insured or through whatever
17 means, but $250,000 has been paid in defense or indemnity
18 prior to triggering coverage under the policy.

19    Q.   If you would turn to, you see there are numbers
20 in the lower corner there.  If you turn to the page
21 numbered ME 534.

22         MR. FRIM:  It should be at the end of the policy.

23    Q.   I believe it's endorsement 28 is what I'm trying
24 to direct you to.

25    A.   Here it is.  Okay.

21

1    issue for me.  That's another underwriting issue I think.
2        Q.   I'm going to show you what has been marked
3    earlier as Exhibit 2 for Mr. Maul's deposition.
4        A.   Okay.
5        Q.   Do you recall when you first began to work on the
6    NCOPO program for York?
7        A.   When?
8        Q.   Yes.
9        A.   Roughly.
10       Q.   When was that, roughly?
11       A.   Probably about August of '03.  No, wait.  It must
12   have been sooner because this says May, so I guess shortly
13   after I got here probably.  Yeah, June.
14       Q.   So when you started to work at York in the summer
15   of 2003 -- is that right?
16       A.   Spring.
17       Q.   April I think you said?
18       A.   Uh-hum.
19       Q.   Were you working out of this office here in
20   New Jersey?
21       A.   Uh-hum.
22       Q.   And then just drawing your attention to Exhibit
23   2, I know this is an e-mail that you did not receive, but
24   does that refresh your recollection as to when you started
25   working on the NCOPO program?

Paul O'Donnell
8/03/2006

22

1    A.    Yes.

2    Q.    Do you believe that that was sometime soon after
3  May of 2003?

4    A.    That's correct.

5    Q.    And what were your responsibilities as a claims
6  examiner regarding the NCOPO program?

7    A.    Confirm coverage for the location, that it was a
8  scheduled location on the policy, to recognize any
9  potentially high exposure cases that might reach the
10 National Union level, to report to my supervisor on all
11 cases, to provide a summary of the case and potential
12 exposure, to report to Lexington on cases that we were
13 recommending reserves in excess of a certain amount.  I
14 guess it's 50 percent of self-insured retention.

15   Q.    Is that what you recall it was?

16   A.    Yeah.  I don't remember.

17   Q.    But there was a level at which point once you
18 reserved about that level?

19   A.    Yeah, yeah, there was, and I think that might
20 have changed in the course of the program.  Or coverage
21 issues we might report something like that, too, if there
22 was an issue affecting coverage.

23   Q.    Is it fair to say that when a claim came in from
24 an insured in the NCOPO program that you needed to assess
25 whether or not that claim was covered under the National

Legalink Boston, A Merrill Company
(617) 542-0039

38

1   A.   I have no idea. It's three years ago.
2        And I don't make decisions. I should just add
3   that, too. I'm not a decision maker, so I may have just
4   been confirming what I was going to proceed to do.
5   Reading it, that's what I read into it, is I was just
6   confirming what we were going to do.
7   Q.   **So even though you felt that the National Union**
8   **policy primary coverage with a 250 K SIR and that the**
9   **Virginia policy was written on the same form and that the**
10  **other insurance clause applied and that both provided for**
11  **sharing by equal shares which would indicate that National**
12  **Union and Virginia Surety would split costs 50/50, right,**
13  **even though you came to that conclusion you were**
14  **nonetheless going to send out a letter stating that**
15  **National Union had no defense obligation?**
16       MR. FRIM:  Objection.
17  A.   This --
18       MR. FRIM:  Objection.
19  A.   This was just a conversation. I'm -- you know,
20  not a lawyer. I'm not familiar with how case law anywhere
21  might affect it. I'm not an underwriter and I'm not --
22  and I don't make the decisions.
23  Q.   **I understand. I'm just asking if that was your**
24  **understanding after reading the policies, yet you sent**
25  **out -- you said you would be sending out a letter stating**

Paul O'Donnell                                               8/03/2006

39

1  that National Union had no defense obligation?

2            MR. FRIM:  Objection.

3       Q.   Let me direct your attention to what we marked as

4  Exhibit 14 in Mr. Maul's deposition and ask you to take a

5  look at that.  Do you recall seeing Exhibit 14 before?

6       A.   When I reviewed documents with Mr. Frim.

7       Q.   You will notice that this letter is dated July 9,

8  2003; is that right?

9       A.   Uh-hum.

10      Q.   And it has some information at the top about the

11 claim.  Do you see that?

12      A.   Right.

13      Q.   It indicates that the plaintiff is Stanley

14 Hopkins and that the mutual insured identified here is

15 AIMCO/30 Eagles Nest.  Do you see that?

16      A.   Uh-hum.

17      Q.   Would that indicate to you that this is the same

18 claim that you were discussing in your e-mails with

19 Ms. Viscione in Exhibit 2?

20      A.   Yes.

21      Q.   When you said in your e-mail to her that you

22 would be sending out a letter to Virginia Surety, is this

23 the letter that you were going to write?

24      A.   I assume so.

25      Q.   And this is the letter that -- in fact, you did