UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11109-RGS

LEXINGTON INSURANCE COMPANY
AND
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH

v.

VIRGINIA SURETY COMPANY, INC.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

May 3, 2007

STEARNS, D.J.

On May 26, 2004, Lexington Insurance Company (Lexington) and National Union Fire Insurance Company of Pittsburgh (National Union)[1] brought this declaratory judgment action against Virginia Surety Company, Inc. (Virginia Surety).  Plaintiffs seek a determination that certain of their commercial general liability (CGL) insurance policies are excess to Virginia Surety's primary layer of insurance and are triggered only when an insured's damages exceed $250,000, *exclusive* of defense costs. On December 6, 2004, Virginia Surety filed a counterclaim seeking a declaration that plaintiffs' policies are triggered whenever damages, *inclusive* of defense costs, exceed $250,000.  On September 29, 2006, Lexington and National Union filed a joint motion for summary

---

[1] At times, Virginia Surety refers to Lexington and National Union collectively as AIG, as the two companies are subsidiaries of American International Group.

judgment.   On October 30, 2006, Virginia Surety filed a cross-motion for summary judgment.[2]  A hearing on the motions was held on February 2, 2007.

## BACKGROUND

In the 1990s, National Program Services, Inc. (NPS), a "risk purchasing group," sponsored a speciality insurance program for a coalition of owners of multi-unit residential housing projects.  Chicago Insurance Company (Chicago Insurance), the carrier for the NPS program, provided CGL coverage to NPS insureds.  National Union provided excess coverage over the policies issued by Chicago Insurance.  In early 2000, Chicago Insurance ended its relationship with NPS.

In May of 2000, a broker for NPS approached Lexington and National Union, seeking CGL insurance on behalf of Apartment Investors Management Company (AIMCO), the owner/manager of thousands of apartment units throughout the United States. National Union agreed to write a $1 million per-occurrence policy, but with a $250,000 self-insurance retention (SIR) clause.  Shortly thereafter, AIMCO joined the National Coalition

---

[2]On October 29, 2006, Virginia Surety filed a motion to strike an exhibit attached by Lexington and National Union to their reply brief.  The exhibit was written by Virginia Surety's counsel and contains information regarding confidential settlement negotiations. See Fed. R. Evid. 408.  Virginia Surety argues that Lexington and National Union should be sanctioned because the court had previously ordered the exhibit stricken from the Complaint.  Lexington and National Union note that the court allowed the motion to strike only after they indicated that they did not object.  The avowed purpose of attaching the letter to the reply brief was to illustrate Virginia Surety's shifting positions on the meaning of the disputed policy language.  While I agree that the inclusion of the letter did not violate the spirit of the previous court order, the dispute can be resolved within the four corners of the policies at issue.  Because the court has no need to consider extrinsic evidence, the motion to strike will be ALLOWED.

of Property Owners (NCPO). National Union then agreed to offer insurance to all NCPO members.

On June 1, 2000, National Union began issuing the NCPO policies. The policies, which were written on standard primary CGL insurance forms,[3] contained a SIR endorsement that stated:

> [National Union's] obligation, under the coverages provided by this policy, to pay "Ultimate Net Loss" on behalf of the "Insured," applies only to the "Ultimate Net Loss" in excess of the Self Insured Retention [of $250,000] stated below, and subject to the Limits of Liability stated in the policy. The terms of this policy, including with respect to our rights and duties with respect to defense of suits apply in excess of the application of the Self Insured Retention amount.

It is undisputed that this language meant that defense costs were to be included in the calculation of the $250,000 SIR. The National Union policies also contained the following "other insurance" clause.

> **4. Other Insurance**
>
> If valid and collectible insurance is available to the insured for a loss we cover . . . . our obligations are limited as follows:
>
> **a. Primary Insurance Policy**
> This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then we will share with all that other insurance by the methods described c. [sic] below.
>
> **b. Excess Insurance**
> This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

---

[3]The policies were issued by National Union, but marketed and underwritten by Lexington. Lexington was responsible for handling the claims covered by National Union's policies.

> (1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
> (2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or
> (3) If the loss arises out of the maintenance or use of aircraft, "autos"or watercraft . . . .
>
> **c. Method of Sharing**
> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes an equal amount until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

It is undisputed that none of the subsections listed in 4b. apply to the claims at issue in this case.

To satisfy the $250,000 SIR requirement, Lexington and National Union insureds had two choices. They could "self-insure" and use their own funds to cover the first $250,000 in damages for each occurrence, or they could cover the amount by obtaining a primary insurance policy. The policies of NCPO members who chose the second option are at the crux of this litigation.

On December 31, 2000, Virginia Surety began issuing CGL policies to NCPO members with a per-occurrence limit of $250,000. The policies were administered by NPS. It is undisputed that defense costs were excluded from the limit. The policies provided that Virginia Surety

> will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .

4

> Our right and duty to defend ends when we have used up the applicable limit of insurance [i.e., $250,000] in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

The Virginia Surety policies also contained an "other insurance" clause identical to the one in the Lexington and National Union policies.[4]

Lexington and National Union argue that their policies are in "excess" to the Virginia Surety policies and attach only at the point Virginia Surety has paid out $250,000 in a judgment or settlement *without counting* defense costs. Virginia Surety, on the other hand, argues that (at the least) once it has paid $250,000 in indemnity *and* defense costs (*combined*) on any claim, Lexington and National Union become co-primary insurers who are required to share with Virginia Surety any additional costs to the limit of their policies.

## ANALYSIS

1. Choice of law

Plaintiffs argue that New York law applies because New York is the one jurisdiction with which all relevant parties, including members of NCPO, have significant contacts. Virginia Surety, on the other hand, argues that New Jersey law should apply because NPS, which at all relevant times served as the managing general agent for its policies, was chartered in New Jersey. The issue need not be decided because there is no material conflict between the law of the two states with respect to whether a policy is or is not a "true" excess policy. While New York and New Jersey law may differ over the role played

---

[4] The policies Virginia Surety originally drafted included defense costs in the calculation of the $250,000 liability limit. State insurance regulators, however, insisted that defense costs be excluded and that only indemnity payments be counted.

by extrinsic evidence in interpreting ambiguous policy language, the policies at issue are unambiguous. Thus, the differences in law are of no consequence. "When a choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should be the end of the matter." Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1092 (1st Cir.1989).

    2.  Lexington and National Union's motion

Lexington and National Union argue that their policies do not provide primary, first dollar coverage. They contend that because the policies are written over the $250,000 SIR, they are "true" excess policies. Lexington and National Union devote a considerable portion of their opening brief to a discussion of a most basic tenet of insurance law: that a primary policy must be exhausted before an excess policy attaches. This well-settled insurance principle is unquestionably true. See Montgomery Ward & Co. v. Imperial Cas. & Indem. Co., 81 Cal. App. 4th 356, 365 (2000) (a "long settled rule"). However, the principle does nothing to advance plaintiffs' position unless the court first determines that the Lexington and National Union policies are in fact excess to the Virginia Surety policies.

"Whether insurance is to be considered 'primary' or 'excess' is to be determined first by reference to the specific terms of the policy." Commercial Union Ins. Co. v. Bituminous Cas. Corp., 851 F.2d 98, 102 (3d Cir. 1998). In construing a policy, the court adheres to ordinary principles of contract interpretation. "[A]n insurance policy, like any contract, must be construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms." Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999). If the policies are unambiguous, extrinsic evidence as to the

insurer's intent is neither relevant nor admissible. Brunetto v. Massachusetts Mut. Life Ins. Co., 200 F. Supp. 2d 380, 382 (S.D.N.Y. 2002).[5]

The Lexington and National Union policies provide that "[t]he terms of this policy, including with respect to our rights and duties with respect to defense of suits apply in excess of the application of the Self Insured Retention *amount*." (Emphasis added). The policies in other words provide coverage over and above the SIR amount of $250,000. Nowhere is it written that they provide coverage in excess of another insurance policy. Moreover, the policies were written on industry-standard primary CGL forms, rather than on industry-standard excess coverage forms. Finally, the "other insurance" clause specifically provides that "this insurance is primary except when b. below applies."[6] The parties agree that section b. does not apply to any of the occurrences that are at issue. Given this clear policy language, the court "will not strain to create an ambiguity where

---

[5]The resolution of this case is a far simpler matter than the length of the parties' briefs would lead one to believe. Although all parties contend that the language of the policies is unambiguous, they also offer extensive discussion of the underlying negotiations and of one another's post-claim conduct. There is no need to consider this evidence. The policies are straightforward and precise in their terms, and the parties must honor the terms by which they agreed to be bound.

[6]Plaintiffs argue that the "other insurance" clause is irrelevant because "other insurance" disputes cannot arise between primary insurers and "true" excess insurers. While this is a correct statement of the law, plaintiffs' argument diverts attention from the real issue. Unless there is a determination that the Lexington and National Union policies were truly excess, the "other insurance" clause is to be given the same weight as any other provision of the policy. Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 229 F.3d 56, 63 (1st Cir. 2000).

none exists." Northland Ins. Co. v. Guardsman Prod., Inc., 141 F.3d 612, 619 (6th Cir. 1998).[7]

Plaintiffs rely on Travelers Indem. Co. v. Am. Cas. Co. of Reading, 786 N.E.2d 582 (Ill. App. Ct. 2003). In Travelers, the "excess policy" (which was specifically so titled) provided coverage in excess of a $500,000 SIR. The court held that "the Travelers excess policy meets all the criteria for an umbrella excess policy. . . [It is] not intended to pay the first dollar of loss. Rather, the policy is triggered after the self-insured retention limit . . . is reached."[8] Id. at 587. However, Travelers is distinguishable in a very significant respect. In Travelers, an endorsement in the excess policy identified with particularity a separate primary policy as the underlying insurance, and specifically stated that any underlying policy scheduled in the endorsement "[is] deemed a part of the self-insurance plan and retention." Id. at 584. In addition, the court noted that the "other insurance" clause in the "comprehensive excess liability policy" clearly stated that the policy "is excess over any such other insurance available to the Insured, including a policy purchased by an additional insured hereunder. Amounts collectible under a self-insured trust plan or other self-insured plan shall be deemed other insurance." Id.

---

[7]"Lack of ambiguity is a relative status, not an absolute one. The parties need not choose phraseology which invariably excludes every possible interpretation other than the one they intend. [I]t [is] sufficient if the language employed is such that a reasonable person, reading the document as a whole and in realistic context, clearly points to a readily ascertainable meaning." Fashion House, 892 F.2d at 1085.

[8]While an "umbrella excess" policy is distinct from a basic "excess" policy, the differences are of no consequence for present purposes.

A different case, cited in Travelers, is more analogous to the matter at hand. In Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co., 649 N.E.2d 460 (Ill. App. Ct. 1995), the court evaluated the priority of coverage of several insurance policies. The first policy was issued by St. Paul with a limit of $100,000. The second policy was issued by Federal as an excess policy with a coverage limit of $1 million. Id. at 461. The Federal policy explicitly stated that it provided coverage "in excess of $100,000 for each claim . . . of the following policy, herein known as the underlying policy: Insurance Company: Employer's Fund Insurance Company." Id. at 462. The court ruled that the Federal policy was not excess to the St. Paul policy because it

> specifically confined its status as an excess carrier only to Employers, not St. Paul, and not any other named or generic policy. The express language of Federal's policy provides that its liability is in excess of the underlying policy identified as Employers. Federal's policy makes no mention of St. Paul or other or any primary policies. Consequently, Federal's policy must be deemed an excess policy only as to Employers. If Federal had intended to be an excess carrier to other or all primary insurers of [the insured], Federal could have included such language in its policy.

Id. at 464.

The same reasoning applies in this case. The policies contemplate only that the insured is responsible for the initial loss of up to $250,000. The policies do not do purport to be excess over any other insurance policy, whether identified by name or generic reference. Moreover, there is no schedule of underlying insurance as is the usual practice with excess policies. See Commerce & Ind. Ins. Co. v. Chubb Custom Ins. Co., 75 Cal. App. 4th 739, 746 (1999); Penton v. Hotho, 601 So.2d 762, 764 n.3 (La. Ct. App. 1992). Nor does the "other insurance" clause declare that the policies are excess. Indeed, it

9

explicitly states that the policies are primary. "The natural, obvious meaning of the provisions of a contract should be preferred to any curious, hidden sense which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind would discover." Utica Mut. Ins. Co. v. Hamera, 162 Misc. 169, 176 (N.Y. Sup. 1936). Had Lexington and National Union intended their policies to be excess over other policy, rather than simply over the SIR, they had any number of missed opportunities to say so.

Plaintiffs' argument that the Lexington and National Union policies are excess because they do not provide first dollar coverage also fails. A policy is not rendered "excess" simply because it sits over a SIR, which is not atypical. See, e.g., Royal Surplus Lines Ins. Co. v. Coachman Indus., Inc., 184 Fed. Appx. 894, 896-897 (11th Cir. 2006) ("The first policy was a commercial general liability policy (primary policy) for the amount of two million dollars, with a self-insured retention ('SIR') of $500,000."). See also Eric Mills Holmes and Mark S. Rhodes, *Holmes' Appleman on Insurance* § 2.16 (2d ed. 1996) ("Typically, the insured will carry a primary policy of insurance that will cover liability and/or property insurance claims starting at the first dollar of loss or the first dollar in excess of the insured's deductible or self-retention. The insured may obtain additional coverage in the form of an excess policy which by its terms will only come into play once the limits of the primary policy have been exhausted.").

Plaintiffs' policies are, as written, excess only to the SIR amount. They are therefore primary with respect to all other sums owed. See 20th Century Ins. Co. v. Liberty Mut. Ins. Co., 965 F.2d 747, 757 (9th Cir.1992) (holding that an excess insurer was excess only to a *specified* primary carrier). Significantly, Lexington and National Union concede

that their policies would have attached to an excess of $250,000 in defense and indemnity costs combined, if the insureds in this case, like other insureds involved in the NCPO program, had elected to become self-insured. Although Lexington and National Union "now wish to treat these policies as excess of all insurance that may fortuitously apply to a given loss . . . [the court] decline[s] to provide [them] with this windfall." AMHS Ins. Co. v. Mut. Ins. Co. of Arizona, 258 F.3d 1090, 1099 (9th Cir. 2001).[9] The Lexington and National Union policies are primary policies, excess only to the $250,000 SIR. After this sum is expended, Lexington and National Union become co-primary insurers with Virginia Surety.

3.  Virginia Surety's Motion

Virginia Surety seeks a declaration that Lexington and National Union are liable for 100 percent of all sums paid by or on behalf of their policyholders above the $250,000 SIR amount, inclusive of defense costs. In the alternative, Virginia Surety argues that Lexington and National Union must share these expenses equally in accordance with the "other insurance" clauses in the parties' policies, up to the respective policy limits.

---

[9]Lexington and National Union additionally argue that a comparison of the insurance premiums charged on each policy illustrates that their policies are excess to the Virginia Surety policies. It is true that "[p]rimary insurance premiums are based, at least in part, on the insurer's consideration that it may be liable to defend an action. In this sense, primary policy premiums are higher, relatively speaking, than excess premiums, because the primary insurer contemplates defending a potential lawsuit when it contracts with the insured." General Motors Acceptance Corp. v. Nationwide Ins. Co., 828 N.E.2d 959, 962 (N.Y. 2005). However, the calculation of an insurance premium is a complex process involving any number of factors. In light of the clear language of the Lexington and National Union policies establishing that they are primary, the amount of the premium is of no consequence.

By the explicit terms of its policy, Virginia Surety is obligated to pay $250,000 in indemnity costs, exclusive of defense costs. The court's determination that the Lexington and National Union policies are co-primary along with Virginia Surety's policies does not alter that obligation. On the other hand, once Virginia Surety has incurred $250,000 in *indemnity and defense costs combined* for a particular occurrence, the $250,000 SIR amount requirement of the Lexington and National Union policies has been met. At that point Lexington's and National Union's liability is triggered and the "other insurance" clauses become engaged. These clauses, which are identically worded, provide that "each insurer [must] contribute an equal amount until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first." Accordingly, after Virginia Surety has paid out $250,000 in costs and indemnity, Lexington and National Union are required to pay a combined 50 percent share of the remaining costs and damages, until each insurer has paid to its policy limit or the loss has been fully satisfied, whichever occurs first.

## ORDER

For the foregoing reasons, Lexington's and National Union's motion for summary judgment is DENIED. Virginia Surety's motion to strike is ALLOWED. Virginia Surety's cross-motion for summary judgment is ALLOWED in part, as explained in this opinion. The parties will discharge their obligations in a manner consistent with the court's declaration.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE